# 22-1289-cr

To be argued by:
**COLLEEN P. CASSIDY**

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 22-1289-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

RICKEY JOHNSON, a/k/a SEALED DEFENDANT 1, a/k/a NEIL DAWN
DEFARREN,

Defendant-Appellant.

_____
APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT RICKEY JOHNSON**

_____

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742

Attorney for Defendant-Appellant
**RICKEY JOHNSON**

**COLLEEN P. CASSIDY**,
_Of Counsel_

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

JURISDICTIONAL STATEMENT PURSUANT TO FED. R. APP. P. 28 . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    The Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    The Government's Evidence . . . . . . . . . . . . . . . . . . . . . . . 7

            1.    No Complaining Witnesses Testify . . . . . . . . . . . . . 7

            2.    Fox News Security Reports the Statements to Police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            3.    Admission of Gutfeld's Hearsay Statements . . . . 10

            4.    The Police Arrest Johnson . . . . . . . . . . . . . . . . . . . . 12

            5.    The Capitol Police is Notified and Warns Boebert's and Manchin's Offices . . . . . . . . . . . . . . 12

i

6.     Kelley's Opinion Testimony As To Why the
Posts Were "Concerning" and Johnson Was
More Likely to Act on Them . . . . . . . . . . . . . . . . . . 15

7.     Instagram's Custodian of Records . . . . . . . . . . . . . 18

B.    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    The Court's Reduction Of The Jury To 11 Jurors
Before Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.    Over Objection, The Court Gives an "Uncalled
Witness" Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.    Summations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

F.    Deliberations and Verdict . . . . . . . . . . . . . . . . . . . . . . . . 29

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

POINT I

The District Court's Decision To Proceed With An 11-Member Jury
Before Deliberations, Over Defense Objections, Violated Rule 23(b)
And Requires Reversal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A.    The Court's Decision to Proceed with 11 Jurors
Before Deliberations Began, Over Defense
Objection, Violated Rule 23(b). . . . . . . . . . . . . . . . . . . . 34

       1.      Rule 23 (b) Requires 12 Jurors Unless the
Parties Stipulate To Fewer . . . . . . . . . . . . . . . . . . . . 34

       2.      Violation of the Rule is Structural Error . . . . . . . . 36

       3.      The District Court's Violation of Rule 23(b)
Requires Reversal . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   B.   The Court's Dismissal of Two Sitting Jurors Over
Defense Objection Was Error . . . . . . . . . . . . . . . . . . . . 39

       1.      The Dismissal of Juror No. 2 for Bias . . . . . . . . . . . 39

       2.      The Dismissal of Alternate 2 . . . . . . . . . . . . . . . . . . 42

POINT II

Admission of Gutfeld's Email Characterizing the Instagram
Messsage as a "Death Threat" Violated the Hearsay Rule and
Johnson's Sixth Amendment Right to Confront the Witnesses
Against Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   A.    Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

   B.   The statement did not meet the "excited utterance"
exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

   C.   Admission of Gutfeld's Email Violated the
Confrontation Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

   D.   Admission of the email was not harmless . . . . . . . . . . . 51

POINT III

The Court's Delivery of an Uncalled Witness Charge with Respect
to the Striking Absence of Alleged Victims, Admonishing the Jury
that "Their Absence Should Not Affect Your Judgment One Way
or the Other," Undermined the Valid Defense Argument that the
Witnesses Did Not Bother to Testify Because They Did Not Take
the Statements Seriously . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

       A.    The Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

       B.    The "uncalled witness" instruction was misleading
           and prejudicial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

POINT IV

The District Court's Admission of Agent Kelley's Opinions About
The Seriousness of The Threats And the Likelihood That Johnson
Would Act on Them Violated Rule 701 and Prejudiced the Defense . . . . . 56

       A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

       B.    Rule 701 Prohibits Lay Law Enforcement Witnesses
           From Testifying To Opinions Based On Their
           Specialized Training And Experience, Or To
           Dispositive Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

       C.    Kelley's Opinion Violated Rule 701 . . . . . . . . . . . . . . . . . 62

           1.    It was based on specialized knowledge . . . . . . . . 62

2.     It usurped the jury's function and told it what
to infer on a dispositive fact . . . . . . . . . . . . . . . . . . . . 64

D.     The Error Affected Cabrera's Substantial Rights . . . . . . 66

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

# TABLE OF AUTHORITIES

## *Cases*

*Brown v. Keane,*
  355 F.3d 82 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Crawford v. Washington,*
  541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 50, 51

*Davis v. Washington,*
  547 U.S. 813 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Elonis v. United States,*
  135 S. Ct. 2012 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Idaho v. Wright,*
  497 U.S. 805 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Neder v. United States,*
  527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Porter v. Quarantillo,*
  722 F.3d 94 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Smith v. Phillips,*
  455 U.S. 209 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Sullivan v. Louisiana,*
  508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Abelis,*
  146 F.3d 73 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32, 54

*United States v. Araujo,*
 62 F.3d 930 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 44

*United States v. Cabrera,*
 13 F. 4th 140 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Caccia,*
 122 F.3d 136 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 54

*United States v. Coppola,*
 671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Curbelo,*
 343 F.3d 273 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Dukagjini,*
 326 F.3d 45 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Essex,*
 734 F.2d 832 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Flores,*
 945 F.3d 687 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 63

*United States v. Garcia,*
 413 F.3d 201 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59, 60, 63, 66

*United States v. Gibson,*
 135 F.3d F.3d (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Greer,*
 285 F.3d 158 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40, 41

*United States v. Grinage,*
    390 F.3d 746 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 60, 61, 65, 66

*United States v. Guerrero-Peralta,*
    446 F.2d 876 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Kaplan,*
    490 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Patterson,*
    26 F.3d 1127 (D.C.Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 44

*United States v. Paulino,*
    445 F.3d 211 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Reichberg,*
    5 F.4th 233, 244 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Saget,*
    377 F.3d 223 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Scully,*
    877 F.3d 464 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Simmons,*
    560 F.3d 98 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Stratton,*
    779 F.2d 820 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Tabacca,*
    924 F.2d 906 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Taylor,*
  498 F.2d 390 (6th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Torres,*
  128 F.3d 38 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40, 41, 42

*United States v. Vayner,*
  769 F.3d 125 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Zappulla v. New York,*
  391 F.3d 462 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## Statutes and Other Authorities

18 U.S.C. §§ 115(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

18 U.S.C. § 875 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Crim. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 63, 64

Fed. R. Crim. P. 23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 63

Fed. R. Evid. 803(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 22-1289-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

RICKEY JOHNSON, a/k/a SEALED DEFENDANT 1, a/k/a NEIL DAWN
DEFARREN,

Defendant-Appellant.

_____
APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

**BRIEF FOR DEFENDANT-APPELLANT RICKEY JOHNSON**
_____

**JURISDICTIONAL STATEMENT PURSUANT TO FED. R. APP. P. 28**

This is an appeal from a final judgment entered on June 9, 2022, in the

United States District Court for the Southern District of New York (Hon.

Lewis A. Kaplan). A notice of appeal was filed on May 26, 2022. The district

court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court's jurisdiction

is invoked under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1. Whether the district court's dismissal of two sitting jurors and decision to proceed with an 11-member jury before deliberations, over defense objections, violated Fed. R. Crim. P. 23(b) and requires reversal.

2. Whether admission of the out-of-court statement of a non-testifying declarant characterizing an Instagram message as a "Death threat" violated the hearsay rule and Johnson's Sixth Amendment right to confront the witnesses against him.

3. Whether the court's delivery of an uncalled witness charge with respect to the striking absence of alleged victims, admonishing the jury that "their absence should not affect your judgment one way or the other," undermined the valid defense argument that the witnesses did not bother to testify because they did not take the statements seriously.

4. Whether the district court's admission of Agent Kelley's lay opinions about the seriousness of the threats and the likelihood that Johnson would act on them violated Fed. R. Evid. 701 and prejudiced the defense.

## INTRODUCTION

Johnson was charged with making threats against two Fox News hosts, Laura Ingraham and Greg Gutfeld, and against Congresswoman Lauren Boebert and Senator Joe Manchin, by videotaping them on television, recording his own voice-over statements to the effect that he was going to kill them, and posting the resulting videos on his Instagram page. His Instagram account had only four followers. The posts were viewed between six and nine times each over a year, including by law enforcement working on this case, and never by the alleged victims themselves. Separately, Johnson sent one message to Gutfeld's Instagram account stating that he and two other Fox News hosts would be killed, and Gutfeld forwarded the message to security at Fox News, which opened an investigation, found the videos, and reported them to the police.

