# 22-1289-cr

---

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 22-1289-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

RICKEY JOHNSON, a/k/a SEALED DEFENDANT 1, a/k/a NEIL DAWN
DEFARREN,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**APPENDIX FOR DEFENDANT-APPELLANT RICKEY JOHNSON
VOLUME I OF III**

---

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**RICKEY JOHNSON**

**COLLEEN P. CASSIDY**,
_Of Counsel_

**A000001**

## TABLE OF CONTENTS TO THE APPENDIX

District Court Docket Sheet,
     S.D.N.Y. 21 Cr. 194 (LAK) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 04

Superseding Indictment,
     filed February 14, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 18

Defense Counsel's Letter Motion regarding Motion to Preclude Hearsay Statements,
     filed February 14, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 22

Government's Letter Response in Opposition to Defense Counsel's
Letter Motion,
     filed February 15, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 32

Defense Counsel's Letter Motion regarding Defense Video and Improper
Expert Testimony,
     filed February 16, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 38

Government's Letter regarding Kelley Testimony Document,
     filed February 17, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 44

Letter Response in Opposition regarding Government's Letter Motion,
     filed February 21, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 46

Government's Letter Motion regarding Juror Dismissal
     filed February 21, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 50

Government's Letter Motion regarding Precluding Argument regarding Instagram's
Policies
     filed February 21, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 56

Trial Transcript,
     dated February 16, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 60

Trial Transcript,
     dated February 17, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 166

Trial Transcript,
     dated February 22, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 398

Trial Transcript,
       dated February 23, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 523

Trial Transcript,
       dated February 24, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 547

Judgment in a Criminal Case,
       filed March 10, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 556

Notice of Appeal,
       filed March 16, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 563

Government Exhibit 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 564

Government Exhibit 205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 566

Government Exhibit 303-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 567

Government Exhibit 603A-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 570

Government Exhibit 603B-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 573

Government Exhibit 604-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 575

Government Exhibit 703-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 578

Government Exhibit 704-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 580

Government Exhibit 803-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 582

Government Exhibit 804-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 584

Government Exhibit 805-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 586

Government Video Exhibits

       GX 302 and 303
       GX 603A and 605
       GX 603B
       GX 604
       GX 703
       GX 704, 803, 804, and 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 588

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,ECF,PRIOR

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00194-LAK-1

---

Case title: USA v. Johnson                                     Date Filed: 03/22/2021

Magistrate judge case number: 1:21-mj-01644-UA                 Date Terminated: 06/09/2022

---

Assigned to: Judge Lewis A. Kaplan

**Defendant (1)**

**Rickey Johnson**                                    represented by   **Zawadi S Baharanyi**
*TERMINATED: 06/09/2022*                                              Federal Defenders of New York
*also known as*                                                       52 Duane Street
Sealed Defendant 1                                                    10th Fl
*TERMINATED: 06/09/2022*                                              New York, NY 10007
*also known as*                                                       (917) 612-2753
Nigel Dawn Defarren                                                   Email: zawadi_baharanyi@fd.org
*TERMINATED: 06/09/2022*                                              *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Designation: Public Defender or*
                                                                      *Community Defender Appointment*

                                                                      **Marisa Kristin Cabrera**
                                                                      Federal Defenders of NY, Inc.
                                                                      52 Duane Street
                                                                      Ste 10th Floor
                                                                      New York, NY 10007
                                                                      917-890-7612
                                                                      Email: marisa_cabrera@fd.org
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Designation: Public Defender or*
                                                                      *Community Defender Appointment*

**Pending Counts**                                    **Disposition**

18:875C.F INTERSTATE                                  IMPRISONMENT: 24 Months.
COMMUNICATIONS - THREATS                              SUPERVISED RELEASE: 3 years.
(1s)

18:875C.F INTERSTATE                                  IMPRISONMENT: 24 Months.
COMMUNICATIONS - THREATS                              SUPERVISED RELEASE: 3 years.
(4s)

**Highest Offense Level (Opening)**

Felony

| Terminated Counts | Disposition |
|---|---|
| 18:875C.F INTERSTATE COMMUNICATIONS - THREATS (1) | Dismissed |
| 18:115.F THREATENING A U. S. OFFICIAL (2) | Dismissed |
| 18:115B.F THREATENPPING - FEDERAL OFFICIAL (2s) | IMPRISONMENT: 24 Months. SUPERVISED RELEASE: 3 years. |
| 18:115B.F THREATENPPING - FEDERAL OFFICIAL (3s) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| Complaints | Disposition |
|---|---|
| 18:875A.F THREATENING INTERSTATE COMMUNICATIONS, 18:115.F THREATENING A UNITED STATES OFFICIAL | |

**Plaintiff**

**USA**     represented by     **Patrick Ryan Moroney**
DOJ-USAO
1 Saint Andrews Plaza
New York, NY 10001
212-637-2330
Email: patrick.moroney@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Kyle Adam Wirshba**
United States Attorneys Office SDNY
1 Saint Andrews Plaza
New York, NY 10007
212-637-2493
Email: kyle.wirshba@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2021 | | SEALED ORAL ORDER as to Sealed Defendant 1. (Signed by Magistrate Judge Gabriel W. Gorenstein on 2/11/2021)(dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |

| | | |
|---|---|---|
| 02/11/2021 | 1 | COMPLAINT as to Rickey Johnson (1). In Violation of 18 U.S.C. 875, 115, and 2 (Signed by Magistrate Judge Gabriel W. Gorenstein) (dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |
| 02/11/2021 | | Arrest of Rickey Johnson. (dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |
| 02/12/2021 | | ORAL CONSENT TO PROCEED BY VIDEO OR TELE CONFERENCE as to Rickey Johnson. (Signed by Magistrate Judge Gabriel W. Gorenstein on 2/12/2021)(dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |
| 02/12/2021 | 3 | CJA 23 Financial Affidavit by Rickey Johnson. (Signed by Magistrate Judge Gabriel W. Gorenstein) (Federal Defender Zawadi Baharanyi Appointed) (dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |
| 02/12/2021 | | Attorney update in case as to Rickey Johnson. Attorney Zawadi S Baharanyi for Rickey Johnson added.. (dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |
| 02/12/2021 | 4 | Minute Entry for proceedings held before Magistrate Judge Gabriel W. Gorenstein: Initial Appearance as to Rickey Johnson held on 2/12/2021., Deft Appears with Federal Defender Zawadi Baharanyi and AUSA Patrick Moroney and Andrew Defilippis for the government. Detention; See Transcript; ( Preliminary Hearing 2/26/2021 (dif) [1:21-mj-01644-UA] (Entered: 02/12/2021) |
| 02/26/2021 | 5 | ORDER TO CONTINUE IN THE INTEREST OF JUSTICE as to Rickey Johnson. Time excluded from 2/26/21 until 3/28/21. (Signed by Magistrate Judge Sarah Netburn on 2/26/21) [**Affirmation by AUSA Patrick Moroney requesting a continuance until March 29, 2021 is attached.] (jbo) [1:21-mj-01644-UA] (Entered: 03/22/2021) |
| 03/22/2021 | 6 | INDICTMENT FILED as to Rickey Johnson (1) count(s) 1, 2. (jm) (Entered: 03/23/2021) |
| 03/22/2021 | | Case Designated ECF as to Rickey Johnson. (jm) (Entered: 03/23/2021) |
| 04/01/2021 | 7 | LETTER MOTION addressed to Judge Lewis A. Kaplan from AUSA Patrick R. Moroney dated April 1, 2021 re: Speedy Trial Exclusion . Document filed by USA as to Rickey Johnson. (Attachments: # 1 Text of Proposed Order)(Moroney, Patrick) (Entered: 04/01/2021) |
| 04/02/2021 | 8 | ORDER re: 7 LETTER MOTION addressed to Judge Lewis A. Kaplan from AUSA Patrick R. Moroney dated April 1, 2021 re: Speedy Trial Exclusion. It is hereby excluded under the Speedy Trial Act, 18 USC 3161(h)(7)(A). The Court finds that the ends of justice served by granting this exclusion outweigh the best interest of the public and the defendant in a speedy trial because granting an exclusion will allow the parties to begin gathering, producing, and reviewing discovery; will ensure the effective representation of counsel in light of difficulties in attorney-client communication occasioned by the COVID-19 pandemic; and will reflect the limited availability of jury trials and court appearances in this District in light of the pandemic. (Signed by Judge Lewis A. Kaplan on 4/2/21) (jw) (Entered: 04/02/2021) |
| 04/13/2021 | | Set/Reset Hearings as to Rickey Johnson: Arraignment set for 4/15/2021 at 09:00 AM before Judge Lewis A. Kaplan via teleconference as video-conference remote production was not available. Counsel, public, and press may call 1-888-363-4749 and use access code 7664205# (Mohan, Andrew) (Entered: 04/13/2021) |
| 04/15/2021 | 9 | CONSENT TO PROCEED BY VIDEO OR TELE CONFERENCE as to Rickey Johnson. (Signed by Judge Lewis A. Kaplan on 4/15/2021) (ap) (Entered: 04/15/2021) |
| 04/15/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Arraignment and IPTC by teleconference as to Rickey Johnson (1) Count 1,2 held on 4/15/2021. Defendant present with attorney Zawadi S. Baharanyi. AUSA Patrick R. Moroney present. Court |

A000006

| | | |
|---|---|---|
| | | reporter Sonya Ketter Moore present. The defendant waived his right to an in-person hearing and the Court so ordered the consent to proceed by remote hearing. The Court addressed the Government's Rule5(f) obligations. The Defendant was arraigned and entered a plea of not guilty. Discovery is due by 4/29/2021. Defense motions are due by 6/29/2021; Government opposition due by 7/13/2021; Defense reply due by 7/20/21; oral argument or a status conference to be held on 7/27/2021 @ 11:00 AM by videoconference. The Government estimates that this would be a one week trial. No tiral date was set. Time from today through and including 7/27/2021 is excluded from speedy trial calculations in the interests of justice. Defendant remained detained. (jbo) (Entered: 05/19/2021) |
| 04/15/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Plea entered by Rickey Johnson (1) Count 1,2 Not Guilty. (jbo) (Entered: 05/19/2021) |
| 04/20/2021 | 10 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Patrick R. Moroney dated April 20, 2021 re: Proposed Protective Order . Document filed by USA as to Rickey Johnson. (Attachments: # 1 Proposed Protective Order)(Moroney, Patrick) (Entered: 04/20/2021) |
| 04/21/2021 | 11 | PROTECTIVE ORDER re: 10 LETTER MOTION addressed to Judge Lewis A. Kaplan from Patrick R. Moroney dated April 20, 2021 re: Proposed Protective Order. Confidential Information so designated by the Government shall not be disclosed by the defendant or defense counsel, including any successor counsel (collectively, "the defense"), other than as set forth herein, and shall be used by the defense solely for purposes of defending this action. All Confidential Information possessed by the defense shall be maintained in a safe and secure manner. (Signed by Judge Lewis A. Kaplan on 4/21/21) (jw) (Entered: 04/21/2021) |
| 05/18/2021 | 12 | RULE 5(f) ORDER as to Rickey Johnson. (Signed by Judge Lewis A. Kaplan on 4/15/21) (jw) (Entered: 05/18/2021) |
| 06/25/2021 | 13 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 6-25-2021 re: Adjournment of Pretrial Deadlines . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 06/25/2021) |
| 06/29/2021 | 14 | MEMO ENDORSEMENT re: 13 LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 6-25-2021 re: Adjournment of Pretrial Deadlines: Mr. Johnson's pretrial motions by August 13, 2021; Government response by August 27, 2021; Mr. Johnson's reply by September 3, 2021...ENDORSEMENT...Granted. SO ORDERED (Signed by Judge Lewis A. Kaplan on 6/29/21) (jw) (Entered: 06/29/2021) |
| 06/29/2021 | | Set/Reset Deadlines/Hearings as to Rickey Johnson:Pretrial Motions due by 8/13/2021. Defendant Replies due by 9/3/2021. Government Responses due by 8/27/2021. (jw) (Entered: 06/29/2021) |
| 07/26/2021 | 15 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Patrick Moroney dated July 26, 2021 re: Rescheduling July 27, 2021 Conference and Exclusion of Time . Document filed by USA as to Rickey Johnson. (Attachments: # 1 Text of Proposed Order)(Moroney, Patrick) (Entered: 07/26/2021) |
| 07/27/2021 | 16 | ORDER as to Rickey Johnson: Upon the application of the United States of America, by and through AUDREY STRAUSS, United States Attorney for the Southern District of New York, ANDREW J. DEFILIPPIS and PATRICK R. MORONEY, Assistant United States Attorneys, of counsel, and with the consent of RICKEY JOHNSON, by and through his attorney, ZA WADI BAHARANYl, it is hereby ORDERED that the time from July 27, 202 l, until September 9, 2021, is hereby excluded under the Speedy Trial Act, 18 U.S.C. § 3161 (h)(7)(A). SO ORDERED. (Time excluded from 7/27/2021 until 9/9/2021) (Signed by Judge Lewis A. Kaplan on 7/26/2021) (lnl) (Entered: 07/27/2021) |

A000007

Case 22-1289, Document 21, 09/26/2022, 3391437, Page8 of 284

| 08/13/2021 | 17 | MOTION to Dismiss *the Indictment*. Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 08/13/2021) |
|---|---|---|
| 08/13/2021 | 18 | MEMORANDUM OF LAW in Support by Rickey Johnson re: 17 MOTION to Dismiss *the Indictment*. filed by Rickey Johnson . (Attachments: # 1 Exhibit Exhibit A)(Baharanyi, Zawadi) (Entered: 08/13/2021) |
| 08/13/2021 | 19 | DECLARATION of Zawadi Baharanyi by Rickey Johnson re: 17 MOTION to Dismiss *the Indictment*. filed by Rickey Johnson, 18 Memorandum of Law in Support filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 08/13/2021) |
| 08/26/2021 | 20 | RESPONSE in Opposition by USA as to Rickey Johnson re: 17 MOTION to Dismiss *the Indictment*.. (Moroney, Patrick) (Entered: 08/26/2021) |
| 09/04/2021 | 21 | REPLY MEMORANDUM OF LAW in Support as to Rickey Johnson re: 17 MOTION to Dismiss *the Indictment*. . (Baharanyi, Zawadi) (Entered: 09/04/2021) |
| 09/21/2021 |  | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Motion Hearing as to Rickey Johnson held on 9/21/2021. Defendant Rickey Johnson present with attorney Zawadi Johnson. AUSA Patrick Maroney present. Court reporter Kristen Carannante present. Oral argument heard regarding defendant's motion to dismiss (DI 17). Motion denied by oral order. Trial scheduled to begin on 2/1/2022 at 9:30 AM. The parties estimate the trial to last one week. Time from today through and including 2/1/2022 is excluded from speedy trial calculations in the interests of justice. Defendant remained detained. (jbo) (Entered: 09/22/2021) |
| 09/22/2021 | 22 | MEMO ENDORSEMENT as to Rickey Johnson on re: 17 MOTION to Dismiss the Indictment filed by Rickey Johnson. ENDORSEMENT: Denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 9/21/2021) (ap) (Entered: 09/22/2021) |
| 10/15/2021 | 23 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Conference held on 9/21/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/5/2021. Redacted Transcript Deadline set for 11/15/2021. Release of Transcript Restriction set for 1/13/2022. (Moya, Goretti) (Entered: 10/15/2021) |
| 10/15/2021 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Conference proceeding held on 9/21/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 10/15/2021) |
| 12/07/2021 | 25 | TRIAL ORDER as to Rickey Johnson. At the September 21, 2021 conference the Court scheduled the preferred trial start date as February 1, 2022. The Clerks Office jury calendar for the first quarter of 2022 has since been issued. The jury panel for this trial will be provided on Wednesday, February 16, 2022 and you must be ready to proceed with jury selection and the immediate commencement trial starting at 9:30 AM. Counsel are responsible for being familiar with the Court's Covid 19 policies posted on the Court's website at: https://www.nysd.uscourts.gov/covid-19-coronavirus; as well as any applicable state, and local requirements. Counsel will schedule an appointment with the courtroom deputy about 30 days in advance of trial date in order to familiarize themselves with the current jury selection procedures, the electronic courtroom evidence presentation system |

**A000008**

| | | and other logistical issues (Signed by Judge Lewis A. Kaplan on 12/7/21)(jw) (Entered: 12/07/2021) |
|---|---|---|
| 12/14/2021 | 26 | SEALED DOCUMENT placed in vault. (jus) (Entered: 12/14/2021) |
| 01/12/2022 | 27 | (S1) SUPERSEDING INDICTMENT FILED as to Rickey Johnson (1) count(s) 1s, 2s-3s, 4s. (jm) (Entered: 01/12/2022) |
| 01/24/2022 | 28 | NOTICE of 12.2(b) as to Rickey Johnson (Baharanyi, Zawadi) (Entered: 01/24/2022) |
| 01/25/2022 | 29 | NOTICE OF ATTORNEY APPEARANCE Kyle Adam Wirshba appearing for USA. (Wirshba, Kyle) (Entered: 01/25/2022) |
| 01/25/2022 | 30 | ORDER as to Rickey Johnson. The defendant's ex parte application is denied without prejudice to renewal by motion served on the United States, any such motion to be accompanied by a memorandum of law demonstrating that the requirements of Fed..R.Crim. P. 17 are satisfied. The ex parte application, which bears a legend indicating that it is not to be filed on CM-ECF, is to be publicly docketed on CM-ECF (Signed by Judge Lewis A. Kaplan on 1/25/22)(jw) (Entered: 01/25/2022) |
| 01/25/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Arraignment via Zoom video-conference as to Rickey Johnson (1) Count 1s,2s-3s,4s held on 1/25/2022. Plea entered by Rickey Johnson Not Guilty. Defendant Rickey Johnson present with attorney Zawadi Johnson. AUSAs Patrick Maroney and Kyle Wirshba present. Court reporter Pamela Utter present. Defendant arraigned on the S1 superseding indictment and entered a plea of not guilty. Trial remains scheduled to begin on 2/16/2022 at 9:30 AM. Defendant remained detained. (Jury Trial set for 2/16/2022 at 09:30 AM before Judge Lewis A. Kaplan.) (jbo) (Entered: 01/25/2022) |
| 01/31/2022 | 31 | MOTION to Exclude *Expert Testimony*. Document filed by USA as to Rickey Johnson. (Wirshba, Kyle) (Entered: 01/31/2022) |
| 01/31/2022 | 32 | NOTICE OF ATTORNEY APPEARANCE: Marisa Kristin Cabrera appearing for Rickey Johnson. Appearance Type: Public Defender or Community Defender Appointment. (Cabrera, Marisa) (Entered: 01/31/2022) |
| 02/01/2022 | 33 | ORDER as to Rickey Johnson: In view of the imminence of the trial, the defendant shall file his response to the government's motion to preclude its proposed expert no later than February 4. The government shall file any reply in support of its motion no later than February 8. (Responses due by 2/4/2022. Replies due by 2/8/2022) (Signed by Judge Lewis A. Kaplan on 2/1/2022) (ap) (Entered: 02/01/2022) |
| 02/03/2022 | 34 | MOTION in Limine . Document filed by USA as to Rickey Johnson. (Moroney, Patrick) (Entered: 02/03/2022) |
| 02/04/2022 | 35 | ENDORSED LETTER as to Rickey Johnson addressed to Judge Lewis A. Kaplan, from Zawadi Baharanyi dated 2/3/2022 re: Defense counsel writes to request Order for Subpoena. ENDORSEMENT: Granted to the extent reflected in the Subpoena attached to the proposed Order. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/4/2022) (ap) (Entered: 02/04/2022) |
| 02/04/2022 | 36 | ORDER FOR ISSUANCE OF SUBPOENA PURSUANT TO RULE 17(b) & (c) as to Rickey Johnson. ORDERED that the subpoena be complied on February 16, 2022 at 9:30 a.m. The subpoena shall be complied with by having the information delivered to Andrew Mohan, Deputy Clerk, at 500 Pearl Street, New York, NY 10007, Room 2240. ORDERED that this is without prejudice to any motion to quash or modify by the government or recipient. (Signed by Judge Lewis A. Kaplan on 2/4/2022) (See ORDER set forth) (ap) Modified on 2/7/2022 (ap). (Entered: 02/04/2022) |

| 02/04/2022 | 37 | Request To Charge by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/04/2022) |
|---|---|---|
| 02/04/2022 | 38 | Proposed Voir Dire Questions by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/04/2022) |
| 02/04/2022 | 39 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-4-2022 re: Withdrawing 12.2 Notice . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/04/2022) |
| 02/04/2022 | 40 | Request To Charge by USA as to Rickey Johnson. (Wirshba, Kyle) (Entered: 02/04/2022) |
| 02/04/2022 | 41 | Proposed Voir Dire Questions by USA as to Rickey Johnson. (Wirshba, Kyle) (Entered: 02/04/2022) |
| 02/06/2022 | 42 | ORDER denying as moot 31 Motion to Exclude as to Rickey Johnson (1). (Signed by Judge Lewis A. Kaplan on 2/6/2022) (Kaplan, Lewis) (Entered: 02/06/2022) |
| 02/06/2022 | 43 | ORDER withdrawing 39 LETTER MOTION withdraw 12.2 notice re: 39 LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-4-2022 re: Withdrawing 12.2 Notice . as to Rickey Johnson (1). (Signed by Judge Lewis A. Kaplan on 2/6/2022) (Kaplan, Lewis) (Entered: 02/06/2022) |
| 02/08/2022 | 44 | MEMORANDUM OF LAW in Opposition by Rickey Johnson re: 34 MOTION in Limine . filed by USA . (Baharanyi, Zawadi) (Entered: 02/08/2022) |
| 02/09/2022 | | Set/Reset Deadlines/Hearings as to Rickey Johnson: Telephone Conference set for 2/9/2022 at 03:30 PM before Judge Lewis A. Kaplan regarding letter motion filed by Fox Corporation. Counsel were notified by email and telephone. Public and press may call 1-888-363-4749 and enter conference ID 7664205# to listen to the conference. All callers must mute their telephones once they join. All callers are reminded that recording or re-broadcast of the conference in whole or in part is prohibited by court rules. (Mohan, Andrew) (Entered: 02/09/2022) |
| 02/09/2022 | 45 | LETTER MOTION to Quash Subpoena served on "Corporate Security at Fox Corporation Document filed Roger L. Stavis(jw) (Entered: 02/09/2022) |
| 02/09/2022 | 46 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-9-2022 re: 45 MOTION to Quash. re: Response to Motion to Quash and Request for Subpoena . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/09/2022) |
| 02/09/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan:Telephone Conference as to Rickey Johnson held on 2/9/2022. Defendant not present, but attorneys Zawadi S. Baharanyi and Marissa K. Cabrera present for the defendant. AUSAs Kyle A. Wirshba and Patrick R. Moroney present. 3rd Party Movant Fox Corporation represent by attorneys Roger L. Stavis and Steven Mintz. Oral argument heard on the 2/8/2022 letter motion (DI 45) to quash the 1/27/2022 subpoena duces tecum served on Fox Corporation. Court ordered the 1/27/2022 subpoena quashed. The Court instructed Federal Defenders that if there is a 2nd subpoena to Fox Corporation it should be made returnable to the Judges Courtroom Deputy, Andrew Mohan, at the start of trial. Letter briefs are due by 2/11/2022 as to the legal standard for the subpoenas being sought. (Court Reporter George Malinowski) (Mohan, Andrew) (Entered: 02/09/2022) |
| 02/10/2022 | 47 | ORDER - The motion of Fox Corporation to quash defendant's subpoena duces tecum dated January 27, 2022 (Dkt 45) is GRANTED, and Defendant's motion to authorize a Rule 17(c) subpoena (Dkt 46) is DENIED, both on the terms and for the reasons stated on the record this day. (Signed by Judge Lewis A. Kaplan on 2/9/22) (jw) (Entered: 02/10/2022) |

**A000010**

| 02/10/2022 | 48 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-10-2022 re: Request for Wifi Access . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/10/2022) |
|---|---|---|
| 02/11/2022 | 49 | ORDER as to Rickey Johnson. It is hereby ORDERED that the Bureau of Prisons, the Metropolitan Detention Center - Brooklyn, and the United States Marshals Service accept the following clothing for Mr. Rickey Johnson, Register Number 30000-509, to wear for appearances at his trial commencing on February 16, 2022 and continuing thereafter: One pair of black slacks; One pair of khakis; Four pairs of socks; Four button-down shirts; One pair of shoes; One belt; Four pairs of underwear; Four white undershirts; One suit jacket (Signed by Judge Lewis A. Kaplan on 2/3/2022)(jw) (Entered: 02/11/2022) |
| 02/11/2022 | 50 | MEMO ENDORSEMENT 48 LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2/10/2022 re: Request for Wifi Access...ENDORSEMENT...Cases were tried without wifi access for over 200 years. Such access may be appropriate in some minority of cases. This is not among them. Denied (Signed by Judge Lewis A. Kaplan on 2/11/22) (jw) (Entered: 02/11/2022) |
| 02/11/2022 | 51 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-11-2022 re: Trial Subpoenas . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/11/2022) |
| 02/14/2022 | 52 | LETTER by Roger L. Stavis, Esq., Mintz & Gold LLP, counsel to Fox Corporation, addressed to Judge Lewis A. Kaplan from Roger L. Stavis, Esq. dated 2/13/2022 re: Letter motion to quash the subpoena issued by defense counsel to Rickey Johnson for Greg Gutfeld's records in possession of the NYPD, Legal Bureau, Document Protections Unit. (Mohan, Andrew) (Entered: 02/14/2022) |
| 02/14/2022 | 53 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-14-2022 re: Motion to Preclude Hearsay Statements . Document filed by Rickey Johnson. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Baharanyi, Zawadi) (Entered: 02/14/2022) |
| 02/14/2022 | 54 | MOTION to Compel *Rule 16 Discovery and Giglio*. Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/14/2022) |
| 02/15/2022 | 55 | ORDER as to Rickey Johnson: Any oppositions to defendant's motions docketed as ECF Nos. 53 and 54, and any opposition, any response to Mr. Gutfeld's letter motion, dated February 13, 2022, to quash the defense subpoena to the New York City Police Department, shall be filed no later than 10 p.m. on February 15, 2022. SO ORDERED. (Responses due by 2/15/2022) (Signed by Judge Lewis A. Kaplan on 2/15/2022) (lnl) (Entered: 02/15/2022) |
| 02/15/2022 | 56 | LETTER MOTION as to Rickey Johnson to Quash Subpoena Served on Fox Corporation. Document filed by Fox Corporation. (lnl) (Entered: 02/15/2022) |
| 02/15/2022 | 57 | ORDER as to Rickey Johnson: Any opposition to Fox Corporation's motion to quash (Dkt 56) shall be filed no later than 8 a.m. on February 16, 2022. SO ORDERED. (Responses due by 2/16/2022) (Signed by Judge Lewis A. Kaplan on 2/15/2022) (lnl) (Entered: 02/15/2022) |
| 02/15/2022 | 58 | ORDER granting in part and denying in part 34 Motion in Limine as to Rickey Johnson (1). (Signed by Judge Lewis A. Kaplan on 2/15/2022) (Kaplan, Lewis) (Entered: 02/15/2022) |
| 02/15/2022 | 59 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Conference held on 2/922 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: George Malinowski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court |

A000011

Case 22-1289, Document 21, 06/23/2022, 3331127, Page12 of 284

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/8/2022. Redacted Transcript Deadline set for 3/18/2022. Release of Transcript Restriction set for 5/16/2022. (Moya, Goretti) (Entered: 02/15/2022) |
| 02/15/2022 | 60 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Conference proceeding held on 2/9/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 02/15/2022) |
| 02/15/2022 | 61 | LETTER RESPONSE in Opposition by USA as to Rickey Johnson addressed to Judge Lewis A. Kaplan from Patrick Moroney dated February 15, 2022 re: 54 MOTION to Compel *Rule 16 Discovery and Giglio*.. (Moroney, Patrick) (Entered: 02/15/2022) |
| 02/15/2022 | 62 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-15-2022 re: 56 MOTION to Quash Subpoena Served on Fox Corporation., 57 Order, Set Deadlines/Hearings, Terminate Motions,,, re: Opposition to Fox Motion to Quash . Document filed by Rickey Johnson. (Attachments: # 1 Exhibit Exhibit A)(Baharanyi, Zawadi) (Entered: 02/15/2022) |
| 02/15/2022 | 63 | LETTER RESPONSE in Opposition by USA as to Rickey Johnson addressed to Judge Lewis A. Kaplan from Patrick Moroney dated February 15, 2022 re: 53 LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-14-2022 re: Motion to Preclude Hearsay Statements .. (Attachments: # 1 Exhibit B - Hunt Transcript)(Moroney, Patrick) (Entered: 02/15/2022) |
| 02/15/2022 | 64 | ORDER denying as moot 54 Motion to Compel as to Rickey Johnson (1). (Signed by Judge Lewis A. Kaplan on 2/15/2022) (Kaplan, Lewis) (Entered: 02/15/2022) |
| 02/15/2022 | 65 | ORDER granting in part and denying in part 56 Motion Quash subpoena on Fox Corp. served 2/11/2022 re: 56 MOTION to Quash Subpoena Served on Fox Corporation. as to Rickey Johnson (1). (Signed by Judge Lewis A. Kaplan on 2/15/2022) (Kaplan, Lewis) (Entered: 02/15/2022) |
| 02/16/2022 | 66 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-16-2022 re: Defense Video and Improper Expert Testimony . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 02/16/2022) |
| 02/16/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Voir Dire held on 2/16/2022 as to Rickey Johnson. Jury trial regarding defendant Rickey Johnson begun before Hon. Lewis A. Kaplan. Defendant Rickey Johnson present with attorneys Zawadi Johnson and Marisa K. Cabrera. AUSAs Patrick Maroney and Kyle Wirshba present. Court reporters Rebecca Forman and Kelly Surina present. Jury of 12 and 2 alternates selected and sworn. Government's case begun. Defendant remained detained. (jbo) (Entered: 02/23/2022) |
| 02/17/2022 | 67 | LETTER by USA as to Rickey Johnson addressed to Judge Lewis A. Kaplan from Patrick Moroney dated February 16, 2022 re: Video Admissibility. Document filed by USA. (Moroney, Patrick) (Entered: 02/17/2022) |
| 02/17/2022 | 68 | LETTER by USA as to Rickey Johnson addressed to Judge Lewis A. Kaplan from Kyle Wirshba dated February 17, 2022 re: Kelley Testimony Document filed by USA. (Wirshba, Kyle) (Entered: 02/17/2022) |
| 02/17/2022 | 69 | ORDER denying as moot 66 LETTER MOTION Admit defense video and strike |

A000012

| | | |
|---|---|---|
| | | testimony re: 66 LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-16-2022 re: Defense Video and Improper Expert Testimony . as to Rickey Johnson (1). (Signed by Judge Lewis A. Kaplan on 2/17/2022) (Kaplan, Lewis) (Entered: 02/17/2022) |
| 02/17/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Rickey Johnson held on 2/17/2022. Jury trial continued. Alternate Juror no. 2 excused. Government rested. Defense case begun and adjourned to 2/22/2022. (jbo) (Entered: 02/23/2022) |
| 02/21/2022 | 70 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Patrick Moroney dated February 21, 2022 re: Juror Dismissal . Document filed by USA as to Rickey Johnson. (Attachments: # 1 Exhibit A - Transcript)(Moroney, Patrick) (Entered: 02/21/2022) |
| 02/21/2022 | 71 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Patrick Moroney dated February 21, 2022 re: Precluding Argument regarding Instagram's Policies . Document filed by USA as to Rickey Johnson. (Attachments: # 1 Exhibit A - Transcript)(Moroney, Patrick) (Entered: 02/21/2022) |
| 02/21/2022 | 72 | LETTER RESPONSE in Opposition by Rickey Johnson addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 2-21-22 re: 70 LETTER MOTION addressed to Judge Lewis A. Kaplan from Patrick Moroney dated February 21, 2022 re: Juror Dismissal .. (Baharanyi, Zawadi) (Entered: 02/21/2022) |
| 02/22/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Rickey Johnson held on 2/22/2022. Jury trial continued. Jurors 2 and 7 excused. Alternate juror no. 1 became juror no. 7. Trial proceeded with 11 jurors. Defense rested. Charge conference held. Closing arguments heard. Jury charged. Deliberations begun and adjourned until 2/23/2022. (jbo) (Entered: 02/23/2022) |
| 02/23/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Rickey Johnson held on 2/23/2022. Jury trial continued. Deliberations continued and a partial verdict of guilty as to counts (S1)One, (S1)Two, and (S4)Four returned. Deliberation as to count (S1)3 adjourned until 2/24/2022. Defense moved for a mistrial regarding the jury not reaching a consensus, which was denied by the Court. (jbo) (Entered: 03/02/2022) |
| 02/24/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Rickey Johnson held on 2/24/2022. Jury trial continued. Deliberations continued and a partial verdict of not guilty as to counts (S1)Three returned. Sentencing on Counts (S1)One, (S2)Two, and (S2)Four is scheduled for 5/25/2022 at 2:30 PM in courtroom 21B. Defense given 45 days to file Rule 29 motions; Government has 30 days thereafter to oppose; Defense replies are due 10 days thereafter. Defendant remained detained. PSI ordered. (jbo) Modified on 5/25/2022 (jbo). (Entered: 03/02/2022) |
| 02/24/2022 | | Set/Reset Hearings as to Rickey Johnson: Sentencing set for 5/25/2022 at 02:30 PM before Judge Lewis A. Kaplan. (jbo) (Entered: 03/02/2022) |
| 02/24/2022 | | Order of Referral to Probation for Presentence Investigation and Report as to Rickey Johnson. (Signed by Judge Lewis A. Kaplan on 2/24/22)(jbo) (Entered: 03/02/2022) |
| 02/24/2022 | | JURY VERDICT as to Rickey Johnson (1) Guilty on Count 1s,2s,4s. Rickey Johnson (1) Not Guilty on Count 3s. (jbo) (Entered: 05/25/2022) |
| 02/28/2022 | 73 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 02/28/2022) |
| 03/01/2022 | 74 | VERDICT SHEET on Counts 1, 2, 4 as to USA v. Rickey Johnson, S1 21 CR. 194. Dated: Feb. 23, 2022. (bw) (Entered: 03/02/2022) |
| 03/01/2022 | 75 | VERDICT SHEET on Count 3 as to USA v. Rickey Johnson, S1 21 CR. 194. Dated: |

A000013

2/24/2022. (bw) (Entered: 03/02/2022)

| 03/08/2022 | 76 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Trial held on 2/16/22 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/29/2022. Redacted Transcript Deadline set for 4/8/2022. Release of Transcript Restriction set for 6/6/2022. (Moya, Goretti) (Entered: 03/08/2022) |
|---|---|---|
| 03/08/2022 | 77 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Trial proceeding held on 2/16/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/08/2022) |
| 03/08/2022 | 78 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Trial held on 2/17/22 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/29/2022. Redacted Transcript Deadline set for 4/8/2022. Release of Transcript Restriction set for 6/6/2022. (Moya, Goretti) (Entered: 03/08/2022) |
| 03/08/2022 | 79 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Trial proceeding held on 2/17/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/08/2022) |
| 03/08/2022 | 80 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Trial held on 2/22/22 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/29/2022. Redacted Transcript Deadline set for 4/8/2022. Release of Transcript Restriction set for 6/6/2022. (Moya, Goretti) (Entered: 03/08/2022) |
| 03/08/2022 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Trial proceeding held on 2/22/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/08/2022) |
| 03/08/2022 | 82 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Trial held on 2/23/22 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/29/2022. Redacted Transcript Deadline set for 4/8/2022. Release of Transcript Restriction set for 6/6/2022. (Moya, Goretti) (Entered: 03/08/2022) |

A000014

| 03/08/2022 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Trial proceeding held on 2/23/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/08/2022) |
|---|---|---|
| 03/08/2022 | 84 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Trial held on 2/24/22 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/29/2022. Redacted Transcript Deadline set for 4/8/2022. Release of Transcript Restriction set for 6/6/2022. (Moya, Goretti) (Entered: 03/08/2022) |
| 03/08/2022 | 85 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Trial proceeding held on 2/24/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/08/2022) |
| 05/10/2022 | 87 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Zawadi Baharanyi dated 5-10-22 re: Extension of Sentencing Submission Deadlines . Document filed by Rickey Johnson. (Baharanyi, Zawadi) (Entered: 05/10/2022) |
| 05/20/2022 | 89 | SENTENCING SUBMISSION by USA as to Rickey Johnson. (Moroney, Patrick) (Entered: 05/20/2022) |
| 05/25/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Sentencing held on 5/25/2022 for Rickey Johnson (1) Count 1s,2s,4s. Defendant Rickey Johnson present with attorneys Zawadi S. Baharanyi and Jennifer Brown. AUSA Patrick R. Moroney present. Court reporter Rose Prater present. Defendant sentenced to 24 Months on each of Counts (S1) One, (S1)Two, and (S1)Four, the terms to run concurrently, that he thereafter serve a term of supervised release of 3 years, and that he pay the mandatory special special assessment of $300. The term of supervised release shall be subject to the mandatory, standard, and following special conditions of supervised release: You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner. You must not have contact with the victim(s) in this case. This includes any physical, visual, written, or telephonic contact with such persons. Additionally, you must not directly cause or encourage anyone else to have such contact with the victim(s). The underlying indictment was dismissed upon motion of the government. Defendant remained detained. (jbo) (Entered: 05/25/2022) |
| 05/25/2022 | | DISMISSAL OF COUNTS on Government Motion as to Rickey Johnson (1) Count 1,2,3s. (jbo) (Entered: 05/25/2022) |

A000015

| 05/26/2022 | 93 | NOTICE OF APPEAL by Rickey Johnson from 90 Judgment. (nd) (Entered: 06/15/2022) |
|---|---|---|
| 06/09/2022 | 90 | JUDGMENT IN A CRIMINAL CASE as to Rickey Johnson (1). THE DEFENDANT: was found guilty on counts (S1)One, (S1)Two, (S1)Four, after a plea of not guilty. Underlying indictment is dismissed on the motion of the United States. IMPRISONMENT: 24 Months on each of Counts (S1)One, (S1)Two, and (S1)Four, the terms to run concurrently. The defendant is remanded to the custody of the United States Marshal. SUPERVISED RELEASE: 3 Years subject to the mandatory, standard, and following special conditions of supervision: You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner. You must not have contact with the victim(s) in this case. This includes any physical, visual, written, or telephonic contact with such persons. Additionally, you must not directly cause or encourage anyone else to have such contact with the victim(s). It is recommended that you be supervised by the district of residence. ASSESSMENT: $300.00 due immediately. (Signed by Judge Lewis A. Kaplan on 6/8/2022) (ap) (Entered: 06/09/2022) |
| 06/14/2022 | 91 | TRANSCRIPT of Proceedings as to Rickey Johnson re: Sentence held on 5/25/2022 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rose Prater, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/5/2022. Redacted Transcript Deadline set for 7/15/2022. Release of Transcript Restriction set for 9/12/2022. (McGuirk, Kelly) (Entered: 06/14/2022) |
| 06/14/2022 | 92 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rickey Johnson. Notice is hereby given that an official transcript of a Sentence proceeding held on 5/25/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/14/2022) |
| 06/15/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Rickey Johnson to US Court of Appeals re: 93 Notice of Appeal. (nd) (Entered: 06/15/2022) |
| 06/15/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Rickey Johnson re: 93 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 06/15/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/27/2022 10:04:18 | | |
| **PACER Login:** | FDle0026 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00194-LAK |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

A000016

| Exempt flag: | Exempt | Exempt reason: | Always |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA           :
                                   :    SUPERSEDING
            - v. -                 :    INDICTMENT
                                   :
RICKEY JOHNSON,                    :    S1 21 Cr. 194 (LAK)
     a/k/a "Nigel Dawn Defarren,"  :
                                   :
        Defendant.                 :
                                   :
- - - - - - - - - - - - - - - - - x
```

## COUNT ONE

### (Threatening Interstate Communications)

The Grand Jury charges:

1.      From at least on or about January 30, 2021, through on or about February 3, 2021, in the Southern District of New York and elsewhere, RICKEY JOHNSON, a/k/a "Nigel Dawn Defarren," the defendant, knowingly and intentionally transmitted in interstate and foreign commerce a communication containing a threat to injure the person of another, to wit, JOHNSON sent electronic messages over the internet to a cable news contributor ("Victim-1") in which he threatened to kill Victim-1, then posted a video to the internet in which he threatened to kill Victim-1.

(Title 18, United States Code, Sections 875(c) and 2.)

A000018

## COUNT TWO

### (Threatening a United States Official)

The Grand Jury further charges:

2.   On or about February 3, 2021, in the Southern District of New York and elsewhere, RICKEY JOHNSON, a/k/a "Nigel Dawn Defarren," the defendant, threatened to assault and murder a United States official with intent to impede, intimidate, and interfere with such official while engaged in the performance of official duties, and with intent to retaliate against such official on account of the performance of official duties, to wit, JOHNSON posted a video on the internet in which he threatened to kill a United States Senator ("Victim-2").

(Title 18, United States Code, Sections 115(a)(1)(B) and (b)(4), and 2.)

## COUNT THREE

### (Threatening a United States Official)

The Grand Jury further charges:

3.   On or about February 3, 2021, in the Southern District of New York and elsewhere, RICKEY JOHNSON, a/k/a "Nigel Dawn Defarren," the defendant, threatened to assault and murder a United States official with intent to impede, intimidate, and interfere with such official while engaged in the performance of official duties, and with intent to retaliate against such official on account of the performance of official duties, to wit, JOHNSON

2

**A000019**

posted a video on the internet in which he threatened to kill a member of the United States House of Representatives ("Victim-3").

(Title 18, United States Code, Sections 115(a)(1)(B) and (b)(4), and 2.)

## COUNT FOUR

### (Threatening Interstate Communications)

The Grand Jury further charges:

4.    On or about February 3, 2021, in the Southern District of New York and elsewhere, RICKEY JOHNSON, a/k/a "Nigel Dawn Defarren," the defendant, knowingly and intentionally transmitted in interstate and foreign commerce a communication containing a threat to injure the person of another, to wit, JOHNSON posted two videos to the internet in which he threatened to kill a cable news contributor ("Victim-4").

(Title 18, United States Code, Sections 875(c) and 2.)

_____          _____
FOREPERSON                       DAMIAN WILLIAMS
                                 United States Attorney

3

**A000020**

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**RICKEY JOHNSON,**
**a/k/a "Nigel Dawn Defarren,"**

Defendant.

---

**SUPERSEDING INDICTMENT**

S1 21 Cr. 194 (LAK)

(Title 18, United States Code,
Sections 875(c), 115(a)(1)(B) and
(b)(4), and 2)

DAMIAN WILLIAMS
United States Attorney

Foreperson

1/12/22   Filed superseding Indictment

USMJ Moses

MG

**A000021**

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 14, 2022

**VIA ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     **United States v. Rickey Johnson**
        **21 Cr. 194 (LAK)**

Dear Judge Kaplan:

We write to request that the Court preclude the government from admitting hearsay statements of a complainant that the Government no longer intends to call as a witness at trial. The statements do not fall under any exceptions to the rule against hearsay and, if admitted, would violate Mr. Johnson's Sixth Amendment right to confront the witnesses against him. Finally, the statements are not relevant and should be excluded under Federal Rule of Evidence 401.

## I.     BACKGROUND

Rickey Johnson is charged with making threatening statements to two Fox News Correspondents, Gregory Gutfeld and Laura Ingraham, and two members of Congress, Joe Manchin and Lauren Boebert. On February 10, the Government disclosed its anticipated witness list which included only one of the complainants- Gregory Gutfeld. On February 11, 2022, the Government informed defense counsel that they no longer intend to call Gregory Gutfeld as a witness. Instead, the sole witness from Fox News will be Clifford Cid, Fox's Director of Security. In light of this disclosure, the defense requested that the Government provide any and all hearsays statements that they intend to elicit through Mr. Cid and the purported bases for admission.

On February 14, the Government informed defense counsel that they intend to admit into evidence an email exchange between Gregory Gutfeld and Clifford Cid, attached as Exhibit A. Specifically, the Government seeks to admit the following emailed statement made by Mr. Gutfeld: "Mentions me and Jesse and Katie Pavlich. That is coming thru from his Instagram account to my Facebook. If you go to his Instagram account which is under his same name you'll see that he says he's in Manhattan." Id.  The exhibit shows that Mr. Gutfeld sent the initial email

**A000022**

Hon. Lewis A. Kaplan

to Mr. Cid on January 30, 2021 at 9:45 a.m. The screenshot of Mr. Gutfeld's Instagram show that Mr. Johnson's messages were sent several hours earlier, at 5:14 a.m. and 5:15 a.m.

## II.     ARGUMENT

### A.  The email is inadmissible hearsay.

Hearsay is defined as "a statement that the declarant does not make while testifying at the current trial or hearing and a party offers in evidence to prove the truth of the matter asserted." Rule 801(c). There is no doubt that the email that the prosecution intends to introduce at trial is offered "to prove the truth of the matter asserted" – that Mr. Johnson allegedly threatened Mr. Gutfeld and his two colleagues and that Mr. Johnson was located in Manhattan at the time.  As it is clearly hearsay, a hearsay exception must apply for the email to be rendered admissible.  Per our conversations with the prosecution on February 14, 2022, the prosecution believes that three hearsay exceptions apply:  present sense impression, excited utterance, and the state of mind exceptions.  As detailed below, none of the exceptions are applicable, particularly given the availability of the witness, and the motion to preclude the introduction of the email should be granted.

### B.  The email does not meet any of the exceptions to the hearsay rule.

#### i.     Present Sense Impression

The hearsay exception for a "present sense impression" applies to a statement describing an event or condition "made while or immediately after the declarant perceived it." *Fed. R. Evid. 803(1).* "Substantial contemporaneity of event and statement" are required to "negate the likelihood of deliberate or conscious misrepresentation." *Id., Advisory Committee Note to Paragraph (1) and (2)*, *1972 Proposed Rules*.

"The idea of immediacy lies at the heart of the exception; thus, the time requirement underlying the exception 'is strict because it is *the* factor that assures trustworthiness.'" 4 Christopher B. Mueller and Laird C. Kirkpatrick,  FEDERAL EVIDENCE § 8:67, 559, 562 (3d ed. 2007) (emphasis in original); *see Miller v. Keating,* 754 F.2d 507, 512 (3d Cir. 1985) (lack of time to deliberately manipulate truth of account is key); *see also Chambers v. Mississippi,* 410 U.S. 284, 298-99, (1973) (hearsay exceptions are premised on the idea that the particular circumstances surrounding the making of certain utterances guarantee their reliability). "Put differently, the temporality requirement must be rigorous because the passage of time -- or the lack thereof -- is the effective proxy for the reliability of the substance of the declaration; hence the greater the passage of time, the less trustworthy the statement is presumed to be, and the more the scales should tip toward inadmissibility." *United States v. Green,* 556 F.3d 151, 155–56 (3d Cir. 2009); *see United States v. Manfre,* 368 F.3d 832, 840 (8th Cir. 2004) ("The opportunity for strategic modification undercuts the reliability that spontaneity insures.").

Here, the prosecution cannot meet its burden of establishing the temporal proximity required to admit the email under the present sense impression exception.  The message to Gutfeld was sent at 5:14am via Instagram direct messenger.  *See* Ex. A at 2.  Gutfeld emailed

**A000023**

Hon. Lewis A. Kaplan

Cid at 9:45am – four and a half hours after the message was sent. *See* Ex. A at 1. Without Gutfeld, there is no way to know when he first read Mr. Johnson's message and when he sent the email to Cid. Indeed, Gutfeld could have read the message upon receipt and waited four and half hours after pondering how to handle the situation before emailing Cid. At the very least, the email establishes that Gutfeld did not immediately send the email to Cid and thus it cannot fall under the exception. As Gutfeld states in the email, he did his own further investigation into Mr. Johnson's Instagram page before contacting Cid, noting that he visited Mr. Johnson's Instagram account to ascertain that he resided in Manhattan. Ex. A. This time lapse, on its own, renders the statement in the email inherently unreliable. Since "immediacy lies at the heart" of the present sense impression exception, there is no way, without Gutfeld's testimony, to establish the temporal requirement and thus, the statement cannot be admitted under the present sense impression exception.

### ii. Excited Utterance

The hearsay exception for excited utterance applies to a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Fed. R. Evid. 803(2)*. The theory for the exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *Id., Advisory Committee Note to Paragraph (1) and (2), 1972 Proposed Rules*. Thus "spontaneity is the key." *Id.* Because a hearsay statement cannot be tested through cross-examination, only statements that "possess circumstantial guarantees of trustworthiness" fit within the exceptions of Rule 803. Therefore, the basis for the exception is that "such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation," because those circumstances "provide sufficient assurance that the statement is trustworthy." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). *Accord, Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004).

The circumstances here provide no such assurance of trustworthiness. Again, the contents of the email itself demonstrate that Gutfeld was not so frightened that he immediately emailed Cid. Instead, Gutfeld, who expressed that he received Mr. Johnson's message through his Facebook account, went through numerous calculated steps before contacting Cid. First, Gutfeld, upon reading the message, left the Facebook application and opened his Instagram application. He then typed in Mr. Johnson's username to search for his Instagram account. Upon finding Mr. Johnson's account, Gutfeld then read through Mr. Johnson's account to determine that Mr. Johnson was in Manhattan. Only at some point after this, did Gutfeld then send Cid an email. Quite simply, these calculated actions are not those of a person operating under "the stress of excitement." Indeed, Gutfeld's email confirms this. Gutfeld's email does not show that he is experiencing the stress of excitement or any emotion at all in the email. At the very least, one would expect an exclamation point or words that indicate the immediate need for action by Fox security to assist with the matter; however, none of these stress indicators are present in the email. Even Gutfeld's decision to draft an email, instead of a phone call, with attached screenshots of Mr. Johnson's Instagram account evince that these are the actions of a person operating in a calculated and decisive manner, rather than under the stress of fear or

3

Hon. Lewis A. Kaplan

excitement. *See United States v. Kosinski*, 976 F.3d 135, 156 (2d Cir. 2020) (rejecting defendant's argument that his statement that he had not retained counsel was an excited utterance as it was not a startling event given the present circumstances; defendant made his statement to FBI agent before being informed of his indictment, and defendant had spoken to FBI two months earlier); *United States v. Marrowbone*, 211 F.3d 252, 255 (8th Cir. 2000) (declarant's lack of fear toward defendant did not support conclusion that he was under stress from encounter with him).

Nor was there any real evidence that Gutfeld would, himself, be startled from the contents of Mr. Johnson's message. As a celebrity and Fox News personality, threats are a normal part of Gutfeld's life. *See* Ex. C. The defense is aware of at least one prior occasion where Gutfeld was threatened by a man in Pennsylvania that resulted with the police being called to the man's house to discourage him from sending any future threatening messages. *See id.* There is no reason to believe that this was any different than other prior situations. *See Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir. 1999) (lapse of time, declarant's age, and the characteristics of the event can all be considered to determine whether stress of excitement continued at time of statement). Moreover, Gutfeld's lack of excitement is further supported by his decision to actively "like" one of Mr. Johnson's purportedly threatening Instagram videos. *See* Ex. B. If Gutfeld had in fact felt excitement, fear, or any other highly emotive feelings from Mr. Johnson's message, he certainly would not have alerted Mr. Johnson to the fact that he was viewing Mr. Johnson's videos by liking it on Instagram. As there is no evidence that the email was written under "stress" from a "startling event," but rather the known facts demonstrate the opposite, the trustworthiness and reliability of the email is undermined. As such, the statement is not admissible under the excited utterance exception.

### iii. Then-existing mental, emotional, or physical condition

This hearsay exception does not apply to any "statement or belief to prove the fact remembered or believed," but only applies to a statement of the declarant's "state of mind (such as motive intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." *Fed. R. Evid.* 803(3). This exception has no application to statements reporting a fact, to prove that fact, like the accusations here. *See United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (excluding statements that were not offered to prove declarant's state of mind but were intended to prove conduct that had occurred). *See also, United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) (where declarant's state of mind was relevant, his statement that he was scared was admissible but not his statement that he was scared because a coconspirator threatened him). "To admit such statements 'would significantly erode the intended breadth of this hearsay exception.'" *Id., quoting United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991).

Here, Gutfeld's message does not convey his motive, intent or plan, nor his emotional, sensory, or physical condition. Thus, it is unclear why the prosecution believes this exception to the hearsay requirement would apply. Rather, the email details only the contents of the message itself and the results of his research into Mr. Johnson's online presence. It will not be admitted to prove Gutfeld's state of mind, which, as explained above, is not relevant. As the Advisory Committee explained, the exclusion of statements of memory or belief to prove the fact

4

Hon. Lewis A. Kaplan

remembered or believed "is necessary to avoid the virtual destruction of the hearsay rule." Fed. R. Evid. 803, *Advisory Committee Note to Paragraph (3)*.  Given the complete lack of discussion of Gutfeld's state of mind at the time of the email, it cannot be introduced under the then-existing mental, emotional, or physical condition exception to the hearsay rule.

### C.  Admission of the email would violate the Confrontation Clause

Gutfeld's email to Cid that Mr. Johnson was messaging Gutfeld via Instagram and was in Manhattan is a testimonial statement made by a non-testifying declarant and its admission would violate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Regardless of the hearsay rules, an out-of-court statement that is testimonial in nature is barred by the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Id*. A testimonial statement is one that declarants would reasonably expect to be used in a prosecution against the defendant, and includes statements made to the police by witnesses who do not testify at trial*. Id.* at 51-52 (statements made to the police at the stationhouse by the defendant's wife about his stabbing were clearly testimonial). *Davis v. Washington*, 547 U.S. 813 (2006) (statements made to police arriving at the scene of the crime about what had occurred were testimonial).

In *Davis*, the Supreme Court explained the difference between statements reporting a past event, which are testimonial, and statements made to stop an ongoing emergency, which are not. 546 U.S. at 828-30. It addressed two cases, *Davis*, which involved a 911 call from a woman reporting an ongoing assault by her former boyfriend, and *Hammon*, which involved statements made to the police on the scene about a similar assault by the declarant's husband just after the assault. *Davis*, 547 U.S. at 817-821. The Court held that the statements made to the responding police in *Hamman* were testimonial because they described an event that had ended and there was no immediate threat to the declarant's person. Her husband was still present and angry but the police had separated them. *Id.* at 829-30. She was describing not "'what is happening' but rather 'what happened.'" *Id.* at 830.  On the other hand, the initial statements in the *Davis* 911 call reported "events as they were actually happening, rather than describing past events," to get the police to stop an ongoing emergency. *Id*. at 827-28.  Even within the 911 call, subsequent statements made after Davis drove away and the emergency seemed to have ended -- but which were not challenged before the Court-- were likely testimonial. *Id.* at 828-29.

Gutfeld's email to Cid was testimonial. It was the kind of statement -- made directly to Fox's security team that works closely with and maintains close contacts within the NYPD – that would be reasonably expected to lead to the arrest and prosecution of Mr. Johnson. Indeed, this is what Gutfeld sought – the investigation and prosecution of Mr. Johnson.  Moreover, there was no ongoing emergency.  Mr. Johnson had sent the message to Gutfeld hours earlier.  Gutfeld, himself, did not even feel the need to immediately alert the security team until he conducted his own independent research into Mr. Johnson.  Indeed, there was only an accusation made to the Fox security team for the purpose of having Mr. Johnson reported, investigated, and arrested, exactly the sort of testimonial statement barred by *Crawford* and *Davis*.

5

Hon. Lewis A. Kaplan

**D. The Statements in the email are not relevant and must be excluded under FRE 401.**

Gutfeld's hearsay statement mentions two colleagues, Jesse and Katie Pavlich, and that Mr. Johnson "is in Manhattan." Ex. A. Neither of these assertions are relevant under Federal Rule of Evidence 401 and therefore they must be excluded.

Federal Rule of Evidence 401 states that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FRE 401. In assessing the relevance of the proffered statements, it is necessary to understand the elements that the Government must prove. Count 1 of the indictment charges Mr. Johnson under 18 U.S.C 875(c) for his statements directed at Gregory Gutfeld. To establish a violation of this statute, the Government must prove the following: First, that the defendant threatened to kidnap or to injure [Cable News Contributor Greg Gutfeld]; Second, that the threat was transmitted in interstate (or foreign) commerce; and Third, that the defendant transmitted the threat knowingly and intentionally. *See* Adapted from *2 Modern Federal Jury Instructions- Criminal*, Instruction 31-7. Consistent with the Supreme Court's ruling in *Elonis v. United States*, 575 U.S. 723 (2015), the Government must prove that 1) a reasonable person familiar with the context of the statements would view the communication as a threat and 2) Mr. Johnson intended the statements as a threat or knew they would be viewed a such. *See* 575 U.S. 723, 740 (2015).

The reference to "Jesse and Katie Pavlich" should be excluded under 401. Neither of Gutfeld's Fox coworkers have been identified as complainants in this matter and the Government does not intend to call them as witnesses. This reference to two individuals who are not part of the case does not tend to make more or less likely that a threat was issued to Gregory Gutfeld or that Mr. Johnson sent these statements with the intent to threaten. Perhaps, if Mr. Johnson was referencing Mr. Gutfeld's wife, children or other relative, the statements could be relevant to whether they were a threat. Their inclusion could then be interpreted as menacing and relevant to the intent behind Mr. Johnson's words. But neither Jesse nor Katie is related to or married to Gutfeld.

The Court should also exclude Gutfeld's reference to Mr. Johnson being in Manhattan. First, Mr. Gutfeld's statement is provably false- Mr. Johnson's Instagram profile references Manhattan but does not say that he is "in Manhattan" as asserted by Mr. Gutfeld. The goal of limiting hearsay is to ensure that unreliable statements, like this one, are not admitted into evidence at trial. Second, Mr. Johnson's reference to a major borough in New York City, has no bearing on the elements of 875(c). Manhattan is a large, densely populated borough with nearly 1.7 million residents.[1] Vague and general reference to such an expansive and heavily populated geographic area does not make it more or less likely that Mr. Johnson intended his statements to

---

[1] Census, Quick Facts: New York County, NY, available at:
https://www.census.gov/quickfacts/table/PST045216/36061,00

A000027

Hon. Lewis A. Kaplan

Mr. Gutfeld as a serious expression of a threat to injure or that a reasonable person would interpret his statements as such. Nor is this reference to Manhattan relevant to the interstate prong of the charged offense. In fact, the Government will need to prove that Mr. Johnson's conduct reached *outside* of New York City in order to secure a conviction.

## III.     CONCLUSION

For the foregoing reasons, the Court should preclude the Government from admitting Gregory Gutfeld's hearsay statements.

Thank you for your consideration of this matter.

Respectfully submitted,

/s/ Zawadi S. Baharanyi, Esq.

Zawadi S. Baharanyi, Esq.
Marisa K. Cabrera, Esq.

*Counsel for Rickey Johnson*

cc:     AUSA Patrick Moroney
        AUSA Kyle Wirshba

**A000028**

| | |
|---|---|
| **From:** | Cid, Clifford |
| **To:** | Gutfeld, Greg |
| **Subject:** | RE: Death threat |
| **Date:** | Saturday, January 30, 2021 11:05:00 AM |
| **Attachments:** | image001.png |

Greg,

Thanks for passing this along. We'll look into this individual and proceed accordingly.

Cliff

**CLIFFORD CID**
DIRECTOR CORPORATE SECURITY

▇▇▇▇▇▇▇

Mobile Phone: ▇▇▇▇▇▇
▇▇▇▇▇▇▇

1211 Ave. of the Americas
New York, NY 10036



**From:** Gutfeld, Greg ▇▇▇▇▇▇▇
**Sent:** Saturday, January 30, 2021 9:45 AM
**To:** Cid, Clifford ▇▇▇▇▇▇▇
**Subject:** Death threat

Mentions me and Jesse and Katie Pavlich. That is coming thru from his Instagram account to my Facebook. If you go to his Instagram account which is under his same name you'll see that he says he's in manhattan

Gg

Sent from my iPhone
This message and its attachments may contain legally privileged or confidential information. It is intended solely for the named addressee. If you are not the addressee indicated in this message (or responsible for delivery of the message to the addressee), you may not copy or deliver this message or its attachments to anyone. Rather, you should permanently delete this message and its attachments and kindly notify the sender by reply e-mail. Any content of this message and its attachments that does not relate to the official business of Fox News or Fox Business must not be taken to have been sent or endorsed by either of them. No representation is made that this email or its attachments are without defect.

**GOVERNMENT EXHIBIT 201**
S1 21 Cr. 194 (LAK)

A000029



**777onyzotus777**

Assign Conversation ▾

:22 AM

bet

he is guilty, as you are

7:15 AM

and you all will be held accountable

you do not belong on television

7:05 AM

you want a trash government that is now the leading
cause of death in america to continue to kill americans

7:03 AM

dumpler

Today at 5:14 AM

6:56 AM

you will be killed

5:15 AM

tell jessie and katie. and can not find their pages

they will be killed as well

4:49 AM

/9...

A000030



 11:33

# Activity

**Promotions**
Recent activity from your promotions.

New

**luxurybargainhotels** started following you. 50w

Follow

This Month

**realgreggutfeld** liked your IGTV video. 51w

Your post contains the same missing context as a post independent fact-checkers reviewed. We've added a notice to your post. 51w

You have a shopping update from **4ocean**. 52w

Earlier

Since your post includes information about COVID-19, we've added a link to a health source. 57w

Since your post includes information about COVID-19, we've added a link to a health source. 57w

Since your post includes information about COVID-19, we've added a link to a health source.

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 15, 2022

**By ECF**
The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

**Re:** *United States v. Rickey Johnson*, 21 Cr. 194 (LAK)

Dear Judge Kaplan:

The Government writes in opposition to the defendant's motion (the "Motion") that seeks to exclude an email from one of the victims in this case, in which the victim forwarded a death threat from the defendant. Because the victim's email relates to a "startling event"—a death threat—and was made while "under the stress of excitement" of that threat, the email is admissible as an excited utterance. The email should also be admitted under the then-existing mental state exception, because portions of the email contain relevant information about the victim's state of mind. In the alternative, the email should be admitted to show its effect on the listener and to provide context for actions taken in response to the email. Admission of the email on any of these grounds does not implicate the Confrontation Clause, because the email was not directed to law enforcement or generated as the result of interrogation, and it is thus not a "testimonial" statement. Accordingly, the Motion should be denied.

## I.    Background

On Saturday, January 30, 2021, at approximately 9:45 a.m., Fox News commentator Greg Gutfeld sent Clifford Cid, the Director of Corporate Security at Fox, an email with the subject line "Death threat." (Ex. A at 1).[1] In the email, Mr. Gutfeld wrote to Mr. Cid:

> Mentions me and Jesse and Katie Pavlich. That is coming thru from his Instagram account to my Facebook. If you go to his Instagram account which is under his same name you'll see that he says he's in manhattan[.] Gg

(Ex. A at 1).

---

[1] A copy of the email is attached as Exhibit A.

Mr. Gutfeld attached to this email a screenshot of the messages to which he was referring. The screenshot shows that user 777onyzotus777 sent messages that included the following:

you will be killed

tell jessie and katie. and can not find their pages

they will be killed as well

(Ex. A at 2).

Testimony from a custodian of records from Facebook (which owns Instagram) will establish that, at approximately 5:15 a.m. on January 30, 2021, the Instagram user 777onyzotus777 sent the Instagram user realgreggutfeld the above-quoted messages. The communications were "direct"—that is, private—messages. The evidence at trial will show that the defendant is Instagram user 777onyzotus777 and that he sent the threats.

Although the Government will not be calling Mr. Gutfeld as a witness, Mr. Cid will testify. The Government anticipates that Mr. Cid will describe his reaction to the email from Mr. Gutfeld, which caused him to take particular steps in response.

## II.  Mr. Gutfeld's Statements Satisfy the Excited Utterance Exception

Federal Rule of Evidence 803(2) provides an exception to the hearsay rule for any "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." To satisfy this exception, the following are required: (i) a startling occasion; (ii) a declarant who appears to have had the opportunity to personally observe the events; (iii) a declarant who was under the stress of excitement when making the statement; and (iv) a statement relating to the circumstances of the startling occasion. *See* 5 Weinstein's Fed. Evid. § 803.04. The "rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). The excited utterance exception is thus "based on the psychological impact of the event" and permits admission of statements that "relate to" the event. *Id.* at 112 n. 3 (emphasis omitted).

The "length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'" *Id.* at 112. The Second Circuit has affirmed the admission of statements under the excited utterance exception even when those statements were made hours after the startling event. *See United States v. Tocco*, 135 F.3d 116, 128 (2d Cir. 1998) (declarant's statement about starting fire made three hours later); *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990) (declarant's statement identifying perpetrators of assault made "five or six" hours after the incident).

In this case, there is no question that Mr. Gutfeld experienced a "startling" event. On that Saturday morning, he received a direct message from an unidentified individual telling him that he "will be killed." The individual also enlisted Mr. Gutfeld to "tell jessie and katie"—whom, the evidence will show, are Mr. Gutfeld's co-hosts—that "they will be killed as well." Mr. Gutfeld

personally observed the startling event, and each of the statements in his email relate to the circumstances of the starting event.

The Court can infer from the contents of Mr. Gutfeld's email that he remained under the stress of the startling threat when he wrote the email. Mr. Gutfeld titled the email "death threat." The Government expects that Mr. Cid would testify that rarely, if ever, has Mr. Gutfeld alerted him to a threat by describing the threat in such terms. And, contrary to the defense's argument (*see* Mot. at 3), the fact that Mr. Gutfeld examined the account that sent him the threat underscores that Mr. Gutfeld was under the stress of the threat at the time he sent the email. Opening the sender's account page—an act that could take less than a minute—is exactly what would be expected of someone who was rattled by the death threat. In light of the gravity of the message that the defendant conveyed, and the fact that Mr. Gutfeld sent the email, at most, within a matter of hours after receiving the threats, the Court should find that the elements of the excited utterance exception are satisfied.[2]

### III.  Mr. Gutfeld's Statements Satisfy the Then-Existing State-of-Mind Exception or Are Otherwise Background to Understand That State of Mind

Mr. Gutfeld's belief that he had received a "death threat" should also be admitted as evidence of his then-existing state of mind, which is relevant to whether the defendant's messages constituted true threats. Federal Rule of Evidence 803(3) provides an exception to the hearsay rule for a "statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). "[A] determination of whether a statement falls within the state of mind exception requires a predicate finding as to whether the statement relates to a then existing state of mind or to a past memory or belief offered to prove the fact remembered or believed." *United States v. Taubman*, 297 F.3d 161, 165 (2d Cir. 2002). Once this standard has been met, the proponent must also establish that state of mind about which the proof relates is relevant to the issues at trial. *See United States v. Quinones*, 511 F.3d 289, 311 (2d Cir. 2007); *United States v. Southland Corp.*, 760 F.2d 1366, 1376 (2d Cir. 1985).

Mr. Gutfeld's statement that the attached messages constituted a "death threat" is evidence of his perception of the statements as a death threat. Mr. Gutfeld's belief is what matters; there is no fact otherwise being asserted by his characterization of the messages as a death threat. *See Quinones*, 511 F.3d at 312 ("We have observed that [w]hen a declaration is admitted only to prove a relevant state of mind, it does not appear to matter . . . whether admissibility is predicated on the declaration not being hearsay . . . or under the [Rule 803(3)] hearsay exception for declaration of states of mind . . . [because u]nder either theory, a state of mind can be proved circumstantially by statements which are not intended to assert the truth of the fact being proved." (alterations in original) (internal quotation marks and citations omitted)). Moreover, Mr. Gutfeld's then-existing belief about the messages is not a statement of memory made to prove a fact. Mr. Gutfeld's characterization of the defendant's messages therefore falls within the Rule 803(3) hearsay exception.

---

[2] Additionally, the video from the defendant that Mr. Gutfeld inadvertently "liked" (*see* Mot. at 4), was not posted until four days after the threatening messages were sent.

In addition to being exempted from the hearsay rule, Mr. Gutfeld's state of mind—that he received a threat—is also relevant to the charged crimes. In threats cases, "proof of the effect of the alleged threat upon the addressee is highly relevant." *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994). As the defendant acknowledges in his own request to charge, the jury may properly consider "the reaction of those who heard or read the statement" when determining whether the defendant made a true threat. Sand, Modern Federal Jury Instructions, Instruction 31-8; *see* Dkt. 37 at 7 (defendant's requests to charge). In a recent interstate threats case, a court in this Circuit noted the probative value of "the reaction of the victim and other listeners" to a jury's evaluation of whether a true threat was made. *United States v. Hunt*, 534 F. Supp. 3d 233, 249 (E.D.N.Y. 2021).[3] Accordingly, Mr. Gutfeld's reaction to the defendant's messages—and his indication that he viewed them as a death threat—is relevant evidence to the issues at trial.

Because Mr. Gutfeld's characterization of the defendant's messages as "death threats" is properly admitted as relevant state-of-mind evidence, the remainder of Mr. Gutfeld's email should be admitted not for the truth of the matter asserted, but as background for why he understood the statements as threats. Mr. Gutfeld noted that the messages "Mention[] me and Jesse and Katie Pavlich" and that he received them "from [the defendant's] Instagram account to my Facebook." Mr. Gutfeld also noted that the defendant's Instagram page "says he's in Manhattan." These messages provide important context for Mr. Gutfeld's belief. *See United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) (upholding admission of statements of "informant who is heard in a tape-recorded conversation with the defendant[,] [s]o long as the informant's recorded statements are not presented for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused . . . ."); *see also United States v. McNair*, 46 F. App'x 658, 659-60 (2d Cir. 2002) (summary order) (upholding admission of recordings between defendant and non-testifying informant where informant's statements "were not offered to prove the truth of the matters asserted but only to render what [the defendant] said in these conversations intelligible" (internal quotation marks omitted) (citing *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995)); *United States v. Romano*, No. 12 Cr. 691 (JFK), 2014 WL 69794, at *1 (E.D.N.Y. Jan. 8, 2014) (same); *United States v. Walker*, No. 99 Cr. 379 (BSJ), 1999 WL 777885, at *4 (S.D.N.Y. Sept. 29, 1999) (same).

## IV. Alternatively, the Statements Should Be Admitted to Show Their Effect on the Listener

Even though Mr. Gutfeld's statements fall within the hearsay exception for excited utterances, and his characterization of the messages as a "death threat" falls within the state-of-mind exception, in the alternative, Mr. Gutfeld's statements should be admitted to show their effect on the listener and as context for Mr. Cid's next steps. In particular, Mr. Gutfeld's email is

---

[3] Notably, the court in Hunt allowed the parties to elicit testimony about law enforcement's reaction to the defendant's threats, noting that such evidence "may be relevant to the context of Defendant's statements and the jury's determination of whether his statements constituted threats in that context." *Hunt*, 534 F. Supp. at 250. The *Hunt* court also permitted testimony from a staff member for a threatened congressperson about the congressional office's reaction to the defendant's threats. *See United States v. Hunt*, No. 21 Cr. 86, Tr. at 701 (E.D.N.Y. Apr. 26, 2021) (attached hereto as Exhibit B).

necessary to explain why Mr. Cid began investigating the defendant's Instagram account and subsequently alerted the NYPD to the messages on it. In general, "statements not offered for their truth, but instead, for their effect on the listener or for context, may be introduced as non-hearsay statements." *United States v. Bouterse*, 765 F. App'x 463, 468 (2d Cir. 2019); *see also United States v. Paulino*, 445 F.3d 211, 216 (2d Cir. 2006) ("It has long been the rule that [s]o long as . . . statements are not presented for the truth of the matter asserted, but only to establish a context . . . ., the defendant's Sixth Amendment rights are not transgressed."). Without these messages, the jury will be left to question why Mr. Cid took the steps he did. Indeed, the defense has already indicated that it intends to cross-examine Mr. Cid regarding his motivations for investigating the defendant's threats. Accordingly, Mr. Cid's receipt of a communication from Mr. Gutfeld describing the messages as death threats is particularly relevant to the jury's consideration of Mr. Cid's testimony and credibility. For all of these reasons, Mr. Gutfeld's statements are therefore also admissible not for their truth, but to show their effect on Mr. Cid.

## V.     The Statements Do Not Violate the Confrontation Clause

Regardless of how the statements are admitted, their admission would not violate the Confrontation Clause, because the statements are not "testimonial."

The Sixth Amendment's guarantee that an accused shall have the right to confront witnesses against him prohibits the admission of out-of-court "testimonial" statements against a defendant, unless the declarant is unavailable and the defendant had a prior opportunity to cross examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004). The "right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements." *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

The Supreme Court in *Crawford* declined "to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. Drawing on *Crawford* and its progeny, however, the Second Circuit has identified several categories of testimonial statements: (i) "ex parte in-court testimony or its functional equivalent"; (ii) "extrajudicial statements contained in formalized testimonial materials, such as affidavits"; and (iii) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Feliz*, 467 F.3d at 232–33 (internal quotation marks omitted). In short, the Second Circuit has explained, each of these examples of testimonial statements "involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004).

Here, the statements in Mr. Gutfeld's email were not made in response "to structured questioning in an investigative environment." *Id.* Mr. Gutfeld was not questioned, and, regardless, Mr. Cid is a Fox employee, and law enforcement was not involved in the email exchange in any way.

In the Motion, the defense asserts that the email is testimonial because it "would be reasonably expected to lead to the arrest and prosecution of Mr. Johnson." (Mot. at 5.) But this misconstrues the standard for testimonial statements. Relying on *Crawford*, the Second Circuit has

A000037

Page 6

declined to adopt "an expansive definition that depend[s] on a declarant's expectations." *United States v. Feliz*, 467 F.3d 227, 235 (2d Cir. 2006). Rather, the question is whether the statements "bear" the "hallmarks of testimonial statements identified in *Crawford*." *United States v. Williams*, 506 F.3d 151, 156 (2d Cir. 2007). Here, the primary reason for Mr. Gutfeld to pass along the threat to his corporate security was to ensure his own safety. Mr. Gutfeld was not subject to interrogation, and his statements were not made to, or elicited by, law enforcement. His statements therefore were not testimonial, and the Confrontation Clause does not bar their admission.

**VI.    Conclusion**

For these reasons, the Government respectfully requests that the Court deny the Motion.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:        _____
Kyle A. Wirshba
Patrick R. Moroney
Assistant United States Attorneys
(212) 637-2493 / 2330

cc (by ECF):    Zawadi Baharanyi, Esq.
Marisa Cabrera, Esq.

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 16, 2022

**VIA ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     **United States v. Rickey Johnson**
        **21 Cr. 194 (LAK)**

Dear Judge Kaplan:

We write this letter to address two issues raised today in trial, namely: 1) the defense's request to admit full videos of Mr. Johnson's Instagram Live on February 3, 2021 and 2) the improper introduction of expert testimony through Capitol Police Officer Brandon Kelley.

I.     **The Court should permit introduction of the full videos from which the Government's exhibits were clipped as these videos are relevant and not unduly prejudicial.**

On February 3, 2021, Mr. Johnson logged onto Instagram, and streamed a live video of his reactions to the February 3 broadcast of "The Five." "The Five" is a Fox News Program featuring five hosts providing commentary on recent political and social events. Gregory Gutfeld and Jesse Watters are both regular correspondents on "The Five." On the February 3 episode of the "The Five," the Gregory Gutfeld, Jesse Waters, and other co-hosts discussed their various opinions on Senator Joe Manchin's role in COVID-relief, their opinions on surging crime rates under President Biden, and the consequences of the Black Lives Matter movement on rising crime. Mr. Johnson can be heard reacting to the commentary. The Government provided the defense with two videos from Mr. Johnson's Instagram Live showing this February 3 broadcast with his overlaying commentary. One video is 7:39 (Exhibit A, USAO 140) and the other is 6:07 (Exhibit B, USAO 139). In its case-in-chief, the Government seeks to admit short clips of Mr. Johnson's February 3 live stream of "The Five," while excluding longer portions that show the political commentary that Mr. Johnson was responding to. We ask the Court to admit in their entirety Exhibit A and Exhibit B, and their corresponding transcripts, provided to the Court earlier this evening. The videos are relevant, critical to the question of Mr. Johnson's intent- i.e. whether he intended his statements as a serious expression of threat to injure or kill, and admissible pursuant to Rule 106.

**A000038**

Hon. Lewis A. Kaplan

### i.     Relevance and prejudice

The proposed videos are relevant and admissible on the issue of Mr. Johnson's intent in making his statements on social media. The Government must establish beyond a reasonable doubt that his words on his social media page were true threats, i.e. serious expressions of an intent injure or kill. The videos show that rather than engaging in targeted and serious threats against Joe Manchin, Gregory Gutfeld, Jesse Watters, and the remainder of the Five, Mr. Johnson took to his Instagram to in order to express frustrations and his own hyperbolic commentary in reaction to the political commentary provided by the hosts of "The Five." What Mr. Johnson is responding to- the commentary and opinions by Fox hosts and guests- is relevant to why he is expressing his frustration and why he is expressing his frustrations in this form of running commentary. Moreover, the longer videos include statements by Mr. Johnson that show that his words were not intended to be literal expressions of an intent to kill or injure.

For example, while the Government Exhibit 603B includes statements like the following seemingly directed at all of "The Five":

> DEFENDANT: Y'all motherfuckers walk the streets of the United
> States of America. I'm coming to kill you.
> WILLIAMS: All right, so Jesse [U/I] //
> DEFENDANT: Y'all motherfuckers walk the streets.

The longer video clip from the Instagram Live would also reveal that Mr. Johnson's statements are not intended to be serious and would not reasonably be received as serious. In Exhibit B he states:

> DAGEN MCDOWELL:  …you know, in front of the camera and behind
> the scenes…
> RICKEY JOHNSON:  I am going to kill you.
> DAGEN MCDOWELL:  …he said he wouldn't do that.  I just want to
> read the tweet that he…
> RICKEY JOHNSON:  You said I would - you're a terrorist.
> You're not a woman.
> DAGEN MCDOWELL:  …you know, death glare at him.  Defund the
> police…
> RICKEY JOHNSON:  Even though I know you're a terrorist, it's
> difficult for me not to call you ma'am.  It's difficult for me
> not to disrespect you.
> DAGEN MCDOWELL:  …greatest weapon.  So, please, you know,
> underestimate folks from the South because of the way we speak
> or where we're from…
> RICKEY JOHNSON:  My bad.  It's difficult for me to disrespect
> you.  My mind is fucked up that way.  I see women as queens.
> I can't help it.  I don't want to help it.  I have the utmost
> respect for my earth.  I'm going to kill you.

This portion of the longer Instagram Live makes it clear that Mr. Johnson was providing running, hyperbolic commentary during his statements on February 3 in response to "The Five."

A000039

Hon. Lewis A. Kaplan

A jury should be able to consider whether he actually meant his words as serious threats towards "The Five" commentator when he also commented on his inability to disrespect women or even refer to them as anything other than "ma'am" in the same Instagram. Similarly, in another portion of the defense's proposed Exhibit B, Mr. Johnson states as follows in response to Jesse Watters discussing Joe Manchin:

```
JESSE WATTERS:  Well, Dana's spot on.  The Republicans overly
romanticized Joe Manchin.  I mean, the Republicans hooked up
with…
RICKEY JOHNSON:  Y'all motherfuckers think this shit is sweet.
Y'all motherfuckers think you live somewhere else other than
in the United States of America.  This shit is not politics.
I'm not joking.  You don't see me.  I don't exist.  I leave my
house to make money.  That's it.
```

The jury could very well believe that, with the greater context of the defenses' proposed videos, that Mr. Johnson did not intend for his statements to be serious expressions of an intent to kill. Mr. Johnson talks about not existing, when he clearly does. This is another example of Mr. Johnson speaking hyperbolically in these videos- in portions that the Government has chosen not to put to the jury.

A recent case in this circuit from the Eastern District is helpful on the issue of relevance and the purpose of admissibility. In *United States v. Cooper*, 19-cr-159 (ARR), 2019 U.S. Dist LEXIS 182576, at *22 (E.D.N.Y. Oct. 22, 2019), the government sought to admit some portions of a defendant's post-arrest oral statements, while excluding others. The request for selective admission was denied. Cooper was charged with assaulting a federal officer. *Id.* at *1. Specifically, the government sought to admit the portion of Cooper's statements "wherein he confessed to driving his car, fleeing the scene, and knowing that the person who stood in front of his car was a law enforcement officer." *Id.* at *21. It sought to exclude the portion where Cooper stated that "(1) he fled because he feared for his life . . . and (2) he denied knowing that he hit (or denied that he hit) the officer with his car." *Id.* Both of these statements were considered relevant and admissible because they provided important context, ensuring that the jury received a "fair and impartial" understanding of Cooper's statements. *Id.* at 22 (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir 1982)). The second statement – that Cooper denied hitting or knowing he had hit an officer with his car – was also admissible because it went directly to whether the interaction "involved physical contact," which was a central element of the charged crime. *Id.* at 23. Admitting only the government's requested portion of the statements would have impermissibly "skew[ed] the overall tenor of Cooper's comments toward the more inculpatory." *Id.* at 24.

As in *Cooper*, Mr. Johnson's statements in the full videos are equally relevant and probative of his true intent and their exclusion would also "skew the overall tenor of [his statements] toward the more inculpatory." Moreover, while the Government argues that the longer videos would be prejudicial, that is not the correct standard for exclusion. Under Fed. R. Evid. 403, only those statements that are unduly prejudicial must be excluded. While the full videos may very well weaken the Government's arguments on Mr. Johnson's intent, they are not

3

Hon. Lewis A. Kaplan

unduly prejudicial. The probative value of the videos on Mr. Johnson's intent far our weights any possible prejudice to the Government. Finally, the defense's inability to introduce the full videos to give proper context to the Government's selective clips would violate his Sixth Amendment right to present a defense. The defense's argument is that Mr. Johnson was not seriously threatening to kill or injure anyone and the videos further underscore the hyperbolic nature of his statements and the statements that he was responding to in the "The Five" broadcast.

### ii.    Rule 106

The videos should come in pursuant to the Rule of Completeness. The Rule states the following: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." *See* Fed. R. Evid. 106. Further, proper admission of evidence under Rule 106 is "to correct a misleading impression or place in context that portion already admitted, it is *for this very reason* admissible for a valid, *nonhearsay purpose*: to explain and ensure the fair understanding of the evidence that has already been introduced." *United States v. Williams*, 930 F.3d 44, 60 (2d Cir. 2019), *cert. denied*, No. 20-6551, 2021 WL 2519269 (U.S. June 21, 2021) (emphasis in original). For the reasons explained above, admission of the defense's videos from Mr. Johnson's Live Stream, would ensure that the jury has a fair understanding of the evidence.

The Ninth Circuit recently found a violation of Rule 106 where a district court allowed the government to introduce excerpted video clips of a recorded post-arrest interrogation, while excluding the remaining interrogation footage as inadmissible hearsay. *See United States v. Lopez*, 4 F.4th 706, 715 (9th Cir. 2021). In that case, the government's excerpts "created the misleading impression that Lopez confessed to the *mens rea* required for conviction," namely, knowledge that the victim was underage. *Id.* at 716-17. The court further explained:

> In response to Lopez's objection, the district court could have excluded the video clips offered by the Government or admitted the Government's clips subject to Lopez's ability to proffer additional portions of the recording under Rule 106. The only course foreclosed by the [Rules] was the one taken here: admitting portions of a document or recording that risked misleading the jury while foreclosing the admission of any additional portions of the same document.

*Id.* at 717. Similarly, the government's video excerpts in this case may create the misleading impression that Mr. Johnson intended his communications to be threatening, which is the *mens rea* required for conviction. The remainder of the footage clarifies that Mr. Johnson was not intentionally making threats, but rather simply responding in kind to an inflammatory, political broadcast. This Court should not foreclose the admission of the remaining portions of the same video.

### iii.    This evidence is not barred under Rule 12.2 as Mr. Johnson is not seeking to introduce expert testimony nor is the defense raising an insanity defense

As Rule 12.2(b) makes clear, notice must be provided if a "defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the

**A000041**

Hon. Lewis A. Kaplan

defendant." Here, the defense has not sought to introduce expert evidence in any form, nor could the introduction of the complete video by construed as such.

Nor does Rule 12.2(a) bar the introduction of the entire video in this case. As the Court noted in response to the prosecution's arguments to the contrary, the defense has in no way claimed that Mr. Johnson did not have the ability to form the intent required under 18 USC 875(c) or 115(a)(1)(B). Rather, the defense's position is that Mr. Johnson did not possess the intent necessary to convict under the two statutes. As such, notice of an insanity defense is inappropriate and unnecessary and the introduction of the entire video cannot be construed to be evading that notice requirement.

## II.     The Court should strike the unnoticed, expert testimony from Capitol Police Officer Brandon Kelly

Capitol Hill Special Agent Brian Kelley's testimony -- that he found Mr. Johnson's Instagram video (Gov't Ex. 703) "concerning" because the use of "I" is more serious than the word "we," the statement "I will kill you" is more serious than "You will die," that repetition of the message makes it a more serious threat, and that the member of Congress was tagged in the post – was all expert opinion testimony. Feb. 16, 2022 Tr. at 57. Its admission violates Federal Rules of Evidence 701 and 702 and the notice requirements of Rule 16. The Second Circuit's recent decision in *United States v. Cabrera*, 13 F.4th 140, 149 (2d Cir. 2021) is dispositive.

*Cabrera* was a drug courier case in which inducement and predisposition were in issue. A government agent testified that the defendant, unlike the "average drug dealer," appeared to be "experienced" because he had employed countersurveillance techniques, which consisted of really bad driving. *Id*. at 145. This testimony was admitted as lay opinion under Rule 701, but the Second Circuit held that it was based on the agent's "specialized knowledge as a DEA detective" and was inadmissible. *Id*. at 150. Lay, or non-expert, opinion is only admissible if it is not based on scientific, technical or "other specialized knowledge." Fed. Rule of Evid. 701(c). "The 'specialized knowledge' restriction in Part (c) 'prevents a party from … conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements set forth in Fed. R. Crim. P. 16.'" *Cabrera,* 13 F.4th at 149, *quoting United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). An opinion that rests "in any way" on specialized knowledge is inadmissible as lay opinion, which is "limited to opinions that result from a process of reasoning familiar in everyday life." *Id*. While the agent's direct observations were admissible, he "reached his opinion through an opaque, intuitive process grounded in some kind of specialized knowledge as to how your average drug dealer typically behaves compared to a drug dealer who is experienced." *Id*. at 150.

Kelley's testimony about the particular reasons he found this video "concerning" were clearly based on "specialized knowledge." Feb. 16, 2022 Tr. at 57. Like the agent in *Cabrera*, his opinions that use of "I" rather than "we" made it a more serious threat, that the statement "I will kill you" presents a more serious threat than "you will die," that repetition was a factor making the threat more serious, and that a member of Congress was tagged in the post were the products of "an opaque intuitive process grounded in some kind of specialized knowledge" as to which threats were "serious." Indeed, this presentation smacked of a "profile" of factors that

5

Hon. Lewis A. Kaplan

made the threat serious. This is expert testimony, and inadmissible because the requirements of Rules 702 and 16 were not met.

Moreover, even if Kelley's testimony were not based on "specialized knowledge," it is not "helpful" to the jury, as required for lay opinion under Rule 701. The jury must determine whether a "reasonable person" would perceive the video as a serious threat. *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015). The jurors are reasonable persons who can decide this for themselves, and do not need a witness to tell them that it is serious and why. The helpfulness requirement of the Rule excludes "opinions which would merely tell the jury what result to reach." *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004). The officer's opinion that he considered this threat particularly serious is not helpful, but "usurps the jury's function." *Id.* at 751. Moreover, Kelley is "presented to the jury with an aura of expertise and authority which increase[s] the risk that the jury [will] be swayed by his testimony, rather than rely on its own interpretation of the [video]." *Id.* As such, Special Agent Kelley's testimony regarding his determination of the seriousness of the threats based on his review of Government Exhibit 703 should be stricken from the record. Moreover, the prosecution should be precluded from asking this same line of questioning of Special Agent Kelley for any future videos the prosecution intends to review with him as well as for any other witnesses the prosecution intends to utilize in this manner as no expert notice has been provided.


## III.  CONCLUSION

For the foregoing reasons, we ask that the Court admit the requested videos of Mr. Johnson's Instagram Live and strike the Capitol police officer's testimony about what makes a threat serious.

Thank you for your consideration of this matter.


Respectfully submitted,

/s/ Zawadi S. Baharanyi, Esq.

Zawadi S. Baharanyi, Esq.
Marisa K. Cabrera, Esq.
*Counsel for Rickey Johnson*


cc:     AUSA Patrick Moroney
        AUSA Kyle Wirshba

6

**A000043**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 17, 2022

**By ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:      ***United States v. Rickey Johnson**, S1 21 Cr. 194 (LAK)*

Dear Judge Kaplan:

      The Government writes in response to the Court's request to provide authority supporting its ruling that permitted United States Capitol Police Special Agent Brandon Kelley to testify about which aspects of the defendant's death threats caused Special Agent Kelley to react the way that he did.

      Specifically, Special Agent Kelley testified that, after reviewing the defendant's threats against Representative Lauren Boebert, Special Agent Kelley contacted Representative Boebert's chief of staff, even though it was shortly before midnight. (Tr. 55:9–24). Special Agent Kelley further testified that he did so based on the intensity of the defendant's language in the threat, the defendant's repeated threats to kill, and the fact that the defendant "tagged" Representative Boebert's Instagram account. (Tr. 57:13–59:2). When the defense explained the basis for its objection during side bar, the Court noted that Special Agent Kelley was explaining "why he did what he did" (Tr. 67:8); observed that this testimony appeared to be "a lay opinion that's rationally based on facts he perceived" (Tr. 67:19–20); and concluded that, even if the threats were viewed under a "totally objective" standard, Special Agent Kelley's reaction was "relevant on the issue of do you think the person would consider it as a threat" (Tr. 68:7–10).

      The standard jury instruction for both Section 875(c) and Section 115(a)(1)(B) threats cases instructs jurors, when determining whether a statement constitutes a threat, to consider "the reaction of those who heard or read the statement." Sand, Modern Federal Jury Instructions, Instructions 14-14 and 31-8. Both parties have asked the Court to adopt this language in its jury charge. (Dkt. No. 37 at 6, 13 (defendant's request to charge); Dkt. No. 40 at 5, 9 (Government's request to charge)). Similarly, in a recent interstate threats case, a court in this Circuit noted the probative value of "the reaction of the victim and other listeners" to a jury's evaluation of whether a true threat was made. *United States v. Hunt*, 534 F. Supp. 3d 233, 249 (E.D.N.Y. 2021).

      Special Agent Kelley's testimony about his reaction to the threats in this case was appropriate for several reasons. The defense does not dispute that the steps Special Agent Kelley

took after receiving the threats are relevant. (Tr. 65:8–10). Additional testimony from Special Agent Kelley was focused on explaining why he took the steps that he did.

Additionally, the defense asserted in its opening statement that the defendant was somehow treated differently from other individuals who made threats to Fox News personnel. (Tr. 40:16–20). By implying that the defendant has been unfairly targeted for prosecution, the defense has put at issue the view of law enforcement as to the severity of the defendant's threats and law enforcement's assessment of the defendant's dangerousness, including in relation to other threats.

Finally, the Government is not offering Special Agent Kelley as an expert. His testimony is rationally based on what he observed after reviewing the threats the day after the defendant posted them. To further guard against any possible confusion, the Court could instruct the jury as the *Hunt* court did. There, Judge Chen included in the jury charge:

> As noted, you heard testimony from individuals including law enforcements who viewed defendant's alleged threats. Although that testimony may inform your view of the context in which a particular statement was made, it is ultimately for you to - and not any witness, law enforcement or otherwise - to determine whether an ordinary, reasonable recipient who's familiar with the context of the statement would interpret it as a threat of bodily injury.

Jury Charge, *United States v. Hunt*, 21 Cr. 86, at 1130 (E.D.N.Y. Apr. 28, 2021) (attached as Exhibit A). This instruction, in conjunction with Government's request for an instruction that law enforcing testimony is not "entitled to any more or any less weight than the testimony of anybody else," (Dkt. No. 40 at 18), will ensure that the jury will not view Special Agent Kelley's testimony as anything other than a lay opinion.

Accordingly, the defendant's motion to strike this portion of Special Agent Kelley's testimony should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:

Kyle A. Wirshba
Patrick R. Moroney
Assistant United States Attorneys
(212) 637-2493 / 2330

cc (by ECF):  Zawadi Baharanyi, Esq.
Marisa Cabrera, Esq.

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 21, 2022

**VIA ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   **United States v. Rickey Johnson**
      **21 Cr. 194 (LAK)**

Dear Judge Kaplan:

We write this letter in opposition to the government's request to dismiss juror number 2. For the following reasons, the defense requests that Court denies the government's motion as there is no legal basis for dismissal.

### There Are No Grounds to Dismiss Juror Number 2

The government has moved to excuse a sworn, sitting juror, juror number 2, on the ground that he is "disruptive" because he was speaking to his fellow jurors in the hall, not about the case, but about his opinions on matters of history and books that he had read. Tr. 121-24. This is clearly no ground to remove him from the jury. The Court has questioned whether the juror should be removed on the ground that he may not have answered truthfully when the Court asked him whether he recognized Detective Cowan and whether he had spoken to him in the hall. The juror's uncertainty in answering does not demonstrate deliberate falsehood bearing on his fitness to serve.

A sitting juror should only be removed for "good cause." *United States v. Delva*, 858 F.3d 135, 158 (2d Cir. 2017). Good cause includes juror misconduct, such as lying to the court or continued violation of the court's instructions. *United States v. Parse*, 789 F.3d 83, 111(2d Cir. 2015); *United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014). However, a juror's mistaken answer or uncertainty as to the question does not demonstrate deliberate falsehood, particularly on an issue that does not affect impartiality or fitness to serve. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 555-56 (1984) (holding that a juror must "fail[] to answer honestly a <u>material</u> question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause" to justify a new trial for juror misconduct (emphasis added)). Therefore, a sitting juror should not be removed unless he has deliberately lied to the court about a matter involving his fitness to serve. The record here shows no

1

deliberate falsehood, but at most confusion about what the juror was being asked, and uncertainty as to where and when he may have seen Detective Cowan. Moreover, the entire record demonstrates that juror number 2 did nothing untoward in the hallway, but was simply speaking to his fellow jurors about something with no bearing on the trial. Detective Cowan just happened to be there, standing very close – probably too close -- to the jurors.

The government reported that juror number 2 was speaking to the other jurors in the hall and Detective Cowan was standing very close to the group. When some of the jurors backed up, the government reported, the juror kept speaking and Detective Cowan leaned in to listen. The next day, the Court investigated whether there was an improper contact. First, the Court asked juror number 2 whether he had "spok[en]or attempted to speak to Detective Cowan," and he said no. Tr. 114. When asked whether he knew who Detective Cowan was, he said "I think he is connected with this case." *Id*. When asked whether he would recognize him if he saw him, he said "no" and repeated that he never tried to speak to any detectives. *Id*. Detective Cowan was brought into the courtroom, wearing a mask as everyone was, and the Court asked the juror if he recognized him. The juror stated, "he looks like I've seen him because of his physique. But I haven't tried to talk to him about anything." 115. The Court asked him if he was sure and he said "Yes, unless I –wait a minute. Unless today I mistakenly got off the"—the Court interrupted with "I'm talking about yesterday." The juror stated "No. What does he have to say? That I spoke to him? I never spoke to him about anything." *Id*. After Cowan left the courtroom, the court asked the juror again whether he recognized the detective as someone he had seen yesterday. The juror said, "I don't know. I don't know. But I say for the umpteenth time, I never spoke to this individual about anything." Id. at 119.

Detective Cowan then reported what he remembered and it did not contradict the juror's statements. Cowan said that he was in the hallway, next to the jurors waiting to enter the courtroom and juror number 2 was speaking in general to the group. The other jurors backed away a bit from juror number 2, but he kept speaking in the same direction. Detective Cowan did not move away but stayed close to listen, about two feet from the juror. *Id*. 120-21. The other jurors were all still close, within six feet of juror number 2 while he spoke, but Cowan stayed closer. *Id*.

Detective Cowan's report showed only that juror number 2 was speaking to a group of his fellow jurors and the detective was lurking around them inappropriately. When the jurors backed away slightly from juror number 2 – staying within six feet of him -- the detective stayed closer to hear more so that he could report what the juror was saying. Juror number 2 did not turn toward the detective to speak to him but continued to face in the same direction and speak to the same group he had been speaking to. And nothing he said was about the case.

There is no room in these facts to conclude that juror number 2 deliberately lied about anything. Clearly, before Detective Cowan came into the courtroom, he only knew his name as someone involved in the case, but did not know whether or not he would recognize him. When the detective came into the courtroom, the juror thought he recognized him but he was not sure from where or when. Afterall, he had been talking to a large group of people in the hall, mostly his fellow jurors, and everyone was wearing masks. His uncertainty, and confusion about what he was claimed to have done wrong, came nowhere close to establishing deliberate falsehood.

2

Notably, juror number 2 was never asked about the substance of his statements during the inquiry, but rather who he intended to direct them to. There is no inconsistency between juror number 2's assertion that he did not intend to direct them towards anyone in particular and Detective Cowan's belief that the statements were directed at him simply because of physical proximity. As such, this is no ground to excuse this juror.

The government's newfound claim that juror number 2 would be "biased" against them based on his interest in finding out who accused him of speaking to Detective Cowan is similarly unavailing and does not warrant dismissal. There is no reason to believe that juror number 2 would be biased against the government because he was interested in knowing the identity of his accuser and that this accuser happened to also be Detective Cowan. First, the government requested that the Court conduct an inquiry into juror number 2 over defense objections. The government cannot now complain that the inquiry that they sought has also rendered juror number 2 biased. This purported self-created bias that the government claims renders juror number 2 unfit cannot now be a basis for dismissal. At the very least, the government has waived consideration of this argument by requesting the inquiry and by failing to object to revealing Detective Cowan's identity to juror number 2.

While the government claims that juror number 2 was visibly sleeping at trial – and at two other occasions that the government failed to bring it to the Court's attention – this does not serve as valid basis for dismissal. First, juror number 2 denied being asleep during the trial testimony. Tr. 243. While the Court may have observed him with his eyes closed at some point, that is not to suggest that he was sleeping. Indeed, juror number 2 may have been looking down at his notes or something in his lower line of vision that made it appear as though his eyes were closed. Additionally, when the Court asked juror number 2 if he was awake, he immediately responded in the affirmative, demonstrating that he was listening attentively. Had juror number 2 been sleeping, there would have been other hallmarks of that fact, such as snoring, not answering the Court's response as quickly, etc. None of those were present in this scenario and his quick response proves otherwise. In short, juror number 2 was not sleeping and, at the very least, the record does not demonstrate the contrary. As such, this cannot be the basis of dismissal.

Additionally, without any complaints or objections from other jurors, it is difficult to understand how the government has concluded that juror number 2 has been a source of distraction and disruption to those jurors. While juror number 2 spoke to the person delivering coffee to the jury room on one occasion – an incident the coffee person may have reported due to concerns that s/he had any exchange with a sworn juror – there has been no expressed concerns from anyone else. This is particularly noteworthy given Detective Cowan's claims that juror number 2 created such a spectacle outside of the courtroom in front of all of the other jurors, yet it was only Detective Cowan that raised it as an issue.

Significantly, there is nothing in the government's submission that contends that the substance of juror number 2's statements would render him unfit to serve. This makes sense as none of juror number 2's statements have any bearing on this case. Indeed, nothing that he had expressed was material to the case nor could it even serve as the basis of a for cause challenge. *See, e.g.*, *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 555-56 (1984). With

A000048

these facts, there is no reason to believe that juror number 2 cannot follow the court's instructions or that he does not understand his oath to serve. As such, juror number 2 should not be dismissed.

### <u>Conclusion</u>

For the foregoing reasons, we ask that the Court deny the government's motion to dismiss juror number 2.

Thank you for your consideration of this matter.


Respectfully submitted,

<u>/s/ Zawadi S. Baharanyi, Esq</u>.

Zawadi S. Baharanyi, Esq.
Marisa K. Cabrera, Esq.
*Counsel for Rickey Johnson*


cc:     AUSA Patrick Moroney
        AUSA Kyle Wirshba

4

**A000049**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 21, 2022

**By ECF**
The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> **Re:** *United States v. Rickey Johnson*, S1 21 Cr. 194 (LAK)

Dear Judge Kaplan:

The Government writes in response to the Court's order for briefing regarding the legal standard for removing a juror. Based on the applicable standard and relevant facts as described below, the Government renews its request for removal of Juror No. 2, who did not credibly answer the Court's questions, evinced an apparent bias against the Government, slept during proceedings, and appears to be a disruptive and distracting influence on the jury.

## I.    Incidents Involving Juror No. 2

After the trial day on February 16, the Government's case agent, Detective David Cowan of the NYPD, informed prosecutors that, during a break in testimony, Juror No. 2 had made unprompted comments directed at him. The Government informed defense counsel and the Court. The following morning, the Court asked Detective Cowan to detail the incident. Detective Cowan explained that, while standing outside the courtroom with a witness while jurors were waiting to re-enter after a recess, Juror No. 2 began speaking toward Detective Cowan and the other jurors. (Tr. 120:10–22).[1] Other jurors moved away from Juror No. 2, but Juror No. 2 continued speaking, faced Detective Cowan, and directed his statements toward Detective Cowan, who was only approximately two feet away from Juror No. 2. (Tr. 120:19–121:5). Among other statements, Juror No. 2 said, in substance, that "the white man stole Manhattan from the Native Americans"; that "Abraham Lincoln did not want to free the slaves"; and that "the white man killed the Native Americans who had tobacco farms in the United States." (Tr. 122:6–16). Detective Cowan said nothing to Juror No. 2 at any point. (Tr. 122:4–5).

The Court also spoke to Juror No. 2, engaging in the following exchange:

---

[1] A copy of the portions of the trial transcript involving colloquy with or about Juror No. 2 is attached as Exhibit A.

| | |
|---|---|
| [COURT]: | It has been brought to my attention that at some point yesterday, you spoke or attempted to speak to Detective Cowan. Is that right? |
| JUROR: | No. No. Who said that? That's untrue. |
| COURT: | Do you know who Detective Cowan is? |
| JUROR: | Yes. In the court? |
| COURT: | Out in the hall. |
| JUROR: | Detective Cowan? No. Where is he? |
| COURT: | Do you know who he is? |
| JUROR: | I think he is connected with this case. |
| COURT: | That's certainly true. Would you recognize him if you saw him? |
| JUROR: | No. I never tried to speak to any detectives. I'd like to know who said that. |
| COURT: | Right now I'm asking the questions. |
| JUROR: | Who is the accuser? |
| COURT: | Let's calm down, Mr. [juror name]. |
| JUROR: | I am. |

(Tr. 114:11–115:3).

The Court then asked Detective Cowan, who had left the courtroom during the questioning of Juror No. 2, to re-enter. (Tr. 115:5–6). When the Court asked Juror No. 2 whether he recognized Detective Cowan, the following colloquy ensued:

| | |
|---|---|
| COURT: | All right. The gentleman who just came in the door wearing the suit and tie in a black mask, do you recognize him? |
| JUROR: | I think I -- he looks like I've seen him because of his physique. But I haven't tried to talk to him about anything. |
| COURT: | You're sure of that? |

**A000051**

JUROR:        Yes, unless I -- wait a minute. Unless today I mistakenly got off the --

COURT:        I'm talking about yesterday.

JUROR:        No. What does he have to say? That I spoke to him?

COURT:        Detective, would you step out, please.

JUROR:        I never spoke to him about anything.

(Tr. 115:11–24).

After soliciting the parties' views about what questions should be asked of Juror No. 2, the Court asked the following additional questions:

COURT:        Mr. [juror name], just one more question for you. When Detective Cowan came into the room this morning, did you recognize having seen him yesterday?

JUROR:        I don't know him. Why? I never spoke to him. Who said that I spoke to him?

COURT:        You are not accused of a crime or anything. Just please answer my questions and spare us the speeches.

JUROR:        Go ahead. Talk to me now.

COURT:        Did you recognize him as someone you saw somewhere yesterday?

JUROR:        Do I recognize him right now?

COURT:        Yes. As someone you saw yesterday.

JUROR:        I don't know. I don't know. But I say for the umpteenth time, I never spoke to this individual about anything. If someone says I did --

COURT:        Mr. [juror name], thank you very much.

(Tr. 119:5–22).

The Court also explained to the parties that it had become aware of "an incident" that morning in which Juror No. 2 "cornered the lady who brought coffee to the jurors and started talking to her." (Tr. 108:9–13). When the Court inquired of Juror No. 2 about this exchange, Juror No. 2 acknowledged the conversation and denied having spoken about the case. (Tr. 115:25–

116:14). Juror No. 2 concluded by again asking, with an agitated demeanor: "I'd like to know. Is this the gentleman that said that I spoke to him?" (Tr. 116:17–18). The Court instructed Juror No. 2 to return to the jury room. (Tr. 116:17–20).

After hearing additional argument, the Court determined that Juror No. 2's statements in response to the Court's questions "certainly contradict[ ] credible testimony by Detective Cowan as to whether he talked to Cowan." (Tr. 130:10–11). The Court allowed Juror No. 2 to remain on the jury pending further briefing. (Tr. 130:11–12).

Later that day, the Court observed Juror No. 2 sleeping during testimony, and engaged in the following exchange:

> COURT: Excuse me. Mr. [juror name], are you awake?
>
> JUROR: Yes.
>
> COURT: Okay.
>
> JUROR: My eyes were opened.
>
> COURT: Oh, no they weren't.
>
> JUROR: Right now, just now, they are.
>
> COURT: Right now they are.

(Tr. 243:16–23).

## II.   Legal Standard

Federal Rule of Criminal Procedure 24(c) permits a court to replace "jurors who are unable to perform or who are disqualified from performing their duties." "The substitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party." *United States v. Gambino*, 951 F.2d 498, 503 (2d Cir. 1991). District courts "have broad discretion under Federal Rule of Criminal Procedure 24(c) to replace a juror at any time before the jury retires if there is reasonable cause to do so." *United States v. Purdy*, 144 F.3d 241, 247 (2d Cir. 1998). A court abuses that discretion only when there is "bias or prejudice to the defendant," which requires that the discharge was "without factual support or for legally irrelevant reasons." *United States v. Fazio*, 770 F.3d 160, 170 (2d Cir. 2014).

## III.   Juror No. 2 Should Be Dismissed

Juror No. 2 should be dismissed because he was not forthcoming to the Court, his answers suggest that he will be biased, he slept during proceedings, and his actions are distracting and disruptive to other jurors.

First, the juror has not been fully truthful to the Court. When the Court asked whether the juror had "attempted to speak to Detective Cowan" the previous day, the juror was unequivocal: "No. No. Who said that? That's untrue." (Tr. 114:11–14). When the Court asked Detective Cowan

to re-enter the courtroom, the juror acknowledged that he believed he had seen Detective Cowan before, but added: "But I haven't tried to talk to him about anything." (Tr. 114:14–16). When the Court confirmed that it was asking about a conversation from the day before, the juror denied having tried to speak to Detective Cowan, then again claimed, "I never spoke to him about anything." (Tr. 115:21–24). After further colloquy, the juror again declared that he "never spoke to [Detective Cowan]," and concluded by stating: "I say for the umpteenth time, I never spoke to this individual about anything." (Tr. 119:9–21).

The juror's statements clearly contradict Detective Cowan's recollection of the events, which was detailed and credible, as the Court determined. (Tr. 130:10). Detective Cowan informed the Court that, while Juror No. 2 made his statements, he was only approximately two feet from Detective Cowan and facing him, after the other jurors had stepped away. (Tr. 121:2–5, 20–24). Yet Juror No. 2 repeatedly denied that he had spoken to Detective Cowan during his colloquy with the Court.

The Second Circuit has affirmed district courts' dismissals of jurors who are not forthcoming about incidents that take place during trial. For example, in *United States v. Arline*, 660 F. App'x 35, 39–40 (2d Cir. 2016), the Circuit concluded that the district court properly found "reasonable cause" to dismiss a juror who had been observed watching a proceeding not intended for the jury, and who then "gave inconsistent answers about what happened." And in *United States v. Fazio*, 770 F.3d 160, 169 (2d Cir. 2014), the district court found that a juror had "serious credibility issues" after giving inconsistent responses about a comment the juror purportedly made during a recess. After the district court observed the juror smirk and make eye contact with another juror during summations, the district court dismissed the juror, and the Circuit found no error in this decision. *Id.*; *see also Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) ("How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity?"). In this case, Juror No. 2's answers to the Court were not credible. The juror should be excused as a result.

<u>Second</u>, Juror No. 2's answers to the Court's questions indicate he is likely to be biased. During his brief colloquy with the Court, Juror No. 2 appeared to be fixated on figuring out who his "accuser" was. (Tr. 115:1). He asked the Court at least six times who had reported his conduct. (*See* Tr. 114:14 ("Who said that? That's untrue."); Tr. 114:24 ("I'd like to know who said that."); Tr. 115:1 ("Who is the accuser?"); Tr. 115:21–22 ("What does he have to say? That I spoke to him?"); Tr. 116:17–18 ("I'd like to know. Is this the gentleman that said that I spoke to him?"); Tr. 119:10 ("Who said that I spoke to him?)).

In addition to being indicative of a lack of truthfulness, Juror No. 2's answers and demeanor also suggest that he will be biased against the Government going forward. The juror was clearly focused on identifying his "accuser." He was visibly agitated and upset by the Court's inquiry. And he expressed an understanding that his version of events was in conflict with the account of the so-called "accuser." It also was readily apparent that the "accuser" was Detective Cowan, who has been referenced in testimony as part of the Government (*see, e.g.*, Tr. 282:2–13), and could be seen in Government Exhibit 303 asking the defendant questions shortly after his arrest (*see* GX 303-T). Accordingly, it appears likely that Juror No. 2 will be biased in his deliberations based on a perceived "accusation" by a member of the prosecution team, and that is another reason why he should be removed.

   <u>Third</u>, the fact that Juror No. 2 was noticeably sleeping during testimony, as the Court observed, further supports dismissing him. (Tr. 243:17–23). The Government noticed two other occasions during this short trial that the juror was sleeping, both during the examination of Government witness Koren Augustin. "A court has considerable discretion in deciding how to handle a sleeping juror; if sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury." *Johnson v. Nicholson*, 349 F. App'x 604, 605 (2d Cir. 2009) (alterations omitted) (internal quotation marks and citation omitted). Courts in this District have, when appropriate, dismissed jurors who repeatedly fell asleep. *See, e.g.*, *Gambino*, 951 F.2d at 503; *United States v. Atilla*, No. 15 Cr. 867 (RMB), Tr. 617–18 (S.D.N.Y. Dec. 1, 2017); *United States v. Russell*, No. 16 Cr. 396 (GHW), Tr. 114–21, 122–25 (S.D.N.Y. Aug. 21, 2018). This fact further supports exercising the Court's discretion to dismiss Juror No. 2.

   <u>Finally</u>, Juror No. 2's conduct appears to be a distraction and disruption to other jurors. Detective Cowan relayed that, when Juror No. 2 made his comments during the recess, there were initially other jurors near him, but as he continued speaking "the other jurors moved away from him." (Tr. 120:19–20). Additionally, the fact that Juror No. 2's exchange with the individual delivering the jurors' coffee—whom he reportedly "cornered"—was independently reported to the Court suggests a second instance in which Juror No. 2's actions made those around him uncomfortable.

   Accordingly, the Government respectfully submits that, in light of the array of circumstances described above, and the applicable legal standard, the Court should exercise its broad discretion and dismiss Juror No. 2.

             Respectfully submitted,

             DAMIAN WILLIAMS
             United States Attorney

   By:

             Kyle A. Wirshba
             Patrick R. Moroney
             Assistant United States Attorneys
             (212) 637-2493 / 2330

cc (by ECF): Zawadi Baharanyi, Esq.
       Marisa Cabrera, Esq.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 21, 2022

**By ECF**
The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Rickey Johnson*, S1 21 Cr. 194 (LAK)

Dear Judge Kaplan:

    The Government writes to request that the Court preclude the defense from making any arguments in closing about the substance of Instagram's policies relating to the evaluation and removal of threatening content, or how any such policies were or were not applied to the defendant's conduct. In short, there is no evidence in the record of what Instagram's policy is with respect to threatening content, or whether or how any such policy has been applied to the content at issue in this case. It therefore would be impermissible for the defense to argue in summation, for example, that (i) Instagram has a policy of removing threatening content, or (ii) the charged threats remain available on Instagram notwithstanding Instagram's policy.

    The only evidence in the record on this subject is that Instagram has policies relating to threatening content; Instagram has the ability to remove threatening content; the defendant's posts were reported to Instagram at some unknown date; the status of any review of his posts is unknown; and the defendant's account has not been closed. The record does not indicate what Instagram's policies are, let alone how they could be or have been applied to the defendant's account. In particular, on cross examination, and then when recalled by the Government, Facebook employee Raquel Morgan testified as follows:

> Q.    You clearly are familiar with how Instagram works; right?
>
> A.    Yes.
>
> Q.    And are you aware that Instagram has -- well, do you know Instagram's policies about removing posts that threaten individuals?
>
> A.    I have in understanding, yes.

**A000056**

Q.   And as part of your understanding, are you aware that Instagram has the ability to remove posts that contain threatening conduct?

A.   Yes.

Q.   And Instagram has the ability to remove posts that contain harassing conduct; right?

A.   Yes.

Q.   And Instagram itself can choose to remove content; right?

A.   Yes.

Q.   And it also can remove content based off of a request from users; right?

A.   Yes.

Q.   And in preparing for your testimony today, you were asked to look into whether Mr. Johnson's account had been removed; right?

A.   Yes.

Q.   And it had not; right?

. . .

[COURT:]   Please answer the question. The question was did Instagram close this account I believe.

WITNESS:   That I'm aware of, no.

COURT:   Do you know for sure that it hasn't, or do you know one way or the other?

WITNESS:   I know for sure that the account has not been closed.

COURT:   Thank you.

. . .

Q.   Ms. Morgan, you stated that the videos had been reported by someone else; right?

A.   That's correct.

Q.        When was that report?

A.        I do not know.

. . .

Q.        Ms. Morgan, you previously testified that you don't know when this account was reported to Instagram's content team. Do you recall that?

A.        I do.

Q.        Do you know what the status of that review is?

A.        No.

Q.        Do you know whether or not it's ongoing?

A.        I believe, I'm not sure, to be quite honest. I have no idea what's really happening with that.

. . .

Q.        Ms. Morgan, does that refresh your recollection as to whether the account is -- as to what the status of the review is?

A.        Yes. It still stands that I do not know what the status is.

. . .

Q.        And in turning back to what Instagram does in its reports, Instagram when it receives a report can decide to take down content, right?

A.        Yes.

Q.        When it receives a report about threatening content, for example, they can decide to take it down, right?

A.        Yes.

. . .

Q.        Certainly, Instagram did not take down any of Mr. Johnson's content, right?

A.        What I can say is it was not taken down, yes.

Page 4

(Tr. 273–78, 297–98, 305 (attached as Exhibit A)).

Where a party in summation cites facts not in evidence, a district court should sustain objections to those arguments and "instruct the jury to disregard the remark." *United States v. Schafrick*, 871 F.2d 300, 305 (2d Cir. 1989); *see also United States v. Zapata*, 369 F. Supp. 2d 454, 460 (S.D.N.Y. 2005) (sustaining Government objections to defense summation "based on evidence that was not presented at trial").

Here, any argument about—or asking the jury to draw inferences relating to—the substance of Instagram's policies would be based on facts not in evidence. Ms. Morgan testified only that such policies exist and that Instagram can remove posts pursuant to that policy, but not about what those policies are. Even more far afield would be any argument that the jury should assign significance to Instagram's application or non-application of these unknown policies to the defendant's Instagram account—particularly when the only evidence in the record on this point is that Ms. Morgan testified that she has "no idea what's really happening" with respect to the status of any review by Instagram of the defendant's account. Such arguments should be precluded as "speculative and predicated on facts not in evidence." *United States v. Londono*, 175 F. App'x 370, 375 (2d Cir. 2006) (upholding sustained Government objection during summation).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:

Kyle A. Wirshba
Patrick R. Moroney
Assistant United States Attorneys
(212) 637-2493 / 2330

cc (by ECF):   Zawadi Baharanyi, Esq.
               Marisa Cabrera, Esq.

**A000059**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                        21 Cr. 194 (LAK)

 5   RICKEY JOHNSON,

 6                Defendant.

 7   ------------------------------x

 8                                    New York, N.Y.
                                      February 16, 2022
 9                                    9:30 a.m.

10

     Before:
11
                          HON. LEWIS A. KAPLAN,
12
                                      District Judge
13

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KYLE A. WIRSHBA
17   PATRICK R. MORONEY
          Assistant United States Attorneys
18
     FEDERAL DEFENDERS OF NEW YORK
19        Attorneys for Defendant
     ZAWADI S. BAHARANYI
20   MARISA K. CABRERA

21

22

23

24

25
```

A000060

```
 1              THE COURT:  Good morning, all.

 2              THE DEPUTY CLERK:  United States v. Rickey Johnson.

 3   Government, are you ready?

 4              MR. WIRSHBA:  Yes, your Honor.  Good morning.  Kyle

 5   Wirshba on behalf of the government.  I'm joined at counsel

 6   table by Paralegal Specialist Charlotte Cooper.  My colleague

 7   Patrick Moroney just stepped out to go to the bathroom.

 8   Apologies.

 9              THE COURT:  Good morning.

10              MS. BAHARANYI:  Good morning, your Honor.  Zawadi

11   Baharanyi for the Federal Defenders.  I am here with my

12   colleague Marisa Cabrera.  We're also joined by our client in

13   the back, and our paralegal Ms. Maliha Jahangiri, who is seated

14   with Mr. Johnson.

15              THE COURT:  Ms. Baharanyi, I could not understand

16   anything you said.

17              MS. BAHARANYI:  Let me repeat, your Honor.

18              Zawadi Baharanyi with the Federal Defenders.  Marisa

19   Cabrera co-counsel on the case.  We are joined by Rickey

20   Johnson our client, and Ms. Jahangiri who is seated with him.

21   That is the paralegal in our office.

22              THE COURT:  Who rearranged the furniture here?  How is

23   it you are facing that way.

24              MS. BAHARANYI:  We do not know the answer to that,

25   your Honor.
```

A000061

```
 1              THE COURT:  Okay.  One of the great mysteries, along
 2    with why the elevator wouldn't come up here from the 22nd
 3    floor.
 4              I gather you folks have a few things you wanted to
 5    talk about; is that right?
 6              MR. WIRSHBA:  There is a pending motion before the
 7    Court.  But there is nothing that the government is seeking to
 8    raise at this time.
 9              THE COURT:  Right.  Anybody want to be heard on it?
10              MS. BAHARANYI:  There are a couple of issues we do
11    want to raise with the Court.
12              THE COURT:  I think maybe you better go to the
13    lectern, because --
14              MS. BAHARANYI:  Sorry.
15              THE COURT:  -- between the mask and everything else,
16    this is a struggle.  You can take your mask off in there.
17              MS. BAHARANYI:  Is this better?
18              THE COURT:  Way better.
19              MS. BAHARANYI:  Yes, yes.
20              So there are a couple of issues we want to raise with
21    the Court this morning.  I think first, beginning with our
22    motion in opposition to Fox's subpoena.  We understand --
23              THE COURT:  I'm sorry.  How do you have a motion in
24    opposition to something?
25              MS. BAHARANYI:  Excuse me.  It is an opposition to
```

A000062

```
 1  Fox's motion to quash.  So we wrote a motion to the Court
 2  yesterday, in opposition to Fox's motion to quash.  Now they
 3  moved to quash --
 4          THE COURT:  What relief are you seeking on your
 5  motion?
 6          MS. BAHARANYI:  Your Honor, we ask you to deny their
 7  motion to quash.
 8          THE COURT:  You don't make a motion to deny somebody
 9  else's motion.  So now I see the source of the immense
10  confusion on the docket.  Your side seems to have been filing
11  every response to somebody else's papers as a motion.  They are
12  not motions, they stay on there forever.  The docket entries
13  are all incorrect.  You filed an opposition to something.  I'd
14  appreciate it if you get all those docket entries corrected and
15  don't do it anymore.  Okay?
16          MS. BAHARANYI:  Your Honor, thank you.  I think as to
17  the heart of the matter, our concern is that they are seeking
18  to squash a subpoena.
19          THE COURT:  Okay.  Now I got it.
20          MS. BAHARANYI:  And if we could be heard on that, your
21  Honor.  I know the Court has already addressed Fox's record
22  subpoena.  We haven't addressed the NYPD License Division
23  subpoena.  Our understanding is that those records were
24  intended to be produced to chambers this morning, whether they
25  have been, we haven't been alerted.
```

**A000063**

```
 1            THE COURT:  I haven't seen them.  And my understanding
 2   was that the documents had been turned over to the government
 3   and the government had produced them.  Is that right?
 4            MR. MORONEY:  No, Judge, those are different
 5   documents.  Those were related to the complaint in
 6   Pennsylvania.
 7            These are the firearm permit for Greg Gutfeld.  Those
 8   materials, which I believe the Court made returnable to the
 9   Court.  I understood that the NYPD was going to produce them to
10   chambers earlier this week, on Monday.
11            THE COURT:  Well, maybe Andy knows something I don't
12   know.  We'll find out when he gets back.  Okay.  At least now I
13   have an idea what you are talking about.
14            MS. BAHARANYI:  And on the substance of that, your
15   Honor, the reason why we wrote to the Court was to provide
16   additional background for our basis for obtaining these
17   records.  I believe the Court has our motion on this issue.  If
18   there are any questions, I am happy to address those.  But I
19   think what's particularly relevant and critical here is we need
20   the ability to impeach the government's witnesses with these
21   records that go towards potential bias.  This also stands when
22   the government is intending to rest on a declarant's statement,
23   a hearsay statement, which they've moved to include and the
24   Court has that pending motion in front of it.
25            So for these NYPD records that go towards Gregory
```

**A000064**

1  Gutfeld's potential bias, we've asked the Court to review these

2  records and to disclose them to us after either after Gutfeld

3  testifies, or if he does not testify, after his hearsay

4  statement is admitted, if it is in fact admitted into evidence.

5  As it goes towards whether he has any motives to fabricate his

6  reaction, his impressions of the comments from Mr. Johnson.

7          THE COURT:  Do you have any reason whatsoever to think

8  that happened here?  Or to be more precise, do you have any

9  reason at all to believe that anything in a carry permit

10  application from the police department could possibly impeach

11  the statement attributed to him, assuming it comes in?

12          MS. BAHARANYI:  Yes, your Honor.  So, we are permitted

13  to impeach a declarant on their credibility.

14          THE COURT:  Do you have any reason -- I understand

15  that.  I took evidence too.  Do you have any reason to think

16  there is anything in the carry permit application that could

17  impeach what he said in the e-mail, which is I gather what we

18  are talking about?

19          MS. BAHARANYI:  Yes, your Honor.  The carry permit

20  application has his statements about his necessity or the basis

21  for requesting this application.  It has the NYPD License

22  Division's response, either rejection or approval.  And either

23  their objection, their approval, their denial of his

24  application.  And it also provides us with the timing of this

25  application.  And if for some reason, for example, NYPD had

1   decided they were going to reject his application, his

2   application to carry a concealed firearm, to reject his long

3   gun application permit application, then this case, his

4   testimony, his statements about what happened and his

5   statements about what Mr. Johnson allegedly did, could be

6   impacted by his motive to, his motive to have this application

7   approved.

8          THE COURT:  What I asked you is, do you have any

9   reason to believe that's true?  Anything on earth is possible.

10  It may be that in the permit application, he said that Prince

11  Andrew was coming to kill him.  It's possible.  He may have

12  said that.

13         MS. BAHARANYI:  We are permitted to impeach the

14  individual.  Not just the statement that could be in that --

15  the statement, the hearsay they are intending to elicit.  But

16  we are permitted to discredit, to impeach the person itself.

17         THE COURT:  Ms. Baharanyi, you are not answering my

18  questions.

19         MS. BAHARANYI:  I am attempting to.  So we are --

20         THE COURT:  If you are going to try, stop telling me

21  that you are entitled to impeach the statement.  I understand

22  that.  That's true.  The question is, do you have any reason to

23  believe that there is anything there that would assist you in

24  doing so?  Not what's conceivably possible on earth.  Do you

25  have any reason to think there is something there, and if so,

**A000066**

1    what is it?

2            MS. BAHARANYI:  Gregory Gutfeld's gun application

3    itself.  That is, that is the reason why we believe there is

4    something there.  His words in that application would be the

5    basis of the impeachment.

6            THE COURT:  How?  How?

7            MS. BAHARANYI:  He has -- the application which I

8    believe is attached as Exhibit A to our motion last night.

9            THE COURT:  A blank.

10           MS. BAHARANYI:  Excuse me?

11           THE COURT:  A blank.  A blank form, right?

12           MS. BAHARANYI:  It is a form that would be filled out

13   by Gregory Gutfeld.  So the form that we've submitted is to

14   show the Court what information he would have been providing

15   and what we are requesting.  And his, the gun application

16   itself would be the basis of impeaching his credibility.

17           THE COURT:  How?

18           MS. BAHARANYI:  The timing of the application, his

19   statements in the application.

20           THE COURT:  Suppose he applied for it six years ago.

21           MS. BAHARANYI:  So, let's say, let's take that.  He

22   applied for this application in 2016, your Honor.  He was

23   denied this application in 2016, and he is seeking to renew his

24   application for a gun permit.

25           THE COURT:  Is there any reason to think it was denied

**A000067**

1   in 2016?

2           MS. BAHARANYI:  The reason why we are requesting these

3   records --

4           THE COURT:  Is you are on a fishing expedition.

5           MS. BAHARANYI:  No.  In the government's 3500, they

6   provided us with information, the following information.  That

7   Gregory Gutfeld applied for a gun permit and a long gun permit.

8   They provided us with the information saying that he wanted to

9   renew this application.  Which suggests --

10          THE COURT:  He wanted to what?

11          MS. BAHARANYI:  Renew this application.  And this is

12  happening in the same context as this case.

13          THE COURT:  And do you have any information about

14  when?

15          MS. BAHARANYI:  About when he was going to renew it

16  or --

17          THE COURT:  When it was first made.

18          MS. BAHARANYI:  That is what we are requesting.

19          THE COURT:  So the answer to my question is, no, you

20  don't.

21          MS. BAHARANYI:  We are not in a position to have

22  those, your Honor.  The reason why we subpoenaed these records

23  is so we have the material necessary so we can complete

24  impeachment, that we can discredit this witness, as we are

25  entitled to do on behalf of Mr. Johnson.  So, we are not in a

**A000068**

1  position to have NYPD's records, his application, and in fact

2  if we had them already, we wouldn't be subpoenaing them.  I

3  think the Court would deny us subpoenaing records we already

4  were privy to and had access to.

5          THE COURT:  No, but you might very well have a lot

6  more information than you have now.

7          MS. BAHARANYI:  What we're missing, your Honor, and

8  what would serve as the basis of impeachment, are his

9  statements on that application.

10          THE COURT:  Suppose he said on the application "The

11  reason I need the gun is I carry a large amount of cash at

12  various points."  Suppose that were so.  Now if that's so, how

13  would it help you impeach him?

14          MS. BAHARANYI:  Well, if the reason why he needs the

15  gun is to carry large amounts of cash, and for whatever reason,

16  the NYPD License Division decided to deny that application, and

17  he's now renewing it in the context of this case, then that

18  serves -- his approach to this case, his motivations and

19  forwarding the message, his motivations behind his conduct in

20  this case serve as his way to finally get the application he's

21  always wanted.  It is a basis for him to move forward in this

22  other field with NYPD firearms using Mr. Johnson.

23          THE COURT:  I can be as imaginative as anybody in

24  imagining a set of circumstances in which maybe it would be

25  useful to you.  But I don't think the question is can I imagine

**A000069**

1   a set of circumstances.  The question is, what evidence, what

2   reason do I have now to believe that a set of circumstances

3   exists.  We can all imagine here until the cows come home.

4            MS. BAHARANYI:  One of the reasons is the 3500 that's

5   been provided to the government.  That is how we know about

6   this application.  Another reason is the language in the 3500.

7            THE COURT:  We don't have to imagine that there was an

8   application.

9            MS. BAHARANYI:  And nor do we have to imagine that

10  there was some decision on this application that did not result

11  in him having a gun.  That's why he wants to renew or look back

12  into it.

13           THE COURT:  Maybe he withdrew it.

14           MS. BAHARANYI:  Your Honor, I think the critical piece

15  is maybe he didn't.  And it is quite possible, and I think in

16  New York City it is very difficult for someone to obtain a

17  concealed firearms permit for many reasons.  It is very

18  difficult for someone to legally keep a firearm within their

19  home.  So, if he is using this process, this case, his reaction

20  to this case, in order to advance his interests in this other

21  setting, we need to have the materials to allow us to explore

22  that.  And I do want to add this, your Honor.

23           THE COURT:  If he had wheels, would he be a bicycle?

24  There you go again.  If.

25           Look, I think I have your point.  And we are not

A000070

1    advancing the ball here.

2          MS. BAHARANYI:  If I can just make this.  We have

3    asked for the records to be turned over to the judge, that is,

4    to you, your Honor.  You ordered that they be submitted to

5    chambers for review prior to disclosing to the defense.  So it

6    might very well be that after reviewing those records, you find

7    there is nothing relevant.  Or, that we do have a basis for

8    obtaining those records.  We are asking for the process that

9    we've already begun to at least be carried out, the process of

10   those records getting to chambers.

11         THE COURT:  I thought that's a process I imposed and

12   you didn't ask for, but that's another matter.

13         MS. BAHARANYI:  We agree with the Court and we are

14   asking for the Court to uphold this process so the Court can

15   answer the questions it has now.  Right now, we are not in a

16   position to do so.

17         THE COURT:  Okay.  If I have them, I'll look at them.

18   And we'll take it from there.  Anything else?

19         MS. BAHARANYI:  Your Honor, I think in addition, we

20   have not received a ruling on the hearsay matter that was

21   raised first in our motion yesterday and the government's

22   response.

23         THE COURT:  You know, you don't need one right now.

24         MS. BAHARANYI:  So we can -- maybe that's the

25   question, is we can raise that at a time where the Court is

**A000071**

1    prepared to address it.

2          Then there is one more issue regarding the motions in

3    limine we'd like to briefly address with the Court.

4          MS. CABRERA:  I don't know if your Honor can hear me

5    from here.

6          THE COURT:  You better move.

7          MS. CABRERA:  Good morning, your Honor.

8          THE COURT:  Good morning.

9          MS. CABRERA:  I just wanted to clarify, I have a

10   clarifying question with respect to document 58, your Honor's

11   decision, memorandum and order dated February 15.  With respect

12   to point two, while we stand by our initial submission, and the

13   arguments therein, I just want to clarify the Court's decision.

14   The prosecution in its motion sought to preclude reference to

15   the political views and events outside those, that were

16   referenced in the videos.

17         THE COURT:  Outside the reference in the videos?

18         MS. CABRERA:  Yes.  I want to make sure I understand

19   the Court's decision correctly.  The defense may still

20   reference and discuss that, those, the events and political

21   views that are brought in through the videos themselves?  Is

22   that how I'm understanding the order?  I mean, obviously the

23   defense has no intention of bringing out any sort of statements

24   made by anyone outside of the contents of the videos at all.

25   But, as the prosecution notes, this case is necessarily going

**A000072**

1    to involve political views that are then being expressed within

2    those videos.

3         THE COURT:  Okay.  Let me hear from the government,

4    please.

5         MR. WIRSHBA:  Thank you.  With respect to the two

6    issues that were raised by defense, I'll start with the

7    clarification on your Honor's ruling on the government's

8    motions in limine.

9         The government did reference there are certain videos

10   that the government intends to offer in its case in chief of

11   the defendant making threats.  To the extent that as part of

12   those videos there is background commentary that can be heard,

13   of course those are part of the exhibits in this case, and

14   those videos -- it was my fault.  I pushed the button by

15   accident.  And those videos, your Honor, will be coming into

16   evidence.  So the content of those videos is part of the case

17   and the defense can make any arguments it wants.

18        What I want to be cautious about is that discussing

19   the videos in general is not a particularly helpful means for

20   the Court to evaluate what the defense is trying to do.  The

21   defendant uploaded tens if not hundreds of videos.  Many of

22   those videos are completely irrelevant to this case, they are

23   not involved in the specific charges that the government has

24   brought here.  And so to suggest that just because the

25   defendant uploaded a video that has some political commentary

**A000073**

1    on it, that it should be admitted into evidence, and that the

2    defense should be able to argue about it, the government thinks

3    goes far too far and is certainly contrary to your Honor's

4    order of yesterday ruling on the government's motion in limine.

5            If there are specific videos that the defense is

6    planning to bring to evidence in this case, and seek to admit,

7    the government may well wish to object to those videos.  For

8    example, it seems, and we'll be raising this with the Court as

9    appropriate, that there is a video the defense would seek to

10   admit that the government objects is irrelevant, and is more

11   prejudicial than probative.  So, while it is true that the

12   government plans to play videos, and there is some background

13   commentary in those videos, the videos have been provided to

14   the defense as exhibits a week ago and provided to Court.

15   Those videos are the ones that pertain to the charges in the

16   indictment.

17           The government just wants to be very clear that it

18   believe yours Honor's order properly understood and it was the

19   government's intention in so moving to preclude any random

20   videos that the defendant may have made that don't have a

21   connection to the charges in this case that may have political

22   commentary in the background.

23           THE COURT:  Do you think the short answer to this is

24   that if they offer something to which you object, you'll

25   object?

1           MR. WIRSHBA:  Absolutely, your Honor.

2           THE COURT:  That's the short answer.

3           MR. WIRSHBA:  Understood.

4           THE COURT:  I don't understand the need for

5    clarification.

6           MS. CABRERA:  I don't think we are on different pages.

7    I think perhaps the prosecution misunderstood what I was trying

8    to clarify.  What I was trying to understand from the Court's

9    order --

10          THE COURT:  Change places with your adversary so I can

11   hear you.

12          MR. WIRSHBA:  Just to prevent one more change of

13   place, perhaps I can one quick thing on the other thing that

14   was taken up with the defense which was the motion to quash the

15   NYPD subpoena.

16          To the extent that the Court has not received that, we

17   understood those materials were produced to the Court.  They

18   were all also produced to the government, and I am not going to

19   get into the content of that information.  But to the extent it

20   would be helpful to the Court for the government to provide

21   those in camera, we can do that at a break if that's the

22   Court's preference.

23          THE COURT:  Let me just have a moment and see whether

24   we have them.

25          I've confirmed that nobody's produced those records to

**A000075**

1   chambers.

2          MR. WIRSHBA:  Your Honor, I believe that NYPD intended

3   to produce them.  We can confirm that and see what happened and

4   we can also provide those in camera for the Court.

5          THE COURT:  Okay.  Good.

6          MS. CABRERA:  So, just I think we are actually on the

7   same page as the prosecution on the matter with respect to the

8   issues that the defense was planning to discuss.  As it was

9   only based on what they intended to introduce, from our

10  understanding, intended to introduce at trial.

11         With respect to point one of docket no. 58.  The

12  defense just wanted to make a quick objection.  That while we

13  agree with the Court that the First Amendment does not protect

14  true threats, the Court's decision, however, is affirmatively

15  and preemptively deciding really the very issue in this case,

16  whether this was in fact a true threat.  The defense's position

17  is it was not.  And that's what we intend to litigate.

18         THE COURT:  It decides no such thing.

19         MS. CABRERA:  I'm sorry?

20         THE COURT:  It decides no such thing.

21         MS. CABRERA:  Your Honor, it is a factual question.

22         THE COURT:  That's correct.

23         MS. CABRERA:  Correct.

24         THE COURT:  You should reread what I wrote because

25  it's very carefully drawn.

**A000076**

1          MS. CABRERA:  My understanding -- so it says, "So long
2     as the government establishes the elements of the charged
3     crimes including that the communications conveyed a true
4     threat, there is no First Amendment defense."
5          Is the Court determining that this was in fact no
6     true -- by virtue of preventing the defense from discussing the
7     First Amendment, it is necessarily deciding that there is no
8     true threat which we believe --
9          THE COURT:  That's absolutely absurd.
10          MS. CABRERA:  Well, we disagree, your Honor.
11          THE COURT:  You haven't seen the jury instructions.
12          MS. CABRERA:  We have not.
13          THE COURT:  No.  But the jury will be charged as to
14     every element that has to be proved, which includes the
15     substance of whether there has been a true threat.
16          MS. CABRERA:  If the jury determines there is no true
17     threat, then the First Amendment is then applicable.
18          THE COURT:  Obviously.
19          MS. CABRERA:  So, preclusion --
20          THE COURT:  As the charge says, in order to convict on
21     each and every count, you have to find facts that amount to a
22     true threat.  Then you don't have a problem, right?
23          MS. CABRERA:  Understood.  The defense's position is
24     that precluding the defense from discussing the First Amendment
25     in a speech case, a political speech case, especially where

**A000077**

1    *United States v. Hunt* that was permitted to be discussed.

2           THE COURT:  There are two different questions.

3    Question one is, does the jury have to find the elements of a

4    true threat?  I totally agree that it does and they will be so

5    instructed.

6           Question number two, are the lawyers entitled to argue

7    the First Amendment to the jury?  In my view, the answer is no.

8    If I permit you to do that, you are inviting the jury to

9    nullify and you are very likely to confuse them quite a bit as

10   between what the elements that they have to find in order to

11   convict are, and what you said.  And therefore, I've structured

12   it this way to eliminate the confusion, and to charge the jury

13   appropriately, as to which you will have every opportunity to

14   be heard.

15          MS. CABRERA:  Understood.  The defense still objects

16   and believes that the precluding us from discussing the First

17   Amendment is necessarily deciding that issue.  As it would be a

18   valid defense to true threats -- to something that is not a

19   true threat.  Thank you.

20          THE COURT:  Okay.  Anything else?

21          MR. WIRSHBA:  Nothing further from the government,

22   your Honor.

23          MS. BAHARANYI:  Nothing from the defense.

24          THE COURT:  Okay.  Thank you.  So we are going to

25   adjourn down to the first floor when they're ready for us and

1    we'll take it from there.

2          There is an envelope in the mailroom from the police

3    department.  So I may get to get that.

4          Just before we recess then, Ms. Wirshba, do you have a

5    single case that supports your position with respect to the

6    argument of the First Amendment as distinguished from the jury

7    having to find a true threat?

8          MR. WIRSHBA:  I'm sorry, your Honor.  Is that a

9    question for the government?

10          THE COURT:  I'm sorry.  I don't know you all well

11    enough.  It's Ms. Cabrera.  I'm sorry.

12          MS. CABRERA:  Yes, your Honor.  Can --

13          THE COURT:  Do you have a single case that says that,

14    assuming that the jury is properly instructed that the jury

15    must find the elements of a true threat in order to convict,

16    that you nevertheless have the right to argue the First

17    Amendment to the jury in those terms?

18          MS. CABRERA:  May I have one moment, your Honor?

19          THE COURT:  Yes.

20          MS. CABRERA:  Is your preference that I speak --

21          THE COURT:  Yes.

22          MS. CABRERA:  Okay.  In *United States v. Hunt*, the

23    Court -- the defense was allowed to argue the First Amendment,

24    and that was a case very similar factually to this case.

25          THE COURT:  But my question was different.  I did not

**A000079**

1    ask you whether any judge has ever allowed the defense to do

2    what you want to do.  I know there are judges who have done

3    that, usually in cases where there has been no objection.  The

4    government's objection raises the question, essentially, of

5    whether you have the right to do it, even if the jury is

6    instructed to find the relevant facts in order to convict.  So

7    telling me that some other district judge once, perhaps in a

8    case where nobody raised the issue, allowed it, is a very

9    different proposition.

10          MS. CABRERA:  I understand the Court's question.

11          While I cannot think off the top of my head that -- I

12   am not sure if even the argument has been made necessarily that

13   it is a right, I -- again, it has been permitted I believe in

14   *Turner* as well in the Second Circuit.

15          THE COURT:  I know it's been permitted.

16          MS. CABRERA:  I understand.  I understand.  But I

17   don't believe there was a case specifically on point.  Of

18   course the defense does maintain a Sixth Amendment right to

19   present a defense.  And we would say that this goes to that

20   right.  And so it's informed by such.

21          THE COURT:  Do you have the right to confuse the jury

22   as to what the law under the First Amendment is?

23          MS. CABRERA:  Your Honor, we are completely confident

24   that this Court could instruct the jury in a way that it would

25   not be confusing, just as other judges had previously done and

**A000080**

1    it did not confuse the jury.

2              THE COURT:  We do not know that, do we.  We really

3    don't.

4              MS. CABRERA:  There was no reason to suggest it had.

5              Thank you.

6              THE COURT:  Thank you.  I'll see you on the first

7    floor.

8              (Jury selection under separate cover)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000081

```
 1                         AFTERNOON SESSION

 2                            2:10 p.m.

 3            (In open court; jury not present)

 4            THE COURT:  Good afternoon.  Please be seated.  I'm

 5   told you have an issue?

 6            MR. WIRSHBA:  Yes, your Honor.  The parties wish to

 7   raise an exhibit that the government understands from hearing

 8   from the defense late last night the defense may seek to admit

 9   in cross-examination relatively early in the government's case

10   in chief.  It is an exhibit that I don't believe has been

11   provided to the Court previously.  And so, the government would

12   plan to, would plan to -- excuse me -- to object on relevancy

13   grounds, and on 403 grounds, and because we didn't want to

14   raise it and allow the Court to listen to it for the first time

15   when the jury was here, we have it, we're prepared to play it

16   now for the Court, if that's what the Court's preference is.

17   It is a seven-minute long video.

18            THE COURT:  No, I told the jury we would get started

19   at 10 past 2 and we are going to get started.

20            MR. WIRSHBA:  Understood, your Honor.

21            THE COURT:  We'll deal with it later.  Okay.

22            THE DEPUTY CLERK:  Judge, shall I bring up the jury?

23            THE COURT:  Yes.

24            (Jury present)

25            THE DEPUTY CLERK:  Shall I swear the jury?
```

**A000082**

1          THE COURT:  Jurors all present as is the defendant.

2          Please swear the jury.

3          THE DEPUTY CLERK:  If the jurors can please rise and

4     raise their right hand.

5          (Jury panel sworn)

6          THE COURT:  Ladies and gentlemen, now that you have

7     been sworn, I am going to give you some preliminary

8     instructions.

9          It is the duty of the jury to find from the evidence

10    what the facts are.  You and you alone will be the judges of

11    the facts.  You then will have to apply to those facts the law

12    as I give it to you, which you must follow, whether you agree

13    with it or not.  Nothing I say or do during the course of the

14    trial is intended to indicate what your verdict should be, and

15    you shouldn't take anything I say as giving you such an

16    indication.

17         The evidence from which you will find the facts will

18    consist of the testimony of witnesses, documents, and other

19    things received into the record as exhibits, and any facts that

20    the lawyers agree to or stipulate to, or that the Court may

21    instruct you to find.

22         Some things are not evidence.  And let me tell you

23    what they are.  First of all, statements, arguments and

24    questions by lawyers are not evidence.  Second, objections to

25    questions are not evidence.  The lawyers of course have an

**A000083**

1    obligation to their clients to make objections when they think

2    evidence is being offered that's not proper under the rules of

3    evidence.  You shouldn't be influenced by the objections or by

4    my rulings on them.  If an objection is sustained, you'll

5    ignore the question.  If it is overruled, you'll treat the

6    answer just like any other.  If I instruct you that some item

7    of evidence is received for a limited purpose only, you must

8    follow that instruction.  Any testimony that I have excluded or

9    told you to disregard or is stricken is not evidence and may

10   not be considered.

11        Anything that you may have seen or heard outside the

12   courtroom is not evidence and must be disregarded.  You must

13   decide the case solely on the evidence presented here in the

14   courtroom.

15        There are two kinds of evidence:  Direct and

16   circumstantial.  Direct evidence is proof of a fact such as

17   testimony of an eyewitness who has personal knowledge of the

18   facts.  Circumstantial evidence is proof of facts from which

19   you may infer or conclude that other facts may exist.  I'll

20   talk to you more at the end of the case about these concepts as

21   well as others, but keep in mind for now that you may consider

22   both direct and circumstantial evidence.

23        Since you are the triers of the facts, it is going to

24   be up to you to decide which witnesses you believe, which you

25   don't believe, how much of any witness's testimony you accept,

A000084

1  and how much you reject.  I'll talk to you at the end of the

2  case about things you might think about in doing that.  For now

3  just bear in mind that deciding credibility is your department,

4  not mine.

5        You probably picked this up from my remarks this

6  morning, but there are a couple of basic rules about criminal

7  cases that you must keep in mind, and I'll remind you of three

8  of them.

9        First of all, the defendant is presumed innocent,

10 unless and until he is proved guilty.  The indictment brought

11 by the government is only an accusation.  It is no more than

12 that.  It is not proof of guilt, it is not evidence.  It proves

13 nothing.  The defendant starts out with a clean slate here.

14       Second, the burden of proof is on the government until

15 the very end of the case.  The defendant doesn't have a burden

16 to prove anything, much less his innocence, or even to present

17 any evidence or to testify.  Since he has the right to remain

18 silent, the law prohibits you from arriving at your verdict by

19 considering that the defendant may not have testified if that's

20 the way it turns out.

21       Third, the government must prove that the defendant is

22 guilty beyond a reasonable doubt.  I'll give you further

23 instructions on what is a reasonable doubt later in the case.

24 But bear in mind that in this respect, a criminal case imposes

25 a much more exacting burden of proof than a civil case.

A000085

1          In this case, the defendant is charged with four

2     counts of threatening people.  Two of the counts involve

3     threats to members of the United States Congress; two of them

4     involve alleged threats to on-air personalities at Fox News.  I

5     am going to give you detailed instructions on the law at the

6     end of the case.  And those instructions will control your

7     deliberations and decisions.

8          The one thing I will say now is this:  The First

9     Amendment protects freedom of speech and expression.  It is not

10    a categorical absolute applying to anything and everything that

11    someone says.  There are distinctions to be drawn and things

12    that are not protected by the First Amendment.  I will instruct

13    you in detail on that at the end of the case.

14         Now, some words about your conduct as jurors.  You

15    must, as I've indicated, decide the case solely on the evidence

16    presented within these four walls.  You are not to conduct any

17    research about the case or anyone involved in it during the

18    course of the trial.  You are not to consult dictionaries,

19    reference works, search the internet, websites, blogs, or use

20    any electronic tools to obtain information about the case or to

21    help you decide it.  Please don't try to find out anything at

22    all from any source outside the confines of this courtroom.

23    Until you retire to deliberate at the end of the case, and I

24    tell you you may begin deliberating, you are not to discuss the

25    case with anyone at all, even among your fellow jurors.  After

1   you retire, you may begin discussion and deliberations about

2   the case with your fellow jurors, but you can't discuss the

3   case with anyone else until you've returned a verdict and the

4   case is over, or until I have dismissed you.

5        I know that many of you use cell phones and all sorts

6   of tools of modern technology. You must not talk to anyone at

7   any time about this case, whether on those devices or

8   otherwise. You can't communicate with anyone about the case.

9   This includes family and friends. You can't communicate with

10   anyone on your cell phone, whether through e-mail, BlackBerry,

11   iPhone, text message, on Twitter or any other blog or website,

12   including also Facebook and Google and MySpace. And I'm sure I

13   haven't named all of them. You know what I mean. You may not

14   use any similar technology of social media, even if I've not

15   specifically mentioned it.

16        If anyone becomes aware of another juror's violation

17   of any of these instructions, you need to inform Andy so he can

18   bring it to my attention. A juror who violates these

19   restrictions and all of those I mentioned to you jeopardizes

20   the fairness of the trial, and a mistrial could result, which

21   could require the entire trial process to be done all over

22   again.

23        Finally, try not to form any opinion until the case is

24   in, until all of the evidence is in. Keep an open mind,

25   please, until you start deliberating at the end of the case.

**A000087**

1     I hope that this case proves to be interesting and a

2  good experience for you.

3     You are welcome to take notes during the trial.  Bear

4  in mind in deciding what you want to do, it is difficult to

5  take notes and pay attention to what the witnesses are saying

6  at the same time.  If you do take notes, be sure that your note

7  taking doesn't interfere with your listening and your

8  consideration of all the evidence.  If you do take notes, don't

9  discuss them with anyone before you begin deliberating.  Don't

10 take your notes out with you at the end of the day.  Leave them

11 in the jury room.  We'll see to it that they're safe.  If you

12 don't take notes, remember it is your individual responsibility

13 to listen carefully to the evidence, and you can't just turn it

14 over to someone else who is taking notes.  We depend on the

15 judgment of all of you to come to a fair verdict, so you must

16 pay attention and keep track of what's going on.

17     Now, the way the trial will work is this.  The

18 government gets to make an opening statement, which I think of

19 as kind of a trailer at the movies.  They will tell you what

20 they think the evidence is going to show by the end of the

21 case.  And then the defendant's attorney may, but is not

22 obliged to, also make an opening statement also, to tell you

23 what they think the evidence will show by end of the case.

24     The opening statements aren't evidence and they are

25 not argument, and I've always thought of opening statements in

A000088

1   trials as very much like trailers at the movie.  In the sense
2   that there are some cases in which you have seen the trailer as
3   it were, and then the movie, that is the trial, turns out not
4   to be just like the trailer led you to expect, and other times
5   it is spot on.  So, just remember this is just an introduction,
6   it is not evidence, and what matters is the evidence.
7           After the opening statement, the government will call
8   its witnesses.  The defense gets to cross-examine them if the
9   defense wishes.  Then the defendant may, if he wishes, present
10  evidence, call witnesses, the government gets to cross-examine.
11  In some case, the government makes a brief rebuttal
12  presentation.  I then meet with the lawyers to advise them how
13  I am going to instruct you on the law.  Actually, I do that
14  before closing arguments.  Sometimes, especially in a short
15  trial, there is a delay in the closing statements because it
16  takes time for the lawyers to receive the proposed instructions
17  and for us to confer about them.  But, once that's done,
18  they'll make their closing arguments, then you'll retire to
19  deliberate on your verdict.  That's the way it goes.
20          And if anything unusual comes up that I should know
21  about, let Andy know.  And if there is anything we can do to
22  make you more comfortable, do the same thing.
23          And we'll now get started.  We are going to hear an
24  opening statement from the government by?
25          MR. WIRSHBA:  Mr. Wirshba, your Honor.

1          THE COURT:  Go ahead.

2          MR. WIRSHBA:  Thank you, your Honor.

3          About a year ago, the defendant, Rickey Johnson,

4  threatened to kill two politicians and two journalists.  He

5  made death threats to his victims.  Saying: "Smile.  I'm going

6  to kill you.  I'm going to personally kill you.  I am going to

7  kill you with my bare hands."  Those are the defendant's words.

8  This man.  Threats he made, some of the threats he delivered by

9  sending online messages directly to his victims, and for others

10  of his threats, he filmed himself threatening his victims and

11  posted the videos online.

12          Why did he do it?  Because he disagreed with these

13  politicians and journalists so he threatened to kill them.  To

14  murder them with his bare hands.

15          When the defendant made these terrifying threats, he

16  knew that his words and videos would place his victims in fear

17  for their lives, and that is exactly what he wanted.

18          Ladies and gentlemen, that is what this case is about.

19  The defendant made threats to kill two members of Congress,

20  Senator Joe Manchin and Congresswoman Lauren Boebert because he

21  did not like what they did in Congress.  And he made threats to

22  kill two television news anchors, Fox News hosts Greg Gutfeld

23  and Laura Ingraham, because he did not like what they said on

24  TV.

25          It is a federal crime to threaten to injure or kill

**A000090**

1   others on the internet.  And a separate federal crime to

2   threaten to injure or kill members of Congress.  That is what

3   the defendant did, and that is why we are here today.

4          During this trial, we are going to have an opportunity

5   to present evidence proving beyond a reasonable doubt that the

6   defendant is guilty of making these threats to kill.  This

7   opening statement is our opportunity to give you a preview of

8   that evidence so you'll have context as it comes in during the

9   trial.

10         So what will the evidence show?  The evidence will

11  show that over the course of several days, about a year ago,

12  the defendant made a series of death threats against his four

13  victims.  On January 30, 2021, the defendant sent direct

14  messages from his Instagram account directly to the account of

15  TV host Greg Gutfeld.  "You will be killed," the defendant

16  wrote.  He then referenced two other hosts on the same network

17  and wrote "They will be killed as well."

18         Mr. Gutfeld, upon receiving these messages, sent them

19  to corporate security, and corporate security at the network

20  then forwarded the messages to the New York City Police

21  Department or NYPD.

22         And the defendant did not stop there.  Just a few days

23  later, on February 3, 2021, the defendant recorded videos

24  threatening his four victims and posted them publicly online

25  using the same Instagram account that he had used to send

A000091

1  direct messages to Mr. Gutfeld.  We are going to show you clips

2  from those videos at this trial.  You'll see and hear the

3  defendant making these death threats.  In the videos, the

4  defendant did not show his face, and instead recorded just his

5  voice speaking over television news footage.  But he wasn't

6  just speaking.  He was yelling.  Intimidating.  Menacing.

7  Threatening to kill.  When news host Laura Ingraham was on the

8  screen the defendant threatened her, saying, "I'm going to

9  personally kill you" and "Laura Ingraham I am going to kill you

10 with my bare hands."  When news host Greg Gutfeld was on the

11 screen the defendant threatened him, screaming, "You're dead.

12 I'm going to kill you."  Then the defendant added -- and these

13 are his words -- "I'm going to look you in your fucking eye,

14 and I'm going to take your fucking life, and everyone knows

15 that I took your life is going to know why."

16        The defendant targeted not just these TV news hosts

17 but also members of Congress who are appearing as guests on

18 these shows.  When Congresswoman Lauren Boebert was on the

19 screen the defendant threatened her, saying, "I'm going to kill

20 you."  And "Smile.  I'm going to kill you."

21        And when footage of Senator Manchin was on the screen,

22 the defendant threatened him too.  Yelling, "Joe Manchin will

23 be executed."  And later adding -- and again, his words -- "You

24 gonna know I fucking did it."

25        And these are just a few examples of the threats that

A000092

1    the defendant made against his four victims in the videos.

2    You'll see and hear those other threats, too.

3        You'll also learn about how law enforcement responded

4    to the defendant's death threats.  You'll learn that the United

5    States Capitol Police in Washington, D.C. is responsible for

6    threats made against members, against members of Congress and

7    investigating those threats.  When the Capitol Police learned

8    of the defendant's threatening videos, a special agent with

9    Capitol Police called the chiefs of staff for both Senator

10   Manchin and Congresswoman Boebert, even though it was close to

11   midnight.  And that same special agent also arranged for local

12   police to perform additional patrols near Senator Manchin's

13   home to make sure he stayed safe.  All because of the

14   defendant's threats to kill those members of Congress.

15       You'll also learn that the defendant not only hid his

16   face when making these threats, but he also used an Instagram

17   account that wasn't registered in his own name.

18       But the defendant, he got caught.  You'll see and hear

19   evidence confirming it was the defendant who posted these

20   threats to kill.  When he was arrested, the phone in

21   defendant's pocket was logged into the Instagram account that

22   he used to send and post his death threats.

23       So that's what some of the evidence is going to show.

24   Now, how will the government prove beyond a reasonable doubt

25   that the defendant committed the charged crimes?  Well, first,

A000093

1   you are going to see and hear the defendant's terrifying

2   threats.  You'll watch the videos he posted, threatening to

3   murder his victims.  You'll read the messages that he sent

4   threatening to kill.  You are going to hear from a special

5   agent with the Capitol Police's Threat Assessment Unit and from

6   the director of corporate security for the news network.

7   They'll tell you about their responses to the defendant's

8   threats to kill.  And you are going to hear from an NYPD

9   sergeant who arrested the defendant and found the cell phone in

10  his pocket that was signed into the Instagram account that the

11  defendant used to make his threats.

12          All of that witness testimony and other evidence will

13  establish beyond a reasonable doubt that Rickey Johnson, the

14  defendant, threatened to kill his four victims.

15          As Judge Kaplan said, this will not be a long trial,

16  but it is an important trial.  The defendant used the internet

17  to make repeated, terrifying threats to murder four victims,

18  just because he disagreed with them.  Those are federal crimes.

19          I'm about to sit down, and later on at the end of the

20  trial, we'll have another opportunity to come before you to

21  explain to you how it was that the evidence proved that the

22  defendant was guilty beyond a reasonable doubt.

23          But between now and then I'm going to ask you to do

24  three things.  First, pay careful attention to the evidence.

25  Second, follow Judge Kaplan's instructions on the law.  And

**A000094**

1  third, use your common sense.  The same common sense and good

2  judgment you use every day to make decisions in your own lives.

3  If you do those things, you will reach the only verdict that is

4  consistent with the evidence in this case.  That the defendant,

5  Rickey Johnson, is guilty as charged.

6          Thank you.

7          THE COURT:  Thank you, Mr. Wirshba.

8          Now the defendant has the right but not the obligation

9  to make an opening statement.  Does the defendant wish to make

10  an opening statement?

11          MS. CABRERA:  Yes, your Honor.

12          THE COURT:  You may proceed.

13          MS. CABRERA:  Late January to early February 2021.

14  Think about where we were during that time in the country.  A

15  year into COVID, tired of quarantining, facing political

16  unrest.

17          At that time, you have my client, Rickey Johnson, who

18  had already spent a year in COVID isolated in his apartment,

19  watching as the world steeped deeper into political turmoil.

20  He became frustrated with what was going on around him,

21  frustrated that people were not taking COVID seriously,

22  frustrated with how many Americans were dying from COVID, and

23  frustrated with the political landscape.

24          And so what did Mr. Johnson do?  He took his

25  frustrations out on Instagram.  He made a series of videos,

A000095

1  alone in his living room, where he stated he wanted to kill

2  certain members of Fox News media's personalities, and members

3  of Congress.

4       Yes, that's why you're here today.  You're here

5  because Mr. Johnson is being prosecuted for his Instagram

6  activity.  Nothing more.

7       You're probably wondering, well, he must have had a

8  ton of followers.  No.  You'll see he only had four.  Or maybe

9  you're thinking, well, there must have been so many views of

10  these videos.  No.  You'll notice that for one of his videos,

11  at 52 weeks after posting, there were only six views.  Or

12  perhaps you are thinking, oh, well, you must have sent those

13  videos to the people he was talking about in the videos.  No.

14  He never sent a single video to anyone.  Nobody was watching

15  these videos and Mr. Johnson knew that.

16       He was shouting "fire," but in an empty theater.

17       All the while, you'll see Mr. Johnson was just trying

18  to -- trying his best during these difficult times.  Like so

19  many New Yorkers, he took COVID seriously.  He wore his mask.

20  And he was working for Caviar, the food delivery service, as an

21  essential worker.  With his job, he needed everyone to take

22  COVID seriously.  And he was frustrated when he heard anyone

23  say otherwise.

24       Now, you are going to get a chance to see and hear Fox

25  News coverage for yourself.  It's provocative, it's

**A000096**

1    inflammatory, and it is intended to invoke a response.  And

2    Mr. Johnson did just that.  He responded.  He responded in

3    kind, and he responded with words, not acts.

4              Now, the Court will instruct you that the prosecution

5    has the burden of proof here, and they have the highest burden,

6    the burden to prove their case beyond a reasonable doubt.  And

7    in determining whether or not they have met their burden, you

8    can both consider the evidence they've presented, as well as

9    the lack of evidence.  Let's talk about the lack of evidence

10   first.

11             Here's what you are not going to see in this trial.

12             THE COURT:  This is a closing argument, counsel.

13             MS. CABRERA:  You will not see any Google searches --

14             THE COURT:  Counsel.

15             MS. CABRERA:  Yes?

16             THE COURT:  You're arguing.  You're not opening.

17             MS. CABRERA:  Okay, your Honor.  There will not -- may

18   we approach?

19             THE COURT:  No.

20             MS. CABRERA:  You are not going to -- you will hear

21   about, you will be instructed with respect to the lack of

22   evidence, or I'm sorry.  That you may consider a lack of

23   evidence here.  And as you will see, there will be no evidence

24   of Mr. --

25             THE COURT:  Counsel.

**A000097**

 1              MS. CABRERA:  Yes?

 2              THE COURT:  You're here to tell the jury what you

 3     expect the evidence to show.

 4              MS. CABRERA:  Okay.

 5              Here's what you will see.  You will see videos -- do

 6     you hear me still?  I can't hear myself.

 7              THE COURT:  Yes.

 8              MS. CABRERA:  Okay.

 9              You will see videos of Mr. Johnson yelling at his

10     television screen while the news is airing and later commenting

11     on his own videos.  You will see a man frustrated at what is

12     happening in our country.  You will see a man engaging in the

13     same political commentary that has been normalized today.  And

14     just as folks used to write seething letters to the editor,

15     Mr. Johnson wrote a version of his own.  He wrote, and this

16     took the form of an Instagram direct message to Fox News host

17     Greg Gutfeld, criticizing his support for Trump, and stating he

18     would be killed.

19              Mr. Johnson was engaged in hyperbole.  It was

20     provocative, it was inflammatory, it was responsive, and it was

21     not criminal.

22              Now you've heard the prosecution refer to this as a

23     case about threats.  And that Mr. Johnson's words on the videos

24     were enough to convict.  But, if that's the case, then why are

25     we here?  We are here --

**A000098**

```
 1                MR. WIRSHBA:  Objection.

 2                THE COURT:  What's the objection?

 3                MR. WIRSHBA:  Mischaracterizing the government's

 4    opening statement.  And making an argument and not highlighting

 5    what the jury is going to hear.

 6                THE COURT:  Let's stick to what the evidence will

 7    show, counsel.

 8                MS. CABRERA:  We are here because Mr. Johnson's words

 9    themselves are not enough.  His frustrations that you'll hear

10    about are not enough.  His anger that you'll hear expressed was

11    not enough.  His venting was not enough.  They must be serious

12    threats.

13                And you are going to hear about how Greg Gutfeld and

14    Laura Ingraham had received threats in the past.  How Fox News'

15    entire security team, how they have an entire security team

16    devoted to threats assessment.  You're also going to hear that

17    Fox News doesn't treat all of these the same.  It varies.  And

18    I implore you, as you hear that evidence, to ponder why that

19    is.  Why does Fox News, why did they choose to pursue

20    Mr. Johnson, but not others.

21                When all the evidence is in, the judge is going to

22    give you two sets of charges.  And as you consider those

23    charges, it will be clear that the prosecution will not be able

24    to prove its case.  First, the prosecution cannot prove that

25    with Greg Gutfeld and Laura Ingraham's celebrity status and the
```

**A000099**

1   constant barrage of criticism and threats from the public that

2   a person with their background would have viewed these as

3   serious threats.  They also cannot prove that Mr. Johnson

4   intended to interfere with Representative Lauren Boebert and

5   Senator Joe Manchin's congressional jobs when he made these

6   videos, because he never even sent them the videos.  They never

7   left his Instagram page.

8          The prosecution cannot prove its case.  And at the

9   conclusion of this trial, my colleague will stand before you,

10  and ask you to find Mr. Johnson not guilty.

11         So I leave you with this to consider.  If the tree

12  falls in the forest, and no one is there to hear it, does it

13  actually make a sound?  If it does, it certainly is not a

14  threatening one.  Mr. Johnson is not guilty.

15         THE COURT:  Thank you, Ms. Cabrera.

16         Government's first witness, please.

17         MR. WIRSHBA:  Yes, your Honor.  The government calls

18  Special Agent Brandon Kelley.

19         I apologize, I know Special Agent Kelley is here.  He

20  may be in the restroom or something like that, but we'll have

21  him here as soon as possible.

22         THE COURT:  Do you have somebody else ready to go?

23         MR. WIRSHBA:  Yes, your Honor, we do.  We have several

24  witnesses ready to go.  But, and they're here.  They're just

25  retrieving Agent Kelley.

```
 1              THE COURT:  If he doesn't get here pretty soon, you
 2   are going to have to change gears.
 3              MR. WIRSHBA:  Understood, your Honor.
 4              THE COURT:  Presumably he knew he was the first
 5   witness, right?
 6              MR. WIRSHBA:  He did, your Honor.  Absolutely he knew
 7   he was the first witness, and he's quite frankly been here for
 8   hours.  I apologize for the inconvenience, your Honor.
 9    BRANDON KELLEY,
10        called as a witness by the Government,
11        having been duly sworn, testified as follows:
12   DIRECT EXAMINATION
13   BY MR. WIRSHBA:
14   Q.   Where do you work, sir?
15   A.   United States Capitol Police.
16   Q.   Where is that located?
17   A.   In Washington, D.C.
18   Q.   What position do you hold with the United States Capitol
19   Police?
20   A.   I'm a special agent.
21   Q.   Are you assigned to any particular group with the Capitol
22   Police?
23   A.   Yes, I am.
24   Q.   What group is that?
25   A.   Investigations Division, Threat Assessment Section.
```

A000101

 1  Q.  What does the Threat Assessment Section do?

 2  A.  Our primary function is to investigate and mitigate any

 3  threats to members of Congress, their staff, their families,

 4  and the Capitol complex as a whole.

 5  Q.  How long have you been a special agent with the United

 6  States Capitol Police?

 7  A.  For roughly two years.

 8  Q.  What did you do before you were a special agent?

 9  A.  I was a uniformed police officer with United States Capitol

10  Police.

11  Q.  How long did you hold that position?

12  A.  About two years as well.

13  Q.  Are you familiar with the Instagram account 777onyzotus777?

14  A.  Yes, I am.

15  Q.  When did you first learn about that particular account?

16  A.  It was February 4, 2021.

17  Q.  How did you become aware of it?

18  A.  On February 4, 2021, NYPD sent over a case referral to

19  United States Capitol Police Threat Assessment Section of a

20  investigation that they were currently working.

21  Q.  Is NYPD the New York City Police Department?

22  A.  Yes, it is.

23  Q.  What happens when threats are referred to Capitol Police

24  from other law enforcement agencies?

25  A.  Essentially all reportings from outside agencies come into

**A000102**

1   one inbox for Capitol Police.  From there, they are triaged by
2   supervisors who then pass them down to special agents to work
3   the case.
4   Q.  What do you mean by triaged?
5   A.  By triaging I mean, because of the high volume of cases
6   that Capitol Police receives, the supervisors on duty take all
7   of the accounts and referrals from that day and go through and
8   pick out any that may need immediate attention for that day,
9   over others that may not need immediate action for an agent to
10  work.
11  Q.  How does Capitol Police categorize the information that's
12  referred to your agency?
13  A.  Capitol Police, we categorize things in three main
14  sections.  One being police information; two, direction of
15  interest; and three, threats.
16  Q.  Let's go through each of those.  First, what's the category
17  police information?
18  A.  A police information to us is a reporting that comes in to
19  Capitol Police where it doesn't have any necessary --
20  necessarily concerning communications within the reporting.
21  However, it is sent to us, we still document the reporting in
22  case it may be needed in the future.
23  Q.  What's the second category, direction of interest?
24  A.  A direction of interest is a reporting that comes in to us
25  that may have some concerning aspect to it, towards members of

**A000103**

1   Congress or the Capitol that we investigate.  However, it does

2   not involve any direct threat of violence to the Capitol or the

3   members of Congress.

4   Q.  What's that third category?

5   A.  The third category is threat.  Essentially it is a

6   reporting that comes into us that involves a direct threat to

7   members of Congress, their families, their staff, or the

8   Capitol.

9   Q.  What, if any, other designations are applied to threat

10  information that's referred to the Capitol Police?

11  A.  Within those categories we also have a priority lead and a

12  non-priority lead.

13  Q.  What does it mean to be designated a priority lead?

14  A.  A priority lead designation is something that the

15  supervisors at face value when they are triaging that day

16  believe that that case needs to be taken action on immediately

17  by the agent.  Essentially, when you get a priority lead, you

18  stop what you are doing on other cases, and you start the

19  priority lead.

20  Q.  When you received the report in this case, how was it

21  designated?

22  A.  It was designated to me as a priority threat.

23  Q.  What did you receive that began your work on this case?

24  A.  I received the original e-mail by NYPD that they were

25  working a case which uncovered --

**A000104**

```
 1                 MS. BAHARANYI:  Objection, your Honor.
 2                 THE COURT:  What is the objection?
 3                 MS. BAHARANYI:  Your Honor, calling for hearsay.
 4                 THE COURT:  I think the answer is "I received the
 5      original e-mail."  Full stop.  Strike the rest.
 6                 Next question.
 7      Q.  What did you do after receiving that e-mail?
 8      A.  I reviewed the contents of the e-mail.
 9      Q.  What did you do next?
10      A.  Opened up the e-mail, the links in the e-mail, and reviewed
11      the contents on Instagram.
12      Q.  The links in the e-mail.  To what did those links refer?
13      A.  They referred to two Instagram posts made by the
14      individual.
15      Q.  What was the user name for the Instagram account that
16      posted the information that you reviewed?
17      A.  It was 777onyzotus777.
18                 MR. WIRSHBA:  Ms. Cooper, if we can display what's
19      been marked as Government Exhibit 701 just for the witness.
20      Q.  Agent Kelley, do you recognize that?
21      A.  It's not -- something's supposed to be on here?
22                 THE COURT:  Yes.
23                 MR. WIRSHBA:  Yes.
24                 THE WITNESS:  I don't see anything.
25                 THE COURT:  Andy, the witness's monitor.
```

A000105

```
1              THE DEPUTY CLERK:  It's not working?  It was working
2   this morning, Judge.  I'm going to check the plug, Judge, and
3   then I'll call for help.
4              THE COURT:  Always a good first step.
5              Do we have a hard copy?
6              MR. WIRSHBA:  We do, your Honor.
7              THE COURT:  Switch to hard copy.
8              MR. WIRSHBA:  Yes, your Honor.  Will do.  May I
9   approach?
10             THE COURT:  Yes.
11  Q.  Agent Kelley, I've handed you something that's been marked
12  as Government Exhibit 701.  Do you see that?
13  A.  Yes, I do.
14  Q.  Do you recognize it?
15  A.  Yes, I do.
16  Q.  What do you recognize it to be?
17  A.  It is the Instagram post that I reviewed on February 4,
18  2021, a screenshot.
19  Q.  A screenshot of that post?
20  A.  Yes.
21             MR. WIRSHBA:  The government offers Government Exhibit
22  701 and would ask to be able to display it to the jury.
23             MS. CABRERA:  No objection.
24             THE COURT:  Received.
25             (Government's Exhibit 701 received in evidence)
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000106**

 1              MR. WIRSHBA:  Ms. Cooper, if we could display that to
 2       the jury.
 3              THE COURT:  Are your screens lighting up with this?
 4       No.
 5              A JUROR:  It's good now.
 6              THE COURT:  We're going to take our afternoon break
 7       here.
 8              MR. MORONEY:  I think the screens started working.
 9              THE COURT:  How about yours?
10       Q.  Agent Kelley, can you see it on the screen?
11       A.  No, sir.
12              THE COURT:  We'll work without it.  So the jury is
13       seeing it.  Let's go ahead.
14              MR. WIRSHBA:  Yes, your Honor.
15       Q.  Agent Kelley, what website is this screenshot from?
16       A.  This is posted on Instagram.
17       Q.  How do you know that?
18       A.  On the top-left-hand corner it states the website.
19       Q.  What is Instagram?
20       A.  Instagram is a social media platform where individuals can
21       post videos or pictures.
22       Q.  What account is this posted to on Instagram?
23       A.  This account is 777onyzotus777.
24       Q.  How do you know that?
25       A.  To the right of the video, there is the poster's name.

```
1  Q.  What type of media did the user post in this instance?

2  A.  This was a video.

3  Q.  How do you know that?

4  A.  Because I reviewed it.

5  Q.  When was this posted?

6  A.  This was posted on February 3, 2021.

7  Q.  Can you tell that from Government Exhibit 701?

8  A.  Yes, I can.

9  Q.  How?

10 A.  On the bottom-right-hand corner, it shows the date that the

11 video was posted.

12 Q.  Who is depicted in the still of this video?

13 A.  That is United States Representative Lauren Boebert of the

14 Colorado's 3rd District.

15 Q.  Is a United States Representative an official position with

16 the United States government?

17 A.  Yes, it is.

18 Q.  How do you know that Representative Boebert is a U.S.

19 Congresswoman from Colorado's 3rd District?

20 A.  I know this for a few reasons.  One of them being since

21 working with the Capitol Police for the last five years,

22 roughly, I've worked in and around Congressional buildings in

23 Washington D.C. where I've been to her office inside of those

24 Congressional buildings.  As well, since then, I have checked

25 Congress.gov and confirmed she was in fact a United States
```

**A000108**

1   Representative at the time the video was posted, and is still

2   currently a United States Representative.

3   Q.  Agent Kelley, what's on the right side of this screenshot,

4   next to where it says 777onyzotus777?

5   A.  That is a video caption.

6   Q.  What's a video caption?

7   A.  A caption is essentially a post that the poster can make to

8   go along with the type of media.  So if the poster posts a

9   video or a picture, they can write anything they want alongside

10  of the video or picture.

11  Q.  Who wrote this video caption?

12  A.  777onyzotus777.

13  Q.  How do you know that?

14  A.  It states right by the caption.

15  Q.  What's the content of this particular video caption?

16  A.  The content of this particular caption is @Ron DeSantis,

17  Rep. Boebert, Constitution CTR, and @Justice Department.

18  Q.  What are those ats?  What does that mean?

19  A.  An at is a tag.

20  Q.  What's a tag?

21  A.  A tag is essentially you are tagging another individual on

22  Instagram to make them aware and notify them of the post that

23  you just posted.

24          MS. CABRERA:  Objection, your Honor.  Move to strike.

25          THE COURT:  I'm sorry, I can't understand you.

**A000109**

```
 1                  MS. CABRERA:  Objection.  Move to strike.

 2                  THE COURT:  On what ground?

 3                  MS. CABRERA:  On the fact that he's testifying to

 4     things he doesn't have a basis of knowledge.  He is not from

 5     Instagram.

 6                  THE COURT:  Let's lay a foundation.

 7                  MR. WIRSHBA:  Of course, your Honor.

 8     Q.  Agent Kelley, have you used social media websites before?

 9     A.  Yes, I have.

10     Q.  Have you used Instagram in particular?

11     A.  Yes, I have.

12     Q.  Are you familiar with the way that Instagram works from

13     your own experience using the website?

14     A.  Yes, I do.

15     Q.  In your work in the Threat Assessment Unit, have you also

16     received training about social media websites?

17     A.  Yes, I have.

18     Q.  And about how threats may be sent over those social media

19     websites?

20     A.  Yes, I have.

21     Q.  Does that training include, does your training and

22     experience as working with the Capitol Police include knowledge

23     of how Instagram works?

24     A.  Yes.

25                  THE COURT:  Objection is overruled.
```

A000110

 1 | Q.  Agent Kelley, you mentioned that this says @Rep. Boebert.
 2 | To what is that referring?
 3 | A.  That is a tag that goes to United States Representative
 4 | Lauren Boebert's official Instagram page.
 5 | Q.  And how do you know that that goes to the official
 6 | Instagram page of Representative Boebert?
 7 | A.  I myself have clicked on that tag, and it does in fact lead
 8 | me directly to her official Instagram page.
 9 | Q.  Did you watch the video that's on the left side of this
10 | screenshot?
11 | A.  Yes, I did.
12 | Q.  Have you also reviewed video clips from this recording?
13 | A.  Yes, I have.
14 | Q.  You'll see in front of you a disc that's marked GX 702.  Do
15 | you see that?
16 | A.  Yes, I do.
17 | Q.  Do you recognize that disc?
18 | A.  Yes, I do.
19 | Q.  What is it?
20 | A.  That is a CD that I reviewed.
21 | Q.  What's on that CD?
22 | A.  That CD has clips from the original video that I reviewed
23 | in February of 2021.
24 | Q.  Those are clips from the video of the screenshot in
25 | Government Exhibit 701; is that right?

**A000111**

 1    A.  Yes, they are.

 2    Q.  Were the clips on that CD marked Government Exhibit 703 and

 3    704?

 4    A.  Yes, they were.

 5    Q.  When you reviewed the clips, were they fair and accurate

 6    representations of what you saw on Instagram when you looked?

 7    A.  Yes, they were.

 8            MR. WIRSHBA:  The government offers Government Exhibit

 9    703 and Government Exhibit 704.

10            MS. CABRERA:  No objection.

11            THE COURT:  They are received.

12            (Government's Exhibit 703, 704 received in evidence)

13            MR. WIRSHBA:  Your Honor, I am going to ask to

14    approach the witness again with paper copies of certain

15    exhibits.

16    Q.  Agent Kelley, I just handed you what is premarked as

17    Government Exhibit 703T and 704T.  Is that right?

18    A.  Yes.

19    Q.  Have you seen these before?

20    A.  Yes, I have.

21    Q.  What are they?

22    A.  These are transcripts from the video that was posted.

23    Q.  Are these fair and accurate transcripts as you reviewed

24    them?

25    A.  Yes, they are.

1          MR. WIRSHBA:  The government would seek to admit

2    Government Exhibits 703T and 704T.

3          MS. CABRERA:  No objection.

4          THE COURT:  For clarification, these are transcripts

5    of the whole video that was posted or transcripts of the clips

6    that are on 703 and 704?

7          THE WITNESS:  These are transcripts of the clips that

8    are posted, sir.

9          THE COURT:  All right.  They are received, but let me

10   say a word to the jury.

11          The evidence is 703 and 704.  That's what was really

12   posted.  The transcripts are in evidence as an aid to you in

13   listening to what was posted.  In the event you find any

14   discrepancy between the transcript and the video clip, it is

15   the video clip that controls.  Let's proceed.

16          (Government's Exhibit 703T, 704T received in evidence)

17          MR. WIRSHBA:  Yes, your Honor.

18          Ms. Cooper, if we could display Government Exhibit 703

19   on the left, and Government Exhibit 703T on the right.  Can we

20   display that for the jury as well.

21          Ms. Cooper, if we could play Government Exhibit 703.

22          (Video playing)

23   Q.  Agent Kelley, what, if anything, did you do in response to

24   watching this particular video?

25   A.  After reviewing this particular video, I sent an internal

**A000113**

1   notification to my chain of command all the way up through the

2   chief of police of my agency.

3   Q.   Why did you do that?

4   A.   That essentially is to make sure my entire chain of

5   command, including the chief of police, is aware that Capitol

6   Police is investigating a threatening communication towards

7   that specific member of Congress, in case they have any type of

8   meetings or public events where the case comes up.

9   Q.   What else did you do, if anything?

10  A.   After sending that internal notification, I attempted to

11  get in contact with the chief of staff for United States

12  Representative Boebert.

13  Q.   What is a chief of staff?

14  A.   A chief of staff is the highest ranking staff member for a

15  United States representative or senator.

16  Q.   Why did you call the chief of staff and not someone else

17  who works for Congresswoman Boebert?

18  A.   I called the chief of staff in this instance, based off of

19  the type of threat and the language was concerning enough to me

20  that I felt that it was necessary to make sure that the office

21  and the member of Congress was properly notified.

22  Q.   What time was it when you made this call to the chief of

23  staff?

24  A.   It was about 11:30 at night.

25  Q.   You mentioned when you reviewed this clip that the language

**A000114**

```
 1    was concerning to you.  About what about this particular clip
 2    was concerning?
 3              MS. CABRERA:  Objection, relevance.
 4              THE COURT:  Mr. Wirshba?
 5              MR. WIRSHBA:  Yes, your Honor?
 6              THE COURT:  What's the relevance?
 7              MR. WIRSHBA:  What?
 8              THE COURT:  On relevance.
 9              MR. WIRSHBA:  On relevance, your Honor.  Yes, this is
10    relevant.  There is clear case law that we can detail for the
11    Court about how the reaction of law enforcement to particular
12    threats is relevant to allowing the jury to evaluate the
13    elements of whether or not there is a true threat, and whether
14    or not the defendant was intending to convey a threat when he
15    made the threat.  Because the individuals who receive those
16    threats and individuals around them are able to testify as to
17    their interpretation, which aids the jury in their
18    determination of whether or not there is a true threat.  There
19    are cases that I can cite for your Honor at sidebar if you
20    want.
21              THE COURT:  Ms. Cabrera?
22              MS. CABRERA:  Your Honor, my understanding is that the
23    Special Agent Kelley just testified that it was in fact his
24    supervisors who made the determination as to how to move
25    forward in informing him where to move next and the seriousness
```

**A000115**

 1  of the threat.

 2          THE COURT:  What he said was that the supervisor

 3  triaged the communications from NYPD, and they classified this

 4  as he described, and then he notified Representative Boebert's

 5  chief of staff or attempted to do so at 11:30 at night.  And he

 6  was asked, as I understood the question, what about this clip

 7  was concerning.

 8          MS. CABRERA:  Correct.  But his personal feelings are

 9  not relevant.  The standard is what the reasonable person would

10  deem to be a threat.

11          THE COURT:  Overruled.

12          MR. WIRSHBA:  May I proceed, your Honor?

13  Q.  Agent Kelley, you mentioned this clip was concerning to you

14  and that's why you called the chief of staff.  What about this

15  clip was concerning?

16  A.  There were three things primarily that stood out to me that

17  concerned me.  One being the intensity of the language.  Two

18  being the repetition.  And three, the fact that the member of

19  Congress was tagged in the post.

20  Q.  Let's go through each of those.  First you mentioned the

21  language was concerning.  What about the intensity of the

22  language was concerning?

23  A.  What I mean by the intensity of the language, I'm

24  specifically speaking of the statement "I'm going to kill you."

25  That statement stood out to me for two primary reasons.  One is

 1   it is an "I" statement.  It is taking ownership of the

 2   statement.  "I" is different than, let's say, "we are going to

 3   kill you."  One is taking more ownership of that action over

 4   the other.

 5          The second portion that concerned me with that

 6   statement was just in general the threat itself.  It was a

 7   threat of death.  "I'm going to kill you."  That is different

 8   to me than something along the lines of "I hope you die."  One

 9   of them is wishful thinking, the other one to me stood out as

10   an individual possibly making or formulating a plan to carry

11   out this action.

12   Q.  You also mentioned the repetition.  What about the

13   repetition concerned you?

14   A.  The repetition concerned me.  And what I mean by that is it

15   wasn't a one-off statement.  The statement was made multiple

16   times throughout this video clip.  And to me, that just -- is

17   strengthening the grievance that an individual might have about

18   to a member of Congress by repeating it over and over again.

19   Q.  The last piece that caused you to call the chief of staff.

20   You were concerned that Congresswoman Boebert was tagged.  Why

21   is that concerning?

22   A.  That's concerning to me because the fact that he -- the

23   individual tagged the member of Congress shows that the

24   individual wanted the member of Congress and their staff to see

25   the post for whatever psychological effect it may have with the

**A000117**

1    member or the office.  He wanted to ensure that the member of

2    Congress reviewed and saw the post that he made.

3    Q.  Were you able to reach Representative Boebert's chief of

4    staff by phone that evening?

5    A.  I was not.

6    Q.  What did you do?

7    A.  I followed up with an e-mail to the chief of staff.

8    Q.  What did you say in this e-mail?

9               MS. CABRERA:  Objection, hearsay.

10              THE COURT:  It's not offered for the truth I presume.

11   Is that right?

12              MR. WIRSHBA:  That's correct, your Honor.  I think

13   that if your Honor would hear the testimony, the statements are

14   not even hearsay statements.

15              THE COURT:  Well, that's what it means that it's not

16   offered for the truth.

17              MR. WIRSHBA:  Yes, your Honor.

18              THE COURT:  I'll take it subject, and if there is a

19   problem, you'll move to strike, Ms. Cabrera.

20   Q.  What did you say in your e-mail?

21   A.  I notified them of the threatening communication.  I

22   notified that if they would like to review the video, that they

23   were tagged in the post, so they were able to find it and

24   review it.  As well, I requested multiple pieces of information

25   from the staff to move forward.

**A000118**

1   Q.   What did you request?

2   A.   I requested the current whereabouts for the member of

3   Congress, United States Representative Boebert, I requested the

4   upcoming schedule for the next two to three weeks, as well as

5   asked if they would like directed patrols of the residence.

6   Q.   Let's go through each of those.  Why did you ask for the

7   congresswoman's current whereabouts?

8   A.   It is important for us in my job to make sure that if she

9   has any type of high-profile events that are currently going

10  on, that we can enhance security based off of this threat that

11  just came in to us that we are currently investigating.

12  Q.   Why did you ask for the congresswoman's schedule?

13  A.   The congresswoman's schedule is important to us for the

14  same reasoning.  As well as we'd like to know if she has any

15  plans on traveling to any locations that we believe that the

16  suspect may be in, so we can enhance security on her end or

17  change travel routes, if necessary.

18  Q.   You also mentioned directed patrols.  What are those?

19  A.   Directed patrols are requests that we put in with local law

20  enforcement, law enforcement agencies, requesting that they

21  send additional patrols throughout their shifts, throughout the

22  member's home town residence so they can look for anything

23  unusual or concerning that may stand out to them while we work

24  the investigation.

25  Q.   What, if any, response did you receive from this e-mail

1   that you sent?

2   A.  I received an e-mail from the chief of staff early the next

3   morning.

4   Q.  What, if anything, did the chief of staff say to you?

5              MS. CABRERA:  Objection.

6              THE COURT:  Sustained.

7   Q.  What, if any, directed patrols did you set up in response

8   to communications with Representative Boebert's office?

9   A.  At the time I did not set up any directed patrols for

10  Representative Boebert's office.

1                    (Continued on next page)

2    BY MR. WIRSHBA:

3    Q.  What did you do to further the investigation into

4    Representative Boebert's -- the messages that were sent tagging

5    Representative Boebert?

6    A.  I'm sorry?

7    Q.  What, if anything, did you do to ensure the safety of

8    Representative Boebert once you reviewed these messages?

9    A.  I provided staff with a photo sheet of the individual.

10   Q.  And why is it that you did not request directed patrols on

11   that occasion?

12   A.  The reason why I didn't request directed patrols -- I

13   requested -- I asked if the office would like directed patrols.

14   At the time I was looking for a yes or no answer.  Since

15   reviewing my original email to staff, I understand there could

16   have been a possible miscommunication.  The way I asked the

17   question, staff did --

18            MS. CABRERA:  Objection.

19            THE COURT:  Sustained as to that part.

20   BY MR. WIRSHBA:

21   Q.  Did you watch any other videos that evening?

22   A.  Yes, I did.

23            MR. WIRSHBA:  Ms. Cooper, can we try to put up just

24   for the witness Government Exhibit 601.

25            If we're not able to, I'm prepared to bring up a hard

**A000121**

                 copy.

       1

       2    Q.  Can you see that Special Agent Kelley?

       3    A.  No, sir.

       4            MR. WIRSHBA:  May I approach, your Honor?

       5            THE COURT:  Yes.

       6    BY MR. WIRSHBA:

       7    Q.  Agent Kelley, I passed you what has been premarked as

       8    Government Exhibit 601.

       9            Do you see that?

      10    A.  Yes, I do.

      11    Q.  What is that?

      12    A.  That is a screenshot of a video, of an additional video,

      13    that I reviewed on February 4, 2021.

      14    Q.  And is it a fair and accurate representation of the

      15    screenshot from that Instagram account that you reviewed?

      16    A.  Yes, it is.

      17            MR. WIRSHBA:  Your Honor, the government offers

      18    Government Exhibit 601.

      19            MS. CABRERA:  No objection.

      20            THE COURT:  Received.

      21            (Government's Exhibit 601 received in evidence)

      22            THE COURT:  Let's take about a ten-minute break here,

      23    folks.

      24            (Recess)

      25            MS. BAHARANYI:  Your Honor, may we have a moment to

**A000122**

1   address the Court before the jury comes in outside the presence

2   of the jury?

3            THE COURT:  I'm sorry.  You're dropping your voice.

4            MS. BAHARANYI:  If we may have a moment to address the

5   Court so the witness can stay on the stand.

6            THE COURT:  The middle part I'm not hearing.  You want

7   to speak to me about?

8            What is it about the witness?

9            MS. BAHARANYI:  We can leave the witness on the stand

10   and perhaps approach the bench, your Honor.

11            THE COURT:  Okay.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. BAHARANYI:  I'm concerned.  This is building off

3    of our last objection about what sounded like quasi expert

4    testimony about if the threat is serious.  The concern is that

5    the government is eliciting this is, one, is that they have not

6    given us any expert testimony.  And two, that they'll seek to

7    do this again in the next video.

8          There certainly is case law that supports him saying

9    what his steps were when he received that message.  We don't

10   dispute that.  But in terms of them going into, oh, you

11   repeated it multiple times which makes it serious, which this

12   witness should be able to testify to, given that he's not an

13   expert, or we certainly weren't provided notice that he was

14   going to be providing expert testimony.  We asked the

15   government to keep it to his steps in the investigation in

16   reaction to the statement.

17          THE COURT:  The statement is what you're objecting to?

18          MS. BAHARANYI:  His steps were his reaction to the

19   statement.  Like he does notify these individuals.  He does

20   request a directed patrol.  We didn't object to them asking

21   that.

22          It is the deep dive into well, here are the elements.

23   Is it that serious.  He is not an expert on that.  He's

24   certainly can't testify to that, and he certainly can't be able

25   to testify about this point.

A000124

 1          MR. WIRSHBA:  Several points, your Honor.  First, the

 2     government does not contend that this is expert testimony in

 3     any way.  This is testimony of an individual, who at the time

 4     the threats were made, received the threats and reacted to them

 5     in his experience explaining what he did and why he did it.

 6          That testimony has been admitted in other trials, and

 7     it's part of the jury instructions that the defense has

 8     submitted in this case where the testimony of law enforcement

 9     about their reaction to the threats is relevant to the elements

10     of whether it's a true threat and the defendant's intent.

11          And I will say the other thing is that the defense has

12     put this issue on the table by opening on the fact that they

13     are going to be questioning about law enforcement's reaction

14     and whether or not they were taking it seriously, not taking it

15     seriously, or whether they should have.  There are other cases

16     that they didn't take as seriously.

17          So it's perfectly appropriate, given that they opened

18     on this and the fact that it's in the instruction which is in

19     Sand, that we be allowed to question this witness about not

20     just what he did but why he did it.  This is someone who

21     received the threats at the time.

22          MS. BAHARANYI:  The level of detail that they're going

23     into with the witness saying, these are the elements that make

24     this serious, that's not necessary, one, to complete the

25     narrative.

**A000125**

```
 1              THE COURT:  But that's not exactly what he said.
 2   You're making what he's saying, I think, somewhat more than
 3   what he's actually saying.
 4              MS. BAHARANYI:  He actually did seem to go into
 5   detail, your Honor, about what makes this serious.  And that is
 6   separate from testifying about --
 7              THE COURT:  I believe what he was saying -- perhaps
 8   I'm wrong -- was that this is why he did what he did.
 9              MS. BAHARANYI:  We have no objection to him explaining
10   the steps that he did.  And in fact, he has already explained
11   that he received information from his supervisor designating
12   this as a threat.
13              THE COURT:  Yes.
14              MS. BAHARANYI:  So the narrative is complete enough
15   without them having --
16              THE COURT:  I understand why you don't want him to say
17   things that are not helpful to your case.  But that in itself
18   is not an objection.  Look.  Isn't it also, at worst from the
19   government's point of view, a lay opinion that's rationally
20   based on facts he perceived?
21              MS. BAHARANYI:  The jury is going to be asked to
22   determine whether this is a serious threat.  And there are
23   certain things that can be drawn out to assist them with that
24   assessment.  But they should not be eliciting testimony like
25   this.
```

**A000126**

```
 1          I want to point out that the government pointed out
 2    that there is plenty of case law.  But I think because courts
 3    have permitted that doesn't mean they endorsed it.
 4          THE COURT:  That's fair.  You give me some case law;
 5    you give me your case law.  For now, it's going to come in.  If
 6    it has to be stricken, it will be stricken.
 7          It seems to me that even if the threats were totally
 8    objective, the reaction of this man is relevant on the issue of
 9    do you think the person would consider it as a threat.  That's
10    my reaction as of now.  So I'm willing to accept argument on
11    this in the form of cases.
12          MS. BAHARANYI:  Thank you, your Honor.
13          (In open court; jury present)
14          MR. WIRSHBA:  Thank you, your Honor.  I believe that
15    the government had just offered and the Court had accepted
16    Government Exhibit 601 into evidence.
17          Mr. Brewer, if you could display that for the jury and
18    for -- well, not I suppose for the jury but the witness.
19    Q.  Do you recognize this?
20    A.  Yes, I do.
21    Q.  And just remind the jury.
22          Where do you recognize this from?
23    A.  This was a screenshot from the original post that I
24    reviewed on February 4, 2021.
25    Q.  And what account is that screenshot posted from?
```

 1   A.   The account is 777onyzotus777.

 2   Q.   And what type of media did the user post in this case?

 3   A.   This was a video.

 4   Q.   How do you know?

 5   A.   Because I reviewed it.

 6   Q.   Who is depicted on the left side of this screenshot.

 7   A.   That is United States Senator Joe Manchin from West

 8   Virginia.

 9   Q.   And is united States senator an official position within

10   the United States?

11   A.   Yes, it is.

12   Q.   How do you know that this individual, Joe Manchin, holds a

13   position as a United States senator?

14   A.   I know this for the same reasons I referred to earlier.

15   Since working with Capitol Police for five years, I've worked

16   inside and around congressional buildings in Washington D.C.  I

17   have been to his office specifically during work.

18          In addition to that, I've checked congress.gov and

19   confirmed that he was a United States senator at the time this

20   video was posted and that he is still a United States senator.

21   Q.   When was this particular video posted if you can tell?

22   A.   This video was posted February 3, 2021.

23   Q.   And who, if anyone, is tagged in this particular post?

24   A.   That is Senator Joe Manchin.

25   Q.   Where do you see that?

1   A.   That is to the right of the video post in blue.

2   Q.   Have you reviewed the full video that's captured here?

3   A.   Yes, I have.

4   Q.   Have you also reviewed video clips from this recording?

5   A.   Yes, I have.

6   Q.   Do you see a disc in front of you that's labeled Government

7   Exhibit 602?

8   A.   Yes, I do.

9   Q.   Do you recognize that disc?

10  A.   Yes, I do.

11  Q.   What's on it?

12  A.   This is video clips from the original video that I reviewed

13  back in February of 2021.

14  Q.   And were those clips that are on that disc marked

15  Government Exhibit 603A, 603B, and 604?

16  A.   Yes, they are.

17  Q.   And when you reviewed those clips, did you find them to be

18  fair and accurate representations of what you saw on Instagram?

19  A.   Yes, I did.

20          MR. WIRSHBA:  Your Honor, the government offers

21  Government Exhibits 603A, 603B, and 604.

22          THE COURT:  The numbers again, please.

23          MR. WIRSHBA:  Of course, your Honor.  603A, 603B, and

24  604.

25          MS. BAHARANYI:  Objection, your Honor.

A000129

1          THE COURT:  On what ground?

2          MS. BAHARANYI:  Your Honor, both on the grounds of

3    relevance and undue prejudice.  Given the way the videos are

4    spliced or cut, it is our understanding that the government

5    does not intend to provide the full context.

6          THE COURT:  I'm sorry?

7          MS. BAHARANYI:  That the government does not intend to

8    provide the full video.  And so these clips, your Honor, we

9    argue are unduly prejudicial in how they are presented to the

10   Court.

11         THE COURT:  I thought you said relevance.

12         MS. BAHARANYI:  The relevance is also in question,

13   your Honor.  Because of the way that these clips are -- the way

14   that these videos are in fact cut, your Honor, reduces the

15   relevancy of the video.  And certainly the relevance is

16   substantially, substantially outweighed by the prejudice, given

17   the way that these videos have been spliced together.

18         THE COURT:  I have 603A, and I have 603B.

19         Are you saying that each of those has been spliced

20   together and that the text that appears there is not continuous

21   in the original?

22         Is that what you're saying?

23         MS. BAHARANYI:  That the government is presenting

24   incomplete evidence, your Honor, portions from a larger video

25   instead of presenting the entire context that would show --

**A000130**

1          THE COURT:  Could you please answer my question.

2          MS. BAHARANYI:  So the text in the transcript, your

3    Honor, that part has not been spliced together.  It's truly the

4    way the videos have been cut and what's left out of the videos.

5          THE COURT:  Okay.

6          MR. WIRSHBA:  Your Honor, these are clips from a

7    longer video.  Yes, we are trying to show those clips that are

8    relevant to ensure that the Court saves time and to highlight

9    the most relevant portions.

10          The government produced these exhibits quite a while

11    ago and marked them as such.  These are from the videos that

12    are charged in the indictment and, as I think your Honor will

13    come to see, contain the language that the government asserts

14    are threats against Senator Joe Manchin, among others.

15          MS. BAHARANYI:  Your Honor, if the government does not

16    object to us admitting the fuller version of these videos, then

17    we wouldn't have a remaining objection.  The issue is if the

18    government then doesn't permit us --

19          THE COURT:  It's not up to them.  It's up to me.  They

20    just told you they don't have any objection anyway.  So if you

21    want to play the whole thing, you can play the whole thing.

22          MS. BAHARANYI:  Fair enough, your Honor.

23          MR. WIRSHBA:  Your Honor, if I may be heard at

24    sidebar.

25          (Continued on next page)

**A000131**

1            (At sidebar)

2            MR. WIRSHBA:  I apologize, your Honor.  This could

3    have been raised with the Court earlier.

4            THE COURT:  Of course it could have.

5            MR. WIRSHBA:  Your Honor, the government does not

6    believe that the whole video should be permitted into evidence.

7            THE COURT:  Why?

8            MR. WIRSHBA:  Because there are parts of it that are

9    extraordinarily prejudicial, have nothing to do --

10           THE COURT:  Prejudicial in what way and to whom?

11           MR. WIRSHBA:  Prejudicial to the victims, prejudicial

12   to the government because he is making political statements

13   there have absolutely nothing to do with the threats in this

14   case.

15           There are things in there that have absolutely nothing

16   to do with what he is saying.  And for the defense at this

17   point to try to offer the entire thing without giving the Court

18   an opportunity to review it, as the government did --

19           THE COURT:  But they're not offering anything.  It's

20   your case.

21           MR. WIRSHBA:  My only point, your Honor, is that the

22   government does not agree that the entire video should be

23   permitted to come in.

24           THE COURT:  I thought that's what you said.

25           MR. WIRSHBA:  That is not what I intended to say, your

**A000132**

1  Honor.  What I was saying is that these particular clips are

2  relevant.

3       MS. BAHARANYI:  And, your Honor, we would not object

4  to the relevance of those particular clips if we were also able

5  to admit the other portions from that same day, the same

6  broadcast, the same video to make sure that the full context of

7  the video is before the jury instead of merely a portion of it.

8       THE COURT:  Yes.  I got that.

9       MR. WIRSHBA:  It doesn't sound like the defense has an

10  objection to the clips.

11       THE COURT:  The issue is not relevance.  They're

12  obviously relevant.  I don't know why relevance was even

13  mentioned.  The issue is, if anything, the rule of

14  completeness.

15       Does anybody happen to remember the number of the rule

16  of completeness?

17       MR. WIRSHBA:  106.  Thank you very much.  All right.

18  The rule of completeness says:  "If any party introduces all or

19  part of a recorded statement, an adverse party may require the

20  introduction at that time of any other part or any other

21  writing or recorded statement and, in fairness, ought to be

22  considered at the same time."

23       What's your showing that in fairness, the rest of it

24  ought to be considered and considered now?

25       MS. BAHARANYI:  Your Honor, the government has already

**A000133**

1    stated here that the rest of the clip shows the political

2    statements that are being made and what his reaction is.  So to

3    only show a small portion of it -- it doesn't show the context

4    of the statement.  So it is incredibly unfair and prejudicial

5    to Mr. Johnson.

6             THE COURT:  Why?

7             MS. BAHARANYI:  Because it makes it seem like he is

8    someone who in one minute says, "I'm going to kill" you when

9    in fact he was speaking for several minutes about his political

10   motivation, about his feelings about what he was reacting to.

11            THE COURT:  Are you telling me, when you say his

12   political motivations, that what is being excluded by offering

13   it in this form is other parts when he says, in words or in

14   substance, I'm threatening the lives of these people because,

15   and then explains his motivation.

16            MS. BAHARANYI:  He doesn't use those exact words, your

17   Honor.  But the words he does use are I'm using the

18   Constitution.  I'm speaking about the constitution.  I'm

19   talking about -- he calls these individuals domestic terrorists

20   for their support of certain things.  But he makes that clear

21   in these other segments of the video.

22            What we simply want, your Honor, is if they're going

23   to introduce that --

24            THE COURT:  I know what you want.  I got that bottom

25   line right from the beginning.

1      MS. BAHARANYI:  If they're going to be able to play a

2  30-second, one-minute, minute-and-a-half clip, then, your

3  Honor, it's only fair that the jury gets the entire video.

4      THE COURT:  Why is it only fair?

5      MS. BAHARANYI:  If fairness dictates.  That's the

6  rule.  If fairness dictates that is necessary.

7      THE COURT:  I know what the rule says.  I just read it

8  to you.

9      Why is it fair?  That's the question.  And I'm going

10 to send the jury home now because this is ridiculous.  And then

11 I'll talk to you.

12     Members of the jury, I think you're going to break

13 while I sort this out.  Please be back at 9:30 tomorrow

14 morning.

15     The witness can stand down.  Everybody can be seated.

16     MR. WIRSHBA:  Your Honor, may I be heard on

17 timeliness?

18     THE COURT:  Yes.

19     MR. WIRSHBA:  Your Honor, we called this witness first

20 because the witness has a graduation that he was hoping to get

21 to tomorrow morning.  Of course, if the Court rules that we

22 must break for the day, then we must.

23     THE COURT:  It's already five after 4:00.  All we're

24 doing is going around in circles.

25     MR. WIRSHBA:  Understood, your Honor.

**A000135**

```
 1              THE COURT:  And if I'm going to play a long tape
 2    because the rule says in fairness, I need to have the rest of
 3    it now, it means now.  So this has to be resolved now.
 4              MR. WIRSHBA:  I understand, your Honor.  I thought
 5    that I should mention it, but understood.
 6              THE COURT:  Ms. Baharanyi, you're very smart and very
 7    articulate.  But I ask you questions sometimes, and what you do
 8    is repeat the conclusion you want.  And I'd like an answer to
 9    the questions I ask.
10              Now, the rule says that you're entitled to this if, in
11    fairness, that's necessary.
12              Now please tell me why in fairness in a case in which
13    your client is charged with threats which are on these excerpts
14    there is something on the rest of the video which of course I
15    haven't seen because of course it was not brought to my
16    attention in the flood of in limine correspondence over the
17    last ten days.
18              What is on the rest of it that you think, in fairness,
19    needs to be heard at the same time?  And why is it that in
20    fairness it needs to be heard at the same time?
21              MS. BAHARANYI:  Your Honor, if I may.
22              THE COURT:  Yes.  Sure.
23              MS. BAHARANYI:  What is on the video is the context
24    that's missing from the clips.
25              THE COURT:  Now let me help you out.  Here is one of
```

A000136

1   the reasons I'm having a problem with your argument:  Whenever

2   an excerpt from anything is offered, the portion of the

3   document or recording that is not offered is always the

4   context.  That is a matter of definition.  It is always the

5   context.

6            So in order to satisfy me that in fairness I have to

7   hear the rest, telling me it's the context simply restates the

8   problem.

9            MS. BAHARANYI:  So let me explain what that context

10  is.  That might be helpful.

11           THE COURT:  I think that's a good start.

12           MS. BAHARANYI:  Okay.  Your Honor, the broadcast, the

13  clip, the video that we seek to have admitted shows

14  representatives of The Five, which is the individuals that

15  Mr. Johnson is charged with threatening, shows their comments,

16  their political comments in their statements, that Mr. Johnson

17  is responding to.

18           That is not included in the clips.  That is not

19  included in their fullest version of the clips that are

20  proposed by the government.  They show the way that The Five,

21  including Greg Gutfeld, one of the complainants --

22           THE COURT:  I'm sorry.  A little clearer.

23           MS. BAHARANYI:  This might be better, your Honor.

24           The video that we're proposing shows the ways in which

25  Gregory Gutfeld, Jessie Waters, two of the individuals named by

**A000137**

1   the government today, are interacting and providing their

2   political commentary that Mr. Johnson then in that very moment

3   is responding to and recording.

4          Now, they've chosen to show only portions of

5   Mr. Johnson's response.  And we believe what the members of The

6   Five, what Gregory Gutfeld is saying, how these individuals are

7   commenting on political events in these videos -- all of that

8   matters to understand Mr. Johnson's statements and his state of

9   mind.

10          THE COURT:  How does it matter?

11          MS. BAHARANYI:  That matters to show his state of mind

12   which is one of the elements of this charge.  875(c) is what

13   did Mr. Johnson intend.  Did he intend to send a threat?  Or

14   did he know that his recipient received it as a threat?  Or if

15   the government --

16          THE COURT:  In other words, if he was standing in the

17   studio with Boebert and Boebert said whatever thing he thinks

18   is totally outrageous -- and I'm passing no judgment about any

19   of the politics here, either way.

20          But he's standing there, and she's going on about

21   whatever she's going on about that really rings his chimes, and

22   he pulled out a gun and he shot her, that context would be

23   relevant to why he shot her and therefore that it wouldn't be

24   enough to admit a video of him shooting her in a murder case.

25   You would have to put in the rest of the video that showed her

**A000138**

 1    outrageous statements.

 2            Isn't that the logic of what you're arguing to me?

 3            MS. BAHARANYI:  Your Honor, I think Rule 106 says that

 4    that is what should happen in a case like this.  I can't say on

 5    the firearms.

 6            THE COURT:  Stick with the hypothetical because I'm

 7    asking it for a real reason.  Don't fight the hypothetical.

 8            MS. BAHARANYI:  In your hypothetical, your Honor,

 9    which involves a completely different crime and not statements

10    but a shooting, but in that hypothetical, if the shooting was

11    relevant in some way to the words that were spoken -- let's say

12    perhaps there is provocation.  There are grounds -- some sort

13    of provocation, then I think it would be relevant in that case.

14            THE COURT:  Is it your position that the statement is

15    less threatening, less immediate, if she said something

16    outrageous?

17            In other words, the more outrageous her statements

18    are, the more your client, when he says, "I'm going to kill

19    you" and whatever else he said about killing her, is

20    justifiable?

21            Is that the argument?

22            MS. BAHARANYI:  Well, the argument really goes to like

23    the elements that must be proven.  So in order for the

24    government to prove its case, it's going to have to prove what

25    Mr. Johnson -- his intent was.

**A000139**

1       And if he's intending to engage in political

2   commentary and in reaction to political commentary that is

3   itself provocative, which is what we want to show, that it is

4   itself reactionary -- if he's engaging in this out of

5   frustration, out of giving his own political commentary, out of

6   exercising his own right and not because he intended it as a

7   threat, it's important for us to show that.  And the full

8   context of the video allows us to show that.

9       Without it, your Honor, we certainly aren't able to

10  effectively present a defense on his behalf.  It would be a

11  violation of his Sixth Amendment rights to keep that sort of

12  context out of the equation when they're going to be allowed to

13  admit --

14      THE COURT:  The question at the moment is whether the

15  rest of it comes in now.  That's the question we're arguing.

16      MS. BAHARANYI:  Your Honor, the rest of it does not

17  have to come in now.  It does not.

18      THE COURT:  Okay.  So we are no longer arguing the

19  rule of completeness.

20      MS. BAHARANYI:  We would.  It does not, so long as we

21  will have the opportunity to present this to the jury so that

22  they have the full context.

23      THE COURT:  You can always offer it.  Now, I don't

24  know whether the government is going to object to it or not.

25      MS. BAHARANYI:  They've certainly indicated they will,

1   and perhaps they won't now that we've argued this point.  But I

2   think that per the rule of completeness, it could very well

3   come in now.

4          What we believe is necessarily required to make sure

5   that Mr. Johnson is getting a fair trial and that the evidence

6   is getting fairly presented is that it comes in at some point,

7   your Honor.

8          THE COURT:  I think I know what your version of a fair

9   trial is, and I'm not sure that I think it's permissible.

10  That's sort of a basic issue here.

11         MS. BAHARANYI:  Well, I think our version of a fair

12  trial means presenting to the jury evidence in context.  So not

13  just to allow the government to go forward with small portions

14  of a video from a particular day and a particular broadcast and

15  omitting the other portions that actually show the context of

16  his statements.  Context is incredibly important here.

17         THE COURT:  It's not a magic word.

18         MS. BAHARANYI:  No.  It's not a magic word, your

19  Honor.  But it is the critical element for what his intent was.

20         THE COURT:  Look.  The government has to prove that it

21  was a serious statement expressing an intention to inflict

22  injury or kill someone.  They have to prove that it was made in

23  the circumstance that a reasonable person who heard or read the

24  statement would understand it as a serious expression of intent

25  to do what he threatened.  And they have to prove that he

A000141

1  intended it to be received as a threat or that he knew it would
2  be so viewed.
3          That's what they have to prove.  Right?
4          MS. BAHARANYI:  That's correct.
5          THE COURT:  Okay.  Now go from there instead of just
6  telling me you have to prove context.
7          MS. BAHARANYI:  The government has to prove
8  Mr. Johnson' intent in this case.
9          THE COURT:  I'm sorry.  I can't hear you.
10         MS. BAHARANYI:  The government has to prove
11 Mr. Johnson' intent.  That much is certainly clear.
12         THE COURT:  Well, it has to prove a particular kind of
13 intent.
14         MS. BAHARANYI:  It has to prove that Mr. Johnson made
15 these statements, either with the intent that they be received
16 or viewed as threats or he made these statements intending them
17 as threats.
18         The video, your Honor, the video is relevant to that
19 element that the government has to prove.  The reason why the
20 full context of the video is relevant is because it shows what
21 Mr. Johnson -- what Mr. Johnson was actually engaging in, the
22 political rhetoric and not threats.  It reveals his state of
23 mind.  And certainly we should be able to argue that.  But that
24 is our position.
25         Apologies, your Honor.  One moment.

1          I think it is important to highlight in this case as

2     well is if the intent question is whether he knew these

3     individuals would receive this information as threats, who

4     those individuals are.  What they're talking about, what kind

5     of language they are using, speaks to that intent.

6          If they are using provocative language, if they're

7     using inflammatory language and that's what would be shown in

8     the video, then there's no reason for Mr. Johnson to believe

9     that they would receive his statements in kind as threats.

10          THE COURT:  So in other words, you think that on the

11     videos they're saying they're going to kill people?

12          MS. BAHARANYI:  On the video they're speaking in ways

13     that are provocative and inflammatory.  I'm not going to

14     misrepresent the videos.  They're not saying, using those

15     words, I'm going to kill someone.

16          But they certainly are using words that are

17     provocative and inflammatory and that show that Mr. Johnson had

18     no reason to believe that when he used provocative and

19     inflammatory words, that they would be perceived as threats.

20          THE COURT:  There is a statute that says that members

21     of Congress commit felonies when they use provocative language.

22     That's the difference between a threat and provocative

23     language.

24          MS. BAHARANYI:  Well, your Honor, when it comes to

25     what Mr. Johnson's state of mind is, what his state of mind was

**A000143**

1    in those moments of making these statements, that is an

2    argument we should be able to make.

3          I think that we certainly can make that argument that

4    just because Fox News didn't use those exact same words, "I

5    will kill you" and "You are a domestic terrorist," doesn't mean

6    that they are not engaging in the level of rhetoric and

7    inflammatory language that to a reasonable person and to

8    Mr. Johnson would make you believe that they may not view his

9    off-the-cuff sort of frustrated remarks as actual threats.

10          They regularly engage in their own political

11   commentary that is frustrated, that is critical, that is

12   inflammatory.  The video itself shows the type of commentary

13   that members of The Five, the broadcast, engage in.

14          And the jury should be able to see that so that they

15   can -- I believe that the standard is whether a reasonable

16   person familiar with the context would think these are threats.

17   That's a critical piece of the context is what we're trying to

18   get in.

19          Your Honor, I want to backtrack a little bit.  The

20   rule of completeness, the Court is correct.  It does require

21   the full video to come in at the point that it's offered.

22          And so at this point, we would in fact be asking that

23   it come in.  And then we can certainly make our arguments later

24   about it, but I want to backtrack on saying that it should not

25   come in now.  It absolutely should pursuant to Federal Rule of

```
 1    Evidence 106.
 2                 THE COURT:  Do you have any case law for me on that?
 3                 MS. BAHARANYI:  Your Honor, I do actually, if you'll
 4    give me one moment.
 5                 MR. WIRSHBA:  First of all, your Honor, I think that
 6    the video is long.  It is sprawling.
 7                 THE COURT:  How long is it?
 8                 MR. WIRSHBA:  This particular video is six minutes,
 9    but there are others that presumably the defense is going to
10    try to put in that are more like 10 minutes, 13 minutes.
11                 Your Honor, the bottom line is that there is no
12    context that is missing here that would allow the rule of
13    completeness --
14                 THE COURT:  I didn't hear what you said.
15                 MR. WIRSHBA:  I'll go inside the box, your Honor.
16                 Your Honor, it's the government's position that
17    nothing that the defense has highlighted is context that is
18    necessary for the jury to understand "I am going to kill you"
19    and the other statements that the defendant made that are
20    threats.  They haven't articulated why that context is
21    necessary and relevant here.  The fact that, as your Honor
22    stated, other people are stating things on TV that are less
23    than "I'm going to kill someone" doesn't in any way provide
24    context.
25                 What it does is that it allows the defense to inflame
```

1    the jury by allowing statements of the victims that have

2    nothing to do with the issues in this case to come in because

3    those statements might be inflammatory to the jurors.

4           But whether they're inflammatory to the defendant does

5    not matter.  The fact that the defendant is upset and inflamed

6    by what others say is not a defense to the charges here.

7           And in addition to that, your Honor, there is nothing

8    misleading about the clips.

9           THE COURT:  Why doesn't it go to a question of whether

10   they expressed a serious statement of intention on his part to

11   kill or injure?

12          MR. WIRSHBA:  Why don't the statements of the Fox News

13   folks?

14          THE COURT:  Yes.  Because he's watching them, and he's

15   spouting them into his Instagram I suppose back and forth.

16   Right?

17          MR. WIRSHBA:  I don't know what your Honor means by

18   "back and forth."

19          THE COURT:  Well, they say something, and he reacts.

20          Is that the way this works?

21          MR. WIRSHBA:  Sort of.  He's just saying, "I'm going

22   to kill you."  In certain cases, it seems like he is responding

23   to what he's saying.  But the government has not cut off the

24   portions that he is responding to when making those threatening

25   statements.

1          The government tried to clip these such that when he

2   makes a statement, if there is a portion of the transcript that

3   he's responding to before his prior statement, it's included.

4          Your Honor, there are many portions of these videos

5   that are just absolutely irrelevant, either the defendant

6   talking about things that have nothing to do with the threats

7   or what Fox News is saying or it's these Fox News commentators

8   speaking on television.

9          It's not as if there is another portion of the video

10  that the defense has not highlighted for you where he says,

11  hey.  I'm going to make a bunch of threats, but I'm kidding

12  around.

13         There's nothing they've been able to highlight for you

14  that's like that because the bottom line is that the other

15  portions of these videos is not necessary context to understand

16  what the defendant is saying and what his intent is in making

17  these statements.

18         THE COURT:  I'm looking at 603AT.

19         MR. WIRSHBA:  603AT, your Honor?

20         THE COURT:  Yes.  I'm going to ask a question of

21  defense counsel about it.

22         The transcript reads defendant mentions my dad.  Then

23  somebody named Williams --

24         Who is Williams?

25         MR. WIRSHBA:  That's a Fox news commentator, your

 1   Honor.

 2            THE COURT:  Said:  "He's been calling for democrats to

 3   work with republicans on COVID relief.  Watch this."  And then

 4   he says, "I want it to be bipartisan.  So if they think that

 5   they are going to basically we're going to throw all caution to

 6   the wind and then just shove it down peoples' throats, that's

 7   not going to happen.

 8            "Chuck Schumer said yesterday on the floor, this is

 9   going to be a bipartisan process.  We encourage bipartisan

10   process."

11            Then the defendant says:  "He's dead.  He's fucking

12   dead.  He's a republican that wants to defund the people.  And

13   Williams says, while Senator Manchin says that, Leader Chuck

14   Schumer who stands for democrats who don't have a loan on COVID

15   stimulus.  And Schumer says, well, I support that idea."

16            And then the defendant goes on and says:  "He can stop

17   it if he wants to.  Ask Steve Mnuchin who wrote the shit down.

18   Joe Biden don't change shit.  Do what the fuck you do.  Make a

19   fucking decision.  Let Steve Mnuchin wrote that shit down."

20   And it goes on in that vein and winds up with a statement about

21   using reconciliation and the defendant again saying:  "Manchin

22   is dead."

23            Now, the question to you is:  What more context is

24   necessary?  You have the direct statement to which your client

25   is responding right there.

 1          MS. BAHARANYI:  The more context that is necessary,

 2   your Honor, would include statements made by Gregory Gutfeld, a

 3   member of The Five who is also part of this broadcast who is

 4   also giving his political statements.  More context would be

 5   more of the language between these respondents.

 6          THE COURT:  And that's why, because of what Gutfeld

 7   says, that your client says, in response to Manchin:  "He's

 8   dead.  He is fucking dead.  He's a republican that wants to

 9   defund the people."

10          Now the "he" he's talking about, your client, is

11   Manchin.

12          Isn't that perfectly obvious?

13          MS. BAHARANYI:  Your Honor, he's talking about Joe

14   Manchin.  But the clip, the video, is a portion of a broadcast

15   of The Five where other parts of the other videos proposed by

16   the government are also excerpted from.

17          Your Honor, so the video would show not just that he's

18   reacting to Joe Manchin, that he's reacting to Ron Williams,

19   the one person who they've chosen to highlight in this

20   transcript is one of the more moderate members of The Five.

21   But it would show that he's reacting generally to the political

22   commentary he's watching.

23          THE COURT:  This is not a general reaction.  This is a

24   threat to kill Manchin because he's a republican that wants to

25   defund the people.  It's not wanting to do Gutfeld.  It's not

**A000149**

```
 1    wanting to do Boebert.

 2              MS. BAHARANYI:  It is actually part of Mr. Johnson's

 3    stream of frustration in the same moment.  We're talking about

 4    a portion of him providing commentary over The Five broadcast.

 5    The rest of it that we want to be able to show --

 6              THE COURT:  Believe me.  I know what you want to show.

 7    I'm trying to get to how any of the rest of that is the

 8    proximate provocation, if you want to call it that.

 9              MS. BAHARANYI:  Your Honor, can you repeat the

10    question.

11              How much is the rest of it?

12              THE COURT:  Yes.

13              MS. BAHARANYI:  The broadcast itself is -- well, we're

14    not seeking to admit other broadcasts.  It's just from

15    February 3 where he's providing a commentary.  And I think the

16    additional video says --

17              THE COURT:  Is this on previous days?  I never heard

18    of The Five.  So I don't know what that is.  But I assume it's

19    a program.

20              MS. BAHARANYI:  Yes, your Honor.

21              THE COURT:  How often is it on?

22              MS. BAHARANYI:  Weekly, your Honor.

23              THE COURT:  Weekly.

24              MR. WIRSHBA:  I believe it's daily, your Honor.

25              THE COURT:  Daily?
```

1          MR. WIRSHBA:  Yes, your Honor.

2          THE COURT:  So in that time period, is he watching it

3   on a daily basis?

4          MS. BAHARANYI:  Your Honor, he watched The Five

5   regularly.

6          THE COURT:  So why isn't it, on your theory, necessary

7   to put in a couple of weeks' worth of it?

8          MS. BAHARANYI:  Because there is only one day in

9   question that is relevant.  It's February 3.

10          THE COURT:  Why is that the only day?

11          MS. BAHARANYI:  Well, only because they charged this

12   one video on February 3, charged with making --

13          THE COURT:  No.  They didn't charge this one video.

14   They charged this threat.

15          MS. BAHARANYI:  This threat within a video on

16   February 3 of The Five broadcast.  That's what makes the rest

17   of that February 3 broadcast of The Five relevant.  The context

18   in which that statement was made shows --

19          THE COURT:  Doesn't there exist a transcript of this

20   whole thing?

21          MS. BAHARANYI:  We can provide the Court with a full

22   transcript, yes.

23          THE COURT:  Today.  Now.

24          MS. BAHARANYI:  We can provide it today, not while

25   we're in session.

A000151

1          THE COURT:  In the next half hour or so.

2          MS. BAHARANYI:  Yes.

3          THE COURT:  Look.  We started off a couple of weeks

4   ago with you proposing to put in mental health testimony.  And

5   the deeper we get into this, the more I can see why you started

6   down that path.  But you withdrew that.

7          MS. BAHARANYI:  That's correct, your Honor.

8          THE COURT:  So there's a certain sense in which you're

9   basically trying to get it in through the backdoor without the

10  expert.  You want to play this whole thing in court to show

11  that the guy's state of mind was kind of out there, to say the

12  very least.

13         MS. BAHARANYI:  Actually, your Honor, no.  That's not

14  our intent.  I think with the video, you're able to see that

15  this is someone in the privacy of his living room --

16         THE COURT:  Posting his messages to people he says

17  he's going to kill.

18         MS. BAHARANYI:  On social media talking about

19  politics, as the Court knows, crude and offensive, yes.  But

20  he's talking about it in response to provocative content on Fox

21  News.

22         And I actually don't think -- I understand the Court

23  may think that's what we intend.  But truly we intend to show

24  that this was some long form of political commentary out of

25  frustration.  That is what it shows, and that is the intent.

**A000152**

1   It's not a mental health issue.

2          THE COURT:  People who commit murders often do so out

3   of long-formed provocation, and it doesn't excuse them.  It

4   doesn't go to the intent.  And I'm having trouble seeing why

5   this is any different.

6          MS. BAHARANYI:  Well, this is different because of the

7   elements of this case -- it's not a murder case -- because the

8   elements of this case aren't about what he intended when he

9   made the statements, not just whether the statements were made.

10          That's what makes a difference.  That's what makes

11  whether he was engaging in some political commentary, even if

12  it was off color and crass, if that is what the jury finds,

13  then they also find him not guilty.

14          They find that he wasn't serious.  The video will show

15  that he's on social media not being serious, not intending for

16  this to be this literal threat, talking about his frustrations

17  with what he's watching.

18          THE COURT:  How do you deal with the tape?

19          MS. BAHARANYI:  Well, your Honor, there's an Instagram

20  person who's taking the stand who I think can help explain

21  tagging a bit more than Mr. Kelley who does not work for

22  Instagram.

23          Tagging does not mean that you're trying to contact

24  someone.  It can be perhaps, but tagging is a way of

25  identifying the person that you're speaking about.

**A000153**

1          When I tag folks, celebrity folks, it's not because I

2     expect them to actually see the tag.

3          THE COURT:  Doesn't the tag in fact go to the account

4     of the person tagging?

5          MS. BAHARANYI:  Well, that's something -- right now, I

6     don't think that that's been established.

7          THE COURT:  I didn't ask you that.  I asked you

8     whether that's the fact.

9          MS. BAHARANYI:  I don't know if it actually went to

10    these people.

11         THE COURT:  In the way in which Instagram works, which

12    you tell me you use, when you tag a person who has an account,

13    does it go to that account?  Whatever you intended, whoever

14    else you wanted to reach, does it go there?

15         I've never used it in my life.  I've got no idea.  I

16    still send communications with a blanket and a campfire.

17         MS. BAHARANYI:  Truly, your Honor, I do not know how

18    it would be received.  These individuals are people with a blue

19    checkmark.

20         THE COURT:  I'm sorry.  A what?

21         MS. BAHARANYI:  A blue checkmark.  That means that if

22    you are a celebrity or someone with a wide following, then you

23    can Instagram and have you, I guess, verify it as that

24    celebrity.  And it shows up on the celebrity account.  So it's

25    a high-profile person's account.  I do not have a high-profile

A000154

1    person's account.  I'm not sure how that differs from regular

2    individuals like Mr. Johnson.

3              THE COURT:  And then of course there's a question of

4    whether your client was knowledgeable about whatever it was.

5              Mr. Wirshba.

6              MR. WIRSHBA:  Your Honor, with respect to this

7    particular Instagram point, I think that there has been

8    testimony that that's exactly what happens on Instagram.

9              THE COURT:  Perhaps, but there may be contrary

10   testimony.

11             MR. WIRSHBA:  There might be, although I will say that

12   we do know, based on the testimony and based on the direct

13   messages that were referenced in the opening and in the

14   exhibits that the government intends to introduce, that

15   accounts, regular accounts, can send messages to famous

16   peoples' accounts, just like anyone else.

17             If there's a question as to whether the famous person

18   is actually on the other side of that or if it's their team,

19   etc., is a different issue altogether.

20             THE COURT:  Yes.  I understand that.

21             MR. WIRSHBA:  Does your Honor require any additional

22   information about the government's argument on the rule of

23   completeness?

24             I think that the bottom line is that the defense at

25   this point has not satisfied their burden that the rule of

**A000155**

1    completeness would require anything additional from these other

2    videos.

3         THE COURT:  At this point, I'm inclined, but I'm not

4    ruling -- I'm inclined to agree with you because what I hear

5    from the defense is, well, it's the context.  But as I pointed

6    out, everything that is potentially arguable under the rule of

7    completeness is always the context.  So it just begs the

8    question.

9         Now, the closest I get to a real argument is the

10   assertion that if you listen to the whole thing, you may

11   conclude that he really couldn't have had any serious intent to

12   kill because if you listen to the whole thing -- I don't know

13   how to put this politely.

14        You know what I'm getting at.

15        MR. WIRSHBA:  Your Honor, that's an inappropriate

16   argument, and they've withdrawn the motion as to that.

17        THE COURT:  Sorry?

18        MR. WIRSHBA:  Are you referencing a 12.2 argument,

19   your Honor?

20        THE COURT:  Well, I'm not referencing it per se.  I'm

21   just saying, without intending to be insulting in any way --

22   and I'm no mental health professional or anything like it --

23   that the argument comes close to saying, anyway, if you listen

24   to the whole thing, it's arguable he's a nut and he never acted

25   to carry out any of this stuff.

**A000156**

```
 1                MR. WIRSHBA:  Well, your Honor, if that's the case,
 2     that would be a violation of the Insanity Defense Reform Act
 3     which would require the defense to file notice that they are
 4     seeking to admit evidence that would show that he cannot form
 5     the requisite intent for whatever reason.
 6                THE COURT:  Not necessarily.  There's a difference
 7     between "cannot form" and "did not form."
 8                MR. WIRSHBA:  Well, that would require a 12.2 notice,
 9     your Honor, which the defense withdrew.
10                THE COURT:  I know they withdrew the 12.2.
11                MR. WIRSHBA:  I think you're right.  What the defense
12     is arguably trying to do here, at least from the government's
13     perspective, is trying to bring into evidence things from which
14     they can perhaps argue later, if they intend, or the jury can
15     conclude what they were trying to do in their 12.2 motion but
16     ultimately apparently were unable to do.  Whether that be
17     because of time or because their doctor did not actually come
18     to the conclusion that they wish, I do not know.
19                But I know that it would be inappropriate to permit
20     the defense to do that in this case where they have withdrawn
21     that notice, not to mention the fact that there are many other
22     portions of these videos that have absolutely no bearing on
23     even that issue, such as things that the Fox News commentators
24     are saying.  And as your Honor has pointed out, it cannot be
25     the case that everything that Greg Gutfeld ever said is context
```

**A000157**

1   for him being threatened to be killed.

2          THE COURT:  Obviously.  Okay.  I think here's where we

3   are:  I would like to have the transcript of this as soon as

4   possible.  And if it's possible to do it by 5:00, I would be

5   very grateful for that.  But alternatively, you can transmit it

6   electronically to my chambers, and I will get it forwarded to

7   me.  That's the first thing.

8          The second thing is that I think it behooves the

9   defense at this point to brief the question in a non conclusory

10  way of how what is actually on this tape, not parts but what is

11  actually on the tape, is relevant on the issue of an element of

12  this offense.

13         And third, I think there may be something to the 12.2

14  point.  And I would like briefing on that from both sides.  I

15  realize you all worked hard last night, but I don't see any

16  other way to go.  You'll be working hard tonight.

17         MS. BAHARANYI:  Your Honor, can we just clarify what

18  about 12.2 is the Court seeking briefing on.

19         THE COURT:  Well, the government takes the position

20  that what you're trying to do by offering this context, whether

21  you're trying to do it or not, what you in effect would be

22  doing would be to produce evidence that's barred under

23  Rule 12.2 by the absence of the notice.  Right?  Is that a fair

24  way to state your position?

25         MR. WIRSHBA:  I think that's fair on that point, your

**A000158**

1   Honor.

2           MS. BAHARANYI:  That's the government's position.  But

3   they, frankly, are just wrong in construing our defense.

4           THE COURT:  Well, then maybe you'll inform me about it

5   in your papers.

6           MS. BAHARANYI:  Your Honor, we are going to reach out

7   to the office to get you this.  I don't know if we will make it

8   by 5:00, your Honor.

9           THE COURT:  Well, given the electronic communications,

10  it's not that urgent, now that I think about it.  You'll get it

11  to me as soon as you can.

12          MR. WIRSHBA:  Your Honor, if I may --

13          THE COURT:  If you'll give me a second.  I want to

14  make sure I'm formulating the questions in the way I want to

15  formulate them.

16          In relevant part -- and I'm reading some extraneous

17  words -- 12.2(b) says if a defendant intends to introduce

18  expert evidence relating to a mental disease or defect or any

19  other mental condition of the defendant bearing on the issue of

20  guilt, you've got to serve a notice and make certain

21  disclosures.

22          So I guess your position is this is not expert

23  testimony.

24          MS. BAHARANYI:  No.  We're not presenting any expert

25  testimony.  It's the video.

1      THE COURT:  So why isn't that a complete answer to

2  your 12.2?

3      MR. WIRSHBA:  Your Honor, I'd have to take a closer

4  look at 12.2.  And I'm happy to do so now, if that would be

5  helpful to the Court.

6      THE COURT:  It would.  I'm looking at a 2020 edition.

7      Is that sufficiently up to date?

8      MS. BAHARANYI:  Your Honor, we have the 2021 edition,

9  but it's the same language.

10     THE COURT:  The same language.  I think the statute

11  that counsel referred to is earlier.  Maybe not.  My 2021

12  edition -- it says the same thing.

13     MR. WIRSHBA:  So, your Honor, I think it's not a 12.2

14  objection -- I'm sorry.  It's not a 12.2(b) objection that the

15  government is making.

16     THE COURT:  I'm sorry.  12.2(g)?

17     MR. WIRSHBA:  I'm sorry, your Honor.  12.2(b), your

18  Honor.  Perhaps I misspoke.  It's a 12.2(a) objection that if

19  there's going to be an assertion and argument by the defense

20  that, as you're saying, he cannot form the requisite intent,

21  then that would be violative of the failure --

22     THE COURT:  But you're saying insanity.  12.2(a) is

23  notice of an insanity defense.

24     MR. WIRSHBA:  And I think that's what they're doing if

25  they are permitted to make arguments that the defendant cannot

A000160

1    form the requisite intent.

2          THE COURT:  Do you remember before when I

3    distinguished to you the difference between "can" and "did"

4    form, cannot and did not form the necessary intent.

5          Their argument, as I understand it, is he did not.

6    And that's what it's relevant to, not that he cannot but that

7    given the provocation and whatever his trigger points are and

8    all of that, he didn't.

9          MR. WIRSHBA:  And their extra context in the videos

10   shows that how I guess would be the government's question.  It

11   seems to us that it's a highly prejudicial way of making an

12   argument that the defense, I suppose, can make based on what is

13   coming into evidence.

14         The idea that they are going to -- that would allow in

15   another case, your Honor, the defense to play a clip of the

16   defendant spacing out, for lack of a better term, and arguing

17   sometimes he spaces out.  And so it must have been that on this

18   occasion, he spaced out and he didn't know what he was doing

19   when he was shooting a gun.

20         That would be exceptionally prejudicial.  First of

21   all, it's not the argument the defense is saying that they are

22   making let me say.  They are saying that they are not planning

23   to make that argument.

24         THE COURT:  Not planning to make which one?

25         MR. WIRSHBA:  They are not going to make an argument

**A000161**

1    that the defendant was not able to form or did not form the

2    intent because of his mental health issues.  And I think that's

3    the argument that your Honor is referencing.

4         What they are saying is that, in their view, the

5    context that matters is that other people were saying

6    provocative things and that he was making political statements.

7    Neither of those things is grounds to allow the admission of

8    the full video because neither of those things, as your Honor

9    has pointed out, is context for the threats.  The context for

10   the threats is in the transcript.

11        One other thing that I want to point out, your Honor,

12   is that there's another video.  And we don't want to have to of

13   course have the same problem before the Court.

14        THE COURT:  You can be sure I don't.

15        MR. WIRSHBA:  So there is a whole nother video that

16   the government has clips.  And I will say this is the first

17   time that the defendants have raised the idea that they would

18   be attempting to put in the entire videos.

19        THE COURT:  Yes, I know.  It would have been a lot

20   fairer to everybody if they had brought this up in a timely

21   way, but they didn't.  And here we are.

22        MS. BAHARANYI:  Your Honor, we didn't really imagine

23   that they would oppose the admission of a fuller context of the

24   same video.  So that's why we're here.  We're prepared to

25   respond to it and to litigate it.

1          THE COURT:  Of course.  Look.  You know, think of the

2    number of times that nobody ever imagined things would happen.

3          MR. WIRSHBA:  Of course.  I will say, quite frankly, I

4    am still not clear on what the government is going to be

5    responding to in terms of what context this particular video

6    because they haven't referenced any specific other portion of

7    this video.

8          THE COURT:  Yes.  I understand that.  But you have the

9    tape, and you can watch it.  And I don't know if you have a

10   transcript or not.  But you can cope with it just as they are

11   going to have to cope with it.

12         MR. WIRSHBA:  Understood, your Honor.  We will attempt

13   to ascertain what portions of it the defense believes are the

14   necessary context.

15         THE COURT:  Yes.  I don't know what else to do with

16   it.  They're entitled to a fair shot.  It seems to me that it's

17   pretty far out, for the reasons that my questions indicated.

18   But I've never seen the rest of the recording.  So I can't make

19   a firm judgment right now.

20         MR. WIRSHBA:  Recordings, your Honor.  There is

21   another recording as well.

22         THE COURT:  We have enough on our hands with this one.

23         MR. WIRSHBA:  Would you like us to also address that

24   other recording?

25         THE COURT:  Well, I guess you better.  And if we're

**A000163**

```
 1   going to have this problem again, I guess you better.  And I
 2   guess you better send me that one time.
 3            What is the other one?
 4            MR. WIRSHBA:  Exhibit 803 --
 5            MR. MORONEY:  803, 804, and 805.  It's those three
 6   clips.
 7            THE COURT:  Okay.  All right.  In the meantime, I'll
 8   be reading the carry permit application.
 9            MR. WIRSHBA:  Understood.
10            THE COURT:  So I appreciate the work you're about to
11   do, and I'm sure my wife appreciates it as well.
12            MR. WIRSHBA:  Thank you, your Honor.
13            MS. BAHARANYI:  Thank you, your Honor.
14            THE COURT:  All right.  Have as good an evening as
15   possible under the circumstances.
16            (Adjourned to February 17, 2022, at 9:30 a.m.)
17
18
19
20
21
22
23
24
25
```

A000164

INDEX OF EXAMINATION

Examination of:                                    Page

 BRANDON KELLEY

Direct By Mr. Wirshba  . . . . . . . . . . . . .43

GOVERNMENT EXHIBITS

Exhibit No.                                   Received

 701  . . . . . . . . . . . . . . . . . . . .48

 703, 704   . . . . . . . . . . . . . . . . .54

 703T, 704T   . . . . . . . . . . . . . . . .55

 601  . . . . . . . . . . . . . . . . . . . .64

A000165

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        21 Cr. 194 (LAK)

5    RICKEY JOHNSON,

6                   Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        February 17, 2022
9                                       9:30 a.m.

10
     Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                        District Judge
13                                        and a Jury

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KYLE A. WIRSHBA
17   PATRICK R. MORONEY
          Assistant United States Attorneys
18
     FEDERAL DEFENDERS OF NEW YORK
19        Attorneys for Defendant
     ZAWADI S. BAHARANYI
20   MARISA K. CABRERA

21

22

23

24

25
```

A000166

 1              (Trial resumed)

 2              (In open court; jury not present)

 3              THE COURT:  Just to put on the record what I was just

 4    telling counsel, I'm advised that yesterday juror number 2, I

 5    believe Mr. Borenstein, during one of our sidebars or recesses,

 6    sort of cornered Detective Cowan out in the hall and sort of

 7    started talking to him.  And I don't know the circumstances in

 8    which that ended, but I need to consider what to do with that.

 9              Secondly, there was apparently an incident this

10    morning where Mr. Borenstein approached corned the lady who

11    brought coffee to the jurors and started talking to her.  I

12    don't know for sure if either the detective or the coffee lady

13    responded to him in any way or said anything to him.

14              And then we also have some issues with the materials

15    that counsel sent me last night about these tapes because I

16    don't know to make of them at all in terms of their

17    relationship with the conversation that we had yesterday.

18              So I'll hear from counsel about what you think should

19    be done about Mr. Borenstein and the events that I described.

20              MR. WIRSHBA:  Yes, your Honor.  The government just

21    wishes to notify the Court about that incident in perhaps a

22    little more detail than described.  In the government's email

23    of last night -- the government has already discussed this with

24    defense counsel and gave them notice of our understanding of

25    the of this communication.

```
1          It's our understanding that this individual did speak
2   at Detective Cowan and perhaps at other of the jurors.
3   Detective Cowan, as I understand it, did not respond in any way
4   for his part.  But he did recall for the government the
5   statements that the individual made in sum and substance which
6   I'm happy to repeat for the Court, if the Court would so
7   desire.
8          THE COURT:  Yes.  I think it ought to be in the
9   record.
10         MR. WIRSHBA:  So it's our understanding that
11  Detective Cowan heard the individual, juror number 2, say:  "Do
12  you know that the white man stole Manhattan from the Indians
13  for some beads.  I read a book that is no longer in
14  circulation.  And there are two white men in England who own
15  stock in tobacco and the Americas.  The white man killed the
16  Indians for their tobacco.  General Sherman and another union
17  general killed all the plains Indians so the railroad could be
18  built.  I read a book that is no longer in circulation, and
19  Abraham Lincoln didn't want to free the slaves.  He only wanted
20  to keep the Union together, and he wanted cheap labor for the
21  Northern States.  Why is it 'the Bronx' and not 'the
22  Manhattan.'"
23         These of course, just to be clear --
24         THE COURT:  I'm sorry.  Why is this the Bronx and not
25  Manhattan?
```

1          MR. WIRSHBA:  I believe he said why is it referred to

2     as "the Bronx" and not referred to as "the Manhattan."  Again I

3     was not there.  Obviously, your Honor.

4          THE COURT:  I see.

5          MR. WIRSHBA:  What I want to be very clear for the

6     record is that these were not in response to any questions of

7     Detective Cowan or anything that prompted this jury to speak

8     with him.  As I understand it, as your Honor put it this

9     morning, I think Detective Cowan was targeted, cornered,

10    whatever you want to call it, and then was spoken at.

11         THE COURT:  All right.  What, if anything, do you

12    suggest be done about?

13         MR. WIRSHBA:  Well, your Honor, I think at this time,

14    the government just wishes to put the Court on notice, although

15    I will say that the incident with the woman bringing the coffee

16    does strike me as an additional area of concern, if there were

17    other jurors around, etc.  Of course I don't know what was said

18    in that incident.

19         But the government would have no objection to the

20    Court inquiring about this.  But at this time, the government

21    just wishes to notify the Court of this interaction.

22         THE COURT:  All right.  Ms. Baharanyi.

23         MS. BAHARANYI:  Your Honor, we agree with the

24    government.  I don't think there are any further steps to take

25    at this time.

**A000169**

1    THE COURT:  All right.  If you both agree that there
2    is nothing further to do now, I'll let it ride.
3        Now, the next problem is alternate number 2, Williemae
4    Williams.
5        Did she go into the hospital last night?
6        THE DEPUTY CLERK:  She said her lips swelled 10 times
7    its normal size.  So she went to the ER.  And when she called
8    me at 9:00 a.m. this morning, she said that she just gotten
9    home from the ER.
10       THE COURT:  And was or was not coming in?
11       THE DEPUTY CLERK:  I told her that I would call and
12   give her instructions, but she said she was up all night.
13       THE COURT:  Did you ask her whether she was able to
14   come in?
15       THE DEPUTY CLERK:  I didn't ask her.
16       THE COURT:  Okay, Counsel.  We could of course call
17   her and see if she's able to come in.  That would result, at
18   best, a delay, and, at worst, losing her.
19       What's your pleasure?
20       MR. WIRSHBA:  Your Honor, I think the government would
21   be comfortable to press ahead without the alternate if it's
22   going to take a long time for her to get in.  We would of
23   course defer to the Court.
24       I will say -- and I apologize -- having consulted with
25   the supervisors, I think it is the government's position that a

**A000170**

1    colloquy with juror number 2 would be appropriate at this time.

2         We of course did not know about this additional

3    incident.  So we believe that some sort of colloquy with this

4    juror would be appropriate.  And I'm sorry that I initially

5    said I didn't think it was necessary.

6         MS. BAHARANYI:  Your Honor, I don't think there is a

7    need for a colloquy with juror number 2.  But I think perhaps

8    the judge could remind the jury not to discuss this case --

9    there is no allegation that he was -- but remind the jury of

10   their obligation not to discuss this case and perhaps also have

11   counsel speak to our witnesses to make sure they're not

12   engaging with in any way or too proximate with the potential

13   jurors on this case.

14        On the issue of Ms. Williemae, your Honor, we would

15   ask, given the fact that there are only two alternates and we

16   are currently in a position where there are at least some jury

17   issues to discuss, I think we'd ask that we wait to see if she

18   is available to participate today so we can prevent any

19   potential delays down the road.

20        THE COURT:  If she's available to participate today.

21        MS. BAHARANYI:  Yes.  I'm certainly hoping that she is

22   able to participate today.

23        THE COURT:  Let's bring Mr. Borenstein in.  And while

24   we're talking to Mr. Borenstein, Andy, you can see whether she

25   feels able to come in today and, if so, how long it will take

 1    her, and tell her we'll get back to her.

 2            THE DEPUTY CLERK:  While you inquire of the jurors in

 3    the courtroom, should Detective Cowan be outside in the

 4    hallway?  Or can he be in the courtroom while juror number 2 is

 5    here?

 6            THE COURT:  Counsel, do you have a view one way or the

 7    other?

 8            MR. WIRSHBA:  No.  We defer to the Court, your Honor.

 9    We're happy to have him remain out, whatever the Court's

10    preference is.

11            THE COURT:  Ms. Baharanyi?

12            MS. BAHARANYI:  Your Honor, I think we would prefer to

13    speak to juror number 2 outside of the presence of

14    Detective Cowan.

15            THE COURT:  Okay.  Detective, could you please step

16    out when he comes.

17            While we're waiting, maybe I can get some basic facts

18    here relating to the tapes.  The government sent two videos to

19    chambers last night that were not marked as exhibits.  One is

20    called videos 1 and is labeled USAO004837.  It's six minutes

21    and a few seconds.

22            Does that correspond to any exhibit in the case or

23    not?

24            MR. WIRSHBA:  Not a government Exhibit, your Honor.

25    But there are clips from that that do correspond, and those are

**A000172**

1   the ones that the government was seeking to admit when the

2   objections came yesterday.

3           THE COURT:  So there are two clips from that?

4           MR. WIRSHBA:  There are three clips from that, your

5   Honor.

6           THE COURT:  And what are they?  What are their exhibit

7   numbers?

8           MR. WIRSHBA:  603A, 603B, and 604.

9           THE COURT:  Mr. Borenstein, come on up.

10          You can take a seat in the chair.

11          It has been brought to my attention that at some point

12  yesterday, you spoke or attempted to speak to Detective Cowan.

13          Is that right?

14          JUROR:  No.  No.  Who said that?  That's untrue.

15          THE COURT:  Do you know who Detective Cowan is?

16          JUROR:  Yes.  In the court?

17          THE COURT:  Out in the hall.

18          JUROR:  Detective Cowan?  No.  Where is he?

19          THE COURT:  Do you know who he is?

20          JUROR:  I think he is connected with this case.

21          THE COURT:  That's certainly true.

22          Would you recognize him if you saw him?

23          JUROR:  No.  I never tried to speak to any detectives.

24  I'd like to know who said that.

25          THE COURT:  Right now I'm asking the questions.

A000173

1           JUROR:  Who is the accuser?

2           THE COURT:  Let's calm down, Mr. Borenstein.

3           JUROR:  I am.

4           THE COURT:  Now let me move on to this.

5           Let's ask Detective Cowan to step in to the back of

6    the courtroom so that Mr. Borenstein can see who he is.

7           JUROR:  Where is he?

8           THE COURT:  Well, it takes a minute for him to get

9    there.

10          JUROR:  Okay.  I can wait a minute.

11          THE COURT:  All right.  The gentleman who just came in

12   the door wearing the suit and tie in a black mask, do you

13   recognize him?

14          JUROR:  I think I -- he looks like I've seen him

15   because of his physique.  But I haven't tried to talk to him

16   about anything.

17          THE COURT:  You're sure of that?

18          JUROR:  Yes, unless I -- wait a minute.  Unless today

19   I mistakenly got off the --

20          THE COURT:  I'm talking about yesterday.

21          JUROR:  No.  What does he have to say?  That I spoke

22   to him?

23          THE COURT:  Detective, would you step out, please.

24          JUROR:  I never spoke to him about anything.

25          THE COURT:  Then, Mr. Borenstein, I am told that this

A000174

1    morning you talked with or to the lady who brought the coffee

2    into the jury room.

3              Is that true?

4              JUROR:  Oh, yes.  I talked to her about -- yes.  Not

5    about this case.

6              THE COURT:  Okay.

7              JUROR:  I talked with her about doctors.  I told her I

8    had a great.  I remember my exact words.  I told her that I had

9    a great doctor, Lester Breidenbach.  Yes.  I spoke to her, not

10   about this case.  I never spoke to anyone about this case.

11             THE COURT:  Did you talk to her about anything else

12   that you've not told us already?

13             JUROR:  Well, maybe, but not anything about this case.

14   I haven't spoken to anyone about this case.

15             THE COURT:  Okay.  Thank you.

16             If you would go back to the jury room.

17             JUROR:  I'd like to know.  Is this the gentleman that

18   said that I spoke to him?  I'd like to --

19             THE COURT:  Sir.

20             JUROR:  Okay, your Honor.

21             MS. BAHARANYI:  Your Honor, before we excuse him, I

22   think maybe if we can just --

23             MR. WIRSHBA:  Can we go to the sidebar?

24             THE COURT:  Mr. Borenstein, wait one minute.  Come to

25   the sidebar, Counsel.

**A000175**

(Continued on next page)

```
 1                 (At sidebar)

 2                 THE COURT:  Yes.

 3                 MS. BAHARANYI:  Apparently I think he was expressing

 4      his frustrations to something, clearly.

 5                 THE COURT:  As indeed is the case.

 6                 MS. BAHARANYI:  But what I want to be clear -- and I

 7      don't think it's been elicited through the colloquy yet -- is

 8      that it's possible that he was sort of just talking and

 9      Detective Cowan was present.

10                 That's why he doesn't even recognize who

11      Detective Cowan is, because he wasn't talking to

12      Detective Cowan and he's never seen Detective Cowan before.  I

13      think that's getting at the source of his confusion today.

14                 Part of my concern is he might have thought we were

15      talking about the police officer who was on the stand

16      yesterday.

17                 THE COURT:  That's why I brought Detective Cowan in.

18      And he bears no resemblance to the police officer who was on

19      the stand yesterday.

20                 MS. BAHARANYI:  I think that initiated the confusion

21      on his part, his confusion there.  So I think maybe if you were

22      to just specify or say is it possible that you were speaking

23      and Detective Cowan was present, instead of, did you talk to

24      Detective Cowan?  That's where we landed.  And I don't think

25      it's clear --
```

```
1              THE COURT:  What you propose to ask is essentially a
2     leading question designed to elicit an answer that you might
3     prefer.  But I will ask one further thing.
4              (In open court; juror present)
5              THE COURT:  Mr. Borenstein, just one more question for
6     you.
7              When Detective Cowan came into the room this morning,
8     did you recognize having seen him yesterday?
9              JUROR:  I don't know him.  Why?  I never spoke to him.
10    Who said that I spoke to him?
11             THE COURT:  You are not accused of a crime or
12    anything.  Just please answer my questions and spare us the
13    speeches.
14             JUROR:  Go ahead.  Talk to me now.
15             THE COURT:  Did you recognize him as someone you saw
16    somewhere yesterday?
17             JUROR:  Do I recognize him right now?
18             THE COURT:  Yes.  As someone you saw yesterday.
19             JUROR:  I don't know.  I don't know.  But I say for
20    the umpteenth time, I never spoke to this individual about
21    anything.  If someone says I did --
22             THE COURT:  Mr. Borenstein, thank you very much.
23             JUROR:  You're welcome.
24             THE COURT:  Go back to the jury room.
25             JUROR:  Thank you.
```

**A000178**

1                    (In open court; jury not present)

2                    THE COURT:  Let's get Detective Cowan in here.

3                    Detective, good morning.

4                    DETECTIVE COWAN:  Good morning, sir.

5                    THE COURT:  It was reported to me that you had some

6    encounter yesterday with Mr. Borenstein who is juror number 2.

7                    DETECTIVE COWAN:  Yes, sir.

8                    THE COURT:  Can you describe to me what happened,

9    where it happened, and exactly what was said and by whom.

10                    DETECTIVE COWAN:  Directly outside the courtroom

11   following one of the jury's breaks, when the jury was

12   returning, as they were waiting to enter the courtroom, all the

13   jurors were standing outside.  And the statements that the U.S.

14   Attorney's Office provided, he was saying them in general to

15   the group?

16                    THE COURT:  Did you say he was saying in general to

17   the group?

18                    DETECTIVE COWAN:  He was saying those statements more

19   to the group.  But as he said them, of course the other jurors

20   moved away from him.  I stood there because there was a witness

21   outside.  So I was standing next to the witness.  And he was

22   saying it in my direction.

23                    THE COURT:  He was what?  I didn't hear you.

24                    DETECTIVE COWAN:  He was addressing them towards me

25   because I was the only one who didn't move away from him.

**A000179**

1          THE COURT:  Did he turn towards you?

2          DETECTIVE COWAN:  He was standing facing towards me,

3    yes.

4          THE COURT:  How far away from you was he?

5          DETECTIVE COWAN:  A foot and a half, 2 feet.

6          THE COURT:  You say that you were with a witness.

7          Who was the witness?

8          DETECTIVE COWAN:  Mr. Cid was outside waiting to come

9    in.

10          THE COURT:  Was there anyone else within let's say

11    6 feet of Mr. Borenstein when this happened?

12          DETECTIVE COWAN:  Yes, sir.  Mr. Cid, an attorney for

13    Fox, and most of the jurors were still within 6 feet because

14    they were right outside the courtroom.  So they were all

15    waiting to come in following one of the breaks, one of the

16    recesses, when these statements were made.

17          THE COURT:  Was he facing, in addition to you and the

18    witness you were standing with, any other jurors?  Or were they

19    sort of behind him, or were they standing in some other manner?

20          DETECTIVE COWAN:  So when he first started speaking,

21    the jurors were clustered together with him.  And as he spoke,

22    they moved away.  And because I didn't step away, because I was

23    standing next to a witness, he just directed his statements

24    towards me.

25          THE COURT:  All right.  And when he directed his

**A000180**

 1   statements toward you, not before, but when he directed his

 2   statements toward you, what did he say, and what, if anything,

 3   did you say?

 4         DETECTIVE COWAN:  I said nothing throughout the

 5   encounter.  At the time that he directed his statements towards

 6   me, it was after he had said that the white man stole Manhattan

 7   from the Native Americans.

 8         He started speaking about two gentlemen in England who

 9   had owned stock in tobacco farms or had interest in tobacco.

10   And that's why the white man killed the Native Americans who

11   had tobacco farms in the United States.

12         Then he said that when the intercontinental railroad

13   was constructed, that General Sherman and another general from

14   the Union Army slaughtered the plains Indians.  And then he

15   started saying that he read a book that's no longer published,

16   and Abraham Lincoln did not want to free the slaves.  He only

17   did so -- he only wanted to keep the Union together, and he

18   freed the slaves because the northern states had interest in

19   cheap labor.

20         THE COURT:  The northern states?

21         DETECTIVE COWAN:  Wanted cheap labor.

22         THE COURT:  Did he say anything else?

23         DETECTIVE COWAN:  No.  At this time, he was outside

24   and the Court was calling the jurors in.  The deputy was

25   outside.  He saw the encounter that he had, and he informed me

**A000181**

1    that he was going to inform the Court.

2         And at the earliest possible time, I informed the U.S.

3    Attorney's Office.

4         THE COURT:  Do counsel want to suggest any further

5    inquiry of Detective Cowan?

6         MR. WIRSHBA:  No, your Honor.

7         MS. BAHARANYI:  Yes, your Honor.

8         Do you want me to direct it to you?

9         THE COURT:  To me.

10         MS. BAHARANYI:  So, your Honor, I think it would be

11    helpful to inquire or to clarify that juror number 2 was facing

12    a group and talking to a group and that Detective Cowan made

13    the decision, when the rest of the group walked away, to

14    remain.  And he just remained facing -- as he was already

15    facing the direction.  Let's be clear about that.

16         THE COURT:  That's almost exactly what he said.  And I

17    heard it the first time.

18         MS. BAHARANYI:  Okay.  So, your Honor, I think that

19    apparently the physical relation and who he was facing and who

20    he was speaking with in the group, I think that is what we

21    would like to clarify.

22         Let me double-check.

23         No further questions, your Honor.

24         THE COURT:  Okay.  Thank you, detective.  You can step

25    out for now.

1          DETECTIVE COWAN:  Thank you, your Honor.

2          THE COURT:  What are your positions regarding what

3    should be done with Mr. Borenstein?

4          MR. WIRSHBA:  Your Honor, the government's position is

5    that Mr. Borenstein should be excused.

6          THE COURT:  Do you want to offer your rationale?

7          MR. WIRSHBA:  Your Honor, I think it's clear that

8    Mr. Borenstein is a disruption.  It appears that he is a

9    disruption outside the courtroom when other jurors are around,

10   and he appears to be a disruption in the jury room.

11         It's also the government's position that he seems to

12   be making statements to individuals, not in response to any

13   stimuli but just making statements that seem rather random.

14   And I would just say that during the colloquy with

15   Mr. Borenstein, it appears, A, that he was very agitated.  And

16   he seems to now think that he was accused of something, even

17   though the Court was just inquiring if something happened.

18         And there is a strong possibility, in the government's

19   view, that it seems from his statements that he seems to think

20   that Detective Cowan, whom he noted, is connected with the

21   case, connected with the government, is making these

22   accusations as it were to defend himself and he has a right

23   under the Constitution and other things that he said.

24         I think that it's clear that given the events that

25   have transpired, that it's unlikely that he will be able to

**A000183**

1   remain unbiased as we go forward.

2              THE COURT:  Ms. Baharanyi.

3              MS. BAHARANYI:  Thank you, your Honor.

4              It is clear from the questioning that the Court

5   conducted with the juror and from the questioning of

6   Detective Cowan that there were no statements at all about this

7   case.

8              And in fact, juror number 2 adamantly reminded the

9   Court during the questioning that he wasn't discussing the

10  case.  He followed the Court's instruction not to do that.  And

11  he was very passionate about making sure you, the judge

12  presiding over this case, knew that he followed those

13  instructions.

14             I think also the content of his statements, because,

15  again, they have nothing to do with the case and he was simply

16  sort of speaking his opinion.  This is someone who states their

17  opinion on the color of the sky outside of the jury room, as

18  you're entitled.  He was doing that.

19             There is no indication, even from Detective Cowan's

20  statements, that he was directing any comment towards a

21  particular person.  He did not know who Detective Cowan was.

22  He was part of the group, and I think he was the only person in

23  the group to stick around.

24             I think it's telling that Detective Cowan knew who he

25  was.  And I think perhaps the proper course would have been for

**A000184**

1  him to also remove himself or go in the bathroom with the

2  witness, or take the elevator instead of remaining in the

3  presence of this juror.

4         I think your Honor, there is also a standard in place

5  for whether a juror that's sworn, a sworn juror, can be

6  dismissed.  And I think it's higher than just because the

7  prosecutor doesn't like his statement and because he appears

8  agitated, that that's grounds for dismissal.

9         THE COURT:  And what do you think that standard is?

10        MS. BAHARANYI:  Well, your Honor, we want to take a

11 moment, perhaps a brief recess, to sort of develop that for the

12 Court.  And I think that perhaps, given the fact that we're

13 still waiting on a juror, this will not delay the process.

14        THE COURT:  What should be made of the fact that he

15 denied having seen Detective Cowan yesterday?

16        MS. BAHARANYI:  He didn't deny seeing Detective Cowan.

17 Really, in fact, when Detective Cowan came in, he did recall

18 seeing this person with that stature.  That's what stood out to

19 him.  What he adamantly denied was targeting him with any sort

20 of conversation.  And I think even Detective Cowan's testimony

21 here, your Honor, supported that.

22        He wasn't speaking at Detective Cowan.  He was just

23 speaking out loud and Detective Cowan happened to remain in his

24 presence.

25        THE COURT:  And he continued speaking and directed his

**A000185**

 1  remarks to Detective Cowan.

 2          MS. BAHARANYI:  He continued speaking, and

 3  Detective Cowan remained.  He never used Detective Cowan's

 4  name.  He never said, hey, you.  I'm talking to you.  This was

 5  him speaking, and Detective Cowan made a conscious choice to

 6  remain, whereas, others chose not to.  And I think that's as

 7  all we're entitled outside this courtroom.  So I think there is

 8  no basis from what we heard today to excuse this juror.  The

 9  comments had nothing to do with this case.

10          THE COURT:  Just so we're all playing with the same

11  facts, my colloquy with Mr. Borenstein on the point where

12  Detective Cowan came in was as follows:

13          "THE COURT:  The gentleman who just came in the door

14  wearing the suit and tie and a black mask, do you recognize

15  him?

16          "MR. BORENSTEIN:  I think I -- he looks like I have

17  seen him because of his physique, but I haven't tried to talk

18  to him about anything.

19          "THE COURT:  Are you sure of that?

20          "MR. BORENSTEIN:  Yes, unless I -- wait a minute.

21  Unless today I mistakenly got off the --

22          "THE COURT:  I'm talking about yesterday.

23          "MR. BORENSTEIN:  No.  What does he have to say?  That

24  I spoke to him?

25          "THE COURT:  Detective, would you step out, please."

1          So the answer of whether he spoke to him yesterday was

2    "No."  That was the answer, no doubt about that.

3          MS. BAHARANYI:  Your Honor, juror number 2's statement

4    that he never tried to talk to him about anything is consistent

5    with what you heard from both juror number 2 and

6    Detective Cowan.

7          THE COURT:  That isn't the question.  I heard that

8    too.

9          MS. BAHARANYI:  I don't see the issue, your Honor.  If

10   he has honestly answered the Court's question, he hasn't made a

11   statement about this case, he's speaking about things totally

12   irrelevant to this case to a group outside the courtroom, I'm

13   not sure what the issue is.

14         THE COURT:  The issue is that when I asked him whether

15   he spoke to Detective Cowan yesterday, the answer was "No."

16         Now, Cowan's testimony is that this guy was talking to

17   a group, the group moved away, and Mr. Borenstein, from a

18   distance of a foot and a half, then addressed his remarks to

19   Cowan and the witness who was with Cowan.  That's the

20   testimony.

21         MS. BAHARANYI:  Cowan's testimony, your Honor, is

22   based on his perception about what he thought the witness was

23   doing.

24         THE COURT:  My perception of your remarks are based on

25   my perception of what you're saying.  So the characterizations

**A000187**

1      really don't help.

2              MS. BAHARANYI:  Your Honor, in this case, if we're

3      taking his characterization as true, it is important for us to

4      recognize that these are just his perceptions.  He's saying

5      because juror number 2 remained in place speaking and because

6      he, Detective Cowan, also remained in place speaking, that

7      meant that juror number 2 was speaking to him.  And that's

8      simply, your Honor, not supported by what Detective Cowan just

9      said, nor is it supported by what juror number 2 said.

10             Juror number 2 told the Court that he never tried

11     talking to him, Detective Cowan, about anything.  And that is

12     supported by both witnesses I guess in the case.  This has

13     somewhat devolved into a new trial, but that is supported by

14     both individuals' statement.  He never tried to talk to

15     Detective Cowan about anything.

16             THE COURT:  He merely succeeded in doing so.

17             MS. BAHARANYI:  He was merely speaking out loud to a

18     group, and Detective Cowan chose to remain in his vicinity.

19     And Detective Cowan had interpreted that in a particular way,

20     but I certainly don't believe that --

21             THE COURT:  All of this repetition is not helpful.

22             MS. BAHARANYI:  Well, your Honor, I'll end.  But I

23     don't think that his interpretation is helpful.

24             THE COURT:  Okay.

25             Do you have an application to excuse him?

**A000188**

1          MR. WIRSHBA:  Yes, your Honor.  The government would

2    move to exclude him and does believe there was a conflict

3    between what Detective Cowan said and what the juror said.

4          THE COURT:  There was, and there is no doubt it, at

5    least not in my mind, and that's what counts for this purpose.

6    But I do want briefing or at least authorities on what the

7    standard is.

8          I'm totally satisfied that there was nothing said

9    about the case.  But the fact remains that we have a very

10    verifiable witness who certainly contradicts credible testimony

11    by Detective Cowan as to whether he talked to Cowan.  Let's see

12    where we go.  For the time being, he can remain.

13          Now, alternate number 2, Ms. Williams, says she feels

14    fine but has swollen lips and said she could get here by 12:30

15    or so.

16          What are your views about what we ought to do about

17    that?

18          MS. BAHARANYI:  Your Honor, I think, particularly

19    given our need to brief and address this issue which has to do

20    with the juror pool itself, we're fine with commencing this at

21    12:30 when alternate 2 is available to come.

22          I don't think that actually changes much of the

23    Court's schedule as promised to the jury at the start of this

24    trial.

25          MR. WIRSHBA:  Your Honor, the government believes we

**A000189**

1    should press ahead.  We have spent a lot of the jury's time

2    arguing, allowing them to be dismissed early yesterday.  It's

3    the government's position that we should continue.

4        The government's witnesses are here, they are ready,

5    and we already have a significant delay at the start of our

6    proceedings this morning regarding this juror issue, and the

7    government believes that we should press ahead without the

8    alternate.

9        MS. BAHARANYI:  I think there's an issue with the

10    positions that the government is taking.  They want to both

11    have the juror excused and also not wait for an alternate, one

12    of two, who is saying that they're available to be here right

13    away.  This does not delay or extend the trial beyond Tuesday,

14    given our expectations of the length of the government's case.

15        THE COURT:  All right.  We're going to press ahead.

16    And alternate number 2 is excused.

17        Now let's get back to these items that were sent to me

18    last night.

19        So I received the video from the government, not a

20    transcript but a video, two videos.  The first was the one we

21    talked about already.

22        The second is labeled video 2, USAOOO4836.

23        Now, what is that?

24        MR. WIRSHBA:  Your Honor, that is a video that the

25    government understood the defense would be objecting to.  But

**A000190**

1   ultimately we learned late last night -- and your Honor knows

2   this is kind of a moving target -- and the defense will not be

3   objecting to the clips for the second video that the government

4   sent.

5            THE COURT:  And does that go for other the clips that

6   are already marked?

7            MR. WIRSHBA:  They are marked.  They are not in

8   evidence.  But we understand, from speaking with the defense,

9   that they will not be making this same objection to those

10  exhibits.

11           THE COURT:  What exhibits are they marked as?

12           MR. WIRSHBA:  Those are 803, 804, and 805, your Honor.

13           THE COURT:  And Ms. Baharanyi, is counsel's

14  understanding of the defense position on those --

15           MS. BAHARANYI:  That is accurate.

16           THE COURT:  Okay.  Now, then the defense sent me what

17  purported to be transcripts of something.  One of them is

18  labeled USA0000139.  And as nearly as I could tell from this,

19  this is a transcript that contains some material that

20  corresponds to Government Exhibit 603A, some material that

21  corresponds to Government Exhibit 603T, some that corresponds

22  to Government Exhibit 603B, some that corresponds to government

23  Exhibit 604T, and some that don't correspond to any of the

24  government's exhibits.

25           MR. WIRSHBA:  Your Honor, I think that's precisely

**A000191**

1  correct.  The video, USAO139, is the full video of the quotes

2  by the defendant.  The government clipped that video, and those

3  clips are Government Exhibit 603A, 603B, and 604 and the

4  corresponding transcripts for those clips.

5          THE COURT:  All right.  So is it then accurate that

6  when we were talking yesterday about the defense's desire to

7  play the whole video, what we were talking about is to play the

8  entirety of the video, the entirety of which is transcribed in

9  this document marked USAOOOO139.

10          Is that right?

11          MS. BAHARANYI:  That is correct, your Honor.

12          THE COURT:  Okay.  When I look at the portions of the

13  whole video corresponding to USAO000139 that are not in the

14  government's submission, I don't see anything at all that, in

15  fairness, needs to be played with the parts that the government

16  wants to play.

17          I start with the proposition that Government Exhibit

18  603A, I believe it is, which corresponds to the first eight

19  attributions on the transcript which is USAO000139, is the

20  start of the video.

21          And so nothing that the government proposes to exclude

22  can explain the threat made on 603A as being the response to

23  something provocative that came before because nothing came

24  before, other than what's in the government's excerpt.

25          There is some material that proceeds what's in

1    government Exhibit T, but that consists almost entirely with

2    Mr. Johnson talking.  There are a few comments attributed to

3    the people, but they're not more than a line in each case.  And

4    they certainly weren't provocative.  And then there's the end

5    of the tape which follows the government exhibit I think it's

6    604T.  And that obviously can't have provoked anything that

7    came before.

8           So on the strict basis, taking into account the rule

9    of completeness and the defendant's provocation argument, I

10   really don't think the whole tape has to be played.  But I'm

11   going to allow it anyway, if the defense is sure they want it,

12   because as I read it, I think it harms the defendant.  But

13   that's your call.

14          If I were defending this case, no way would I play the

15   rest of the tape.  But it's your call.  If you want the whole

16   tape played, we're going to do that.

17          Is that what you want?

18          MS. BAHARANYI:  Yes, your Honor.

19          THE COURT:  Okay.  We'll do that.  Then I think we are

20   ready to go.

21          THE DEPUTY CLERK:  I'll bring up the jury, Judge.

22          THE COURT:  Yes.

23          MS. BAHARANYI:  Your Honor, there is one more issue

24   regarding Capitol Police Officer's Kelley's statement.  I think

25   we briefed that for the Court last night.

A000193

 1              THE COURT:  I know you did.  I'm not ready to deal

 2    with that.

 3              MR. WIRSHBA:  Your Honor, just to be clear, you are

 4    only ruling on one of the two videos that the defendant sent?

 5              THE COURT:  Absolutely.  Somebody is going to have to

 6    tell me what the exhibit is going to be.

 7              MR. WIRSHBA:  Yes, your Honor.  The full exhibit will

 8    be, your Honor -- Government Exhibit 605 will be the full

 9    video.

10              THE COURT:  Okay.  Fine.

11              MR. WIRSHBA:  One other thing just to raise with the

12    Court.  I think that during the colloquy in front of the jury

13    yesterday, the lawyers, in advocating to your Honor --

14    obviously the defense was just trying to advocate as strongly

15    as it could.  But there was mention, I believe, that the

16    government wasn't willing to play the whole tape.

17              To the extent that your Honor would find it

18    appropriate, I think a curative instruction might be

19    appropriate in this case, noting that it's not up to the

20    government whether or not the entire tape comes in or not, but

21    it is up to the Court.  And each party is able to play the

22    portions that are permissible under the rules of evidence.

23              THE COURT:  Yes.  And they're going to hear the whole

24    tape.

25              MR. WIRSHBA:  With respect to this tape, yes.  But I

**A000194**

 1  wouldn't want the jury to have the impression that where we

 2  play clips, for example --

 3          THE COURT:  I see.

 4          MR. WIRSHBA:  Thank you, your Honor.

 5          MS. CABRERA:  Your Honor, briefly, if your Honor is

 6  not prepared to rule on the issue with respect to

 7  Special Agent Kelley's testimony, we would then ask that the

 8  prosecution not be able to inquire as to Agent Kelley's

 9  assessment, we believe, of what they will now introduce in

10  Government Exhibit 603.

11          That video gives information of what is more

12  concerning in that video as he did when discussing the video

13  involving Boebert, which was Exhibit 703.

14          THE COURT:  I will deal with questions as they're

15  asked.

16          MS. CABRERA:  Thank you.

17          THE DEPUTY CLERK:  Jury entering.

18          (In open court; jury present)

19          THE DEPUTY CLERK:  Please be seated, everyone.

20          THE COURT:  Good morning, everybody.

21          The jurors are all present, except alternate number 2

22  who has been excused because she's had health issues overnight.

23          Let's continue with the witness.

24          Agent Kelley, you're still under oath.

25          And you may proceed.

```
 1              MR. WIRSHBA:  Thank you, your Honor.

 2              Ms. Cooper, could we put up Government Exhibit 601,

 3   please, for both the jurors and the witness.

 4   BRANDON KELLEY, resumed.

 5        called as a witness by the Government,

 6        having previously been duly sworn, testified as follows:

 7   DIRECT EXAMINATION (Cont'd)

 8   BY MR. WIRSHBA:

 9   Q.  Mr. Kelley, can you see that today?

10   A.  Yes, I can.

11   Q.  Fantastic.

12              Agent Kelley, just to reorient us, just remind us what

13   is on the screen here.

14   A.  This is a screen capture of the video that I reviewed from

15   Instagram on from February 4, 2021.

16   Q.  And who is it that's depicted on the left side of this

17   screen capture?

18   A.  That is United States Senator Joe Manchin from the state of

19   West Virginia.

20   Q.  Did you review the video from this recording?

21   A.  Yes, I did.

22   Q.  Did you also review the caption on the right?

23   A.  Yes, I did.

24   Q.  Yesterday I believe you called that a video caption; is

25   that right?
```

1  A.  That's correct.

2  Q.  Are you able to tell who wrote this video caption?

3  A.  Yes, I am.

4  Q.  How?

5  A.  On the upper right-hand side right next to the caption

6  itself in dark blue, it has the user's name.

7  Q.  And who, if anyone, is tagged in this capture?

8  A.  That is Senator Joe Manchin that's tagged.

9  Q.  And could you read the caption aloud for the jury, please.

10 A.  Yes.  "@joemanchin.  You want it to be bipartisan.  You

11 want to defund the people.  You have voted with dump to

12 maintain his terrorism.  Bitch, you are a terrorist and will be

13 held accountable for your treason."

14          MR. WIRSHBA:  At this time, the government would like

15 to offer Government Exhibit 605.

16          MS. BAHARANYI:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 605 received in evidence)

19          MR. WIRSHBA:  Ms. Cooper, if you could please display

20 Government Exhibit 605 for the jury and for the agent.  And you

21 can play it.

22          (Video played)

23 BY MR. WIRSHBA:

24 Q.  Agent Kelley, did you also review clips from this video?

25 A.  Yes, I did.

1  Q.  And are those clips labeled Government Exhibit 603A, 603B,

2  and 604?

3  A.  Yes, they were.

4           MR. WIRSHBA:  Your Honor, the government offers

5  Government Exhibit 603A, 603B, and 604.

6           MS. BAHARANYI:  No objection.

7           THE COURT:  603A, 603B, and 604 are received.

8           (Government's Exhibits 603A, 603B, and 604 received in

9  evidence)

10  BY MR. WIRSHBA:

11  Q.  Agent Kelley, did you also review transcripts of those

12  clips, 603AT, 603BT, and 604T?

13  A.  Yes, I did.

14  Q.  Are those fair and accurate?

15  A.  Yes, they were.

16           MR. WIRSHBA:  Your Honor, the government offers 603AT,

17  603BT and 604.

18           THE COURT:  They are received.

19           (Government's Exhibits 603AT, 603BT and 604 received

20  in evidence)

21  BY MR. WIRSHBA:

22  Q.  After you watched this video, what did you do?

23  A.  The first thing I did after watching this video was sent an

24  internal notification to my chain of command all the way up to

25  the chief of police.

A000198

1   Q.  Why did you do that?

2   A.  That was to ensure that my entire chain of command,

3   including the chief, was aware of the situation, Capitol Police

4   was investigating a threatening communication towards this

5   particular member of Congress in case they had any meetings

6   about this.

7   Q.  What else did you do?

8   A.  After that, I contacted the chief of staff for

9   Senator Manchin's office.

10  Q.  What time was it when you did that?

11  A.  It was roughly midnight.

12  Q.  Why did you call at that time of night?

13          MS. BAHARANYI:  Objection.  Relevance.

14          THE COURT:  Overruled.

15          THE WITNESS:  I called at that time of night to ensure

16  that the chief of staff could pass along the message to any

17  staff members that needed to know and to also get in touch with

18  a member of Congress since they have the best access to the

19  member of Congress and best access to the questions and the

20  answers I needed.

21  BY MR. WIRSHBA:

22  Q.  Why did you call the chief of staff and not someone else

23  from Senator Manchin's office?

24  A.  I called the chief the staff because they are the

25  highest-ranking member of that office.  They have the best

1    access to a member of Congress.  They have the best access to

2    the answers that I needed for my questions.

3    Q.  Were you able to speak with the chief of staff that

4    evening?

5    A.  Yes, I was.

6    Q.  And what did you say to him?

7              THE COURT:  I'm sorry.  What was the question?

8              MR. WIRSHBA:  "What did you say to him?"

9              THE COURT:  Go ahead.

10             THE WITNESS:  I provided the chief of staff with the

11   threatening statements.  I advised the chief of staff that if

12   the office would like to review the statements, that the

13   senator was tagged in the post for their review.  In addition

14   to that, I requested the member of Congress, Senator Manchin's,

15   current whereabouts, the schedule for the next upcoming weeks

16   for the senator, and if the office would like directed patrols.

17   BY MR. WIRSHBA:

18   Q.  And was the response of Senator Manchin's chief of staff?

19             MS. BAHARANYI:  Objection.

20             THE COURT:  I think you need to lay a better

21   foundation.

22             MR. WIRSHBA:  Understood, your Honor.

23   Q.  What did you do in response to this conversation you had

24   with the chief of staff?

25   A.  I provided directed patrols for the office.

1  Q.  Remind the jury.  What are directed patrols?

2  A.  Directed patrols are requests that we put in with local law

3  enforcement in the area where the member of Congress resides in

4  their state.  We put these requests in to ask for assistance

5  with extra patrols by uniformed police to go through the area

6  where the member of Congress lives, to ensure that there is

7  nothing out of the ordinary or concerning taking place while we

8  conduct this investigation.

9  Q.  And why did you provide directed patrols in this particular

10 matter?

11 A.  I provided them in this particular matter just because of

12 the concerning nature of these statements.

13          MS. BAHARANYI:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  I provided directed patrols for this

16 case specifically for the concerning nature and the threatening

17 aspect of the comments that were made in this post.

18 BY MR. WIRSHBA:

19 Q.  Is it your practice to provide directed patrols when it's

20 not requested by a particular congressional office?

21 A.  It is not.

22 Q.  So who, if anyone, requested directed patrols in this case?

23 A.  That would be the chief of staff for the office.

24 Q.  So what did you do when you got off the phone with the

25 chief of staff for Senator Manchin?

**A000201**

1   A.  Once I got off the phone with the chief of staff for

2   Senator Manchin's office, I called up Charleston PD in West

3   Virginia and requested that the directed patrols take place for

4   the next upcoming weeks for the member's residence.

5   Q.  And approximately what time did you make this phonecall to

6   the Charleston police department?

7   A.  It was about midnight as well.

8           MR. WIRSHBA:  Thank you, your Honor.  No further

9   questions.

10          THE COURT:  Thank you.  Cross-examination.

11  CROSS-EXAMINATION

12  BY MS. CABRERA:

13  Q.  Agent Kelley, you first heard of Rickey Johnson on

14  February 4, 2021?

15  A.  I was notified of the case on February 4 of 2021.

16  Q.  You'd never previously heard of Rickey Johnson?

17  A.  Before that, no.

18  Q.  Boebert's staff had never mentioned him to you?

19  A.  No, ma'am.

20  Q.  Manchin's staff had never mentioned him to you?

21  A.  No, ma'am.

22  Q.  And this name came to you from the NYPD?

23  A.  Yes, ma'am, it did.

24  Q.  And to be clear, no one had claimed that they had ever

25  observed Mr. Johnson at the Capitol Building?

**A000202**

```
 1   A.  Not at that time.

 2   Q.  Or at any time?

 3   A.  No.

 4   Q.  And to be clear, the Capitol Building is in Washington

 5   D.C.; correct?

 6   A.  Yes, it is.

 7   Q.  And Mr. Johnson, to your knowledge, was in New York City?

 8   A.  Yes.

 9   Q.  Now, when you received this case, your supervisor had

10   already looked at it?

11   A.  Yes, he did.

12   Q.  And you mentioned that it was deemed a priority threat.

13   A.  Yes.

14   Q.  And there are two types of threats, either priority threat

15   or non priority?

16   A.  Out of practice, all threats that are given to us because

17   of the language and the directness of the threat is given to us

18   as a priority.  The difference in priority versus non priority

19   comes into play when you're talking about other cases such as

20   direction of interests or police information.

21   Q.  I understand.  So it can be a priority lead or a non

22   priority lead?

23   A.  Correct.

24   Q.  And this was considered priority?

25   A.  Yes.
```

**A000203**

 1   Q.  And it was considered priority before you had ever received

 2   the case; correct?

 3   A.  Yes, it was.

 4   Q.  So if you hadn't been at work that day and this case had

 5   gone to your colleague, it would have still been a priority;

 6   correct?

 7   A.  Based on face value, yes.  It would have been passed down

 8   to another colleague as a priority.

 9   Q.  Now, in February of 2021, you notified Manchin's staff of

10   Mr. Johnson's video; correct?

11   A.  I'm sorry.  What was the date?

12   Q.  In February of 2021.

13   A.  Yes.

14   Q.  You notified Boebert and her staff of Mr. Johnson's video;

15   correct?

16   A.  Yes, I did.

17   Q.  And that was the first time they were made aware of the

18   existence of the video?

19   A.  Yes.

20   Q.  And you only first saw the videos when the NYPD sent them

21   to you; correct?

22   A.  That is correct.

23   Q.  And that's because Mr. Johnson never sent the video to you

24   directly?

25   A.  The video was never sent to Capitol Police by the suspect.

**A000204**

1   Q.  Nor did he send it to anyone in Congress; correct?

2           MR. WIRSHBA:  Objection.  Beyond the scope of the

3   witness' knowledge.

4           THE COURT:  Then I guess he'll tell us then.

5           THE WITNESS:  Can you repeat your question.

6   BY MS. CABRERA:

7   Q.  Nor did he send it to anyone in Congress; correct?

8   A.  That's not necessarily true.

9   Q.  Were you approached about the existence of this video from

10  Manchin's staff?

11  A.  Not at that time.

12  Q.  Were you approached about the existence of this video from

13  Boebert's staff?

14  A.  No.

15  Q.  Were you approached about this video from anyone in

16  Congress?

17  A.  No.

18  Q.  Now, you said that upon watching these videos, you then

19  reached out to Manchin's staff.  Correct?

20  A.  Yes.

21  Q.  You called them?

22  A.  Manchin's staff, yes.

23  Q.  And you told them there was a threat made against Manchin.

24  A.  Yes.

25  Q.  And they believed you.

1   A.   Yes.

2   Q.   And you offered Manchin increased security.

3   A.   Yes, I did.

4   Q.   And Manchin accepted your offer.

5   A.   The chief of staff requested that extra security take place

6   at the member's residence, yes.

7   Q.   And you offered it to them as well.

8   A.   Yes.  Out of practice when these type of threats come in,

9   it is common practice for us to ask if these offices would like

10  these directed patrols to make the office, the member of

11  Congress, etc., to maintain their health and their safety

12  during this.

13  Q.   And they responded to that offer?

14  A.   Yes.

15  Q.   And they accepted that offer?

16  A.   Yes.

17  Q.   But Manchin's staff had never independently reached out

18  requesting it; correct?

19  A.   I don't think there was enough time for them to.  I was

20  reaching out to them almost immediately after I reviewed the

21  video.

22  Q.   So Manchin's staff never independently asked you for

23  heightened security; correct?

24  A.   When I approached them, I asked them if they would like the

25  security, which they answered me and said yes.

 1  Q.  I'm sorry.  That's not my question.

 2          Prior to that, they had never independently asked you

 3  for heightened security until this phonecall?

 4  A.  That is correct.

 5  Q.  And to your knowledge, Manchin never obtained an order of

 6  protection in this case?

 7  A.  I'm sorry.  Repeat that.

 8  Q.  To your knowledge, Manchin never obtained an order of

 9  protection against Rickey Johnson?

10  A.  I'm sorry.  I don't understand the question.

11  Q.  Are you familiar with orders of protection?

12  A.  Yes.

13  Q.  To your knowledge, Senator Manchin never received an order

14  of protection in this case?

15          MR. WIRSHBA:  Objection.

16          THE COURT:  Sustained.  The question is unclear.

17  You've phrased it in such a way that if he doesn't know, he can

18  answer that question yes and you leave what it means up in the

19  air.

20  BY MS. CABRERA:

21  Q.  Senator Manchin did not obtain an order of protection in

22  this case.

23          THE COURT:  That would be no.

24          MS. CABRERA:  I started the last question with "To

25  your knowledge."  So I can try it that way.

**A000207**

1   Q.  To your knowledge, do you know if Senator Manchin obtained

2   an order of protection?

3               MR. WIRSHBA:  Objection.

4               THE COURT:  Sustained as to form.

5               Agent, do you know one way or the other whether

6   Senator Manchin ever obtained an order of protection with

7   respect to Mr. Johnson?

8               THE WITNESS:  I am unaware, your Honor.

9   BY MS. CABRERA:

10  Q.  Thank you.

11              You also called Boebert's office; correct?

12  A.  Yes, ma'am.

13  Q.  They did not answer your call?

14  A.  No, ma'am.

15  Q.  So you followed up with an email?

16  A.  That is correct.

17  Q.  And you informed them that there was a possible threat;

18  correct?

19  A.  That is correct.

20  Q.  You didn't say it was a concerning threat; right?

21  A.  In my business and job, in my past experience, when passing

22  on these notifications to offices, it is assumed that when we

23  are working a threat and we are providing them with an update

24  on a threat case, that the threat it's concerning.  So, no, I

25  didn't use the word "concerning," but it was implied.

1   Q.  Okay.  I just want to be very clear that I'm asking about
2   the words that were used.
3            You didn't say it was concerning threat; correct?
4   A.  I did not use the word "concerning."
5   Q.  You did not say it was a serious threat?
6   A.  I did not use the word "serious."  I just said it was a
7   threat.
8   Q.  You said it was a possible threat.
9   A.  Correct.
10  Q.  And then you asked if they wanted additional security
11  detail.
12  A.  That is correct.
13  Q.  You requested her address.
14  A.  That is correct.
15  Q.  She did not respond.
16  A.  Not immediately, but they did end up responding back.
17  Q.  When did they respond?
18  A.  I believe February 8.
19  Q.  And you requested her schedule?
20  A.  Yes, I did.
21  Q.  And she didn't respond again to the request of her
22  schedule?
23  A.  She did.
24  Q.  When did she respond to that?
25  A.  The responses were all -- there was one email on

A000209

 1  February 8.

 2              MS. CABRERA:  With the Court's indulgence.

 3  Q.  Now, she did not -- when she did finally respond to you,

 4  did she respond -- she did not respond to a request for

 5  additional security specifically?

 6  A.  So that was where I was stating yesterday that there was

 7  possible a miscommunication --

 8  Q.  I'm sorry.  That wasn't the question.

 9              And your Honor sustained the defense objection as to

10  that.  So we would ask that the Court direct the witness not to

11  surmise about it.

12              THE COURT:  What's your question?

13  BY MS. CABRERA:

14  Q.  My question is:  She did not reply to the requests for

15  additional security.

16  A.  I can't answer that without stating the miscommunication I

17  believe that happened.

18  Q.  Did Boebert say, yes, I want security?

19  A.  No.

20  Q.  And you sent them the video?

21  A.  Yes.

22  Q.  But Boebert didn't watch the video?

23  A.  I'm not sure.

24  Q.  On January 11, 2022, you sent an email to Boebert's

25  chief of staff, Jeff Small.  Correct?

 1  A.  I'm not sure of the date, but that sounds about right.

 2  Q.  And you spoke to him on the phone afterwards?

 3  A.  I've spoken to him a lot.  I'm unsure what conversation

 4  you're specifically asking about.

 5  Q.  Well, you remember receiving an email from Boebert's

 6  legislative aid on January 12, 2022?

 7  A.  I would like more information, if possible.

 8       MS. CABRERA:  Maliha, can we pull up 3510-36 up on the

 9  monitor, only for the witness.

10  Q.  Do you see what's been marked -- well, I'm showing you an

11  email dated January 12, 2022.  Just take a look at it.  When

12  you've read it, let me know.

13  A.  Yes, ma'am.

14  Q.  Okay.  And so in this email --

15       THE COURT:  The email is not in evidence.

16       MS. CABRERA:  I'm sorry.  You're correct, your Honor.

17  Q.  Does this sufficiently refresh your recollection?

18  A.  It does.

19       MS. CABRERA:  You can take it down.  Thank you.

20  Q.  And so you received an email from Boebert's legislative aid

21  on January 12, 2022; correct?

22  A.  Yes.

23  Q.  And she asked you for a copy of the video referencing

24  Boebert?

25  A.  Yes.

**A000211**

1    Q.  And that was because Boebert herself was asking for this

2    video.

3    A.  I can't speak to that.

4            THE COURT:  Will you just try to speak a little bit

5    more slowly.

6            MS. CABRERA:  Sure.  Apologies.

7    Q.  Based on the email you received on January 12, 2022, you

8    responded by resending them Mr. Johnson's video; correct?

9    A.  That is correct.

10   Q.  And this was the same video -- and that was consistent with

11   what they requested you to do; correct?

12   A.  Yes.

13   Q.  And this was the same video you sent them in February of

14   2021?

15   A.  That is the same video that they reviewed.  That is the

16   same video that I reviewed in February of 2021.

17   Q.  And, again, do you know if Boebert ever obtained an order

18   of protection against Mr. Johnson?

19   A.  I'm unaware.

20   Q.  Now, you investigated Mr. Johnson yourself; correct?

21   A.  NYPD was the primary investigative unit.  What I did was a

22   very face-value investigation.

23   Q.  But you did your own investigation; correct?

24   A.  We conducted some database checks.

25   Q.  And in these database checks, you were able to find his

1  personal identifying information; correct?

2  A.   That is correct.

3  Q.   You checked to see if he had a hunting license.

4  A.   Yes.   That is correct.

5  Q.   And that's important to know because it might render

6  someone more dangerous?

7  A.   That is a step that we take as an added layer of threat

8  assessment.   It comes up if an individual has any type of

9  hunter's license or anything like that in one of our databases.

10       We take that at face value because the database check

11  that we use has been wrong in the past.   So just because that

12  database check stated that he did not have a license or a

13  hunting license does not ensure the fact that he had no hunting

14  license.   But we take that as a consideration for our threat

15  assessment.

16  Q.   So you used this database to confirm that in assessing the

17  threat; correct?

18  A.   We use these databases to get information.   Information is

19  what helps us conduct our threat assessment.   So these

20  databases are to help us gather more fashion.

21  Q.   And it's important that the information is correct?

22  A.   Yes.

23  Q.   And accurate?

24  A.   Yes.

25  Q.   And this database told you that he did not have a hunting

**A000213**

 1   license?  Correct?

 2          THE COURT:  You're stepping on his last words, and

 3   you're talking very fast, and it's very difficult to get what

 4   you're saying.

 5   BY MS. CABRERA:

 6   Q.  So my question -- yes or no? -- did this database show that

 7   he had a hunting license?

 8   A.  This database did not show that he had a hunting license.

 9   Q.  And this database showed that he did not have a concealed

10   weapons permit; correct?

11   A.  That is correct.

12   Q.  And this database showed that he did not have a history

13   with firearms or explosives; correct?

14          MR. WIRSHBA:  Objection.

15          THE COURT:  Sustained certainly as to form.

16   BY MS. CABRERA:

17   Q.  And this database did not show that he had a history with

18   firearms?

19          MR. WIRSHBA:  Objection.

20          THE COURT:  What's the objection now?

21          MR. WIRSHBA:  Hearsay.

22          THE COURT:  Sustained.

23          MS. CABRERA:  Your Honor, this is a database that they

24   used to inform the entire investigation.

25          THE COURT:  You're offering it for the truth of the

A000214

1  matter asserted; right?

2          MS. CABRERA:  Correct.

3          THE COURT:  Therefore, it's hearsay.

4          MS. CABRERA:  He has attested to the fact that this is

5  a database that the Capitol Police used and was maintained --

6          THE COURT:  There was no objection.

7          MS. CABRERA:  I'm sorry?

8          THE COURT:  There was no objection.

9  BY MS. CABRERA:

10  Q.  Special Agent Kelley, you're personally familiar with

11  Boebert?

12  A.  Yes.  I'm familiar with United States Representative

13  Boebert.

14  Q.  You've seen her in the Capitol Building?

15  A.  Yes.

16  Q.  You've interacted with her personally?

17  A.  I wouldn't say personally.  I've interacted with their

18  staff on a personal level.

19  Q.  You know what she looks like.

20  A.  That is correct.

21  Q.  And she's previously sought permission to carry guns in the

22  Capitol though?

23          MR. WIRSHBA:  Objection.

24          THE COURT:  Sustained.

25  BY MS. CABRERA:

**A000215**

1   Q.  During COVID, meetings have been held virtually; correct?

2   Committee meetings.

3            MR. WIRSHBA:  Your Honor, objection.

4            THE COURT:  Sustained.

5            MS. CABRERA:  On what basis?

6            THE COURT:  On the basis that it's not a proper

7   question.

8   BY MS. CABRERA:

9   Q.  During COVID, have meetings been held virtually?

10           MR. WIRSHBA:  Objection.  May we approach?

11           THE COURT:  Sustained.

12  BY MS. CABRERA:

13  Q.  Representative Boebert is on committees; correct?

14           MR. WIRSHBA:  Objection.

15           THE COURT:  Sustained.

16           MS. CABRERA:  On what ground, your Honor?

17           THE COURT:  On the ground that it isn't relevant.

18           MS. CABRERA:  Your Honor, I'm trying to get to where

19  it is relevant.

20           THE COURT:  Well, you better start with something

21  relevant.

22  BY MS. CABRERA:

23  Q.  Representative Boebert works in the Capitol Building; is

24  that correct?

25  A.  That is correct.

A000216

1   Q.  And she is a member of Congress?

2   A.  That is correct.

3   Q.  And part of her duties as a member of Congress are to be

4   part of committee; correct?

5   A.  That is correct.

6   Q.  And during COVID, those meetings weren't held in person.

7           MR. WIRSHBA:  Objection.

8           THE COURT:  Sustained.

9           MS. CABRERA:  Your Honor, I'm trying to get to the

10  point.

11          THE COURT:  You can't get there this way.

12          MS. CABRERA:  With the Court's indulgence.

13  Q.  Now, the defense is going to --

14          Can you pull up Defense Exhibit C.  It's not to the

15  jury.

16          I'm showing you what has been marked for

17  identification purposes as Defense Exhibit C.

18          This is a photo; correct?

19          MR. WIRSHBA:  Your Honor, we have never seen this

20  before.  If you'll give me a moment, I've asked for copies.

21          Thank you, your Honor.

22          THE COURT:  I'm sorry?

23          MR. WIRSHBA:  I said thank you.

24  BY MS. CABRERA:

25  Q.  This is a photo of Representative Boebert; correct?

```
 1              THE COURT:  It's not in evidence.  You don't get to do
 2    that.
 3    BY MS. CABRERA:
 4    Q.  What does this show?
 5              MR. WIRSHBA:  Objection.
 6              THE COURT:  Sustained.
 7    BY MS. CABRERA:
 8    Q.  I'm showing you what has been marked for identification
 9    purposes as Defense Exhibit C.
10              What is it?
11              MR. WIRSHBA:  Objection.
12              THE COURT:  Sustained.
13              MS. CABRERA:  I'm not sure what the issue is, your
14    Honor.
15              THE COURT:  You don't have any idea whether he has
16    ever laid eyes on it, first of all.  What you're asking for I
17    can't even tell because I've never seen the exhibit either, as
18    far as I know.
19              MS. CABRERA:  I'm asking for him to identify
20    Representative Boebert who --
21              THE COURT:  I'm sorry?
22              MS. CABRERA:  Asking him to identify Representative
23    Boebert who is in this photo.
24              MR. WIRSHBA:  Your Honor, objection.  I think there is
25    a clear reason that they're doing it, and I'm happy to discuss
```

A000218

1    it at sidebar.

2              THE COURT:  All right.  Can somebody bring a copy of

3    the exhibit so I can see it.

4              MR. WIRSHBA:  Your Honor, we'd ask that it be taken

5    down in the meantime.

6              THE COURT:  Pardon me?

7              MR. WIRSHBA:  We'd ask that it be taken down in the

8    meantime.

9              THE COURT:  Take it down.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A000219**

1              (At sidebar)

2              MS. CABRERA:  Your Honor, part of the question under

3      the statute is whether Mr. Johnson intended to impede,

4      interfere, or retaliate against Representative Boebert.

5              MS. BAHARANYI:  Or intimidate.

6              MS. CABRERA:  Or intimidate.  We are trying to

7      establish that this is a woman, through Agent Kelley who has

8      testified he is familiar with her, that this is a woman —— and

9      that's a screenshot in the committee room itself —— who has

10     made herself known as a person who carries weapons, concealed

11     weapons.  It would then impact —— this goes directly to

12     Mr. Johnson, whether or not he actually possessed any sort of

13     real intent to do anything by virtue of that.

14             THE COURT:  If you want to call Johnson and establish

15     that Johnson knows these facts, that's one thing.  You're not

16     doing this.  You just can't do this like that.

17             MS. CABRERA:  Your Honor, he knows ——

18             THE COURT:  For the record, what they want to do is

19     not show a photo of Boebert to see whether the man can identify

20     Boebert.  They want him to identify her from a photo showing an

21     automatic weapon behind her head.  And we're just not going to

22     do it this way.  It's not proper.

23             MS. CABRERA:  Just to be clear, this is a photo ——

24     this is a screenshot of how she appeared on a Zoom meeting for

25     a congressional committee meeting.

**A000220**

```
 1              THE COURT:  So what?

 2              MS. CABRERA:  I just want to make that clear, that

 3    this was part of her official duties.

 4              THE COURT:  Are you offering to prove that your client

 5    had seen that photo or the equivalent at some time at or before

 6    when he made the threats?

 7              MS. CABRERA:  What I'm saying is --

 8              THE COURT:  Answer my question.  Yes or no.

 9              MS. CABRERA:  Can you repeat the question, your Honor.

10              THE COURT:  Are you offering to prove that your client

11    had seen that photo or otherwise knew of Ms. Boebert's weapons'

12    proclivity before he made the alleged threats?

13              Is that what you're trying to do?

14              MS. CABRERA:  I'm trying to say that this is common

15    knowledge.

16              THE COURT:  Please answer my question.

17              MS. CABRERA:  So through that, yes.  And it is common

18    knowledge.

19              THE COURT:  Good.  If you want to do that, you should

20    call your client.

21              MS. CABRERA:  Okay.  Thank you.

22              (Continued on next page)

23

24

25
```

```
 1                     (In open court)
 2                     THE COURT:  There may be other avenues as well, but
 3      this isn't one of them.
 4      BY MS. CABRERA:
 5      Q.  Can you pull up Government Exhibit 701.
 6                     Did you take this screenshot?
 7      A.  I don't believe so, no.
 8      Q.  Did law enforcement send it to you?
 9      A.  I'm unsure.
10      Q.  When you saw the video, when you saw -- the video on
11      Instagram you saw, this is what it looked like, correct?
12      A.  That is correct.
13      Q.  It had these tags on the right-hand side?
14      A.  I'm sorry?
15      Q.  Strike that record.  Strike that.
16                     The date it was posted on the bottom was February 3,
17      2021?
18      A.  That's correct.
19      Q.  At the time of this screenshot, it had been up for 52
20      weeks, correct?
21      A.  That is correct.
22      Q.  And there were only nine views within the 52 weeks of its
23      posting, correct?
24      A.  That is correct.
25      Q.  And at this point, law enforcement had already viewed the
```

**A000222**

1  videos, correct?

2  A.  That is correct.

3  Q.  So, of those nine views, some of them were law enforcement?

4  A.  Yes, I imagine that is correct.

5  Q.  Can you also pull up Government Exhibit 601.

6          Now again, is this what the video looked like at the

7  time in which you viewed it?

8  A.  Yes, that's correct.

9  Q.  And date it was posted here was also February 3 of 2021?

10 A.  Yes, ma'am.

11 Q.  And at the time of this screenshot, it had been up for 52

12 weeks?

13 A.  Yes, ma'am.

14 Q.  And for this video, there were only six views?

15 A.  Yes, at that time it is showing six views.

16 Q.  And again, this was already when law enforcement had

17 obtained the video?

18 A.  That is correct.

19 Q.  And they had been of those six views?

20 A.  I would imagine, yes, those were counted.

21 Q.  You can take that down.

22          I want to talk a little bit about Instagram and how it

23 works.  You are familiar with direct messages on Instagram?

24 A.  Yes.

25 Q.  There are similar to text messages in a way?

**A000223**

 1  A.  How so?

 2  Q.  You send actual text -- words to a person to an inbox?

 3  A.  In some occasions, but Instagram also has the ability to

 4  direct message a photo or video as well.

 5  Q.  Correct.  And when you receive one, they go to an inbox?

 6  A.  That is correct.

 7  Q.  And it remains there unread when you receive a message?

 8          MR. WIRSHBA:  Objection.

 9          THE COURT:  Sustained.

10  Q.  When you get a message in your inbox, I'm sorry.  Strike

11  that.

12          When you receive a direct message, it goes in an

13  inbox, correct?

14          MR. WIRSHBA:  Objection.

15          THE COURT:  Asked and answered.

16  Q.  You are then notified that you have a direct message in the

17  inbox?

18          MR. WIRSHBA:  Your Honor, can we clarify about who

19  "you" is?

20  Q.  A person.  A person is then notified if they have received

21  a direct message in their inbox, correct?

22  A.  That is correct.

23  Q.  And then, when you read it, that notification is gone,

24  correct?

25  A.  I don't believe in all cases that the notification goes

A000224

1    away.

2    Q.  Well, when you had read a message, when you read a direct

3    message on Instagram, it states "seen" underneath, correct?

4    A.  I believe so, yes.

5    Q.  So the sender knows when somebody reads a direct message on

6    Instagram?

7    A.  As far as I know, yes.  Unless there is a setting that

8    takes that away, that read receipt gets taken away just like

9    text messages.  I am unaware if that's a possibility.

10   Q.  You are unaware whether or not Instagram has that function?

11   A.  Yes.

12   Q.  But a tag is different than a direct message, correct?

13   A.  Yes and no.

14   Q.  A tag can be used only as an identifier?

15   A.  A tag to my understanding is a way to notify somebody of a

16   post.  So, a tag, you use that individual's name or user name

17   to tag that individual.  Whatever you tag that individual on,

18   they get notified of that post that they were tagged on.  So it

19   is a way of notifying.

20   Q.  But you can use it to identify someone in an image,

21   correct?

22   A.  You can.

23   Q.  Or you can tag someone being discussed in a video if you so

24   choose?

25   A.  Yeah, you can tag somebody for any reason.

A000225

1  Q.  Exactly.  You can tag a person for no reason at all as

2  well, correct?

3  A.  Yes, but in this case it was clearly for --

4  Q.  Well --

5  A.  -- another reason.

6  Q.  I'm asking you that a person can be tagged for no reason as

7  well, correct?  I'm not asking about this case.

8  A.  They can be tagged for the reason -- essentially the only

9  reason to tag somebody is to notify them, whatever reasoning

10 behind notifying them is.  Essentially, to tag somebody is to

11 notify, no matter what reason is behind it.

12 Q.  Okay.  Well, let's talk about that.  Can you pull up

13 Government Exhibit 701.

14        I am showing you Government Exhibit 701.  Here, so,

15 Boebert is featured in the video, correct?

16 A.  Yes, that's United States Representative Boebert.

17 Q.  She's tagged?

18 A.  Correct.

19 Q.  Other people are tagged in this video as well?

20 A.  That's correct.

21 Q.  They are not appearing on the video?

22 A.  No, ma'am.

23 Q.  Like Ron DeSantis.  He is not in the video?

24 A.  As I recall, no.

25 Q.  The Constitution Center is not in the video?

**A000226**

1   A.  That is correct.

2   Q.  The Department of Justice is not in the video?

3   A.  Yes.

4   Q.  But they are all tagged.

5   A.  Yes, they are all tagged in this video.

6          THE COURT:  Does that mean that they are all notified

7   of the video?

8          THE WITNESS:  That's correct, your Honor.

9          THE COURT:  Thank you.

10  Q.  Unlike a direct message, there is no inbox of tags,

11  correct?

12  A.  I'm -- I believe, no, it goes to a notification, a

13  different notification feed.

14  Q.  Right.  And as --

15         MR. WIRSHBA:  Objection, your Honor.

16         THE COURT:  What?

17         MR. WIRSHBA:  Just counsel is testifying.

18         THE COURT:  This is cross, she is entitled to lead.

19  Q.  I'm sorry.  You mentioned --

20         THE COURT:  I couldn't get that.

21  Q.  I'm trying to remember the last sentence.

22         It was notified.  That's correct; it is a

23  notification?

24  A.  You get notified.

25  Q.  Okay.  So, if someone has a lot of notifications, they can

A000227

1  get pushed down, correct?

2  A.  I'm unsure what you mean.

3  Q.  So, when you access Instagram, on -- I'm directing you

4  specifically to accessing Instagram on your phone.  You can

5  have multiple notifications, correct?

6  A.  Yes.

7  Q.  And you might have to scroll to be able to view all of

8  them, correct?

9  A.  That is correct.

10  Q.  And someone who might have a lot -- if someone has a lot of

11  followers, they may have a lot of notifications, correct?

12  A.  I can't speak to that.

13  Q.  Well, you mentioned Boebert has an Instagram page, right?

14  A.  Yes, she does.

15  Q.  She can be tagged by a photo, she can be tagged by anyone

16  in a photo, correct?

17  A.  Yeah, that's correct.

18  Q.  And it can be somebody who is actively following her on

19  Instagram?

20  A.  I believe it can be anybody can tag her.

21  Q.  Right.  It can be anyone in the public, correct?

22  A.  Correct.

23  Q.  Can you pull up Defense Exhibit D.

24         Do you recognize this?  I'm showing you what's been

25  marked for identification purpose as Defense Exhibit D.

```
 1           Do you recognize this?
 2   A.  Yes, I do.
 3   Q.  What is it?
 4   A.  What is it?
 5   Q.  Hmm-hmm.
 6   A.  That is United States Representative Lauren Boebert's home
 7   page on her Instagram.
 8   Q.  And with the exception of the redactions on the bottom, is
 9   it a fair and accurate depiction of her Instagram page?
10   A.  Currently, I am unable to speak on that.
11   Q.  When you accessed it on that day, is that what it looked
12   like?
13   A.  I can't speak to exactly what was on this page at the time.
14   But, that does, that is depicting United States Representative
15   Boebert on that Instagram page.
16   Q.  Is there any reason to believe that it's not her official
17   page?
18   A.  No, there is no reason for me to believe that, but I am
19   unable to confirm this is what the page looked like at the time
20   that I reviewed it.
21   Q.  Okay.  Does it currently depict, though, her -- does it
22   depict her tag that was noted in Government Exhibit 701?
23           MR. WIRSHBA:  Objection.
24           THE COURT:  Sustained.  I don't understand it.
25   Q.  Can you pull up 701.  Can you put them up side by side.
```

**A000229**

1    Thank you.

2             I'd like to direct your attention to Government

3    Exhibit 701.  The tag listed there is @Rep. Boebert, correct?

4    A.  On 701?

5    Q.  Yes.

6    A.  That is correct.

7    Q.  The Instagram handle on Defense Exhibit D is also Rep.

8    Boebert, correct?

9             MR. WIRSHBA:  Objection, your Honor.

10            THE COURT:  I'm sorry?

11            MR. WIRSHBA:  Objection.  Defense Exhibit D is not in

12   evidence.

13            THE COURT:  Sustained.

14   Q.  What is the handle listed on Defense Exhibit D?

15            MR. WIRSHBA:  Objection.

16            THE COURT:  Sustained.

17   Q.  Now that you've reviewed 701, and reviewed the handle

18   listed there, is this a fair and accurate depiction of what

19   Rep. Boebert's page looks like?  Is it consistent with that

20   handle?

21            THE COURT:  Sustained.

22   Q.  Is it, is that handle consistent with what was listed in

23   Government Exhibit 701?

24            MR. WIRSHBA:  Objection.

25            THE COURT:  Sustained.

```
 1              MS. CABRERA:  We seek to move it in evidence.

 2              MR. WIRSHBA:  Objection.

 3              THE COURT:  Sustained.

 4              MS. CABRERA:  The Court's indulgence.

 5   Q.  How many followers did Rep. Boebert have on Instagram when

 6   you reviewed her page?

 7   A.  I'm unsure.

 8   Q.  Was it -- if you had to ballpark it.

 9   A.  I don't feel comfortable ballparking that type of question.

10   I'm sorry.

11   Q.  Was it more than 10?

12   A.  I can't speak to that.  But I would imagine it was more

13   than 10.

14   Q.  Rep. Boebert has a verified profile, correct?

15   A.  That is correct.

16   Q.  There is a blue checkmark next to her name?

17   A.  That is correct.

18   Q.  And that's a profile that's usually reserved for

19   celebrities, correct?

20   A.  Not necessarily celebrities, but I imagine anybody who

21   needs a verified profile.

22   Q.  And somebody needs a verified profile if their profile

23   could potentially be subject to fraudulent profiles, correct?

24              MR. WIRSHBA:  Objection.

25              THE COURT:  Sustained as to form.
```

1    Q.  The people that have verified profiles are folks that are

2    usually well known, correct?

3              MR. WIRSHBA:  Objection.

4              THE COURT:  Do you have any way of knowing that?  Just

5    answer my question yes or no, please.

6              THE WITNESS:  What was the question, your Honor?

7              THE COURT:  The question was the people that have

8    verified profiles are folks that are usually well known,

9    correct?

10             THE WITNESS:  I have no way to verify that that's how

11   verified users come about.  I'm unsure of that process.

12   Q.  You testified on direct you've been trained on Instagram,

13   correct?

14   A.  I am.

15   Q.  You're trained on how it works?

16   A.  To a degree, yes.

17   Q.  And you know how profiles are created?

18   A.  That is correct.

19   Q.  And yet you are telling me now you don't know the

20   difference between a verified profile and an unverified

21   profile?

22             MR. WIRSHBA:  Objection.

23             THE COURT:  That's not what he said at all.

24   Q.  You are telling me that you don't understand what renders a

25   profile verified?

1          MR. WIRSHBA:  Objection.

2          THE COURT:  Sustained.  It's not what he said.

3   Q.  Now, just like Boebert, Manchin also has a blue checkmark

4   next to his name, correct?

5   A.  That's correct.

6   Q.  That means he's also verified?

7   A.  That is correct.

8   Q.  And that means that he's also, that he himself also,

9   it's -- let me phrase it this way.

10          Folks with verified profiles often have a high

11   follower count, correct?

12          MR. WIRSHBA:  Objection.

13          THE COURT:  Sustained.

14          MS. CABRERA:  On what ground?

15          THE COURT:  Let's start with the fact that what's

16   high?  How high is high?

17   Q.  Folks with verified profiles are usually popular or well

18   known?

19          THE COURT:  Look, I've already sustained objections to

20   that or immaterial variations of that question quite a few

21   times.  It's not going to get any better, so let's move on.

22          MS. CABRERA:  Sure.

23   Q.  Now, when you initially received this case in February of

24   2021, you didn't first investigate Mr. Johnson, correct?

25   A.  That is correct.

A000233

1   Q.  You investigated a person named Robert Mixon?

2   A.  Yes.

3   Q.  You requested a social media scrub of his accounts?

4   A.  That is correct.

5   Q.  You did database checks on him?

6   A.  Yes, that is correct.

7   Q.  You found his Social Security number?

8   A.  Yes.

9   Q.  His date of birth?

10  A.  Yes, identifiers.

11  Q.  You looked up his access to weapons?

12  A.  Yes, I did all the checks that I did for the defendant.

13  Q.  And then you informed Boebert's team about Mixon?

14  A.  Yes.

15  Q.  And you informed Manchin's team about Mixon?

16  A.  That is correct.

17  Q.  But then that changed, correct?

18  A.  That is correct.  At the time we believed that Mixon was

19  the subject of the case.  As soon as that changed, and NYPD

20  provided me with the confirmed correct information on the

21  suspect, I clarified with all the offices and made sure they

22  are aware of the actual suspect in the case.

23  Q.  Right.  So it was the NYPD that told you it was the wrong

24  person, correct?

25  A.  That is correct.

**A000234**

1  Q.  None of your independent investigation revealed that,

2  correct?

3  A.  As I said before, my -- Capitol Police took a secondary

4  route in this investigation.  NYPD was the lead.  So all of my

5  database checks were at very face value, and we were taking the

6  information from NYPD at face value for the identification

7  purposes.

8  Q.  You work for the Threats Assessment Section.  How large is

9  that section?

10  A.  Do you mean people?

11  Q.  People.

12  A.  Roughly 25 agents with four or five supervisors.

13  Q.  You have a Threats Assessment Section because they

14  frequently come in, threats, correct?

15  A.  That is correct.

16  Q.  And they're often, they are usually to Congressional

17  people?

18  A.  Our threshold for investigating is for members of Congress,

19  their staff, their families, and any threats towards the

20  Capitol itself.

21  Q.  Everything that comes in as a threat is going through your

22  office for the Capitol Building, correct?

23  A.  Yes.  If not, we get notified such as this case by NYPD or

24  outside agencies that they are currently working on something

25  which we work on together jointly.

**A000235**

1   Q.  Is it fair to say there has been an increase in threats in

2   recent years?

3   A.  I can only speak for the last two years.  We have seen an

4   increase in reportings within the last couple of years.

5   Q.  And that started increasing when COVID began in March of

6   2020?

7   A.  No, not necessarily.  Just a steady increase throughout

8   every year.  It's not necessarily related to anything specific.

9   Q.  Was there an increase after the January 6 riots?

10  A.  There was an increase in reporting for sure, because we had

11  open tip lines for the January 6 investigation.  So we had an

12  increase of reportings in general.

13  Q.  And these threats, this is all you do for work, correct?

14  A.  I am assigned to the Threat Assessment Section.

15  Q.  So the more threats that you have, the more work you have.

16  A.  Yes, but out of the 400 threats that my office received

17  last year, I only worked 15.

18  Q.  What about internal threats?  Do you address -- do you, let

19  me rephrase.

20          Do you ever address, do you ever receive threats

21  internally from one member of Congress to another?

22  A.  I'm sorry, I don't understand that question.

23  Q.  Are threats ever reported from one member of Congress to

24  another?

25          MR. WIRSHBA:  Objection.

**A000236**

```
 1            THE COURT:  I don't see the relevance and I don't see

 2   how he would know.  Sustained.

 3   Q.  There are policies on how you handle these threats,

 4   correct?

 5   A.  We do have policies.

 6   Q.  They're written?

 7   A.  Yes.

 8   Q.  You are trained on them?

 9   A.  I am.

10   Q.  They tell you how to respond to a report of a threat?

11   A.  They give us guidelines and we're taught and experienced

12   throughout years of experience on how the proper mitigation

13   techniques and investigative efforts go into each case.

14   Q.  You're trained how to document these threats as well?

15   A.  Yes.

16   Q.  And what steps to take when you are alerted of one?

17   A.  That's correct.

18   Q.  And your job involves working with high-profile people,

19   correct?

20   A.  Yes, I would say so.

21   Q.  So, these threats are taken seriously when they come in?

22   A.  Yes, definitely.

23            MS. CABRERA:  May I have one moment, your Honor.

24   Q.  Now, you currently been a special agent for two years?

25   A.  Roughly, yes.
```

**A000237**

1   Q.  At the time of this video, you were there for about one

2   year, correct?

3   A.  That is correct.

4   Q.  And prior to that, you were a uniformed officer for two

5   years?

6   A.  Roughly, yes.

7   Q.  And that has been the extent of your career as an officer,

8   correct?

9   A.  Yes, I've been in law enforcement since 2017.

10  Q.  And when, again, when this case came to you, it came to you

11  as a priority threat, correct?

12  A.  That is correct.

13  Q.  You handled it as such?

14  A.  I did.

15  Q.  From your supervisor's orders?

16  A.  I, my supervisor's orders when something comes in as a

17  priority, it is to review the documentation and the reporting

18  immediately.  How I handle it is all on me after reviewing the

19  videos.  So as a priority lead, my supervisor gives it to me

20  and tells me I need to look at this immediately.  How I handle

21  it, they trust me and my training and experience to handle it

22  as I see fit.

23  Q.  Part of the reason why it was a priority threat was because

24  it came from the NYPD?

25  A.  No, it was all based off of the statements that my

A000238

1   supervisor reviewed.

2   Q.  So it had nothing to do there was an open and active

3   investigation happening?

4   A.  It has nothing to do with that.  They take the statements

5   at face value, and that's how they handle the priority or

6   non-priority.

7   Q.  When you watch these videos, there was no specifics as to

8   how these threats would be carried out, correct?

9   A.  Specifics as in?

10  Q.  Well, no reference as to when this would happen?

11  A.  I don't believe there was an exact date or time that the

12  individual stated.

13  Q.  No references to any weapons in anyone's possession?

14  A.  That's true, no.

15  Q.  No mention of an intent to obtain a weapon?

16  A.  No.

17  Q.  No references to family members of the Congress members?

18  A.  That is correct.

19  Q.  No reference to addresses of where the Congress members

20  lived?

21  A.  That is correct.

22  Q.  And so, it wasn't -- it was pretty general, correct?

23  A.  I would say that is incorrect, based off of the statements

24  in general.  The statements were enough without anything else

25  in addition to the statements for us to take this as a serious

A000239

1    case.

2    Q.  Right.  You said you had other things that caused you to be

3    concerned.  Right?

4    A.  Yes, there were factors in the video.

5    Q.  And you said that it was because he said "I" instead of

6    "we," right?

7    A.  There is multiple reasons.

8    Q.  That was one of them, correct?

9    A.  That is.

10   Q.  And there was another, that he said "he would" instead of

11   "he hoped," correct?

12   A.  Correct.

13   Q.  And because he said it more than once.  Correct?

14   A.  That is correct.

15   Q.  And because he tagged the Congress members?

16   A.  Yes.

17   Q.  So those were the reasons that you were concerned?

18   A.  All of those reason goes into my threat assessment at the

19   time.

20   Q.  Even though there was no specificity as to any sort of

21   weapons, correct?

22          MR. WIRSHBA:  Objection.

23          THE COURT:  You are just arguing.  Sustained.

24          MS. CABRERA:  One moment.  No further questions.

25          THE COURT:  Thank you.  We'll take our morning break.

A000240

```
 1    15 minutes.

 2              (Recess)

 3              (In open court; jury present)

 4              THE COURT:  Okay.  The defendant and the jurors are

 5    all present as they've been throughout.  The witness is

 6    reminded he's still under oath.

 7              Is there any redirect?

 8              MR. WIRSHBA:  Yes, your Honor.

 9              THE COURT:  Please proceed.

10    REDIRECT EXAMINATION

11    BY MR. WIRSHBA:

12    Q.  Special Agent Kelley, you mentioned on direct examination

13    that last year the Capitol Police had 400 threats; is that

14    right?

15    A.  That is correct.

16    Q.  And when you say threats in that circumstance, to what were

17    you referring?

18    A.  Referring to cases such as these, direct threats that were

19    passed down to agents to work as a threat case.

20    Q.  How many reports of possible threats came into the Capitol

21    Police last year?

22    A.  About 10,000 total.

23    Q.  So, am I right in doing some quick math in saying that's

24    about 4 percent of the total reports were designated threats?

25    A.  That is correct, roughly 4 percent.
```

**A000241**

 1   Q.  And that was the designation in this case, correct?

 2   A.  Yes.

 3   Q.  How many threats did you work last year?

 4   A.  I worked 15 last calendar year.

 5   Q.  Do you remember being asked on direct examination questions

 6   about the number of times that the videos had been watched?

 7   A.  Yes.

 8   Q.  How does the popularity of videos affect your threat

 9   assessment?

10   A.  It doesn't affect it at all.  What we assess is the

11   statements that are made and any factors that we see within

12   those statements.

13   Q.  You were also asked on direct examination about whether or

14   not someone from Congresswoman Boebert's office asked for

15   additional security.  Do you remember that?

16   A.  I do remember that.

17   Q.  You mentioned there was a miscommunication, didn't you?

18   A.  Yes.

19   Q.  Could you explain what you meant?

20           MS. CABRERA:  Objection.

21           THE COURT:  Overruled.

22   A.  What I mean by that miscommunication is when I originally

23   sent the followup e-mail to the chief of staff for

24   Representative Boebert's office, I, looking back now, realized

25   I framed the question in a way to make their answer back to me

A000242

1   unclear in my eyes.  What I was looking for was a yes or no to

2   directed patrols.  But the way I framed the question, I believe

3   now that them providing me with the member's residence was

4   their answer for directed patrols.  I just didn't notice it.

5           MS. CABRERA:  Objection, your Honor.

6           THE COURT:  Overruled.

7   Q.  So, looking back on it, do you think that Congresswoman

8   Boebert's office intended to ask you to set up directed

9   patrols?

10          MS. CABRERA:  Objection.

11          THE COURT:  Sustained.

12  Q.  Special Agent Kelley, do you remember being asked on

13  cross-examination about whether someone could tag a post on

14  Instagram?

15  A.  Yes, I do.

16  Q.  You were asked about the purposes of that tagging, right?

17  A.  Yes.

18  Q.  Specifically, you noted that a tag could be used for

19  notification purposes, right?

20  A.  That is correct.

21          MR. WIRSHBA:  Could we put up, Ms. Cooper, Government

22  Exhibit 601 in evidence for everyone.

23  Q.  Just to reorient everyone, Special Agent Kelley, this is

24  one of the Instagram posts you reviewed from 777onyzotus777,

25  right?

**A000243**

```
 1    A.   Yes, that is correct.

 2    Q.   That's Senator Joe Manchin on the left side that?

 3    A.   Is correct.

 4    Q.   Who, if anyone, is tagged in this particular post?

 5    A.   That is Senator Joe Manchin who is tagged.

 6    Q.   And when you reviewed this post, what did you assess to be

 7    the purpose of the tagging in your experience?

 8              MS. CABRERA:  Objection.

 9              THE COURT:  Sustained.

10    Q.   Looking at this post, can you tell to whom -- withdrawn.

11              What about this post, if anything, led you to take the

12    steps that you did in calling the chief of staff for Senator

13    Manchin?

14              MS. CABRERA:  Objection.

15              THE COURT:  Overruled.

16    A.   There were a couple primary factors, some of which being

17    the same as the video for Representative Boebert.  The

18    intensity of the language, the repetition of the statements.

19              MS. CABRERA:  Objection, your Honor, under Cabrera.

20              THE COURT:  Did you hear my ruling?  Apparently not.

21    I overruled your objection.  Don't interrupt the witness again,

22    please.  Let's start again.

23    A.   I believed the concerning factor to me was primarily the

24    intensity of the language, the repetition of the statements,

25    and to this post specifically, what was mentioned in the
```

**A000244**

1    caption of the post.

2    Q.  Let's talk about the caption.  What about the caption led

3    you to take the steps you did in calling the chief of staff

4    late at night?

5    A.  The caption, what stood out as the caption was the last

6    line, the "bitch, you are a terrorist and will be held

7    accountable for your treason."

8            MS. CABRERA:  Objection, your Honor.

9            THE COURT:  Next question.

10   Q.  Why is it that that portion of the caption caused you to

11   take the steps that you did?

12           MS. CABRERA:  Objection.

13           THE COURT:  Overruled.

14   A.  This caption to me or this statement in the caption stood

15   out to me as a justification for the individual, that the

16   individual believed that he was justified in whatever actions

17   that he threatened to do.  To me, that speaks volumes, based

18   off of if he believes he's justified, he's probably more likely

19   to actually act on those actions.

20   Q.  Do you remember being asked on cross-examination about

21   whether the defendant was in New York as opposed to in

22   Washington or somewhere else?

23   A.  Yes.

24   Q.  Being asked about whether the defendant had ever been to

25   the Capitol, in your knowledge?

**A000245**

 1   A.  Yes.

 2   Q.  Where did you assess the defendant to be who sent these

 3   videos?

 4   A.  We assessed, as far as NYPD, to be in New York.

 5   Q.  Why did you take the steps that you did in contacting the

 6   chief of staff, for example, of Senator Manchin if the

 7   individual was in New York?

 8   A.  Because we believed, even though the individual is in New

 9   York, that is a quick enough and close enough area to

10   Washington, D.C. to actually act on these actions.  We also

11   wanted to make sure that the representative was not traveling

12   to an area in New York or surrounding New York, to make sure

13   that those proper enhancements to security were taken.

14   Q.  In your experience, can individuals travel from one state

15   to another?

16   A.  Yes.

17              MR. WIRSHBA:  Nothing further, your Honor.

18              THE COURT:  Any recross?

19              MS. CABRERA:  No questions.

20              THE COURT:  Thank you.  The witness is excused.

21              (Witness excused)

22              THE COURT:  Next witness.

23              MR. MORONEY:  Your Honor, the government calls

24   Clifford Cid.

25    CLIFFORD CID,

**A000246**

1          called as a witness by the Government,

2          having been duly sworn, testified as follows:

3  DIRECT EXAMINATION

4  BY MR. MORONEY:

5  Q.  Good afternoon, Mr. Cid.

6          Where do you work?

7  A.  I work at Fox Corporation.

8  Q.  What's your position there?

9  A.  Director of corporate security.

10  Q.  Can you explain for us what you do as the director of

11  corporate security.

12  A.  My primary responsibilities there are conducting

13  investigations, and to a lesser extent ensuring the safety of

14  the employees and talent.

15  Q.  When you say "talent," who are you referring to?

16  A.  Referring to the on-air correspondents and the on-air

17  personalities on Fox, Fox News.

18  Q.  What sorts of investigations do you work on in your role as

19  the director of corporate security?

20  A.  Many of them, majority of them are social media threats,

21  e-mailed threats, and stalking cases.

22  Q.  Who are the threats to?

23  A.  Typically to talent.

24  Q.  How long have you worked for Fox?

25  A.  Going on 10 years, sir.

**A000247**

1   Q.  Before you joined Fox, where did you work?

2   A.  I had a close to 32-year law enforcement career, in both

3   NYPD and Suffolk County PD.

4   Q.  Were you part of any task forces?

5   A.  In the 28 years in Suffolk County PD, I was a detective for

6   21 years.  In those years I was with the Drug Enforcement

7   Administration Task Force for two and a half years in the early

8   '90s, as well as the Joint Terrorism Task Force, NYPD FBI JTTF

9   for almost three years, covering before and after 9/11, which I

10  was present at Ground Zero.

11  Q.  Mr. Cid, are you familiar with an Instagram account with

12  the user name 777onyzotus777?

13  A.  Yes, I am.

14  Q.  When did you first become familiar with that account?

15  A.  In the January of last year.

16          MR. MORONEY:  If I could ask Ms. Cooper to please put

17  up Government Exhibit 405 just for the witness.  What's been

18  marked as 405 for identification only.  I'm sorry.  That's 205.

19  Q.  Mr. Cid, have you seen this before?

20  A.  Yes, sir, I have.

21  Q.  Does that appear to be -- let me ask you.  Without going

22  into the contents, can you just tell us generally what this is.

23  A.  It is a screenshot of a social media comment made by the

24  profile name 777onyzotus777.

25  Q.  Does this is appear to be a fair and accurate depiction of

A000248

1    what you saw?

2    A.  Yes, sir, it does.

3    Q.  How were you alerted to the messages in this image?

4    A.  I was alerted to that by an e-mail sent to me by one of the

5    talent, Greg Gutfeld.

6    Q.  Who is Mr. Gutfeld?

7    A.  He's one of the Fox on-air talent, and he also is on the

8    show called The Five.

9    Q.  Do you recall when you first saw these messages?

10   A.  Yes, I believe it was January 30, a Saturday, in 2021.

11          MR. MORONEY:  The government offers Government Exhibit

12   405.  Excuse me, 205.

13          MS. BAHARANYI:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 205 received in evidence)

16   Q.  Mr. Cid, can you please read these messages.

17   A.  Yes, sir.

18          "Bet he is guilty, as you are.  And you all will be

19   held accountable.  You do not belong on television."

20   Q.  Mr. Cid, I am going to stop you for one moment.  I'm sorry.

21          MR. MORONEY:  Could Ms. Cooper please display

22   Government Exhibit 205 to the jury.

23   Q.  Mr. Cid, go ahead, if you don't mind, just starting from

24   the top.

25   A.  Yes, sir.

A000249

```
 1            "Bet he is guilty, as you are.  And you all will be
 2    held accountable.  You do not belong on television.  You want a
 3    trash government that is now the leading cause of death in
 4    America to continue to kill Americans.  Dumpler.  You will be
 5    killed.  Tell Jesse and Kate, and can not find their pages.
 6    They will be killed as well."
 7    Q.  Mr. Cid, do you have any idea, what was your understanding,
 8    if any, of the reference to Jesse and Katie?
 9    A.  I understood them to be Katie Pavlich and Jesse Watters who
10    appear on the same show called The Five.
11            MR. MORONEY:  I'll ask Ms. Cooper if she can please
12    put up what's marked Government Exhibit 201 just for witness.
13    It's been marked 201 for identification only.
14    Q.  Mr. Cid, do you recognize this document?
15    A.  Yes, sir, I do.
16    Q.  Again, without going into its contents, generally what is
17    it?
18    A.  Generally it is the communication that Greg Gutfeld sent to
19    me that morning and my response back to him with regard to the
20    image we just viewed.
21    Q.  Can you tell us who's involved in this correspondence.
22            MS. BAHARANYI:  Objection, your Honor.
23            THE COURT:  Sustained for the moment.
24    Q.  Mr. Cid, is that a fair and accurate copy of the e-mail as
25    you recall it?
```

**A000250**

1    A.  Yes, sir, it is.

2              MR. MORONEY:  The government offers Government Exhibit

3    201.

4              MS. BAHARANYI:  Objection, your Honor.  Hearsay.

5              MR. MORONEY:  As we laid out in our letter, we believe

6    this is both an excited utterance, given the way that

7    Mr. Gutfeld titled the e-mail, as well as being offered for his

8    then existing mental state, that is Mr. Gutfeld.

9              THE COURT:  You are speaking too quickly for me to get

10   what you said.

11             MR. MORONEY:  Sure.  This is an excited utterance,

12   given the way Mr. Gutfeld titled the e-mail and the

13   circumstances.  It is also being offered to show Mr. Gutfeld's

14   then existing mental state.  The other statements in here are

15   not being offered for their truth, just to show his reaction.

16             THE COURT:  Differentiate what's being offered for the

17   truth and what isn't.

18             MS. BAHARANYI:  Can we do this at the bench before it

19   comes before the jury, your Honor?

20             THE COURT:  Yes.

21             (Continued on next page)

22

23

24

25

1                    (At the sidebar)

2          THE COURT:  What's being offered for the truth?

3          MR. MORONEY:  The subject death threat.  This is 201.

4   That's already in evidence.

5          THE COURT:  What's being offered for the truth?

6          MR. MORONEY:  The subject line death threat.

7          THE COURT:  I don't understand that.

8          MR. MORONEY:  Judge, the entire e-mail is really being

9   offered for Mr. Gutfeld's mental state.  In other words, the

10  fact he received this and he was afraid.

11         MS. BAHARANYI:  There is nothing in the e-mail, your

12  Honor, that actually reflects his mental state.  Nor there is

13  anything that states an excited state of being.  What they are

14  trying to do is get in this inadmissible hearsay by claiming

15  they are not offering it for its truth when that is what they

16  want do.

17         They are able to call this witness if they wanted to,

18  but they haven't.  Which means Mr. Johnson's confrontation

19  clause, Sixth Amendment right to confront the witnesses against

20  him would be in violation by having this witness bring in

21  statements that we believe are testimonial under *Crawford*, and

22  Mr. Johnson would not have the ability to cross-examine this

23  witness.

24         THE COURT:  They're certainly not testimonial.  Let's

25  start with that.  That's the rule.  That issue is closed.

A000252

```
 1              Now, the page I have has two sides to it.  Am I
 2   dealing with both sides or not?
 3              MR. MORONEY:  Correct.  The other side --
 4              THE COURT:  One of you says yes and one of you says
 5   no.
 6              MS. BAHARANYI:  The other side is already admitted and
 7   there is not a hearsay argument that we have to that.  It is
 8   the e-mail coming from Gregory Gutfeld, this --
 9              THE COURT:  Let's back up.  What I'm referring to the
10   other side is, what, an attachment to the e-mail?
11              MR. MORONEY:  Correct.  That attachment is already in
12   evidence.
13              THE COURT:  It's already in.  So all we have to focus
14   on is the first page.
15              Now, death threat.  How Gutfeld received the threat I
16   think both of your proposed jury charges indicate is relevant.
17   Yes?
18              MR. MORONEY:  Yes, Judge.
19              MS. BAHARANYI:  Relevant, yes.
20              THE COURT:  Yes.
21              MS. BAHARANYI:  He can testify to that, your Honor.
22   But it can't come in through his hearsay.
23              THE COURT:  He wrote here -- I see what you are
24   saying.  You are saying that the words death threat are offered
25   to prove that that in fact is the way he took it.
```

**A000253**

1          MS. BAHARANYI:  And that it was a death threat that he

2     is saying -- he is saying this is a death threat and this is

3     how he's receiving it and they are trying to get this in

4     through -- well, yeah.

5          THE COURT:  Stop, please.  It's really not useful,

6     every single time we focus on a small piece, for you to repeat

7     your whole argument.

8          MS. BAHARANYI:  Very well, your Honor.

9          THE COURT:  Now, your position on this is it is an

10    excited utterance, the words "death threat."

11         MR. MORONEY:  Correct.  Several hours at most after he

12    received the messages, we think the words "death threat" speak

13    for itself.

14         THE COURT:  What about the paragraph below the subject

15    line?

16         MR. MORONEY:  Again those are all related to the

17    startling event, consistent with the excited utterance.  That's

18    all the exception requires, Judge, is that those statements be

19    related to the startling event which all of these are.

20         THE COURT:  Well --

21         MS. BAHARANYI:  On that point, excited utterance, your

22    Honor has the e-mail.  There is nothing about this that

23    suggests an excitement, surprise.  There is no exclamation

24    marks that you might expect an e-mail that is an excited

25    e-mail.  There's no all capitalizations.  There is nothing in

A000254

1    there that suggests this is an excited utterance.

2                In fact, the timing is significant here as well, your

3    Honor.  This e-mail is sent at 9:45 a.m.  If your Honor turns

4    to the back of this exhibit, you can see the messages that you

5    will be killed, tell Katie and Jesse.  Those messages come to

6    him several hours earlier.

7                THE COURT:  What do you mean by come to him?

8                MS. BAHARANYI:  Are sent to Gregory Gutfeld.

9                THE COURT:  Sent to him.  Sent to him.

10                MS. BAHARANYI:  Well, yes.  And then we know from the

11    3500 provided and what we provided to the Court is he then,

12    Gregory Gutfeld then takes steps to investigate.  He doesn't

13    immediately --

14                THE COURT:  Define that.  You are saying 5:45 in the

15    morning he starts investigating?

16                MS. BAHARANYI:  5:15 in the morning this message comes

17    in.  And instead of immediately reporting it --

18                THE COURT:  When does he read it for the first time?

19                MS. BAHARANYI:  He doesn't say when he -- and if he

20    were here, we could ask him that.

21                THE COURT:  I don't want to hear that right now.  I

22    heard that.

23                MS. BAHARANYI:  He doesn't say when he read it for the

24    first time.  What he does say, your Honor, is he does his own

25    investigation.  He goes on to the profile page.  He looks up

1   information on this individual's profile, which means there is

2   this --

3          THE COURT:  When does he do that?

4          MS. BAHARANYI:  Before reporting it.  Before sending

5   this e-mail.

6          THE COURT:  When does he first see the e-mail?  We

7   don't know.

8          When does this program air that he's on?

9          MR. MORONEY:  I don't think this is specifically

10  related to the program.  The program is on at 5.  5 to 6.

11         THE COURT:  5.

12         MR. MORONEY:  5 p.m.

13         THE COURT:  Okay.  So if he is like a normal human

14  being, he gets up, he has breakfast, and takes a shower, he

15  goes to the office, and the most or at least the permissible

16  inference is he sees this thing some time much later than you

17  would like me to assume in ruling on this.

18         MS. BAHARANYI:  Your Honor, that's an inference that I

19  don't think is permissible here.  He needs to lay that

20  foundation.  What time he woke up that morning, what time he

21  got his coffee, and what time he saw these messages, he is not

22  here to do so.  They need to lay that foundation to admit this.

23         THE COURT:  These are reasonable inferences.

24         MS. BAHARANYI:  Given that the fact --

25         THE COURT:  At best the preliminary question of fact,

**A000256**

 1   as I understand Rule 104, is for me to resolve, right?

 2          MR. MORONEY:  That's our understanding.

 3          MS. BAHARANYI:  We could do a colloquy of the witness

 4   to see if he knows what time Gregory Gutfeld woke up that

 5   morning.  We don't expect he does.

 6          THE COURT:  Neither do I.

 7          MS. BAHARANYI:  Without that information, we're

 8   assuming, we are assuming that this was a close -- that he

 9   didn't read these messages, with no facts, there is no basis

10   for that assumption.

11          THE COURT:  What about the paragraph beneath?  If I

12   conclude that "death threat" is an excited utterance, what's

13   the defendant's position on the paragraph that follows?

14          MS. BAHARANYI:  Well, it does not go to state of mind.

15   First of all, they are admitting it for it truth.  He discusses

16   Jesse and Katie.

17          THE COURT:  Take it one step at a time.  It mentions

18   me and Jesse and Katie.  And the attachment in fact does that

19   and obviously it mentions him.  So this is what you call

20   absolutely nothing worth arguing about.

21          MS. BAHARANYI:  There is an additional reference here.

22   Mentions me and Jesse and Katie Pavlich.  That is coming

23   through from his Instagram.  And if you go to his Instagram

24   account, you go to his Instagram account which is under his

25   same name, you'll see he says he is in Manhattan.

**A000257**

```
1               That's not something, if we you turn to --

2               THE COURT:  I understand.  That is coming through from

3       his Instagram account.  That's obvious from the attachment,

4       right?  That much of it.

5               MS. BAHARANYI:  It is actually, so he's saying, your

6       Honor, he receives a Facebook and then from there.

7               THE COURT:  Can you stay with the point.

8               MS. BAHARANYI:  That point is not obvious.

9               THE COURT:  That's not the one I am asking you about.

10      You just can't stop.  So much of it is said that is coming

11      through from his Instagram account.  Is obvious from the

12      attachment which is already in evidence.  Do we all agree on

13      that?

14              MR. MORONEY:  I do, Judge, yes.

15              MS. BAHARANYI:  Yes, yes.

16              THE COURT:  Okay.  Now we get to the point that you

17      want to talk about a minute ago.  To my Facebook.  Is that

18      offered for the truth or not?

19              MR. MORONEY:  No.

20              THE COURT:  Does it matter to anyone?

21              MR. MORONEY:  No.

22              THE COURT:  No.  Okay.  The next sentence says if you

23      go to his Instagram account which is under his same name,

24      you'll see that he says he is in Manhattan.

25              Are you offering that for the truth or not?
```

A000258

1          MR. MORONEY:  Just for Mr. Gutfeld's belief.  In any

2    event that is a statement by the defendant.  He's saying -- he

3    says it.

4          THE COURT:  He says it where?

5          MR. MORONEY:  No.  Mr. Gutfeld's statement is

6    attributing it to something that the defendant said.  He says,

7    so I think that's a statement by a party opponent.

8          MS. BAHARANYI:  This is two levels here.  He is

9    saying, one, he is saying -- he says it.  It is clearly not on

10   the other piece of this exhibit offered.

11         THE COURT:  Let's stop there.  Does it in fact on your

12   client's Instagram account say that he's in Manhattan?

13         MS. BAHARANYI:  No.  Your Honor, on my client's

14   Instagram account it just says Manhattan.  It does not say I am

15   in Manhattan.  It does not say I live in Manhattan.

16         THE COURT:  Is the client's Instagram profile or

17   whatever you call it where he says Manhattan in evidence?

18         MR. MORONEY:  No.

19         THE COURT:  So you're offering this for the truth,

20   right?

21         MR. MORONEY:  Just for its effect on Mr. Gutfeld in

22   that he took the threat to be a serious one.  That's why he was

23   afraid.

24         THE COURT:  I'm going to receive "death threat" as an

25   excited utterance.  I draw the inferences that I spoke of

**A000259**

1   before as the finder of fact on this issue by a preponderance

2   of the evidence and the logic of this situation, given the time

3   in the middle of the night when the Instagram post went up, and

4   given the fact that Mr. Gutfeld does an evening show, the most

5   logical sequence of events is that he sees this materially

6   later than 5 something in the morning.  And that this is all in

7   a compressed, relatively compressed time frame.

8            I would rule the same way even if I didn't draw that

9   inference, because the time frame doesn't preclude this in my

10  view, even if we are talking about a 5 something in the morning

11  start.  But, I conclude the time frame is much shorter for

12  reasons already articulated.

13           The "mentions me and Jesse and Katie Pavlich," there

14  is no harm to anybody of that coming in for whatever basis.

15  That it's coming from his Instagram account.  Same thing.  And

16  the balance, I think, it goes to the exited utterance and the

17  effect on Mr. Gutfeld's state of mind.

18           Now, if anybody wants me to parse this to the jury,

19  and give a limiting instruction, I'll do it.

20           MS. BAHARANYI:  Your Honor, one piece that I don't

21  think has been reflected perhaps in our argument today as it

22  should, is that this, this statement, this he's in Manhattan,

23  would be unduly prejudicial if it were to be admitted.  One,

24  his Instagram does not say he is in Manhattan.  So first it is

25  an inaccurate summarization.  Two, the probative value of this

1   is quite low, your Honor.  This is not something that needs to

2   be proved in order to meet the elements of the offense.  It is

3   not -- in fact, they have to show, your Honor, to meet the

4   elements of the offense, that his conduct somehow reached

5   outside of Manhattan.  Outside of New York City.

6           THE COURT:  It is not of limited probative value.  The

7   fact that he's in Manhattan and indeed, there was a reference,

8   wasn't there, in one of the tapes by the defendant I think with

9   respect to Gutfeld, about seeing him or being with him in Soho.

10          MR. MORONEY:  That's correct.

11          THE COURT:  So, it is seriously of probative value,

12  because it goes to the immediacy of the threat, there is no

13  question about it.

14          Now the question is whether we're wasting our time

15  here, because the fact that his profile page says Manhattan on

16  it is otherwise proveable, plus the reference in the tape by

17  the defendant to being near Gutfeld in Soho.  Is there anything

18  worth fighting about with respect to this last sentence?

19          MR. MORONEY:  Judge, I think it's not being offered

20  for its truth.  At this point that's fine, if you want to

21  receive that statement subject to a limiting instruction.  It

22  is not being offered for its truth.

23          THE COURT:  Anybody want a limiting instruction?

24          MS. BAHARANYI:  Yes.

25          THE COURT:  The instruction is it is not offered for

A000261

1    the truth but for the effect on Mr. Gutfeld.

2              MR. MORONEY:  Just that particular statement, Judge.

3    We believe the rest was an excited utterance.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Government Exhibit 201 has been offered in

3    evidence.  It is received.  It may be published to the jury.

4    And I have to give you some special instructions about this.

5    It is a two-page exhibit.  The first page is an e-mail from an

6    e-mail chain that starts from Mr. Gutfeld to Mr. Cid.  And the

7    second page is a screenshot of the defendant's Instagram

8    message.  Is that right?

9          (Government's Exhibit 201 received in evidence)

10         MR. MORONEY:  That's correct, your Honor.

11         THE COURT:  That was attached to Mr. Gutfeld's

12   communication to Mr. Cid.

13         The attachment is already in evidence.  You have that

14   already.  You've seen it.  I need to talk to you a little bit

15   about the e-mail from Mr. Gutfeld to Mr. Cid.

16         First of all, there is a subject line that says "death

17   threat."  That is in evidence solely for you to consider with

18   respect to Mr. Gutfeld's state of mind when he received the

19   Instagram post.

20         It then says "That is coming through from his

21   Instagram account to my Facebook."  That is received for the

22   same limited purpose, not for the truth of how the message got

23   to him.

24         The last sentence of the e-mail which says, "If you go

25   to his Instagram account, which is under his same name, you

**A000263**

1  will see he says he's in Manhattan." That is also in evidence

2  only to establish Mr. Gutfeld's state of mind, and not for any

3  other purpose. It is most particularly not proof that if you

4  go to his Instagram account, you'll see that he says he's in

5  Manhattan.

6          Okay. Any further instruction anybody is asking for?

7  No. Let's go on.

8          MR. MORONEY: If I could ask Ms. Cooper to please put

9  up Government Exhibit 205 next to Government Exhibit 201. And

10 display both to the jury.

11 BY MR. MORONEY:

12 Q. Mr. Cid, when Mr. Gutfeld sent you that e-mail, what did he

13 write in the subject line?

14 A. He wrote "death threat" in the subject line.

15 Q. In your experience, was it common or unusual to receive

16 such an e-mail from Mr. Gutfeld?

17         MS. BAHARANYI: Objection, your Honor.

18         THE COURT: Sustained.

19 Q. What time did Mr. Gutfeld send this e-mail to you?

20 A. He sent that e-mail on Saturday, January 30, 9:45 in the

21 morning.

22 Q. Did you respond to Mr. Gutfeld?

23 A. Yes, I did.

24 Q. Approximately what time did you respond to him?

25 A. That would have been at approximately 11:05 a.m. on the

**A000264**

 1   same date.

 2   Q.   What, if any, action did you take that day in response to

 3   this communication from Mr. Gutfeld?

 4   A.   What I did, considering he had entitled it "death threat,"

 5   which he doesn't often do --

 6             MS. BAHARANYI:  Objection, your Honor.

 7             THE COURT:  Strike that "he doesn't often do."  Go

 8   ahead without using that phrase.

 9             THE WITNESS:  Yes, sir.

10   A.   What I did was I looked the profile name up of

11   777onyzotus777 on Instagram to see if I could find out any

12   background on this individual.

13             MR. MORONEY:  Ms. Cooper, you can take down Exhibit

14   201 and 205.

15   Q.   Mr. Cid, after you reviewed that account, did you take any

16   further action that day?

17   A.   Yes, I did.

18   Q.   What did you do?

19   A.   I notified the NYPD.

20   Q.   Why did you notify the NYPD?

21   A.   Because the videos and the information that I came up with

22   during that time in between showed somebody that could -- a

23   very dangerous individual that was posting --

24             MS. BAHARANYI:  Objection, your Honor.  And I would

25   move to strike.

**A000265**

```
1            THE COURT:  We're going to strike "the dangerous
2   individual" characterization.  Let's start this in a better
3   way.
4   Q.  Mr. Cid, during your review of the account, did you observe
5   anything about the location of the sender?
6   A.  Yes, in Manhattan.
7   Q.  Did that fact have any significance to you as you
8   determined your next steps?
9   A.  Yes, it did.
10  Q.  Where does Mr. Gutfeld film his show?
11  A.  In Midtown Manhattan.
12  Q.  Where does Mr. Gutfeld live, if you know?
13  A.  Downtown Manhattan.
14  Q.  Mr. Cid, did you watch videos from this account around the
15  time of your review in February of 2021?
16  A.  Yes, I did.
17            MR. MORONEY:  If I could ask Ms. Cooper to please put
18  on the screen what's in evidence as Government Exhibit 603B and
19  also please publish that to the jury.  And if I could ask
20  Ms. Cooper to please put what's in evidence as Government
21  Exhibit 603BT alongside that.  And if Ms. Cooper, could go to
22  the second page of Government Exhibit 603BT, thank you.  If we
23  could now play Government Exhibit 603B.  If you are able to
24  start at 40 seconds.  But if not, we'll play the full.
25            I'll play 603B starting at 40 seconds.
```

1          (Video playing)

2          MR. MORONEY:  Ms. Cooper, if you could go back about

3   five seconds, please.  Just stop it at 45 seconds.

4   Q.  Mr. Cid, are you able to see the video there?

5   A.  Yes, sir.

6   Q.  Who is the individual shown in that top box?

7   A.  That's Greg Gutfeld.

8   Q.  That statement about stepping in Soho, did you have any

9   understanding of what that meant?

10         MS. BAHARANYI:  Objection, your Honor.

11         THE COURT:  What's the objection?

12         MS. BAHARANYI:  Objection, speculation as to what was

13  meant by the person making the statement.

14         THE COURT:  Overruled.

15  Q.  So Mr. Cid, you can answer.  What was your understanding of

16  the reference to Soho?

17  A.  My understanding of that was Soho being a neighborhood in

18  Downtown Manhattan that the profile or the defendant in this

19  case happened to pass Mr. Gutfeld in passing on the sidewalk.

20  And that was my understanding of it in Soho.

21         MR. MORONEY:  Ms. Cooper, could you please put up

22  what's in evidence as Government Exhibit 604 alongside what's

23  in evidence as Government Exhibit 604T.  You can publish both

24  to the jury, please.

25         If we could go to the second page of Government

**A000267**

1    Exhibit 604T.  If you could now please play Government Exhibit

2    604.

3              (Video playing)

4    Q.  Mr. Cid, who is the individual shown in the video right

5    now?

6    A.  That's Greg Gutfeld.

7              MR. MORONEY:  If I could please ask Ms. Cooper to put

8    up what's in evidence as Government Exhibit 704, alongside

9    Government Exhibit 704T.  If we could please go to the second

10   page of Government Exhibit 704T and publish both of these

11   exhibits to the jury.  And Ms. Cooper, if could you please play

12   Government Exhibit 704.

13             (Video playing)

14   Q.  Mr. Cid, who is the individual pictured in white on that

15   video?

16   A.  That is Laura Ingraham.

17   Q.  Who is Laura Ingraham?

18   A.  She is one of the Fox on-air personalities based primarily

19   out of Washington.

20             MR. MORONEY:  Ms. Cooper, I ask you show only the

21   witness what's been marked Government Exhibit 801 for

22   identification only.

23   Q.  Mr. Cid, have you seen this document before?

24   A.  Yes, sir.

25   Q.  Just generally what is it?

**A000268**

1    A.  That's a screenshot of one of the videos that the defendant

2    posted.

3    Q.  Is that a fair and accurate depiction of the video as you

4    saw it?

5    A.  Yes, sir, it is.

6              MR. MORONEY:  The government offers Government Exhibit

7    801.

8              MS. BAHARANYI:  No objection.

9              THE COURT:  Received.

10             (Government's Exhibit 801 received in evidence)

11   Q.  Mr. Cid, in front of you on the left-hand side there should

12   be a disc labeled Government Exhibit 802.

13   A.  Yes, sir.

14   Q.  Have you accessed that disc before?

15   A.  Yes, sir, I have.

16   Q.  Feel free to take it out of its envelope if you need to.

17   A.  Okay.

18   Q.  Just generally, what is on that disc?

19   A.  Three, what's on the disc are three different segments of

20   videos which I initialed as having viewed on February 10,

21   initialed February 10, 2022.

22   Q.  Just break that down.  Have you watched each of the clips

23   that are contained on that disc?

24   A.  I did, sir.

25   Q.  And how do you know that those are the clips you watched?

**A000269**

1   A.  Because I did so here.

2   Q.  How did those clips relate to what was shown on the screen,

3   Government Exhibit 801?

4   A.  They're consistent with one another.

5          MR. MORONEY:  Ms. Cooper, can you publish Government

6   Exhibit 801 to the jury if you haven't already done so.

7          Your Honor, the government offers the three segments

8   from that disc, Government Exhibit 803, 804 and 805, in

9   evidence.

10         MS. BAHARANYI:  No objection.

11         THE COURT:  They're received.

12         (Government's Exhibit 803, 804, 805 received in

13  evidence)

14         MR. MORONEY:  If Ms. Cooper can show only the witness

15  Government Exhibit 803T.  Just scroll to the second page,

16  please.  And then if you can please pull up Government Exhibit

17  804T only for the witness.  If you could please scroll to the

18  second page.  And if Ms. Cooper could last put up Government

19  Exhibit 805T just for the witness.

20  Q.  Mr. Cid, have you seen those three documents before?

21  A.  Yes, sir, I have.

22  Q.  What are they?

23  A.  Transcriptions of the defendant in the video of Ms.

24  Ingraham.

25  Q.  Have you reviewed them?

**A000270**

1   A.  Yes, sir, I have.

2   Q.  Do they, in your view, correctly depict the statements made

3   in those three videos on the disc in front of you?

4   A.  Yes, they do.

5          MR. MORONEY:  Your Honor, the government offers

6   Exhibits 803T, 804T, and 805T in evidence.

7          MS. BAHARANYI:  No objection.

8          THE COURT:  Received.

9          (Government's Exhibit 803T, 804T, 805T received in

10  evidence)

11         MR. MORONEY:  I'd ask Ms. Cooper to please put up

12  Government Exhibit 803 next to Government Exhibit 803T.  If you

13  can please scroll to the second page of 803T.  And then please

14  play Government Exhibit 803 -- I'm sorry show these all to the

15  jury.

16         (Video playing)

17         MR. MORONEY:  Ms. Cooper, if you put up Government

18  Exhibit 804 and next to it 804T.  If you can please scroll to

19  the second page of 804T.  If you could display those for the

20  jury.

21         (Video playing)

22         MR. MORONEY:  Ms. Cooper, if you can please put up

23  Government Exhibit 805 next to Government Exhibit 805T.  Scroll

24  to the second page of Government Exhibit 805T.  If you could

25  please display those to the jury and play Government Exhibit

**A000271**

1   805.

2            (Video playing)

3   Q.  Mr. Cid, who is the woman depicted in Government Exhibits

4   803, 804 and 805 that we just watched?

5   A.  Laura Ingraham.

6            MR. MORONEY:  Nothing further, your Honor.

7            THE COURT:  Thank you.  Cross-examination.

8            MS. BAHARANYI:  Yes, your Honor.

9            THE COURT:  You can please proceed.

10  CROSS-EXAMINATION

11  BY MS. BAHARANYI:

12  Q.  Mr. Clifford, you were informed of a threat by Gregory

13  Gutfeld, right?

14  A.  Yes, ma'am.

15  Q.  And this led you to Mr. Johnson's Instagram page, correct?

16  A.  Correct, ma'am.

17  Q.  Excuse me.  This led you to his Instagram page, correct?

18  A.  It led me to a screenshot of the Instagram and the profile

19  user name.

20  Q.  You went to, after learning about this statement from

21  Gregory Gutfeld, you went to 777onyzotus777's Instagram

22  profile?

23  A.  Correct, ma'am.

24  Q.  Correct.  And you actually watched some of the videos on

25  this Instagram profile of 777onyzotus777?

```
 1   A.  Yes, correct.

 2   Q.  While you were watching these videos, you were able to hear

 3   the content on the videos, right?

 4   A.  I'm sorry.  Could you repeat that?

 5   Q.  While you were watching the videos, you were able to hear

 6   what was being said on the videos?

 7   A.  Yes.

 8   Q.  And yet you did not report these videos to Instagram,

 9   right?

10          MR. MORONEY:  Objection.

11          THE COURT:  Sorry?

12          MR. MORONEY:  Objection.

13          THE COURT:  Sustained.  Stricken.  The jury will

14   disregard.

15   Q.  Mr. Clifford, you were watching these videos to see, to

16   further your investigation, right?

17   A.  That's correct, ma'am.

18   Q.  And you were looking for any content that you thought could

19   assist with your investigation, right?

20   A.  To an extent, ma'am.

21   Q.  And the content that you would be looking for would be

22   possible threats, right?

23   A.  We already had a threat.  I just wanted to try to find out

24   more in his background who this person was.

25   Q.  But in going to the Instagram page, you were looking to see
```

**A000273**

 1 │ if there is anything that could tell you more about who this
 2 │ person was, right?
 3 │ A.  Yes, ma'am.
 4 │ Q.  And what to make of the comments, right?  The threats,
 5 │ right?
 6 │ A.  Could you please repeat that question?
 7 │ Q.  Going to his Instagram profile would help you know what to
 8 │ make of the statements, right?
 9 │ A.  It would give me some context to work with, correct.
10 │ Q.  And in fact, after going to the Instagram page, you didn't
11 │ take any further steps with Instagram, right?
12 │         MR. MORONEY:  Objection.
13 │         THE COURT:  Sustained.
14 │ Q.  Now, Mr. Clifford, you started this investigation around
15 │ January 2021, right?
16 │ A.  Correct, ma'am.
17 │ Q.  When the investigation began, no one else from Fox even
18 │ knew about Mr. Johnson's videos, right?
19 │         MR. MORONEY:  Objection.
20 │         THE COURT:  Sustained.
21 │ Q.  Mr. Clifford, to your knowledge, well, let's put it this
22 │ way.
23 │         Mr. Clifford, you never received a report about videos
24 │ on Mr. Johnson's page from individuals at Fox, right?
25 │ A.  That sounds like an incomplete question.  Would you mind

A000274

1 rephrasing it?  I would appreciate it.

2 Q.  You never received any reports from any Fox employees about

3 the videos on Mr. Johnson's page, right?

4    MR. MORONEY:  Objection.

5    THE COURT:  Well, I think Mr. Gutfeld is a Fox

6 employee, right?

7    MS. BAHARANYI:  Your Honor, I am asking about any

8 videos, reporting any videos, not messages.

9    THE COURT:  Okay.  Overruled.

10 Q.  So, you never received a report about any videos on

11 Mr. Johnson's page from Fox employees, right?

12 A.  Other than Mr. Gutfeld that day, no, I did not.

13 Q.  We'll get to what Mr. Gutfeld sent you, but, no -- you help

14 protect Laura Ingraham, right?

15 A.  In a broad sense, yes.

16 Q.  You handle any security threats coming her way, right?

17 A.  Yes, when I can.

18 Q.  She didn't reach out to you about Rickey Johnson, right?

19    MR. MORONEY:  Objection.

20    THE COURT:  Overruled.

21 Q.  Laura Ingraham did not reach out to you about a Rickey

22 Johnson, right?

23 A.  Not to my knowledge.

24 Q.  And you also deal with any security threats with Jesse

25 Watters, right?

**A000275**

 1  A.  When he has them; correct, yes, I do.

 2  Q.  And Jesse Watters never reached out to you about any videos

 3  by Mr. Johnson, right?

 4  A.  Not prior to that day, no.

 5  Q.  The only person who reached out to you was Gregory Gutfeld,

 6  right?

 7  A.  Correct.

 8  Q.  And to your knowledge, Gregory Gutfeld never received any

 9  calls from Mr. Johnson, right?

10          MR. MORONEY:  Objection.

11  Q.  To your knowledge.

12          THE COURT:  Rephrase it.

13  Q.  Gregory Gutfeld never reported --

14          THE COURT:  "As far as you know."

15  Q.  As far as you know, well, Mr. Clifford, as far as you know,

16  Gregory Gutfeld never received any calls from a Rickey Johnson,

17  right?

18          MR. MORONEY:  Objection.

19          THE COURT:  Overruled.

20  A.  I don't know if he ever did.  Not to my knowledge, no.

21  Q.  He certainly never reported receiving phone calls from

22  Rickey Johnson to you.

23  A.  He did not.

24  Q.  And he never reported receiving any e-mails from Rickey

25  Johnson, right?

**A000276**

 1   A.   Correct.

 2   Q.   He never -- do you know if Gregory Gutfeld has a personal,

 3   has a private social media account?

 4   A.   I'm not sure if he has a private.  But, the communication

 5   he did receive was a direct Instagram message.

 6   Q.   My question to you is if you are aware if he has a private

 7   social media page.

 8   A.   I am -- oh, he has a -- a GregGutfeld.com website.

 9   Q.   And he never --

10   A.   Independent of this whole matter.

11   Q.   For the GregGutfeld.com website, Mr. Gutfeld never told you

12   he received any messages from Rickey Johnson on that website

13   either, right?

14   A.   Not to my knowledge.

15   Q.   He never reported that to you, right?

16   A.   Not to my knowledge.  He has in the past, but not with

17   respect to this particular matter.

18   Q.   Well, you handle security threats that are -- any issues

19   that are bought to you by Fox talent, correct?

20   A.   Correct.

21   Q.   And Gregory Gutfeld is a Fox talent, right?

22   A.   Correct.

23   Q.   And he did not make any mention of Rickey Johnson sending

24   him messages through his personal website, right?

25        MR. MORONEY:  Objection.

A000277

 1          THE COURT:  The objection is what?

 2          MR. MORONEY:  Asked and answered.

 3          THE COURT:  Sustained.

 4    Q.  To your knowledge, Mr. Gutfeld never responded to

 5    Mr. Johnson's messages on Instagram, right?

 6    A.  To my knowledge, he did not.

 7    Q.  And to your knowledge, he never reported Mr. Johnson's

 8    Instagram --

 9          THE COURT:  The formulation of the question, as I have

10    pointed out a couple of times, leaves a problem.  The witness

11    says "it's correct."  That could be construed as meaning that

12    he has a definite knowledge that this never happened, and it

13    could also be construed as meaning he doesn't know one way or

14    the other.

15          Why don't you ask it in a way that would eliminate

16    that problem, such as "as far as you know."

17    Q.  Mr. Clifford, as far as you know, Mr. Gutfeld never

18    responded to any messages, any messages from Rickey Johnson on

19    Instagram, right?

20    A.  As far as I know, he did not.

21    Q.  And as far as you know, Mr. Gutfeld never commented on

22    Rickey Johnson's social media page, his Instagram page, right?

23    A.  Not to my knowledge.

24    Q.  And as far as you know, well, let me ask it this way.

25          You provided Mr. Gutfeld with the photo of Rickey

1   Johnson, right, at some point in your investigation?

2   A.   I don't recall offhand if I did that.

3   Q.   Mr. Gutfeld has been informed of Rickey -- has been

4   informed that the 777onyzotus777 social media page is connected

5   to a Rickey Johnson, right?

6   A.   Right.

7   Q.   And he was informed of this information by Fox, by yourself

8   as well, right?

9   A.   I don't recall telling him exactly who the person's name

10  was, what his name was, no.

11  Q.   But you told him that someone had been identified, right?

12  A.   I don't recall telling him that in this particular case.

13  Q.   Well, Mr. Gutfeld never told you that -- Mr. Gutfeld never

14  reported someone stepping to him in Manhattan, right?

15  A.   He did not.

16  Q.   And in fact, he never reported any sort of interaction with

17  the person named Rickey Johnson, right?  Other than --

18  in-person reaction with the person named Rickey Johnson, right?

19  A.   No, ma'am, he did not.

20  Q.   So let's talk a little bit about Soho.  Excuse me.  About

21  Downtown Manhattan.

22       So, Soho is an area of Manhattan, correct?

23  A.   Correct, ma'am.

24  Q.   With restaurants, right?

25  A.   Yes.

1    Q.   Bars?

2    A.   Busy area.

3    Q.   It is a busy area.  And Mr. Johnson references passing

4    through Soho, right?

5    A.   In that one sentence, he referenced stepping up to

6    Mr. Gutfeld.

7    Q.   He references being in Soho, right?

8    A.   Hmm-hmm, correct.

9    Q.   And Soho has millions of individuals living there, right?

10          MR. MORONEY:  Objection.

11          THE COURT:  Doubtful.

12          Sustained.

13   Q.   Well, you are aware that Soho is a popular area of

14   Manhattan, right?

15   A.   Yes, I am.

16   Q.   You work for Fox Corporation.  In your work for Fox

17   Corporation, you have to deal with the threats coming in to

18   your on-air talent, right?

19   A.   That's one of my responsibilities, correct.

20   Q.   One of your roles, right?

21   A.   Hmm-hmm.

22   Q.   And as part of your work in early 2021, you were seeing an

23   increase in threats towards Fox hosts, right?

24   A.   There was a slight increase, ever since I guess President

25   Trump came in.  So across the board it was generally a little

1   busier.

2   Q.  There was a slight increase since President Trump came in?

3   A.  Yeah, since the administration change, there was a jump in

4   activity.  And then after the insurrection there was another

5   little bit of a jump.  So it was pretty busy.

6          THE COURT:  How much longer, counsel, how much longer

7   do you expect to be with this witness?

8          MS. BAHARANYI:  Your Honor, I have probably another

9   like 30 minutes.

10          THE COURT:  All right.  We'll break for lunch here,

11   folks.  Let's try to resume at quarter to 2.

12          And counsel, remain for a minute because I have

13   something.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

**A000281**

1              THE COURT:  All right, folks, you can be seated.  I

2    wanted to report to you that I have completed an in camera

3    review of the documents turned over by the New York City Police

4    Department Licensing Division that had been subpoenaed, and

5    there is absolutely nothing in it that has any relevance to

6    this case at all.  Except that the pistol permit application

7    was initially made after the incident in this case, and refers

8    to Mr. Johnson as part of the reason why Mr. Gutfeld wanted a

9    carry permit.  Beyond that, in other words, whatever is in

10   there is helpful to the prosecution, not to the defense.  So

11   they're not going to be turned over.

12             MS. BAHARANYI:  Your Honor, we would appreciate a

13   moment to discuss this.  Because, one, that information might

14   actually be relevant to Gregory Gutfeld's credibility, and

15   that's critical here since his hearsay statements are being

16   allowed in.  So I would ask before the Court make that decision

17   we would have a moment to confer.

18             THE COURT:  Well, do it quickly.

19             (Pause)

20             MS. BAHARANYI:  Thank you, your Honor.  We agree with

21   the Court's assessment.  We don't have any additional comments.

22             THE COURT:  Okay.  It also postdates, obviously, the

23   e-mail that we just had the conversation about at the sidebar.

24   Okay.

25             These will be sealed, and they will be available for

1    the court of appeals if there is ever an appeal and should it

2    prove necessary.  Thank you.

3              MR. MORONEY:  You said 1:45?

4              THE COURT:  1:45.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **PATRICK R. MORONEY, ESQ., and KYLE WIRSHBA, ESQ.,** Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007

Dated:      New York, New York
             September 29, 2022

*Colleen P. Cassidy*

**COLLEEN P. CASSIDY**
Assistant Federal Defender