The defense at trial was that these video statements, which Johnson recorded while he watched television at home alone during the pandemic and after the January 6th insurrection, were not "true threats" but were hyperbolic political speech, protected by the First Amendment, that would

not be taken, and were not meant to be taken, seriously.

The trial was rife with error. Most important, the district court committed structural error by proceeding with 11 jurors well before deliberations began over defense objection, in violation of Federal Rule of Criminal Procedure 23(b). *United States v. Curbelo*, 343 F.3d 273, 280 (4th Cir. 2003). The twelfth juror was erroneously dismissed for bias and another sitting juror was dismissed without good cause, both over defense objection.

In addition, not one of the alleged victims came to testify. Instead, the government relied on a hearsay statement by Gutfeld, in which he emailed the Instagram message to Fox News security with the subject line "Death threat," to prove that he took the threat seriously. Defense objections on hearsay and confrontation grounds were overruled. Further, despite the valid defense argument that the failure of any of the alleged victims to testify demonstrated that they did not consider the statements true threats, the district court charged the jurors, over defense objection, that the

absence of these witnesses "should not affect [their] judgment one way or another."

These two errors worked in synergy to severely prejudice the defense, and the prosecutor took full advantage in rebuttal summation. He told the jury to ignore as a "distraction" the defense argument that the witnesses' failure to testify showed that they did not take the threats seriously, invoking the court's instruction that their absence should not affect their judgment in any way. He told the jury to instead focus on Gutfeld's hearsay statement characterizing the message as a "Death threat," repeating the phrase twice, as proof that he took it seriously.

Further, over defense objection, the district court admitted testimony from a Capitol Police agent, not qualified as an expert, about why he considered Johnson's statements particularly concerning and why he thought Johnson might act on them. This violated Rule 701 and was prejudicial error that  undermined the defense that these statements were not true threats. *United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021).

After lengthy deliberations, the 11-member jury convicted Johnson of

three counts and acquitted him of one count.

## STATEMENT OF FACTS

### I.    The Charges

Johnson was charged with two counts of transmitting threatening

communications in violation of 18 U.S.C. § 875 and two counts of

threatening a United States official in violation of 18 U.S.C. §§ 115(a)(1)(B)

and (b)(4). A. 18-20. Count One charged him with posting a video on

Instagram in which he said he was going to kill  Fox host Greg Gutfeld and

sending Gutfeld an electronic message via Instagram stating that he would

be killed. A. 18. Count Four charged him with posting videos on Instagram

in which he said he would to kill Fox host Laura Ingraham. A.20. Counts

Two and Three charged him with posting videos on Instagram in which he

said he would assault and kill Senator Joe Manchin and Representative

Lauren Boebert. A.19. All of the counts required proof that the statements

were "true threats" – that they were intended to be taken as serious threats

to inflict bodily injury or to kill and that they were made in such

circumstances that a reasonable person who heard them would understand

them as such. A.498. The §115 counts required additional proof of intent to

intimidate or interfere with the duties of a federal official. A.503.

## II.  The Trial

Trial began before Judge Kaplan on February 16, 2022.

### A.  The Government's Evidence

#### 1.  No Complaining Witnesses Testify

The government called none of the subjects of the statements to

testify at trial. Neither Gutman, Ingraham, Boebert, nor Manchin testified.

Aside from the Instagram custodian of records, the government called only

security personnel and law enforcement witnesses who investigated the

threats.

#### 2.  Fox News Security Reports the Statements to Police

Clifford Cid, director of corporate security at Fox News, testified that

on January 30, 2021, Gutfeld, a host of the show "The Five," emailed him a

message he received from Johnson's Instagram account. A.249. The message read: "Bet he is guilty, as you are. And you all will be held accountable. You do not belong on television. You want a trash government that is now the leading cause of death in America to continue to kill Americans. Dumpler. You will be killed. Tell Jesse and Kate, and can not find their pages. They will all be killed as well." A.249-50, 566, GX 205. Cid understood Jesse and Kate to be Jesse Watters and Katie Pavlich, co-hosts of The Five. A.250.

Cid reviewed Johnson's account and found that Johnson was in Manhattan, and that he had posted two videos recording Gutfeld on television,  with his own statements in a voice-over ranting about politics and saying that Gutfeld was "dead" and that he was going to kill him and everyone would know it. A.573-77, 588, GX 603B, 604. [1] He also referred to Gutfeld as having "stepped up" to him in  SoHo.  A.266-67, 573, 588, GX

---

[1] All of the videos constituting the alleged threats are on a disc included in Appellant's Appendix at A.588 The transcripts of each video are also included at A.570-586.

603B. Gutfeld never reported anyone "stepping up to" him or any in-person interaction with Johnson. 220.

Cid also found videos of Ingraham, another Fox host, on television with Johnson's voice-over stating that she was a racist and domestic terrorist and that she would be killed and he wanted her dead, and that he was going to kill her. A.268-71, 588, GX 704, 801-804. Johnson tagged others, like Florida Governor Ron De Santis in these posts, but not Ingraham herself. A.292, 588, GX, 704. Johnson had not tagged Gutfeld in his video posts either. A.588, GX 603A and 605.

Cid notified the NYPD about the posts. A.265. Cid acknowledged that many threats to Fox personalities were not reported to security and of those that were, all threats were not handled in the same way. A.287. Some threats were referred to the police and some were not. A.301-02. The court precluded defense cross-examination about how those determinations were made, disallowing questions about Fox protocols and whether a person's political views were considered. A.285-289, 298, 301-305, 316. The

court also precluded questioning about whether Cid reported the posts to Instagram. A.273.

### 3.     Admission of Gutfeld's Hearsay Statements

Over defense objections, the court admitted Gutfeld's statements in his email to Cid, including the subject line characterizing the Instagram message as a "Death Threat" and his statement that he had looked up Johnson's Instagram account and it showed that he was in Manhattan. A.22-29, 254-60, 263, 264. Defense counsel objected on the ground that this was inadmissible hearsay of an out-of-court declarant, and testimonial statements of a non-testifying witness in violation of the Confrontation Clause. A.22-29, 252-55. The government claimed that the subject line was an excited utterance, admissible for its truth, and that the body of the email was "related to the startling event" and admissible to show Gutfeld's state of mind. A.251-52, 255. Defense counsel argued that there was no excitement conveyed in the message, nor any urgency in sending it. It was sent at 9:45, several hours after Gutfeld received the message from Johnson

at 5:15, and Gutfeld had taken the time to investigate and look up Johnson's profile. A.254-56.

The court ruled that the "Death threat" subject line was an excited utterance. A.259-60. Although the government offered no evidence whatsoever as to when Gutfeld read the Instagram message, the court posited that it was "reasonable" to infer that he woke up, had breakfast, took a shower, went to the office, and only then looked at his Instagram feed, so that he read the message "much later" than when it came in. A.256, 259-60. The court stated that it would rule the same way even without the inference that the "time frame [was] much shorter," but did not explain why. A.260. The court ruled that Gutfeld's statement that Johnson was in Manhattan was admitted not for its truth but only for its effect on Gutfeld, and it was probative because it showed the immediacy of the threat. A.261-62. The court instructed the jury that all of the statements in the email were admitted to show Gutfeld's state of mind when he received the Instagram post. A.263.

### 4. The Police Arrest Johnson

The NYPD arrested Johnson when he arrived at his residence on his bicycle on February 11, 2021. A.340-44, 351. He was wearing a large backpack cooler for food delivery. A.352. The police did not draw their weapons and had no expectation that he would be armed. A.350-51. Johnson was polite and cooperative and answered questions about himself accurately. A.352-53. Sergeant Jane Gjidija recorded the arrest with her body camera and video clips of the interaction were introduced and played at trial. A.345-47, 588, GX 302-03. They depicted Johnson politely answering all of the questions asked him and joking with the police. *Id.*

The police searched Johnson and found only his cellphone, some cash and his keys. A.343. Forensic analysis of his cellphone showed that it was the source of his Instagram account. A.365-75.

### 5. The Capitol Police is Notified and Warns Boebert's and Manchin's Offices.

The NYPD referred the statements about  Representative Boebert and Senator Manchin to the United States Capitol Police and the referral was

assigned to Agent Brandon Kelley. He had been in the Threat Assessment

Section for about a year when this was assigned to him. A.101-02, 238. All

threats were considered priority and Kelley's supervisors had designated

this one as a priority for immediate action. A.104, 203. Kelley opened the

links in the email he received, which were Instagram posts, and reviewed

the contents of the posts. A.105. The account's user name was

777onyzotus777. *Id.* One of the posts was a video of Representative

Boebert. A.106-08. The video included a voice-over in which Johnson stated

that Boebert was a terrorist and he was going to kill her. A.112-13, 588, GX

703, 703T. It bore a caption tagging the Instagram accounts of DeSantis,

Boebert, Constitution CTR, and the Justice Department. A.109.

    After reviewing the video, Kelley sent an internal notification up the

chain of command to the chief, and then called Boebert's chief of staff at

11:30 p.m. A.113-14. He got no answer, so he followed up with an email

informing the chief of staff of a "possible threat." A.118, 208-09. Kelley

testified that he called the chief of staff because he found the video

"concerning," A.114, but he did not characterize the video as such in his email. A.208.

In his email, Kelley asked Boebert's chief of staff for Boebert's schedule for the next two to three weeks so extra security could be provided for any high-profile events. He also asked whether she would like patrols by local law enforcement in her home town. A.119. Boebert did not request a patrol and none was set up. A.120, 210. Nor did Boebert or her chief of staff review the video. When Kelley emailed the chief of staff almost a year later, on January 11, 2022, the chief of staff wrote back requesting a copy of the video. A.210-11.

The second post Kelley reviewed was a video of Manchin posted in the same Instagram account on February 3, 2021, with Johnson recording statements of his own calling him "Steve Manchin" and saying he "is dead" and "will be executed." A.198, 570-75, 588, GX 603A, 603B. A caption on the video read: "@joemanchin. You want it to be bipartisan. You want to defund the people. You have voted with dump to maintain his

terrorism. Bitch, you are a terrorist and will be held accountable for your treason." A.197.

Kelley followed the same procedure, notifying the chain of command up to the chief, and calling Manchin's chief of staff. A.199. He told the chief of staff about the statements and where to find them to view them, asked for Manchin's upcoming schedule, and asked whether the office would like patrols in his home area. A.200-01. The chief of staff accepted the offer of patrols, so Kelley called the police department in Charleston, West Virginia and requested patrols of Manchin's residence for the next few weeks. A.202.

The videos had been viewed by few people after being posted for 52 weeks: Boebert's had six views and Manchin's had nine views, including those of law enforcement. A.222-23.

### 6. Kelley's Opinion Testimony As To Why the Posts Were "Concerning" and Johnson Was More Likely to Act on Them.

Over defense objection, Kelley, who had neither been noticed nor qualified as an expert, testified that three things stood out in the Boebert

post that concerned him: the intensity of the language, the repetition, and the fact that Boebert was tagged. A.115-16. Elaborating, Kelley theorized that the use of "I" in "I'm going to kill you" took "ownership" of the action, and that the statement of an intention to kill "stood out as an individual possibly making or formulating a plan to carry out this action." A.116-17. He was also concerned about the repetition of that statement, which he thought was "strengthening the grievance" against the member of Congress. A.117. He found the tagging "concerning" because it showed that Johnson wanted the Congress member and her staff to see the post. A.117-18.

Defense counsel objected to this testimony about Kelley's theories on the ground that it was expert testimony from a witness who had neither been noticed nor qualified as an expert. A.42, 115-16, 124-26. The government argued only that law enforcement's reaction was relevant to whether it was a true threat and that such testimony had been admitted in other trials, without citing those cases. A.125. The court admitted this

testimony on the ground that "the reaction of this man is relevant on the issue do you think the person would consider it as a threat." A.127. The court did not address the Rule 701 violation.

Kelley testified that tagging a post with someone's name was a way of notifying the person of the post, but he acknowledged that a tag, unlike a direct message, does not go to the recipient's inbox but stays in a different feed for notifications. A.226-27 Defense counsel tried to cross-examine Kelley about the facts that Boebert and Manchin had numerous followers and numerous tags, and that tag notifications got pushed down by new ones, but Kelley denied knowledge of that. A.227-228. The court precluded defense counsel from questioning Kelley about Boebert's Instagram page, which revealed her numerous notifications. A.230-31.

On redirect examination, the prosecutor elicited, over defense objection, the same opinion testimony from Kelley about the Manchin video -- that the video was concerning because of the intensity of the language, the repetition of the statements, and the caption that said "you

are a terrorist and will be held accountable for your treason." A.244-45.

Again over defense objection, Kelley was allowed to testify that the caption "stood out to me as a justification for the individual, that the individual believed that he was justified in whatever actions that he threatened to do." A.245. Kelley went on: "To me, that speaks volumes, based off of [sic] if he believes he's justified, he's probably more likely to actually act on those actions." A.245.

### 7. Instagram's Custodian of Records

Raquel Morgan, a Facebook custodian of records, testified from Instagram's business records that Johnson posted the videos in question and sent the one private message to Gutfeld. A.322-30. The videos posted by Johnson had not been shared with or forwarded to anyone. A.335. Morgan explained that "tagging" a photo, video or post simply mentions another account holder and can notify the person tagged about the post. A.331. Whether a user will see a notification from tagging depends on the user's settings. A.33.  Anyone can choose not to be notified of tags. *Id*.

Morgan testified that Instagram has the ability to remove threatening posts and that it had not removed Johnson's posts. A.333-34. Over objection, the court allowed the government to elicit that when it asked Morgan to play the videos the day before trial in preparation to testify, she had "some concern" that they sounded "explicitly threatening" and she notified legal counsel. A.363-64.

**B.    The Defense Case**.

Defense counsel argued that tagging Boebert and Manchin was insignificant because a person with a large Instagram following would have many thousands of tags and could not be expected to see them all. A.387, 461-62. It sought to prove the simple fact that they had large followings and thousands of tags. A.387. The defense called an investigator with the Federal Defenders Office to testify that he investigated the Instagram accounts of Boebert and  Manchin and found that they had verified accounts with hundreds of thousands of followers. A.382-89. The court precluded the evidence on relevance grounds, although defense counsel explained that this was relevant to the government's claim that

19

tagging them made the threat more serious and that tagging them was an

effort to intimidate the officials or interfere with their duties, a required

element of the counts relating to Boebert and Manchin. A.387-89.

**C.    The Court's Reduction Of The Jury To 11 Jurors Before Deliberations**.

Over defense objections, the court reduced the jury to 11 jurors well

before deliberations began, at the close of the evidence before summations

and charge. A.400-03. In a trial with less than two days of testimony, [2] the

court dismissed three jurors before the defense rested. A.189-90, 399-403.

First, on the second day of trial, the government moved to dismiss Juror 2.

A.189. Then, with that request pending and under consideration by the

court, the court dismissed, over defense objection, Alternate 2, leaving only

one alternate. A.189. The next morning, the court excused Juror 7 without

objection because he became unavailable, leaving only 12 jurors and no

alternates. A.399. That same morning, the court dismissed Juror 2 over

---

[2] The trial began at 2:10 p.m. on February 16, 2022, A.82, and both parties had rested by the start of the third day of trial, February 22. A.402-03.

20

defense objections, leaving an 11-member jury. A.400-03.

Defense counsel moved for a mistrial on the ground that an 11-member jury was not permitted under Rule 23(b)(1) before deliberations without consent of the parties. A.403, 435-36. The court insisted that the rules allowed it to proceed with an 11-member jury. A.403-04, 435-36.  The defense also objected to the court's dismissal for cause of Juror 2, which finally reduced the jury to 11, and included that as a ground for mistrial. A.46-49, 435.

The court dismissed the jurors as follows.

The government moved to dismiss Juror 2 on the second day of trial after a detective, who was on the prosecution team but not a witness, reported that the juror spoke to him in the hall the previous day. A.167-68, 189. The government reported that the juror was speaking to a group of people in the hall that included other jurors and Detective Cowan, about his opinions on historical topics and books that he had read, all unrelated to the case. A.47, 168-69. Detective Cowan, who was with the government

team, was standing very close to the group of jurors. When some of the jurors backed up, the juror kept speaking and Detective Cowan leaned in to listen. A.47. He heard Juror 2 saying that white men killed the Indians for their tobacco and stole their land and that Abraham Lincoln did not want to free the slaves. A.168.

The court questioned the juror about whether he had spoken to or attempted to speak to the detective. The juror said that he did not. A.173. When asked whether he knew who Detective Cowan was, he said that he thought he was connected to the case. *Id*. Detective Cowan was brought in wearing a mask and the court asked the juror whether he recognized him. He said, "he looks like I've seen him because of his physique. But I haven't tried to talk to him about anything." A.174. The court asked if he was sure and the juror said, "No. What does he have to say? That I spoke to him? I never spoke to him about anything." *Id*. After Detective Cowan left the room, the court again asked the juror whether he recognized the detective as someone he had seen yesterday, and the juror said, "I don't know. I

don't know. But I say for the umpteenth time, I never spoke to this individual about anything." A.178.

The court questioned Detective Cowan, who did not contradict the juror's statements. He said he was in the hallway, next to the jurors waiting to enter the courtroom and Juror 2 was speaking in general to the group. The other jurors backed away a bit from Juror 2, but he kept speaking in the same direction. A.179-80. Detective Cowan did not move away but stayed close to listen. The other jurors were all still close, within six feet of Juror 2 when he spoke, but Detective Cowan stayed closer. *Id.*

The government argued that Juror 2, identified as Mr. Borenstein, should be dismissed because he was "disruptive," making statements that "seem rather random." A.183. It also argued that he should be dismissed because he seemed agitated to have been accused and would be unlikely to remain unbiased. A.183-84. The defense argued that there were no grounds to dismiss him: he had followed the court's instructions and expressed that adamantly so the court would understand. A.184. Defense counsel stated

that the man's random opinions had nothing to do with the case. *Id.*

Finally, the defense argued that Detective Cowan provoked the whole

incident by being where he should not have been, instead of distancing

himself from the jurors. A.184, 186.

Meanwhile that same morning, Alternate 2 called the court to say she

had had a health emergency during the night, but had returned from the

emergency room and was fine, and could be there by 12:30. A.170, 189. The

court dismissed the juror over defense objections. A.189-90. Defense

counsel objected specifically on the ground that the government was

already pressing to dismiss Juror 2. A. 190.  If both were dismissed, they

would be down to only 12 jurors, with none to spare. Nevertheless, the

court dismissed Alternate 2. A.189-90.

The next day, Juror 7 was dismissed because his child care had

collapsed due to an emergency and he was not available. A.399. After

moving up the only alternate to make a bare twelve, the court dismissed

Juror 2, Mr. Borenstein,  on the ground that his level of agitation and upset

at what he considered a false accusation made him "impliedly biased

against the prosecution. A.399-403. The court theorized, without asking

Mr. Borenstein, that it was "entirely likely that he attributed what he

regards as a false accusation to the prosecution team. . . . The chain of

events is such that I infer that he holds it against the prosecution." A.400-

01. The court ruled: "This is a circumstance in which the facts support the

presumption of bias, and in any case, my conclusion as the finder of fact on

this is that he is actively biased against the government in all of the

circumstances." A.401.

It dismissed the juror and ruled, over strong defense objection, that

"under rule 24 [sic] the case can go to the jury with 11 jurors." A.401, 403-

04. When defense counsel moved for a mistrial for proceeding with 11

jurors, the court repeated: "Rule I believe it is 24 specifically permits the

trial to go forward with 11 jurors, where alternates are exhausted, and the

number is 11 by virtue of excusal of a juror for good cause." A.403-04. The

defense renewed its motion for a mistrial, citing Rule 23(b) and *United*

*States v. Curbelo*, 343 F.3d 273 (4th Cir. 2003). A.435. The court insisted it had "the right to excuse the juror for good cause, both under (b)(2) and (b)(3)," although there was no stipulation between the parties and it was before deliberations had begun. A.436.

### D. Over Objection, The Court Gives an "Uncalled Witness" Charge.

In charging the jury, the court referred to the "number of people whose names you've heard" and instructed the jury that both sides had an equal opportunity to call them as witnesses and the jury should draw no inferences nor reach any conclusions about what they would have said if called. A.514. The court warned: "Their absence should not affect your judgment one way or another." *Id.*

Defense counsel objected to this charge before it was given, citing two Second Circuit cases disapproving of such an instruction. A.414-17 (citing *United States v. Caccia,* 122 F.3d 136, 139 (2d Cir. 1977); *United States v. Abelis*, 146 F.3d 73, 84 (2d Cir. 1998)). After all, as defense counsel argued in summation, the failure of any of the purported victims to testify tended to

prove that they did not take the statements seriously. The court overruled the objection and delivered the charge. A.416-17, 514.

### E. Summations

The prosecutor argued in summation that Gutfeld's email titled "Death threat" showed that he took the threat seriously. A.455. He also referred the jury to Kelley's opinion that he found the threats concerning and that Johnson spoke as if he were "justified in what he was going to do." A.453.

Defense counsel focused on the lack of evidence, including the "elephant in the room" – the failure of any of the alleged victims to testify. A.466. She argued that this showed that they did not take the threats seriously. *Id*. Counsel also argued that tagging celebrities was insignificant because they were tagged constantly, they could turn off notifications of tags, and there was no evidence or reason to think that Manchin or Boebert would actually be notified of their tags. A.461-62. She argued that Kelley was an inexperienced capitol police officer who treated every case

seriously, even if it were not. A.466.

In rebuttal, the government again discussed Kelley's opinion that Johnson appeared to believe he was justified and that it more likely that he would act. A.477. It focused on Kelley's testimony about tagging and argued: "Special Agent Kelley told you that in his training and experience, tagging someone makes them aware and notifies them to the content you just posted." A.481.

In response to the defense argument about the absence of any victims at trial, the government made full use of the court's uncalled witness charge:

> Now the defense spent some time noting that the victims did not testify in this case . . . . "[Y]ou're going to hear a specific instruction from Judge Kaplan" that "the absence of any witness should not affect your judgment in any way. *Let me repeat that*. The absence of any witness should not affect your judgment in any way.

A.487 (emphasis added). The government called the absence of these witnesses at trial a "distraction," and told the jury to focus on "the evidence

28

of Greg Gutfeld's reaction," his hearsay statement characterizing the

message he received as a death threat:

> "You know how he viewed the defendant's threats
> because you saw an email from Greg Gutfeld to Clifford
> Cid, the direct of corporate security, right after Mr.
> Gutfeld received the threats. In that email, Mr. Gutfeld
> called the defendant's messages a "death threat," a
> "death threat." Of course that's how Mr. Gutfeld viewed
> the defendant's messages."

A.487-88.

### F.    Deliberations and Verdict

The jury began deliberations at 3:09 p.m. on February 22, the third

day of trial. A.524.   Deliberations continued the next day. Just after noon,

the jury asked whether it could consider the defendant not guilty by virtue

of mental defect and whether it had to convict him if it thought he was

mentally ill. A.530-31. The court instructed the jury to decide the case on

the evidence and the law it was given,  and gave a general instruction that

the jury should convict if all elements of a count were proven beyond a

reasonable doubt, but must acquit if each element was not proven beyond a

reasonable doubt.  A.536-37. At 5:50 p.m., the jury delivered a guilty

verdicts on Counts One, Two, and Four, but could not reach agreement on Count Three, the Boebert count. A.542-43.  The court instructed the jury to keep deliberating on Count Three and the next day at 5:08 p.m., the jury acquitted Johnson on that count. A.548-52.

On May 25, 2022, Johnson was sentenced to 24 months' imprisonment. A.556-60**.**

## SUMMARY OF ARGUMENT

The district court committed multiple errors in the course of this very short trial. In blatant violation of Fed. R. Crim P. 23(b), it proceeded with an 11-member jury well before deliberations began, over defense objection, after dismissing three sitting jurors in less than two days. The Rule allows a court to proceed with 11 members only by written stipulation of the parties, or after deliberations have begun for just cause. *Id.* The court's violation of the Rule is structural error. *United States v. Curbelo*, 343 F.3d 273, 280 (4th Cir. 2003).  In addition, the court's dismissals of two jurors were without good cause and independent error. The last juror dismissal,

reducing the jury to 11, was based on an erroneous application of the "implied bias" doctrine to the court's own speculation about juror's possible bias, and alternative finding of actual bias without a basis. *United States v. Greer*, 285 F.3d 158, 171, 172 (2d Cir. 2002); *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997)). Before that, the court dismissed a juror, over objection, who had a medical emergency that would make her three hours late for court.

None of the alleged victims testified at trial. Instead, the government was allowed to prove that the statements were understood as true threats through a series of erroneous rulings made by the court. First, the court admitted the hearsay statement of a non-testifying declarant characterizing the message he received as a "Death threat," in violation of the hearsay rules and the Confrontation Clause, *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Second, the court instructed the jury, over defense objection, that the absence of these witnesses "should not affect [its] judgment one way or the other," undermining the valid defense point that their absence showed

that they did not take the statements seriously. *United States v. Abelis*, 146 F.3d 73, 84 (2d Cir. 1998). Third, the court violated Rule 701 by admitting as lay opinion the testimony of the Capitol Police agent about why he found Johnson's statements particularly concerning and concluded they demonstrated an intent to follow through. *United States v. Cabrera*, 13 F. 4th 140, 149 (2d Cir. 2021).

All of these errors were essential to the government's case, which otherwise was extremely thin on the issue of whether Johnson's statements were "true threats." There was no evidence that Johnson took any steps beyond ranting at his television and posting the rants; he did not even google the subjects and repeatedly called Joe Manchin "Steve." The government used every one of the court's errors to its advantage in summations, focusing the jury on Gutfeld's hearsay characterization of the message as a "Death threat," on Agent Kelley's opinions about Johnson's likelihood of following through, and on the court's instruction not to consider the absence of the alleged victims at trial. These errors prejudiced

the outcome and require a new trial.

## ARGUMENT

## POINT I

**The District Court's Decision To Proceed With An 11-Member Jury Before Deliberations, Over Defense Objections, Violated Rule 23(b) And Requires Reversal**.

The district court violated Rule 23(b) of the Federal Rules of Criminal Procedure by proceeding with an 11-member jury before deliberations over defense objection. The Rule requires a written stipulation of the parties to proceed with fewer than 12 jurors unless deliberations have begun. Violation of this Rule is structural error and requires vacatur of the conviction, as the Fourth Circuit has squarely held on identical facts. *United States v. Curbelo*, 343 F.3d 273, 280 (4th Cir. 2003).

In addition to the structural error of proceeding with an 11-member jury over defense objection, the court's dismissal of two sitting jurors that led to the deficit  was not justified by "good cause." The court dismissed one juror over defense objection because a medical emergency delayed her

from coming to court for only three hours. With knowledge that excusing the second juror would require the case to be submitted to a jury of only 11 members,  the court erroneously dismissed that juror on the ground that a false accusation by a government team detective left him implicitly biased against the government. The court's dismissal of these sitting jurors was an abuse of discretion, particularly where the rulings left the jury without 12 members.

**A.    The Court's Decision to Proceed with 11 Jurors Before Deliberations Began, Over Defense Objection, Violated Rule 23(b).**

**1.    Rule 23 (b) Requires 12 Jurors Unless the Parties Stipulate To Fewer**.

Rule 23(b)(1) provides that a "jury consists of 12 persons unless this rule provides otherwise." The rule contains only two exceptions to the requirement of a 12-person jury.  Subsection (b)(2) provides that the parties may stipulate to a smaller jury:

> (2) **Stipulation for a Smaller Jury.** At any time before the verdict, the parties may, with the court's approval, stipulate in writing that:
> **(A)** the jury may consist of fewer than 12

persons; or

**(B)** a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins.

Subsection (b)(3) allows the court to excuse a juror for good cause and permit 11 jurors to decide the case without a stipulation only after deliberations have begun:

(3) **Court Order for a Jury of 11.** After the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror.

The Rule is "clear and unequivocal" that the court may not proceed with an 11-member jury before deliberations without the written consent of the parties. *Curbelo*, 343 F.3d at 278 and n.4. It is so clear that the government conceded error in *Curbelo*, explaining that "nobody picked up a rule book" in district court and that "if the parties had read Rule 23(b), as opposed to relying on their memories, we wouldn't have this issue before

the Court." *Id.*[3] As in *Curbelo*, "the district court possessed no discretion –

prior to deliberations – to conduct the trial with an eleven-member jury,

absent [Johnson's] consent." *Id.*

2.     **Violation of the Rule is Structural Error.**

In its well-reasoned opinion, the Fourth Circuit in *Curbelo* held that

this very violation of  Rule 23(b) -- proceeding with 11 jurors before

deliberations without a stipulation  --  is structural error, invalidating the

conviction without any showing of prejudice. *Id.* at 280.  This is because "it

affects the very 'framework within which the trial proceeds, rather than

simply . . . the trial process itself.'" *Id*. at 281 (quoting *Neder v. United States*,

527 U.S. 1, 8 (1999)). And like other structural errors, *Curbelo* reasoned, a

Rule 23(b) violation has repercussions that are "necessarily unquantifiable

and indeterminate." *Id.*  (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282

(1993)).

*Curbelo* relied on several Circuit cases holding other violations of

---

[3] The government in *Curbelo* argued only that it was harmless error. *Id.* at
278.

36

Rule 23(b) to be structural error. *E.g., United States v. Patterson*, 26 F.3d 1127 (D.C.Cir. 1994); *United States v. Essex*, 734 F.2d 832 (D.C. Cir. 1984) (both holding structural error the erroneous dismissal of the 12th juror after deliberations began under Rule 23(b)(3)); *United States v. Araujo*, 62 F.3d 930 (7th Cir. 1995) (reversing dismissal of juror during deliberations, and vacating conviction without considering prejudice); *United States v. Taylor*, 498 F.2d 390, 392 (6th Cir. 1974)(rejecting harmless error review for Rule 23(b) violation of obtaining only an oral stipulation); *United States v. Guerrero-Peralta*, 446 F.2d 876, 877 (9th Cir. 1971)(same).

### 3. The District Court's Violation of Rule 23(b) Requires Reversal.

In this case, the district court violated 23(b) by dismissing three jurors and diminishing the jury to 11 members well before deliberations began, just after the close of evidence, before summations and charge. Not only was this done without a stipulation, the defense objected and cited the Rule to the district court. The court nevertheless insisted that it had the authority to proceed with 11 jurors, erroneously ruling that "under Rule 24 [sic], the

case can go to the jury with 11 jurors." 342. This was structural error and requires vacatur of Johnson's conviction. *Curbelo*, 343 F.3d at 280. *Curbelo* is directly on point.

Even if the error were not structural, the absence of a juror could not have been harmless in this case. The jury struggled with the evidence over two days, almost as long as the testimony had taken, and ultimately acquitted on one of the four counts. The case was far from overwhelming on the dispositive issue, whether these statements constituted "true threats." None of the purported victims testified. The only evidence, other than the videos themselves, was the self-serving testimony of law enforcement and security personnel who had pushed this case forward.

In such a close case, the loss of any juror cannot be considered harmless. The final juror may well have been a strong addition to the side in favor of acquittal. Indeed, this is likely why the government was so determined to eject Juror 2 from the trial after he expressed idiosyncratic political views. Moreover, as discussed next, the court's blatant violation

of Rule 23(b) was the result of its erroneous dismissal of this juror and

another juror without good cause.

## B.     The Court's Dismissal of Two Sitting Jurors Over Defense Objection Was Error.

The court's reduction of the jury to 11 members over defense

objection violated Rule 23(b) regardless of whether there was good cause

for the juror dismissals that led to the deficit. However, aside from the

unlawful submission of the case to only 11 jurors without consent, the

court's dismissals of Juror 2 and Alternate 2 were unjustified by good

cause, and therefore abuses of discretion.

### 1.     The Dismissal of Juror No. 2 for Bias

The district court erred in ruling that Juror 2 had implied bias against

the government, or in the alternative, was actually biased. The

circumstances were insufficient to establish implied bias, which is a legal

doctrine, and the court did not inquire into the juror's actual bias.

Therefore, neither implied or actual bias could justify the juror's removal.

"Implied bias does not depend on 'determinations of demeanor and

credibility' but is bias presumed as a matter of law." *United States v. Greer*, 285 F.3d 158, 171, 172 (2d Cir. 2002). Implied bias or "automatically presumed bias" should be reserved for 'extreme situations'"such as "jurors who are related to the parties or who were victims of the alleged crime itself." *Id*. at 172 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) and *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997)). Actual bias or "bias in fact" is found "either because the juror admits partiality" or because "the judge finds actual partiality based on the juror's voir dire answers."*Torres*, 128 F.3d at 45. This Court has held that in jury selection, "actual bias cannot be found unless a prospective juror is adequately questioned on voir dire with respect to his or her ability to apply the law impartially." *Id*. at 44. At least as much is required to remove a sitting juror, which demands good cause. Rule 23(b).

The district court muddled the concepts of actual bias and implied bias; the record established neither. The court entirely failed to question Juror 2 about whether he was biased against the government or could be

fair. Therefore, actual bias could not be established. *Torres*, 128 F.3d at 44.

The only inquiry the court conducted was to interrogate the juror to

determine whether he had  spoken to the detective in the hallway (he

hadn't) and whether he falsely denied doing so (he didn't do that either).

Because the detective ultimately confirmed that the juror was in fact

speaking to the other jurors, among whom the detective was

(inappropriately) standing, the court could not and did not ultimately find

that the juror either spoke to the detective or falsely denied that he had

done so. The court concluded, however, that the juror's defensive reaction

to being wrongly accused of speaking to the detective -- which the

government and the court provoked -- created "implied bias."

This kind of speculation about what the juror thought cannot support

implied or "automatically presumed" bias, which is limited to *per se* types

of bias, like a relationship to a party. *Greer*,  285 F.3d at 172 The court's

theory of the potential bias of Juror 2 could possibly support a finding of

actual bias, but only if the juror were questioned about that bias and either

acknowledged it or otherwise gave answers that conveyed bias. *Torres*, 128 F.3d at 44. There was no such questioning and no basis for a determination of actual bias.

### 2. The Dismissal of Alternate 2

The court's dismissal of Alternate 2 because a medical emergency delayed her arrival in court by a few hours was likewise unjustified. On the morning of the second day of trial, this juror called to report a medical emergency overnight that would delay her arrival by three hours, until 12:30 p.m. The government at that very time was pressing for the dismissal of Juror 2. Excusing both would require the only alternate to move up to make a jury of 12 members, leaving none to spare. For this reason, defense counsel objected to excusing the alternate and urged the court to wait for her. Moreover, a good portion of that morning was taken up with interrogation of and argument about Juror 2, without the jury present. A. 166-195. The court's dismissal of the alternate under these circumstances was unjustified.

A review of the case law addressing dismissal of a juror because of brief unavailability confirms that the court's dismissal of the alternate under the circumstances here was an abuse of discretion. While there is "no 'bright line test' for determining the length of juror unavailability that constitutes good cause for excusal," *United States v. Paulino*, 445 F.3d 211, 226 (2d Cir. 2009), there are limits on a court's impatience. This Court has affirmed decisions excusing a juror who would be absent for two days of deliberations, *id.*, a juror who was hospitalized and would be out for some time, *United States v. Gibson*, 135 F.3d F.3d 257, 259 (2d Cir. 1988), and a juror who would be absent for four and one-half days, *United States v. Stratton*, 779 F.2d 820, 832 (2d Cir. 1985). However, in *United States v. Simmons*, 560 F.3d 98, 110 (2d Cir. 2009), this Court concluded that the trial court's dismissal of a juror based on a projected one-day absence was "at the margins" of the court's discretion and could only be affirmed based on the court's specific finding that the delay would present a hardship to another juror and risk losing that juror. This Court reasoned, "Without

basing its decision on this additional factor, we have serious doubts as to whether the district court's decision would have been a permissible exercise of discretion." *Id*. Other Circuits have found abuse of discretion in a district court's dismissal of a juror based on brief unavailability. *United States v. Tabacca*, 924 F.2d 906, 915 (9th Cir. 1991) (dismissal of juror who was certain to be available the next day); *Patterson*, 26 F.3d at 1129 (dismissal of juror who had chest pain and had to go to doctor, without determining how long he would be absent); *Araujo*, 62 F.3d at 933-36 (dismissal of juror with car trouble without determining the length of his absence).

The district court's dismissal of the alternate juror here was beyond the margins of discretion. An inquiry was already underway on the dismissal of Juror 2, urged by the government, and dismissal of both jurors would have reduced the jury to 12 with no room to excuse any juror who became actually unavailable. The alternate had a medical emergency that was resolved and she was absent for not even one day, but only three

hours of court. In any event, much of those three hours were consumed

with a hearing about Juror 2.  Ultimately, the court did dismiss Juror 2, and

in the meantime, Juror 7 became unavailable. Therefore, as was foreseeable

and foreseen by defense counsel, the jury was reduced to 11 members.

Although it was the court's erroneous dismissal of Juror 2 for bias that

ultimately reduced the jury to 11 persons, the court's dismissal of the

alternate for missing three hours of court also led directly to that outcome.

And this was also unjustified, based on nothing more than the court's

impatience. As such, it was an abuse of discretion.

## POINT II

**Admission of Gutfeld's Email Characterizing the
Instagram Messsage as a "Death Threat" Violated
the Hearsay Rule and Johnson's Sixth Amendment
Right to Confront the Witnesses Against Him.**

The government called none of the subjects of the statements alleged

to be true threats to testify at trial, not even Gutfeld, the only one who had

actually received a message and who reported it to Fox security. If any

such witness had been called, he or she would have been cross-examined

about whether they took the threat seriously, because a statement only qualifies as a threat under the criminal statutes if it was made under such circumstances that a reasonable person would understand it as a "true threat" of injury. *Elonis v. United States*, 135 S. Ct. 2012 (2015). Rather than call Gutfeld -- or any of the other subjects of the threats charged -- the government used Gutfeld's out-of court email characterization of the direct message he received as a "Death threat," to prove that he considered it a true threat. This was hearsay, but the district erroneously admitted it as an "excited utterance," a hearsay exception under Federal Rule of Evidence 803(2). The statement did not qualify as an excited utterance because it lacked the spontaneity required for the exception. It was inadmissible hearsay that went to the very heart of the case. The admission of this statement without any ability to cross-examine Gutfeld made it impossible for the defense to challenge the government's claims about what he meant and deprived Johnson of his Sixth Amendment right to confront witnesses.

## A. Standards of Review

A district court's admission of evidence is reviewed for abuse of discretion. *United States v. Saget*, 377 F.3d 223, 232 (2d Cir. 2004). Abuse of discretion includes an error of law. *United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017). Confrontation Clause violations are reviewed *de novo. United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021).

## B. The statement did not meet the "excited utterance" exception.

The hearsay exception for excited utterances applies to a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The theory for the exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *Id.*, Advisory Committee Note to paragraph (1) and (2), 1972 Proposed Rules. Thus, "spontaneity is the key." *Id.* Because a hearsay statement cannot be tested through cross-examination, only statements that "possess circumstantial guarantees of

trustworthiness" fit within the exceptions of Rule 803. *Id.* The basis of the exception is that truly spontaneous statements in response to a startling event are "given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation," because those circumstances "provide sufficient assurance that the statement is trustworthy." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). *Accord Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004).

There was no spontaneity in Gutfeld's email characterizing the message as a "Death threat." As defense counsel pointed out, Gutfeld sent the email several hours after he received the Instagram message. In the intervening hours, he had conducted his own research, found Johnson's Instagram page, and learned that he was in Manhattan. There was no basis to infer that Gutfeld was under any "stress" or was excited. There was not even an exclamation point in the email. Nor was there any basis to conclude that Gutfeld found the Instagram message at all startling. The evidence showed that Fox celebrities received many such messages, and

many were not even reported.

The district court's theory -- that Gutfeld woke up, had breakfast, showered, went to the office, and only then looked at his Instagram feed, so that he probably only saw the message "much later,"closer to when he sent the email– was entirely unfounded. There was zero evidence supporting this theory. Indeed, it was not even argued by the government. This scenario was simply made up by the trial court and was not the "reasonable" inference that the court claimed.

The lack of spontaneity or any evidence suggesting that Gutfeld was under "the stress of excitement" caused by the email was fatal to its admission as an excited utterance. And Gutfeld's characterization of the message was critical to the government's case, as its summation demonstrated.

**C.     Admission of Gutfeld's Email Violated the Confrontation Clause.**

Gutfeld's email sending the Instagram message he received to Fox News security and characterizing it as a "Death threat" was a testimonial

statement made by a non-testifying declarant and its admission violated the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Regardless of the hearsay rules, an out-of-court statement that is testimonial in nature is barred by the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Id.* A testimonial statement is one that reports an event that has occurred, as opposed to an ongoing emergency, and that a declarant would reasonably expect to be used against the defendant prosecutorially. *Id.* at 51-52; *Davis v. Washington*, 547 U.S. 813 (2006).

Gutfeld's email was testimonial. It reported a message that he had received several hours before, not any ongoing emergency. Gutfeld reported the message to Fox security, the internal police of Fox, which in turn reported such matters to the police. Therefore, Gutfeld would reasonably have expected his report to be used prosecutorially, as it in fact was. Indeed, Gutfeld told Cid, the security agent, what he had learned about Johnson, to help locate him. This email is the kind of testimonial

statement barred by *Crawford* and *Davis*.

**D.  Admission of the email was not harmless.**

Gutfeld's characterization of the Instagram message that he would be killed as a death threat was far from harmless. The key issue in the case, as the court charged, was whether a reasonable person would understand the statement as a "serious expression of an intent to inflict bodily injury or to kill." Gutfeld could not bother to show up for trial, but the government used his email to argue to the jury that he took this threat seriously. The government made devastating use of his statement in rebuttal summation. Dismissing defense counsel's valid point that the absence of any complaining witnesses at trial showed that they did not take the threats seriously, the prosecutor argued that Gutfeld's email proved that he did take the message seriously:

> You know how he viewed the defendant's threats because you saw an email from Greg Gutfeld to Clifford Cid, the direct of corporate security, right after Mr. Gutfeld received the threats. In that email, Mr. Gutfeld called the defendant's messages a "death threat," a "death threat." Of course that's how Mr. Gutfeld viewed

the defendant's messages.

428-29.

Yet Gutfeld could not be cross-examined about what he meant or whether he actually took the threat seriously. Cross-examination could well have contradicted the government's interpretation of this email. Gutfeld's use of the subject line "Death threat" did not necessarily mean that he actually considered this a true threat to kill him. That could have simply been a category of types of communication used by Fox security. Its meaning was actually ambiguous but the government got a lot of mileage out of it because Gutfeld did not testify and could not be questioned about it.

# POINT III

### The Court's Delivery of an Uncalled Witness Charge with Respect to the Striking Absence of Alleged Victims, Admonishing the Jury that "Their Absence Should Not Affect Your Judgment One Way or the Other," Undermined the Valid Defense Argument that the Witnesses Did Not Bother to Testify Because They Did Not Take the Statements Seriously.

Over defense objection, the district court instructed the jury that both sides had an equal opportunity to call the absent witnesses – the alleged victims – and that the jury should draw no inferences nor reach any conclusions about what they would have said if called. 455. The court warned: "Their absence should not affect your judgment one way or another." *Id.* This instruction severely prejudiced the defense that the threats were not serious or true threats. It entirely undermined the valid defense argument that the subjects' failure to testify demonstrated that they did not take the threats seriously.

## A. The Standard of Review.

This Court "reviews a jury instruction challenge *de novo.*" *Cabrera*, 13 F.4th at 146 (quoting *United States v. Coppola*, 671 F.3d 220, 247 (2d Cir.

2012)). A jury instruction which misleads the jury as to the correct legal standard is error. *Id*.

**B. The "uncalled witness" instruction was misleading and prejudicial.**

Delivery of this instruction was error and highly prejudicial in the circumstances of this case. In general, this Court has held that an uncalled witness charge is "inappropriate" where a witness is equally available to both sides. *United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1977). In *United States v. Abelis*, 146 F.3d 73, 84 (2d Cir. 1998), this Court approved of the district court's decision to give no uncalled witness charge for witness equally available to both sides, and to instead allow defense counsel to argue the issue to the jury. In this case the uncalled witness instruction was not only inappropriate; it was devastating to the defense.

The government had to show that a reasonable person would take Johnson's threats seriously. Yet not a single target of the threats testified -- not even Gutfeld, who had reported the message he received and started the investigation that led to this prosecution. The defense had an entirely

valid point that the failure of any of the subjects to bother to testify showed

that they did not take these videos seriously. It argued this to the jury. But

the court's uncalled witness charge effectively told the jury to disregard

this argument because the absence of these witnesses "should not affect

[its] judgment one way or another."

This was legally incorrect and misleading.

And the government hammered this instruction home in its rebuttal

summation:

> Now the defense spent some time noting that the victims
> did not testify in this case . . . [Y]ou're going to hear a
> specific instruction from Judge Kaplan [that] "the
> absence of any witness should not affect your judgment
> in any way. *Let me repeat that.* The absence of any witness
> should not affect your judgment in any way."

428 (emphasis added). Thus the government was able to argue, with the

full backing of the court's instruction, that the actually valid point made by

the defense – that witnesses who did not bother to show up in court

probably did not take these threats seriously– was a "distraction" that

could not be considered. 428.

Moreover, this error dovetailed with the hearsay/Confrontation Clause error of admitting Gutfeld's characterization of the message he received as a "Death threat." Right after the prosecutor invoked the court's instruction to ignore the absence of Gutfeld or any other victim at trial, he told the jury that Gutfeld's "death threat" characterization in the email was all the evidence it needed to prove that he took it seriously. Given the extremely thin evidence on the "true threat" issue, and the importance of the lack of evidence to the defense, this charge cannot be considered harmless.

**POINT IV**

**The District Court's Admission of Agent Kelley's Opinions About The Seriousness of The Threats And the Likelihood That Johnson Would Act on Them Violated Rule 701 and Prejudiced the Defense.**

Rule 701 prohibits a law enforcement witness who is not noticed and qualified as an expert from presenting opinions that derive from specialized knowledge. *Cabrera*, 13 F.4th at 149. It also precludes opinion testimony that is not "helpful" to the jury but usurps the jury's function

56

and tells it what inferences to draw on the ultimate issue of fact. *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004). Agent Kelley's opinions about why he found Johnson's statements particularly concerning and his conclusion that the statements demonstrated Johnson's intent to follow through violated the Rule. They were based on specialized knowledge, not just ordinary perception. To the extent that they were based on Kelley's ordinary perceptions, his opinions could add nothing helpful to the jury, who saw and heard exactly the same statements, and who had to decide what to infer from them. Kelley's opinions affected Johnson's substantial rights because they carried an aura of expertise defeating his sole defense that the statements were not true threats but political hyperbole.

## A.    Standard of Review

This Court "review[s] a district court's decision to admit evidence for abuse of discretion" and will reverse if an error affects a "substantial right." *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005). "A district court abuses its discretion when it bases its ruling on an erroneous view of the

law." *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014) (quoting *Porter*

*v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). "An evidentiary error affects

substantial rights if it had a 'substantial and injurious effect of influence' on

the jury's verdict." *Garcia*, 413 F.3d at 210 (quoting *United States v.*

*Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003).

**B.     Rule 701 Prohibits Lay Law Enforcement Witnesses From Testifying To Opinions Based On Their Specialized Training And Experience, Or To Dispositive Conclusions**.

Agent Kelley was neither noticed nor qualified as an expert under

Rule 702. Therefore Rule 701 governs his testimony. That Rule provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

This Court has held that Rule 701 bars the admission of law

enforcement testimony as lay opinion where it is based on specialized

knowledge rather than ordinary perception. *Cabrera*, 13 F. 4th at 149.

Specifically, the "specialized knowledge" restriction in Rule 701(c)

58

"prevents a party from ... conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements set forth in Fed. R. Crim. P. 16." *Id.* (quoting *United States v. Garcia*, 413 F.3d at 210). The Rule precludes lay witnesses from expressing opinions that rest "in any way" on specialized knowledge. *Id*. Lay opinion testimony is "limited to opinions that result from a process of reasoning familiar in everyday life." *Cabrera*, 13 F.4th at 149 (quoting *United States v. Flores*, 945 F.3d 687, 707 (2d Cir. 2019).

Thus in *Cabrera*, this Court held that a DEA agent's testimony that the defendant's driving patterns were unusual compared to an average drug dealer and his conclusion that he was an experienced drug dealer was based on specialized knowledge and barred by Rule 701. 13 F.4th at 150. This testimony did not relate events, or merely describe the driving patterns; rather the agent reached his opinion "through an opaque, intuitive process grounded in some kind of specialized knowledge as to

how your average drug dealer typically behaves compared to a drug dealer who is experienced." *Id.* In *Cabrera*, this Court relied on *Garcia*, 413 F.3d at 216-17, which reversed the district court's admission of DEA testimony that the defendant was a member of a drug conspiracy, ruling that the witness's "reasoning process was not that of an average person in everyday life" but of a law enforcement officer with considerable "specialized training and experience" in narcotics trafficking. *Cabrera*, 13 F.4th at 150 (quoting *Garcia*, 413 f.3d at 216-17).

Nor may a witness testify to a conclusion that "usurp[s] the function of the jury to decide what to infer" from the evidence and tells the jury "what inferences to draw." *Grinage*, 390 F.3d at 750. Rule 701(b)'s "helpfulness requirement is 'principally designed to provide assurance against the admission of opinions which would merely tell the jury what result to reach.'" *Flores*, 945 F.3d at 706 (quoting *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007)). Thus, "courts should be wary of opinion testimony whose 'sole function is to answer the same question that the trier

of fact is to consider in its deliberations." *Id.* at 210 (quoting 4 Weinstein's

Fed. Evid. 701.05 (2d ed. 2004)). A witness who interprets the same

evidence that is before the jury and tells them what it means is not

"helping" the jury; he is simply telling them what to infer. *Grinage*, 390 F.3d

at 750.

In *Grinage*, this Court reversed the conviction based on the admission

of a DEA agent's testimony, as lay opinion under Rule 701, interpreting

intercepted phone conversations and opining about what the participants

meant.  390 F.3d 750-51. This Court held that the testimony was not

"helpful" to the jury but instead usurped its function. *Id.* The contents of

the phone calls were in evidence and it was "the function of the jury to

decide what to infer from the content of the calls." *Id.* The agent's opinion

could only tell the jurors what to infer.

**C.     Kelley's Opinion Violated Rule 701.**

**1.     It was based on specialized knowledge.**

This case is closely analogous to *Cabrera* in the government's reliance on law enforcement opinion based on specialized knowledge, in the guise of lay opinion. Agent Kelley testified about his training and experience in the threat assessment unit of the Capitol Police. He then opined that Johnson's  use of the first person "I" showed in "I will kill you" showed "ownership" of the action, that this statement "stood out as an individual possibly making or formulating a plan to carry out this action," and that his repetition of the statement "strengthen[ed] the grievance" against Boebert. A. 116-18. Similarly, he testified that the caption of the Manchin video, accusing Manchin of treason, "stood out to me as a justification for the individual; that the individual believed that he was justified in whatever actions that he threatened to do." Kelley concluded: "To me, that speaks volumes, based off of [sic] if he believes he's justified, he's probably more likely to actually act on those actions." A. 244-45.

Kelley's "reasoning process was not that of an average person in everyday life" but, like the DEA agent's opinion in *Cabrera*, was the result of "an opaque, intuitive process grounded in some kind of specialized knowledge." 13 F.4th at 150. Indeed, these opinions sounded like the product of a police "profile" of threat characteristics. It appeared to be expert testimony, improperly admitted as lay opinion under Rule 701, "conferring an aura of expertise" on Kelley "without satisfying the reliability standard for expert testimony in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16." *Cabrera*, 13 F.4th at 149 (quoting *Garcia*, 413 F.3d at 215).

This undermined a key purpose of Rule 701, which "ensures that a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16." Fed. R. Evid. 701, Advisory Comm. Notes to 2000 Amendment. *See also Flores*, 945 F.3d at 707. Rule 16(a)(1)(G) requires the government to give the defendant "a written summary of any" expert testimony, specifying "the witness's opinions, the bases and reasons for

those opinions, and the witness's qualifications." This mandatory

disclosure "is intended to minimize surprise that often results from

unexpected expert testimony . . . and to provide the opponent with a fair

opportunity to test the merits of the expert's testimony." Fed. R. Crim. P.

16, Advisory Comm. Notes to 1993 Amendment. Here, with disclosure and

notice, Johnson could have challenged Kelley's expert qualifications -- he

had only been in the threats assessment unit for one year, for example --

and the bases of his opinions about what made the threats serious.

> 2.     **It usurped the jury's function and told it what to infer on a**
>        **dispositive fact.**

Kelley's opinion that Johnson's language demonstrated a likely

intention to act on his statements could not be "helpful" to the jury as lay

opinion. His opinions that Johnson's statements "stood out" as "possibly

making or formulating a plan to carry out this action," and that the words

he used made him "probably more likely to actually act on those actions,"

were not based not on expertise -- he was not qualified as an expert --, nor

on any advantage in perception. Kelley had viewed and heard exactly the

same evidence as the jury.

What Johnson's words meant and what he likely intended them to convey were questions for the jury to decide. The district court charged the jury that a true threat was one that a reasonable person would understand as a "serious expression of an intent to inflict bodily injury or to kill." Kelley opined that the words used conveyed such a serious expression. This was not "helpful" to the jury. The jurors themselves could consider the words and what they conveyed. Kelley saw the very same videos that the jury saw. As a lay witness – not an expert – he added nothing to the evidence before the jury to "help" it understand the evidence. His opinion was no better than that of a man on the street – unless, of course, it was based on his professional experience, in which case it was barred by Rule 701(c).

As in *Grinage*, "he usurped the function of the jury to decide what to infer from the content" of the statements and simply told the jurors what to infer. 390 F.3d at 750. Thus, Kelley's testimony reproduced the

"overarching" error identified in *Garcia*: he was "essentially telling the jury that he had concluded that [Johnson] was guilty." 413 F.3d at 210.

**D.    The Error Affected Cabrera's Substantial Rights.**

"Where the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence is weak," this Court "cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict." *Grinage*, 390 F.3d at 751. In reviewing Rule 701 error for harmlessness, this Court considers: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Garcia*, 413 F.3d at 217 (quoting *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004)). Here all factors weigh against finding the error harmless.

The evidence was extremely thin on the true threat issue. The only evidence was the statements themselves. Johnson had taken no steps

whatsoever to find out where the subjects lived. He had not even

conducted a Google search of their names. Indeed, he repeatedly referred

to Joe Manchin as "Steve Manchin." Nor had he sent the videos to the

subjects. The only thing he sent was the Instagram message to Gutfeld,

which did not use the first person "I" but use the passive "You will be

killed." The evidence showed that Johnson merely sat in his own

apartment watching these controversial celebrities on the TV screen and

recording his own wild statements.

The prosecutor used the opinion testimony in both his main and

rebuttal summations. He told the jury that Kelley's reaction showed how

serious the threats were and that Kelley thought Johnson believed he was

justified to take the actions he talked about. He focused on Kelley's opinion

about the tagging and reminded the jury of Kelley's "training and

experience."

Kelley's opinion was critical to the government's case. Kelley was the

only witness who opined about the seriousness of the threat. Finally, the

evidence was not cumulative of any other evidence. It was the only opinion testimony and went right to the heart of the case: whether these statements were serious threats.

## CONCLUSION

For the foregoing reasons, Johnson's conviction should be vacated and a new trial ordered.

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.
   APPEALS BUREAU

By: _Colleen P. Cassidy_____

**COLLEEN P. CASSIDY**
Attorney for Defendant-Appellant
   **RICKEY JOHNSON**
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

## CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by CM/ECF electronic filing on the United States Attorneys/S.D.N.Y.; Attention: **PATRICK R. MORONEY, ESQ., and KYLE WIRSHBA, ESQ.,** Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007.

Executed on:  New York, New York
September 29, 2022

*Colleen P. Cassidy*
**COLLEEN P. CASSIDY**
Assistant Federal Defender

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 12, 122 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Corel WordPerfect X3** with **14 characters per inch in Palatino Linotype** type style.

Attorney for Defendant-Appellant **RICKEY JOHNSON**

Dated:  New York, New York
September 29, 2022

*Colleen P. Cassidy*
_____
**COLLEEN  P. CASSIDY**
Assistant Federal Defender